UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
CASSANDRA SHIH,

                              Plaintiff,

                -against-

PETAL CARD, INC. f/k/a CREDITBRIDGE, INC.,
ANDREW ENDICOTT, and JASON GROSS

                            Defendants.

--------------------------------------------------------------------x

             JURY TRIAL DEMANDED

             CIVIL ACTION NO:18-cv-5495-JFK

             **AMENDED
COMPLAINT**

      Plaintiff CASSANDRA SHIH ("Shih"), by her attorneys DELBELLO DONNELLAN

WEINGARTEN WISE & WIEDERKEHR, LLP, as and for her Amended Complaint against

Defendants PETAL CARD, INC. f/k/a CREDITBRIDGE, INC. ("Petal"), ANDREW ENDICOTT

("Endicott"), and JASON GROSS ("Gross"), herein, alleges:

### INTRODUCTION

      1. The claims in this action arise from the misconduct, breaches of fiduciary duties, breach

of joint venture agreement, breach of actual or implied contract, and misappropriation of a business

idea, by Defendant Endicott toward his co-venturer, Plaintiff Shih, in connection with the

formation of CreditBridge, Inc., which is now known as Petal Card, Inc.  Petal is a credit card

company that extends credit to individuals with little to no credit history in the United States,

primarily targeting young adults, students, immigrants, and minorities.

      2. Petal began as a business venture between Plaintiff Shih and Defendant Endicott.  The

idea for Petal was Shih's alone, as was the idea for Petal's original name, CreditBridge.  Shih is a

native of Wellington, New Zealand, and, while working in New York as an intern at New

Zealand's Permanent Mission to the United Nations in 2014, observed that she and other migrants

struggled to access credit in the United States.  She soon realized that students, as well as certain minorities and cultural groups, also struggled to access credit in the United States because of the country's traditional FICO credit score system.

3.  Shih became friends with Endicott while in New York, and remained in contact with him after her internship ended and she left the United States in August 2014.  In April 2015, Endicott induced Shih into sharing her business concept with him by proposing to her that the two start a company together.  In doing so, Endicott offered his services as a corporate attorney and investment banker with the skill and expertise to raise financing, organize the company, keep the books, do taxes and manage employees.  As reflected in his emails, Endicott considered Shih a "highly capable and intelligent person" and invited her to share a business idea with him, stating that he, "just need[ed] a product".  Endicott knew that Shih had entrepreneurial ambitions, that she aspired to return to New York to live and work, and that it was a challenge for her to do so because of her visa status, and that it would be easier for her to do so if she had a business reason.

4.  Shih trusted Endicott as a friend and recognized that, as an investment banker located in New York, he would have the capability to raise financing for a startup in Shih's target market. Shih also relied upon his representation that, as a Harvard educated attorney, he had the skill and expertise to organize a company in the United States.  Thus, Shih contacted Endicott a few days after he told her that he "just needed a product" and, with the mutual understanding that the two would start a company together, Shih shared with Endicott her vision for a credit bridging service that would extend credit to individuals without credit history in the United States, particularly migrants, with a view towards enabling customers to build a United States credit history and eventually become eligible for mainstream credit.  Endicott was immediately enamored with Shih's proposal, calling it in various separate communications "amazing", "seriously very good",

"viable", "a good idea", and "worth trying". After discussing the prospect in more detail, Shih and Endicott agreed, in Endicott's words, to "create this things" (*sic*), and the two immediately proceeded to research and develop a company which would independently assess individuals' creditworthiness and extend credit to creditworthy individuals who were unable to obtain credit from traditional sources.

5.    Shih and Endicott researched and developed the business collaboratively and extensively through Facebook Messenger sessions, Skype meetings, emails, and Dropbox exchanges in April, May, and June 2015.  In May 2015, Shih and Endicott named the venture CreditBridge at Shih's suggestion, jointly developed its business model, and discussed what steps would need to be taken to formalize and grow the company, including approaching investors and partners.  As Shih and Endicott agreed, Endicott presented CreditBridge to potential partners and investors on Shih and Endicott's behalf.  However, when third parties validated the viability of CreditBridge to Endicott, he abruptly and without any explanation cut off all contact with Shih, thereby breaching his fiduciary duties to her as her co-venturer, corporate promoter, agent for purposes of seeking investor interest, and attorney that had marketed his expertise and offered to Shih his skill and services at organizing a company in the United States.

6.    After cutting all contact with Shih, Endicott continued to develop her CreditBridge concept and business model with other partners, including his Harvard Law School classmate, Defendant Jason Gross.  He did so under the CreditBridge name, misappropriating Shih's credit gap idea, Shih and Endicott's collaborative work product, and their company.  Endicott registered a CreditBridge twitter account in June 2015, two weeks after his last meeting with Shih, held a contest for a CreditBridge logo and launched a CreditBridge website in the summer of 2015, began hiring personnel in or around August 2015, left his full-time job in or around September 2015, and

incorporated CreditBridge, Inc. in Delaware in February 2016.  Meanwhile, Shih, who believed Endicott to be fundraising for CreditBridge on her behalf, repeatedly attempted to contact Endicott to discuss CreditBridge throughout the summer of 2015 and into 2016, and remained in the dark as to Endicott's intentions and activity due to Endicott's silence.  Knowing that Shih's visa status would be an obstacle to Shih's ability to hold him accountable for her interest in CreditBridge, Endicott ignored Shih for nine months, until on or about March 24, 2016, when he finally broke his silence after Shih had sent a demand for her interest in CreditBridge to Defendant Gross.  In his email to Shih, Endicott apologized for "ending communication so abruptly", acknowledged that he "treated [Shih] poorly," and then incredibly and implausibly claimed, despite overwhelming documentation to the contrary, that "my business, CreditBridge, Inc. . . has no connection whatsoever to anything you and I discussed in the past . . . and is not based on any of your business ideas."  Shortly after that email, Endicott and Gross tellingly changed the name of CreditBridge to Petal, although the CreditBridge corporate form otherwise continued.  Endicott now holds himself out as the co-founder and Chief Financial Officer of the company, while Defendant Gross holds himself out as a co-founder and the Chief Executive Officer.

7.  To date, Petal (CreditBridge) has raised $3.4 million in seed funding, $13 million in Series A funding, and $34 million in debt financing. It issued a limited number of credit cards to "credit invisible" individuals in an invitation only test phase from September 2017 through the summer of 2018, targeting young adults, students, immigrants, and minorities.  Petal officially launched its credit card publicly on October 2, 2018, targeting individuals that have not yet had the opportunity to build credit under the United States credit system. Shih has been wrongfully deprived of her 50% interest in the company to the unjust enrichment of Endicott, Gross, and their new partners and investors.

## PARTIES

8.  Plaintiff Cassandra Shih is a citizen of New Zealand.  At the time of commencement of this action, she was a resident of the State of New Jersey with an address at 135 Ramview Avenue, Ramsey, New Jersey.

9.  Defendant Petal Card, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 94 Bowery, New York, New York 10009.

10.  Defendant Andrew Endicott is an attorney admitted to practice law in the State of New York and a resident of the State of New York.

11.  Defendant Jason Gross is an attorney admitted to practice law in the State of New York and a resident of the State of New York with an address at 427 East 12th Street, Unit 4B, New York, New York 10009.

## JURISDICTION AND VENUE

12.  This Court has jurisdiction over this action under 28 U.S.C. §1332 inasmuch as there existed complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### Background

13.  Plaintiff Shih came to New York from New Zealand in 2014 to complete an internship with the New Zealand Permanent Mission to the United Nations.

14.  While in New York for her internship, Shih met and befriended Andrew Endicott.

15.  Endicott is a 2012 graduate of Harvard Law School who is admitted to practice law in the State of New York.

16. When they met in 2014, Endicott worked full time as a corporate attorney at the law firm of Wilkie Farr and Gallagher, LLP ("Wilkie Farr").

17. Shih and Endicott became friends during the Summer of 2014.

18. Shih's internship ended in July of 2014, and she left the United States in August 2014 to travel to Taiwan before eventually returning to her native New Zealand.

19. Shih and Endicott kept in regular contact after Shih left New York, communicating at least once a month, and sometimes more.

20. Endicott repeatedly communicated to Shih that he was unhappy at Wilkie Farr.

21. Endicott left Wilkie Farr in the summer of 2014 to take a job as an investment analyst at Lazard Middle Market Investment ("Lazard").

22. Endicott repeatedly communicated to Shih that he was unhappy with his job at Lazard.

23. Shih communicated to Endicott her entrepreneurial ambitions and her desire to return to New York to live and work.

**Endicott Proposes That Shih and Endicott Start a Company Together**

24. On or around April 24, 2015, Endicott proposed to Shih on Facebook Messenger that the two "start a company" together.

25. In proposing to Shih that the two "start a company" together, Endicott touted his access to investors as an investment banker at Lazard and his skill and authority as a corporate attorney.

26. At other times during the course of their friendship, Endicott had boasted about his legal skill and expertise, as well as the significant contacts he had made as an investment banker.

27. On or about April 24, 2015, Endicott and Shih exchanged the following communications on Facebook Messenger:

> ENDICOTT:  Let's start a company together.
> That does some cool trans-pacific stuff.

6

| | |
|---|---|
| SHIH: | I'm so on board. |
| | You got skills? |
| ENDICOTT: | I'm a lawyer and an investment banker. |
| | I would say so. |
| SHIH: | I mean, how do you see them applying? |
| ENDICOTT: | I can raise financing, set up the company and understand ecommerce |
| | Keep the books, do taxes, manage employees |
| | I basically just need a product |
| SHIH: | Hahaha |
| ENDICOTT: | I'm not really kidding. I'm looking for something cool to sell and haven't really been able to find it |

28. Later in their April 24, 2015 Facebook Messenger conversation, Endicott reiterated to Shih his frustration with his current employment situation at Lazard, stating "Yeah I'm tired of getting my brains beeat in" (*sic*).

29. Shih informed Endicott in their April 24, 2015 Facebook Messenger conversation that, although her native Wellington, New Zealand had a good startup community, it lacked startup money.

30. Endicott stated to Shih in their April 24, 2015 Facebook Messenger exchange that money for a new business venture would not be an obstacle.

31. Endicott specifically stated to Shih in their April 24, 2015 Facebook Messenger exchange:

I don't know that money is a huge issue.

I think I can get money.

7

32. Shih responded to Endicott in their April 24, 2015 Facebook Messenger exchange:

> Well if you're serious, let's talk more.

### Shih Shares Her Credit Gap Business Concept with Endicott

33. Shih considered Endicott's proposal over the weekend of April 25 and 26, 2015 and determined that a New York based attorney and investment banker such as Endicott could help her develop an idea she had for a credit bridging service for new migrants to the United States who had little to no American credit history, and therefore could not access credit in the United States.

34. Shih had been thinking about the problem of access to credit in the United States since her 2014 internship in New York.

35. During her time in New York, Shih learned that other expatriates cannot obtain credit cards and frequently struggle to access credit to purchase cars, secure apartment leases, open bank accounts, or assist with daily expenses.

36. Shih believed a credit bridging service could help new migrants access consumer credit, as well as Americans who lacked access to credit.

37. Shih identified a market in people located in the United States that did not have access to credit, and sought a partner who could assist her with organizing a company and securing financing.

38. It was particularly attractive to Shih that Endicott had offered his legal services and expertise as an attorney with the skill to organize a company in the United States, and represented to Shih that he had contacts through his investment banking career that could lead to potential investors and partners in the company.

39. Shih also trusted Endicott as a friend.

40.   Accordingly, three days after Endicott proposed that he and Shih start a company together, and stated that he just needed a product, in a Facebook Messenger exchange on or about April 27, 2015, Shih proposed to Endicott her idea for a credit bridging service that would enable immigrants without a United States credit history to access consumer credit in the United States and build a United States credit history.

### Endicott is Fascinated by Shih's "Amazing Idea" And They go to Work Implementing It

41.   Endicott was fascinated by Shih's credit bridging concept.

42.   In a Facebook Messenger communication to Shih on or about April 28, 2015, Endicott wrote:

> That's an amazing idea.
>
> It's seriously very good
>
> There might be some hidden obstacles, but if not, then it's worth trying.

43.   That very day, on or about April 28, 2015, Endicott began researching the issue of access to credit in the United States.

44.   Endicott sent Shih a link through Facebook Messenger on or about April 28, 2015 to a CNBC article entitled "Do Credit Scores Matter Outside the US?"

45.   Endicott also sent Shih a link through Facebook Messenger on or about April 28, 2015 to a Washington Post article about the incorporation of rent payments into credit scores, telling Shih, "This is relevant."

46.   Endicott also researched the public filings of major credit agencies in the United States on or about April 28, 2015.

47.   Endicott sent Shih an email on or about April 28, 2015 with the subject line "Int'l Credit Reporting Idea" which transmitted to Shih public filings and industry reports for Equifax, Experian, and Transunion.

48.   Endicott's April 28, 2015 email to Shih stated:

> This is of interest.  I've pulled a bunch of public filings of the big players in the industry as well as industry reports on them.  Check them out and let me know what you think.

49.   Shih and Endicott also jointly researched and discussed Shih's idea extensively over Facebook Messenger on April 28, 2015.

50.   In their April 28, 2015 Facebook Messenger conversation, Endicott asked Shih to elaborate on her idea, and Shih described to Endicott her idea for a company that could evaluate a customer's creditworthiness outside of the FICO credit score realm by conducting a more representative assessment of an individual's creditworthiness, thereby enabling the individual to access credit.

51.   A key benefit of the service would be that the customer's use of the service would help them establish and/or improve their FICO credit score.

52.   In the course of their conversation on April 28, 2015, Endicott stated to Shih over Facebook Messenger:

> I think the idea is viable
>
> There's a problem, and this would solve that problem, and it probably wouldn't be that expensive

In a separate communication over Facebook Messenger on or about April 28, 2015, Endicott stated:

> This is a good idea

53. Endicott and Shih concluded their discussion on April 28, 2015 with the following exchange:

| | |
|---|---|
| ENDICOTT: | Thanks! |
| | Let's create this things (*sic*) |
| SHIH: | no worries, you said you wanted to start a business |
| ENDICOTT: | It will give you an excuse to run around the world some more |
| SHIH: | I do love that |
| | I'm currently waiting on security clearance which is massively cramping my style |
| ENDICOTT: | Haha, sounds rough |
| SHIH: | you have no idea.  okay anyway do some digging, let me know |
| | if all signs are still towards viability then we can start building a small team |
| ENDICOTT: | sounds good |

54. Thus, on April 28, 2015, Shih and Endicott agreed to create a business based upon Shih's idea.

55. Specifically, Shih accepted Endicott's proposal that the two start a company together, and they each affirmed their mutual agreement to contribute personal services toward the development of a company based upon Shih's credit gap idea and thereafter proceeded as partners, co-venturers, or co-promoters in the development of a company which would seek to provide credit to those who were unable to access traditional credit sources.

**Shih and Endicott Begin to Perform their Agreement
to Research and Develop Shih's Credit Gap Bridging Concept**

56.  On or about May 3, 2015, Shih wrote Endicott a Facebook Messenger communication inquiring as to whether he still thought the idea was viable.

57.  Endicott responded on or about May 3, 2015 by confirming that he did think it was viable and advised Shih that he was continuing to research it.

58.  Endicott also advised Shih in a Facebook Messenger communication on or about May 3, 2015 that he was talking to people who they might consider bringing on board as part of their team.

59.  Throughout May and June 2015, Endicott and Shih then proceeded to collaboratively develop Shih's credit bridging concept as equal partners via email, Facebook Messenger conversations, Skype meetings, and a shared Dropbox.

60.  Specifically, on or about May 5, 2015, Endicott sent Shih an email that contained a document entitled "Credit Scoring Market Structure", and requested Shih's help with building out a market structure breakdown for the business.  He stated in this email:

> I am trying to figure out exactly how the data is flowing to lenders (particularly in the international setting) to start ginning up a solution.

61.  Shih provided input with respect to the market structure breakdown in connection as they collaboratively worked to "gin up" a solution.

62.  On or about May 6, 2015, Endicott sent Shih various emails with the subject line "Credit Score – Information Diagram" that contained an attachment and links to articles concerning the handling of consumer credit information in the international setting.

63.  On or about May 7, 2015, Endicott sent Shih an email which stated:

> After having learned more about the credit scoring process, I'm warming more to the idea of actually lending the money in-house (rather than relying on third-party lender) given that it might be difficult to convince lenders to use a new credit score.

64.  On or about May 7, 2015, Endicott sent an email to Susan Johnston Taylor, a freelance journalist who had written on the topic of access to consumer credit in the United States.  He blind copied Shih on that email, which stated:

> Susan,
>
> I am working with a group that's setting up a venture to tackle the gap in credit available to immigrants in the US due to various causes (e.g., lack of credit scores).  I've read your article linked here and came away with a few thoughts / questions.
> Would it be possible to speak with you over the phone for a few minutes this week or next week?  The call would be brief.  Thank you so much for your help, and I look forward to speaking with you if you have time.
>
> Regards,
> Andrew

65.  The "group" and "venture" referenced in Endicott's email to Johnston Taylor was comprised of Shih and Endicott as demonstrated by the fact that Endicott blind copied Shih on the email.

66.  Shih responded to Endicott on or about May 7, 2015 with an extensive email that provided her input and analysis with respect to the articles by Johnston Taylor, and stated, among other things:

> I'm glad you're warming to the idea of lending money in-house, since it means you're envisaging a company with access to capital that can independently vet clients.

67.  Endicott then told Shih on or about May 7, 2015,

> Great, we're on the same page overall.  I think your concept of bridging would be akin to being a guarantor, which is interesting

13

and would be cheaper than lending itself.  It leaves a problem of convincing banks to participate, but lightens capital requirements.

68.  On or about May 8, 2015, Shih wrote Endicott an email with the subject line "Credit to New Migrants" which stated, among other things:

> With regards to clients not having assets, I think that's just part of the risk we absorb. We could try cut risk by only taking on MNCs that bring large numbers of workers into the US. As well as having US-based assets, if the company breaches the individuals still have an incentive to pay and protect their own credit score. I'd be interested on whether you think we'd need a proven service to convince an MNC to contract with us or whether we could do that from the outset?
>
> Also, I think it's not too early to start thinking about start-up money and possible places to get it. Even coming to a ballpark figure would be helpful. Things like compliance costs I'll have to rely on your knowledge of the US for, as well as a bunch of other things. Between us, what do you see as the key skills that are missing and what sort of people might be suited to filling them?

69.  On or about May 10, 2015, Endicott shared a folder of files entitled "Credit Bridge Concept" with Shih through Dropbox and wrote to Shih in an email:

> Let me know if you don't get the invite to the dropbox folder. We needed a place to share files beyond just emailing.

70.  On or about May 10, 2015, Endicott sent Shih an extensive email with the subject line "Big Questions" which proposed a delegation of labor between the two with respect to the development of their business plan.

71.  In his email of May 10, 2015, Endicott also asked if Shih had any thoughts on a business name for their venture, and stated:

> You noted that we should think about raising money in your last message.  I agree, and I've been looking into it as I research.  The main thing we should be doing now to advance fundraising though is nailing down the business model.  That said, I will start cataloging people we could reach out to for financing and share that with you once it's in good shape.

14

72.  Shortly thereafter, in mid-May 2015, Endicott contacted an attorney named Saish Setty to discuss Shih and Endicott's credit venture.

73.  On or about May 18, 2015, Endicott forwarded to Shih an email that Setty had sent to him with the subject line "Credit Score Startup" that contained a note from Setty which stated "Thought you might be interested in these guys" and a link to an article on www.techcrunch.com about a company called Vouch, which markets itself as "The First Social Network for Credit".

74. On or about May 13, 2015, Endicott emailed Berk Ustun about Shih and Endicott's venture and even attached the "Big Questions" data file spreadsheet which was Shih and Endicott's in-process collaborative work product.

75.  Endicott's May 13, 2015 email to Ustun stated:

> I need your help with something.  I'm trying to estimate FICO distributions of various immigrant populations.  Absolute scientific precision isn't the goal - just want to be generally close.   I have rudimentary information concerning economic / education characteristics of a few immigrant populations, and I have the FICO distribution (over time, also) in the US.
>
> How would you generally approach this?  I don't think I'll be able to get income / wealth distribution data for immigrant populations, so I was hoping to use median income + poverty rate as a rough guide to get there.   Would need to guess for a good number of the populations based off intuition unless I can find better info. Thoughts?
>
> I've attached my in-process data file for this.  All of this is to answer "Question A."   Would probably aim to do this for the top-20 immigrant groups from 2013.

76.  Endicott then forwarded his May 13, 2015 email to Ustun to Shih with the subject line "Fwd: Grafting US FICO Characteristics onto Foreign Populations", and stated to Shih:

> FYI - this guy is getting a PHD at MIT in computer science and is a wiz kid at stats.  He would be good counsel on stuff like this.

77. A website maintained by Brooklyn Bridge Ventures, as well as startup website Angel List at www.angel.co, have both listed Berk Ustun as a founder of Petal.

78. In a Skype meeting held on or about May 16, 2015, Endicott and Shih discussed the CreditBridge business plan, including product development, potential team members, employees and business partners, expenses, how the company would make money including anticipated profits, losses, and expenses and how such profits, losses, and expenses would be shared, consumer behavior, venture capital, Shih's availability to return to New York to be present for important pitches or to generally work on the venture, and the circumstances under which Shih would relocate to New York permanently. In particular, Endicott and Shih discussed the following in the May 16, 2015 Skype meeting:

a.   Endicott suggested bringing on a friend from law school as an additional founding member, and Shih and Endicott both agreed to search for a data scientist or other technology specialist to assist with product development.

b.   Shih expressed reservations about bringing on partners that she had not had an opportunity to meet, either through a video call or in person, and Endicott agreed that he would not promise equity in their venture to anyone without Shih's prior approval.

c.   Shih and Endicott agreed to limit the size of their founding team to the minimum needed to obtain seed capital, which they would then use to hire contractors and employees. This strategy was specifically proposed by Shih and agreed to by Endicott in order to allow Shih and Endicott to retain greater control of the company and a larger share of future profits.

d.     Shih and Endicott discussed equity, expenses, costs, profits, and losses, and, because they were the only partners at the time, agreed to share them in equal proportion, 50% to Shih and 50% to Endicott.

e.     Endicott accepted responsibility for incorporating the company and agreed that 50% of its stock would be issued to Shih and the other 50% to himself.

f.     The initial expenses Shih and Endicott identified were for website design and hosting, contractors, domestic travel for Endicott and travel to the United States for Shih, and pitch materials and other costs associated with pitching the company to investors.

g.     After both had initially resisted the expansion of their business model beyond international professionals, Shih and Endicott agreed that they should not limit their focus to international professionals who were migrants to the United States, but should instead expand their thinking to address other untapped sources of credit worthy people who faced barriers when attempting to access credit. Shih pointed out that issues such as language obstacles, or a psychological or cultural aversions to debt, likely created an untapped market for what Shih and Endicott were creating. Shih agreed to investigate banking and consumer credit services in Asia to learn more about how creditworthiness was rated there, and to explore how her findings could inform Shih and Endicott's product development.

h.     Shih and Endicott agreed that the task of fundraising would be delegated entirely to Endicott due to his background as an investment banker, his sophistication as an attorney, and his ability to pitch in person in New York

to investors on Shih and Endicott's behalf.  Shih and Endicott agreed that if early fundraising efforts were successful, it would signal that the concept had passed an initial viability "litmus test", and Shih would at that time begin planning to relocate to New York permanently.

    i.    Shih and Endicott also discussed the possibility of Shih travelling to New York in the meantime, during the Summer or Fall of 2015, to be present for important pitches or to generally work on the company, and Endicott agreed to pay fifty percent (50%) of Shih's travel costs as per their agreement to share costs in equal proportion.

79.  Thus, by on or around mid-May 2015, the business that Shih and Endicott agreed to create based upon Shih's idea was no longer just a goal.  Business models were considered and being "nailed down", the identity of a potential "team" was taking shape, investors were being catalogued, and risks were evaluated.

80.  In addition, the effort was a collaborative one between Endicott and Shih as evidenced by Endicott's statements, such as "Great, we're on the same page overall", his solicitation of Shih's input, and the multitude of emails and Facebook Messenger exchanges evidencing their partnership and discussing their division of labor.

81.  Thus, by mid-May 2015, the actions of Endicott and Shih established an implied agreement to create a joint venture.  In particular in this regard:

    a.  a delegation of labor existed between Shih and Endicott.

    b.  Financial resources were being identified.

    c.  Shih contributed the idea and her personal experiences.

    d.  Endicott contributed his skill and expertise as a corporate attorney and

investment banker as well as his contacts from those careers.

e. The property (ie., the business model) had been identified.

f. Shih and Endicott both exhibited control over the business by virtue of their foregoing proprietary contributions of skill, knowledge, perspective and ideas.

g. Shih and Endicott each relied on the other's expertise with regard to bringing the venture to market.

h. Shih and Endicott had agreed that profits and losses were to be split equally.

i. Endicott was reaching out to potential team members such as Ustun, who later held himself out as a founder of both CreditBridge and Petal, and sharing Shih and Endicott's collaborative work product with him in connection with Shih and Endicott's research.

82. After mid-May 2015, the joint venture accelerated.

83. On or about May 17, 2015 Shih shared with Endicott an extensive memo that she had prepared addressing questions posed in Endicott's May 10, 2015 email with the subject line "Big Questions".

84.  On or about May 20, 2015, Endicott sent Shih an email containing a detailed list of tasks and responsibilities in connection with the preparation of pitch materials for investors, and agreed to conduct a further Skype meeting on May 30, 2015.

85. Endicott then missed the Skype meeting scheduled for May 30, 2015.

86. In a Facebook Messenger conversation held on or about June 2, 2015, Endicott wrote to Shih:

> Hey, I apologise (*sic*) for skipping this wknd.  Work was awful this
> weekend.

On the bright side, I've had a lot of very constructive conversations with people who have financing connections the past few days, which has been good

Want to re-schedule?

87.   In response, Shih suggested that the two reschedule their Skype meeting for June 6-7, 2015, to which Endicott, "Awesome . . . Looking forward to it."

## Shih and Endicott Name Their Venture "CreditBridge" at Shih's Suggestion and Agree To Approach Potential Investors

88.   On or about June 6, 2015, Shih and Endicott discussed potential names for their company via Facebook Messenger, and Shih reiterated her preference that the company be called CreditBridge.

89.    Shih and Endicott held a Skype meeting on or about June 6-7, 2015 during which they settled on the name CreditBridge, and further discussed product development, team members, partners, employees, expenses, profits and losses, consumer behavior, and venture capital.

90.    Endicott had been encouraged by constructive conversations he had had regarding financing, as referenced in his June 2, 2015 email to Shih, so the June 6-7, 2015 Skype meeting was particularly focused on ensuring that Endicott had what he needed to begin pitching CreditBridge to investors, including clarity as to the terms of any agreement that Endicott was authorized to enter into with investors that would bind Shih and CreditBridge.

91.    Endicott and Shih also reaffirmed their commitment to proceed with their CreditBridge joint venture as equal partners during the June 6-7, 2015 Skype meeting.

92.    In particular, Shih advised Endicott during their Skype meeting on or about June 6-7, 2015 that work obligations and an upcoming three-week vacation to the South Island of New Zealand would temporarily limit her ability to work on CreditBridge.  Since things were moving

quickly, Shih inquired as to whether Endicott would prefer to purchase some of Shih's interest in CreditBridge from her, so that Endicott could tell investors that he held a controlling stake in the company.  Endicott rejected Shih's proposal, and stated to Shih that, since it was "your idea", he did not want to work on CreditBridge without Shih as his equal partner.

93.    Shih and Endicott also agreed in their June 6-7, 2015 Skype Meeting that they would finalize a business proposal slide deck and take CreditBridge into a "pitch phase," with Endicott soliciting investment from venture capitalists and other investors while Shih was on her upcoming vacation to the South Island of New Zealand.  Endicott agreed to report any significant developments back to Shih, but reminded Shih that his full-time investment banking job demanded most of his time so she should expect some delay as to Endicott's progress raising funds.

94.    On or about June 7, 2015, after their Skype meeting, Endicott sent Shih an email with the subject line "Slide Deck" which stated "here's the slide deck I'm referring to" and contained an attachment called "CreditBridge Business Plan Deck".

95.    The document "CreditBridge Business Plan Deck" contained proposed slides for Endicott's pitch to investors, and was the result of Endicott and Shih's collaborative work and discussions over the past months.

96.    Although the version sent with Endicott's June 7, 2015 email was incomplete, Shih and Endicott both understood that the slide deck would be finalized utilizing the market research and business models that Shih and Endicott had jointly discussed, analyzed, and developed, as well as in response to feedback that Endicott received from potential investors.

97.    Shih and Endicott both understood that Endicott would use the slide deck, or some variation of it, to pitch CreditBridge to investors while Shih was on vacation.

98.     Accordingly, by June 7, 2015, the terms of the joint venture that Endicott and Shih had created and agreed to enter into became even more specific in that:

        a.     the venture was given a name.

        b.     the presentation of the business model was finalized.

        c.     it was agreed that equity shares would not be distributed or promised to third-parties without the approval of both Shih and Endicott.

        d.     control of the joint venture was vested in ownership of shares of stock which were to be issued and distributed to Endicott and Shih in equal 50% shares, and that their respective interests in the venture would not be lessened by issuing shares to third-parties without the approval of both Shih and Endicott.

        e.     It was agreed that Endicott would seek funding for the venture by pitching CreditBridge to potential investors.

99.     Clearly Shih and Endicott had agreed to offer a product or service that afforded access to credit to those without it.  Technology for the product or service was to be supplied by third-parties identified by Endicott and agreed to by Shih, with Ustun being the foremost candidate.  Obtaining capital for the venture was delegated to Endicott who was actively pursuing investors and had the contacts to do so.  Both Shih and Endicott were acting on behalf of the joint venture and in reliance upon their agreement to create CreditBridge.

100.  It is not uncommon in the start-up community for co-founders to act as business partners, co-promoters, and/or joint venturers without having set forth the terms of their agreement in a specific writing, because a written partnership or joint venture agreement can discourage venture capital investment by implying mistrust between the co-founders.

**Endicott Goes Silent But Continues to Develop CreditBridge**

101.  Shih sent Endicott a Facebook Messenger message from her vacation on or about June 28, 2015 to check on Endicott's progress with CreditBridge.  It stated:

> Hey how's it going?  Sorry for the radio silence on creditbridge.
> Have been working flat out and am now in a campervan touring the
> South Island, but thought I should touch base.

102.  Endicott did not respond to Shih's message but he was moving forward with CreditBridge in the Summer of 2015.

103.  Endicott opened a CreditBridge Twitter account on or about June 21, 2015, and a large number of CreditBridge's tweets are directed toward immigrants to the United States and expatriates (see www.twitter.com/creditbridge; @creditbridge).

104.  Endicott registered and launched a CreditBridge website at www.creditbridge.com in or around July of 2015.

105.  Endicott launched a logo contest for CreditBridge on the website for 99designs in or around June 2015 without consulting Shih.  The contest was available at https://99designs.ca/logo-design/contests/help-create-logo-america-next-wave-immigrants-will-498241 and the summary of the contest at that website stated, "Help create the logo that America's next wave of immigrants will see on their credit cards."  Screenshots from the 99designs logo contest are annexed as Ex. A.

106.  In connection with the 99designs logo contest, Endicott described CreditBridge to potential designers in a manner that was completely consistent with Shih's idea and Shih and Endicott's joint venture:

> CreditBridge is a credit provider for new immigrants / migrants to
> the United States. It's ideal customer is professional and financially
> stable, yet from another country originally. We will issue credit
> cards and other forms of financing to these customers.

23

107.    In or around July of 2015, Endicott began blogging about consumer credit in the United States on the CreditBridge website he had registered.

108.    Blog entries posted to the CreditBridge website between July of 2015 and March of 2016 included the following titles: "Beat the Credit Bureaus at Their Own Game", "Consumer Action and CreditBridge Collaboration: Credit Scores in the U.S.", and "101 Things to Do Before Moving to America."

109.    The CreditBridge website utilized the logo obtained from the June 2015 99designs contest, and the logo was also featured on CreditBridge's Twitter feed and on an early mock-up of a CreditBridge credit card.  An image of that card bearing the logo is annexed as Ex. B.

110.     On or about August 8, 2015, Shih sent Endicott a communication over Facebook Messenger to wish him a happy birthday expecting that her message would prompt an update from Endicott as to his progress with CreditBridge.  Endicott did not respond.

111.    On or about August 11, 2015, Shih saw a Facebook post made by Endicott's girlfriend, Yulia Michelle Fradkin ("Fradkin"), by which Fradkin advertised for staff for CredtiBridge. The post stated:

> A friend's start-up is looking for a computer scientist/software engineer/statistician.  About the company:  CreditBridge is a technology-enabled finance company dedicated to bridging a gap in the existing consumer lending system with respect to immigrants, students, and others that lack representative U.S. credit scores. CreditBridge seeks to offer credit-building financial tools, credit cards, and consumer loans that will expand access to these groups of people.  Please lmk [let me know] if you know anyone.

112.    Since Shih and Endicott had agreed that the size of the staff of their company would be mutually agreed upon, Shih, after seeing Fradkin's post for CreditBridge staff on Facebook,

sent Endicott an email on or about August 12, 2018 with the subject line "CreditBridge" which

stated:

> Just saw on Facebook that Yulia posted about looking for a
> computer scientist, software engineer, or statistician for
> CreditBridge.
>
> We should set up a time to talk more about it.  I'm free this weekend
> if that suits for a Skype.

113.    Endicott did not respond to Shih's August 12, 2015 email.

114.    Shih knew Fradkin personally from her time in New York and had been friendly

with her, so Shih sent Fradkin a communication on Facebook Messenger on or about August 22,

2015 which stated:

> hey Yulia, did you manage to verify Andrew is in fact alive and
> well?
>
> I saw your post about CreditBridge looking for a new data person.
> I don't know if Andrew mentioned but CreditBridge is my idea.  I
> suggested it to him in April and we worked on it for the next few
> months but I wasn't sure if he was still interested?
>
> Can you get him to give me a buzz if you do find him, cheers!

115.    Fradkin responded to Shih via Facebook Messenger on or about August 22, 2015

and stated that Endicott was "in Turkey right now" and "yeah I think they are trying to see if there

is general investor interest".

116.    Fradkin was living with Endicott at the time, so Shih was pleased to receive a

recognition from Fradkin that Fradkin was aware of Shih's role as a co-founder of CreditBridge.

117.    Shih was also gratified to learn that Endicott was pursuing financing for the joint

venture despite having to travel internationally for work, and his international travel helped explain

why Endicott had not followed up regarding his progress.

118.    Fradkin's message confirmed to Shih that she could rely upon Endicott to continue

to perform the tasks delegated to him under their joint venture agreement, namely pursuing financing for CreditBridge and incorporating the company.

119.    Thereafter, Shih allowed Endicott to pursue financing for CreditBridge without interference from her believing that he was carrying out their agreement and that he would follow up as he said he would when he had something significant to report.

120.    CreditBridge, Inc. was formally incorporated under the laws of the State of Delaware by Defendant Endicott and Defendant Gross in or around February 2016.

121.    At or around that time, in February of 2016, Shih noticed that Endicott's profile on the website "LinkedIn" had changed to reflect that Endicott's position was Co-Founder of CreditBridge.

122.    Shih was able to navigate from Endicott's LinkedIn profile to Defendant Jason Gross's, which listed Gross's position as Co-Founder of CreditBridge.

123.    Gross's identification as Co-Founder of CreditBridge was extremely concerning to Shih.

124.    Thereafter, in or around February of 2016, Shih attempted to access the Dropbox folder she shared with Endicott that contained their work-product and discovered that Endicott had removed Shih's ability to access it.

125.    Indeed, unbeknownst to Shih, shortly after their June 6-7 Skype Meeting Endicott began making business decisions without Shih.

126.    Despite assuring Shih that he would not do so without her knowledge and consent, Endicott brought on other partners.

127.    Defendant Gross was an early partner that Endicott brought to CreditBridge unbeknownst to Shih without her knowledge or consent.

26

128.    Defendant Gross, who graduated from Harvard Law School in 2012, the same year as Endicott, is believed by Shih to be the law school friend of Endicott's that Endicott referenced in their May 16, 2015 Skype meeting.

129.    Gross now holds himself out as a co-founder and the Chief Executive Officer of Petal, and previously held himself out as a co-founder and the Chief Executive Officer of CreditBridge.

130.    Berk Ustun was another early partner of Endicott's who was brought to CreditBridge without Shih's knowledge or consent and has held himself out as a co-founder of Petal, and previously held himself out as a co-founder of CreditBridge.

131.    Endicott never advised that he was making business decisions with respect to CreditBridge without Shih, and instead ignored her repeated attempts to inquire about the status of CreditBridge.

132.    On or about February 16, 2016, Shih sent an email to Endicott and Gross at their CreditBridge.com email addresses with the subject line "CreditBridge's Future". The email was addressed to Endicott and stated:

> Andrew,
>
> I am writing to you to express my concern at the way I have been treated in the formation of CreditBridge and to convey my expectation that we find a way to settle my concerns going forward.
>
> CreditBridge was my business idea which I shared with you on the mutual understanding that we would pursue its development in partnership. We worked collaboratively on research, business models and concepts and discussed branding, investment opportunities, the division of responsibilities and the possibility of bringing on specialist skills to perform tasks that we could not manage ourselves.
>
> When you did not reply to my attempt to contact you last June I charitably believed that you had put CreditBridge on the backburner.

> In the months following June I noted with concern steps that were being taken without consultation or agreement from me, including the advertisement on Facebook for staff and the establishment of a CreditBridge website.  However, I retained a deteriorating hope that you would act ethically and that we would be able to have an honest conversation about CreditBridge and our roles in its future.
>
> With the incorporation of CreditBridge in Delaware at the beginning of this month the facts are no longer capable of bearing a charitable interpretation.  Your intent is clearly to cut me out of the business which I conceived of and pursued in good faith with you, and to which I am entitled to 50 per cent ownership.
>
> I urge you to consider carefully your response to this matter.

133.    Neither Endicott nor Gross responded to Shih's February 16, 2016 email.

134.    On or about March 1, 2016, Shih sent a further message to Endicott's email address which also enclosed her February 16, 2016 email and reiterated that she would like to resolve the issue and will continue to seek a fair remedy.

135.    Endicott did not respond to Shih's March 1, 2016 email.

136.    On or about March 2, 2016, Shih sent a message to Defendant Gross's LinkedIn which enclosed the email she had sent to Endicott and Gross on February 16, 2016 and urged Gross to contact her.  Gross never responded.

137.    On or around March 23, 2016 Shih sent a further email to Defendant Gross alone which stated:

> Jason,
>
> This is the third time I am reaching out to try and make contact with you.
>
> On 16 February I sent an email to your CreditBridge address detailing my concerns over the way I was treated in the formation of CreditBridge.  On 2 March I sent an InMail to your LinkedIn account reiterating these concerns.  Since I haven't heard back from you in over a month, I can only assume that you either did not receive my messages or that you do not wish to respond.  Either way,

28

I feel obliged to try at least one more time to discuss this matter with you because of the significant impact it could have on you. I know Andrew has received my messages and has chosen to ignore them.

CreditBridge was my business idea which I worked on with Andrew last year on the mutual understanding we would pursue its development in partnership. By cutting me out of the business Andrew acted in bad faith towards me and continues to do so by ignoring my attempts to contact him. If you are aware of the situation and you choose to ignore me you will become complicit in his unethical conduct. The New York State Bar Association Code of Professional Responsibility expressly states that lawyers shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

My purpose in reaching out to you today is to:

(i) ensure that these circumstances are brought to your attention;
(ii) provide you with the opportunity to ask me any questions you may have and demonstrate your willingness (or unwillingness) to co-operate with me on this issue;
(iii) inform you of my intention to pursue a fair remedy in the matter through all means available to me.

My preference is still to work this out between the parties. However, if I do not hear from either you or Andrew within the next two weeks I will be forced to begin involving other people.

Regards,

Cassandra.

138. Endicott finally responded to Shih within 24 hours of her direct email sent only to

Gross. Endicott's email to Shih, sent on or about March 24, 2016 (Ex. C), stated:

Hi Cassie,

Thanks for your letter. It's nice to hear from you again. It's been too long since we've spoken and I hope all is well with you. I'm sorry that our relationship ended last year. I treated you poorly as a friend and I want to apologize for ending communication with you so abruptly.

Our lack of communication seems to have caused a misunderstanding on your part regarding my business,

CreditBridge, Inc. This business has no connection whatsoever to anything that you and I discussed in the past. Contrary to what you've claimed in your letter, CreditBridge is a credit card company and is not based on any of your business ideas.

CreditBridge is also just a startup, with no revenue, no customers, no material contracts, and no outside investors. I have no income now after leaving my job at Lazard, and I'm personally funding the start-up costs of the business. Needless to say, I've been racking up some pretty scary credit card debt.

I was surprised by how you've portrayed me in your letter and I hope we can resume being friends. You're an incredibly intelligent and capable person, and I think it's a shame that we did not ever get the chance to work together. I really admire your passion and I encourage you to pursue your business ideas just as I've pursued mine. If I can ever be of any help to you, please let me know.

I wish you the best of luck with everything!

Regards,
Andrew

139. Endicott's response to Shih was patronizing, dishonest, and implausible.

140. In particular, Endicott's claim that "his company", CreditBridge, Inc., "has no connection whatsoever to anything" that Shih and Endicott had discussed, and is not based upon any of Shih's business ideas, is contradicted by extensive evidence, including but not limited to (i) Endicott and Shih's Facebook Messenger conversations, (ii) their email exchanges, (iii) their shared Dropbox, along with the fact that Endicott removed Shih's ability to access the shared Dropbox, and (iv) their Skype exchanges; as well as (v) Endicott's emails to third parties such as Ustun, Setty, and Susan Johnston Taylor, (vi) Fradkin's Facebook post about CreditBridge and Shih's Facebook Messenger exchange with Fradkin, (vii) the retention by Endicott and Gross of the CreditBridge name, (viii) Endicott's characterization of CreditBridge on the 99design website in connection with the logo contest he conducted, (ix) the content and nature of the CreditBridge Twitter feed which was established two weeks after Endicott and Shih's last CreditBridge meeting,

(x) the content and nature of blog articles posted to the CreditBridge website which Endicott established shortly after cutting off contact with Shih (see for instance, CreditBridge.com, *101 Things to Do Before Coming to America* (Mar. 8, 2016) [Ex. D], and (xi) Endicott's suggestion that he and Shih work with Gross and Ustun, both of whom had held themselves out as co-founders of both CreditBridge and Petal.

141.   Shih responded to Endicott with an email sent on or about March 25, 2016 that also copied Defendant Gross and stated:

> It is good to finally hear from you.  I am relieved that you are now ready to engage in a serious and honest discussion with me.  When you stopped responding after months of cooperative work last year I felt that my trust in you was broken.
>
> From the outside it appears that the company we worked on and CreditBridge Inc are the same company.  I would appreciate it if you could explain how the two are separable, in particular:
>
> i) When exactly did you first start working on CreditBridge Inc.? How and when did the idea come to you?
>
> ii) Did you begin this work alone or with others?  If alone, how long before others got involved?
>
> iii) What does CreditBridge Inc do, and how is it different from the business that we were working on?
>
> Please get back to me promptly.

142.   Neither Endicott nor Gross responded to Shih's March 25, 2016 email despite Endicott's statement to Shih one day earlier that, "if I can ever be of any help to you, please let me know."

143.   Sometime thereafter Endicott restricted Shih's ability to access his Facebook page.

144.    CreditBridge, Inc. changed its name to Petal Card, Inc. in or around June 2016, shortly after Endicott, Gross and Shih's March 2016 email exchange.

## Petal is Shih's Company and it is Experiencing Rapid Growth

145.     The CreditBridge incorporated by Endicott in February 2016 is the very same company as the CreditBridge that Endicott and Shih developed and continues to be the same company today, notwithstanding its name change to Petal.

146.    From its inception, CreditBridge has sought to address the credit gap that Shih identified to Endicott by independently assessing the creditworthiness of individuals in the United States who lack a sufficient FICO score, and by providing credit to such individuals, specifically through the issuance of credit cards.

147.    Petal still targets the same demographics and markets that Shih and Endicott identified in the summer of 2015, offering credit to millennials, immigrants, and other consumers with limited United States credit history.  Defendant Gross himself has described Petal as targeting people who have "spent years of [their lives] in another country, like millions of veterans and first- and second-generation immigrants."[1]

148.    Petal's website states "Millions of Americans aren't able to access credit, simply because they haven't had credit in the past. Millions more are trapped in confusing, misleading and expensive credit card debt that feels impossible to overcome". This mission statement is virtually identical in words and theme to the one that appeared on the CreditBridge homepage prior to its name change to Petal: "There's more to you than your credit score. Millions are shut out of credit cards, student loans, mortgages and other forms of borrowing because they lack a representative U.S. credit history. We aim to change that."

---

[1] As described by Defendant Jason Gross at  https://medium.com/@jasonbgross_/petal-ba2bb74718f4

149.    Although it is common for a start-up to evolve and deviate from its originally contemplated business plans and ideas in response to market conditions, investor interest, and other factors, Petal is notable for how little it has deviated from the company Shih and Endicott created, the business plan and slide deck that was the product of Shih and Endicott's collaborative work, and the original concepts and ideas that Shih shared with Endicott upon accepting his offer to start a company with him.

150.    For instance, Petal now issues credit cards to populations that are underserved by the United States credit scoring system, whereas Shih and Endicott's original CreditBridge business plan sought to address the problem of access to credit for immigrants and other populations underserved by the United States credit system, including the specific need for immigrant populations to access credit cards.

151.    Petal also uses a credit scoring system that it invented which incorporates cash-flow credit underwriting to assess creditworthiness based on the money an individual earns and spends. Shih specifically brought to Endicott's attention that the traditional FICO system in the United States was not necessarily representative of an individual's credit-worthiness, and proposed that their company create a more representative way of assessing an individual's credit worthiness.

152.    Shih also specifically advised Endicott as early as April 28, 2015 that their business plan should "involve the company underwriting the risk of borrowing", an idea which Endicott initially rejected, and later warmed to.   Shih also proposed that CreditBridge explore the idea of partnering with multi-national corporations who could provide salary and financial information for immigrant employees that would assist with underwriting.  This idea was similar in nature and a precursor to the cash-flow underwriting that Petal utilizes today.

153.    Indeed, the core business mechanics of Petal remain as described in Shih and

Endicott's June 2015 CreditBridge Business Plan Slide Deck, where CreditBridge is described as an "alternative lending platform" that collects data to independently assess the creditworthiness of potential borrowers, and partners with U.S. financial institutions to lend to those who qualify.

154.   In this regard, having now created and tested its system of assessing creditworthiness, Petal is at the stage of partnering with financial institutions to extend credit to those who qualify, and has partnered with Visa and Jefferies Bank.

155.   Thus, Petal's product three and a half years following its inception is a credit card that targets the same market identified by Shih and Endicott in the summer of 2015 – that is, millennials, immigrants, and other consumers in the United States who are shut out of mainstream borrowing due to their lack of a qualifying FICO score.

156.   Indeed, it was Shih who contributed the lion's share of the value that was generated in Petal's first few months as a startup company known as CreditBridge.  As Endicott himself stated to Shih on May 10, 2015, "[T]he main thing we should be doing now to advance fundraising . . . is nailing down the business model."  Shih's contributions to the business model included, but were not limited to:

     a.    The original idea for the service.

     b.    Market structure breakdown and market research, through which Shih identified a large, stable, growing and underserved market in the form of migrants that struggled to access credit in the United States due to the country's traditional credit system, and dominance of the FICO score within that system, as well as a potentially broader market in the form of minorities, students, and other groups in the country that were under-served by that system.

c.   Product development, the product being an innovative credit bridging service that would allow customers to more easily transition to the mainstream credit system by building up their score.  The "build your credit score" concept remains a primary marketing focus of Petal.  The Petal website states "Get credit, without a credit score. Petal is not like other cards. We look at the money you make and the bills you already pay to help you qualify instantly. That means you can get a great credit card and start building your credit score, even if Petal is your first credit card. It's that easy."

d.   Business modelling, including the specific idea of an independent credit underwriting system, which Endicott initially opposed in favor of a new credit scoring system, as well as the ideas to leverage the value of the data obtained by running the service, and lowering capital investment to reduce risk.

e.   The original name of the company, CreditBridge. Shih had suggested a portmanteau, and later specifically suggested CreditBridge.  Endicott suggested the more internationally flavored CreditPassport.

f.   Financing strategy and promotional material, which Shih and Endicott discussed at length before Endicott cut off all communication.

Thus, CreditBridge was not a mere idea of Shih's.  CreditBridge had a name. CreditBridge had a definite business plan that had been carefully considered and mutually agreed to by Shih and Endicott.  CreditBridge's co-founders, Shih and Endicott, agreed to split profits and losses equally. They also agreed that each would receive 50% of all shares upon incorporation.  And CreditBridge

was incorporated.  CreditBridge was thus a joint venture that Shih and Endicott entered into.  The only term that had not been accomplished, was as with all start-ups, financing.  And when Endicott found the investors, he froze Shih out.

157.  Petal raised $3.4 million in seed financing between 2015 and 2016.

158.  On January 10, 2018, Petal announced that it raised an additional $13 million in Series A financing which will be used to roll out its credit card nationwide.

159.  In October 2018, Petal announced that it had raised an additional $34 million in debt financing to facilitate the public roll-out of its first product, the Petal credit card.

160.  Petal is experiencing rapid growth, advertising for several employment positions with posted annual salaries ranging from $100,000 to $240,000, including the positions of Head of Growth, Data Engineer, Head of Product, and Software Engineer.

161.  Gross has known at least since February of 2016, but a reasonable inference under the circumstances is that he has more likely known since around May of 2015, that the concept for CreditBridge/Petal was originally Shih's, and that Shih and Endicott had developed the business collaboratively – yet he has refused to acknowledge Shih's role in the formation of the company.

162.  Endicott, Gross, and Petal failed to disclose to its shareholders, partners, and investors that the concept for CreditBridge and Petal was originally Shih's, that Shih and Endicott developed it collaboratively, and that Shih is a rightful shareholder of Petal in equity.

**AS AND FOR A FIRST CLAIM FOR RELIEF ADDRESSED
TO ANDREW ENDICOTT AND PETAL: BREACH OF FIDUCIARY DUTY**

163.  Plaintiff Shih repeats and re-alleges each of the allegations contained in paragraphs 1 through 162 as though fully set forth herein.

164.  By virtue of the foregoing, Endicott knowingly agreed to act and advise on Shih's behalf on matters pertaining to the development, incorporation, and financing of a company called

36

CreditBridge which would independently assess individuals' creditworthiness and extend consumer credit to creditworthy individuals who were otherwise unable to access consumer credit through the traditional United States FICO system.

165.   Endicott invited, encouraged, and acquired Shih's trust and confidence in Endicott's intent to act on her behalf on matters pertaining to CreditBridge, and by virtue of the resulting influence that Endicott obtained over Shih, Endicott induced Shih to contribute her ideas, insight, research, analysis, time, and work product toward the development of CreditBridge's business model and pitch materials.

166.   Endicott leveraged and exploited the superior position of knowledge and influence that he had acquired over Shih to conceal his disloyalty in order to effectuate Shih's total exclusion from CreditBridge, Inc., and to appropriate her 50% interest in CreditBridge, Inc. for himself and his other partners and investors.

167.   Even if, hypothetically, CreditBridge, Inc. is a different company from Shih and Endicott's CreditBridge, as Defendant Endicott asserted in his March 2016 email to Shih, Endicott would nonetheless have breached fiduciary duties to Shih by failing to include Shih in any business opportunities that arose as a result of Endicott's work for or role in Shih's CreditBridge in 2015. Because of (1) the substantial similarity between the business concepts of Shih's CreditBridge and CreditBridge, Inc. upon its incorporation; (2) the contemporaneous timing and temporal proximity of the companies' inceptions; (3) and the fact that CreditBridge, Inc. is managed by the same individuals that Endicott proposed bringing to CreditBridge – Endicott, Gross, and Ustun – there is a highly reasonable inference that the two are the same company, or at a minimum, that Endicott's participation in CreditBridge, Inc. and Petal arose directly from business opportunities that he obtained due to his role in and work for Shih's CreditBridge.

*Fiduciary Duty as Co-Venturers*

168.  By virtue of the foregoing, Plaintiff Shih and Defendant Endicott manifested their intent to be equal partners and joint-venturers for the purpose of developing Shih's credit gap business idea into a product and company which they called CreditBridge.

169.  Shih and Endicott each made mutual contributions to the joint venture, with Shih contributing, among other things, the business idea, insight and analysis which was incorporated into CreditBridge's business model and pitch materials, and her time, effort, experience, market research, strategies, skill, and knowledge.

170.  Shih and Endicott maintained joint proprietorship and control over the CreditBridge joint venture until Endicott wrongfully misappropriated the venture for himself.

171.  Shih and Endicott agreed to share profits and losses for their CreditBridge joint venture on a 50%-50% basis before Endicott wrongfully misappropriated the venture for himself and stopped communicating with Shih.

172.  Shih reposed trust and confidence in Endicott as her co-venturer, attorney, promoter of the company and friend, and particularly relied on him in good faith to develop her idea through their joint venture because of her geographic isolation and her visa status.

173.  By virtue of the foregoing, Endicott owed Shih a fiduciary duty as a co-venturer.

*Fiduciary Duty as Attorney*

174.  Endicott also owed Shih a fiduciary duty as an attorney who had specifically held himself out as having the skill, expertise, and experience necessary to organize a company in the United States, as well as the ability to attract potential investors and partners.

175.  Endicott expressly undertook to provide specific legal services for Shih, including incorporating CreditBridge, Inc., issuing Shih a 50% interest upon its incorporation, and ensuring

Shih's and the company's ongoing compliance with corporate and financial laws and regulations.

176.   Shih understood from Endicott that he would provide specific legal services for Shih and CreditBridge relating to regulatory compliance, the organization and formation of the company, and that he would issue 50% of the stock in the company to Shih.

177.   Due to Shih's residence in New Zealand, and her lack of familiarity with American corporate law and business organization practices, Shih relied upon Endicott's skill, expertise, and experience as an attorney both when she shared her credit gap business idea with him and as they jointly developed the CreditBridge business model, and reposed trust and confidence in him in that regard.

178.   Endicott encouraged Shih's reliance and was at all times aware of Shih's trust and confidence in him as an attorney.

179.   Endicott had specifically touted his skill, expertise, and connections as a Harvard-educated New York attorney who could assist Shih in organizing a New York-based company when he induced Shih to share her credit gap business concept with him.

180.   Endicott thus owed Shih a fiduciary duty to act with the utmost loyalty to Shih as an attorney with whom she reposed trust and confidence in connection with the disclosure and development of her credit gap business idea and the legal organization of CreditBridge.

181.   Despite knowing that Shih relied on Endicott in his professional capacity as an attorney to render to her legal services and legal advice pertaining to CreditBridge, Endicott never once disclaimed his status as Shih's or CreditBridge's attorney, and instead knowingly allowed her to continue under the belief that he acted and advised her in that capacity.

182.   Endicott never informed Shih that he did not intend to organize their company or issue 50% of its stock to Shih, or that he intended to use the information and work product that

he obtained from Shih for any purpose other than formally organizing a company with and for Shih.

183.  If, hypothetically, as Endicott claimed in his March 24, 2016 correspondence to Shih, that "his business, CreditBridge, Inc." were different from the company that Shih and Endicott worked on together, then Endicott never disclosed to Shih that he intended to set up a competing company with the same name that offers the same product to remedy the same market deficiency as the company that Shih and Endicott worked on in 2015.

184.  Endicott also never advised Shih to seek independent counsel in connection with their venture.

*Fiduciary Duty as a Corporate Promoter*
*and Agent for the Purposes of Fundraising*

185.  Endicott and Shih formed a pre-incorporation promoters' agreement when Endicott offered to "start a company" with Shih and Shih accepted that offer, and the two proceeded to organize and promote CreditBridge, with the mutual goal of incorporating, promoting, and managing a for-profit corporation and sharing that corporation's equity and losses between themselves in equal parts.

186.  By virtue of the foregoing, Shih and Endicott agreed to act and did act as pre-incorporation co-organizers and co-promoters of CreditBridge, Inc. in the period between April 2015 and June 2015.

187.  Endicott continued to act as a promoter and organizer of the same company through the time of its incorporation.

188.  Shih played a critical role in the origin of CreditBridge, Inc., now known as Petal Card, Inc., by, among other things, conceiving of the company's original idea, naming it, contributing to the development of its business model, conducting preliminary market research to

identify areas of future development and growth, and assisting in the creation of and research for promotional materials used to attract investment in the company.

189.    Even if, hypothetically, Shih's CreditBridge is a different company from CreditBridge, Inc., as Defendant Endicott asserted, Endicott owed Shih a fiduciary duty to include her in any company which resulted from or is derived from business opportunities that he obtained as a result of his role in or collaborative work with Shih on CreditBridge in 2015.

190.    Endicott thus owed Shih fiduciary duties as a corporate promoter, because Shih was both a corporate co-promoter and also an anticipated shareholder of CreditBridge, Inc.

*Fiduciary Duty as an Agent for Fundraising*

190.    Endicott also owed Shih a fiduciary duty as an agent for the purpose of securing investment in CreditBridge.

191.    Endicott agreed to approach potential investors on Shih's behalf, to pitch CreditBridge's business model to such investors for the purpose of obtaining debt and/or equity financing for CreditBridge, and to represent Shih's expressed desires and known interests during negotiations with prospective investors.

192.    The principal-agent relationship between Endicott and Shih is evinced by the control that Shih exerted over the timing and content of Endicott's pitches to investors, the overall CreditBridge business model and fundraising strategy, the terms of any investment deal that resulted from Endicott's fundraising efforts, and the final right to approve or reject any financing offer which Endicott was ultimately able to obtain.

193.    Indeed, Endicott had specifically touted his experience as an investment banker and his access to potential investors and partners, as well as his ability to organize a company, when

he induced Shih to share her credit gap business concept with him, stating among other things, to Shih, "I am an investment banker", "I can raise financing", "I don't know that money is a huge issue", and "I think I can get money".

194.  By virtue of the foregoing, Shih and Endicott formed a principal-agent relationship for the purpose of obtaining investment in CreditBridge.

*Fiduciary Duty to a Shareholder in Equity*

195.  Shih and Endicott were equal owners and equal *de facto* shareholders in the CreditBridge company that they created, and they each had an equal interest in the CreditBridge work product and the Business Plan slide deck that they collaboratively prepared.

196.   As an executive and *de facto* shareholder, Endicott owed a fiduciary duty to Shih as a shareholder in and co-founder of CreditBridge with whom he was on equal footing.

*Fiduciary Duty due to Informal Relationship of Trust and Confidence*

197.   Shih and Endicott maintained an ongoing social relationship prior to their agreement to develop Shih's credit gap business idea, and prior to the formation of CreditBridge.

198.   Endicott invited and encouraged Shih to trust, confide, and rely on his fidelity and competence on matters related to CreditBridge, and successfully obtained and accepted the responsibility to provide services and advice on Shih's behalf.

199.   By virtue of the foregoing, Endicott knowingly leveraged and exploited the very trust and confidence that he had bargained for and obtained from Shih, and utilized the resulting position of superior information and influence to effectuate Shih's total exclusion from CreditBridge, Inc. and appropriate Shih's 50% interest in CreditBridge, Inc. for himself.

200.   Endicott's abuse of Shih's trust and confidence was extremely effective in freezing her out of CreditBridge because: (1) Shih resided in New Zealand and relied entirely on Endicott

for information about Endicott's progress in promoting and organizing CreditBridge; (2) Endicott had accepted sole responsibility for presenting CreditBridge's business model to investors; and (3) Endicott controlled the shared Dropbox which contained Shih and Endicott's collective work product they produced while laying the groundwork for CreditBridge, Inc.;

201.   Shih had reason to believe that Endicott would act with her best interests in mind with respect to the business idea she shared with him, the formation of CreditBridge, and the CreditBridge business plan that they collaboratively prepared because of their ongoing social relationship, as well as the fact that Endicott was an attorney who had offered to start a company with Shih, induced her to share her ideas with him, worked collaboratively with her, agreed to organize their CreditBridge company for their mutual benefit, and specifically agreed to utilize his experience and contacts from his time in investment banking to identify potential investors and partners to whom they would pitch their mutually developed business plan.

202.   Shih was in a position of particular weakness and dependence on Endicott, and Endicott was in a position of strength and dominance with respect to Shih, because (1) Shih, a New Zealander, lacked familiarity with American law, startup culture, and business organization practices; (2) Endicott had contacts who were potential investors in start-ups in New York, Shih's target market, and (3) Shih was located in New Zealand and had limited ability to travel to New York in 2015, obtain information about CreditBridge without Endicott's cooperation, and hold Endicott accountable for his eventual self-dealing.

203.   Endicott also held himself out as having special skills and knowledge about American and New York law and startup financing, and Shih relied upon those skills and that knowledge in good faith.

204.   Endicott deliberately accepted Shih's trust and confidence by offering his services

and personal contacts as an attorney and investment banker, agreeing to develop a company with Shih as his equal partner, and allowing Shih to continue contributing insight, analysis, market research, and other work product toward the development of CreditBridge's business model without ever disclaiming any of the responsibilities that he had previously offered to Shih.

205.    Endicott also accepted Shih's trust and confidence by agreeing to utilize the "CreditBridge Business Plan Deck", or some variation of it, to pitch Endicott and Shih's CreditBridge business plan to investors, and to report back to Shih as to any significant progress.

206.    By virtue of the foregoing, Endicott owed Shih a fiduciary duty arising from the relationship of informal trust and confidence between them.

### Endicott Breached His Fiduciary Duties to Shih

207.    By virtue of all of the foregoing, Endicott was required to exercise the utmost good faith and undivided loyalty toward Shih in connection with the joint venture they named CreditBridge.

208.    Endicott breached his fiduciary duties to Shih by virtue of the conduct described herein, including but not limited to (1) freezing Shih out of the CreditBridge venture which later became Petal; (2) refusing to communicate with Shih concerning CreditBridge after June 2015 and thus breaching his obligation to make full disclosure to her of all material facts concerning CreditBridge; (3) capitalizing on Shih's geographic isolation and visa status by cutting off communications with Shih concerning CreditBridge; (4) bringing on other partners and investors to develop the CreditBridge idea without Shih's knowledge and consent; (5) engaging in self-dealing by wrongfully misappropriating Shih's business concept, CreditBridge, and Shih and Endicott's shared work product, for himself and other partners; (6) refusing to acknowledge Shih as a co-founder of Petal; (7) failing to issue shares to Shih at the incorporation of CreditBridge;

(8) depriving Shih of her rightful 50%  interest in Petal and the attendant profits and professional opportunities; and (9) failing to disclose to Creditbridge's and Petal's shareholders, partners, and investors that the concept for CreditBridge and Petal was originally Shih's, that Shih and Endicott developed the company's business model together, and that Shih is a rightful shareholder of Petal in equity.

209.    Endicott's conduct can be imputed to Petal because he acted, and continues to act, in his capacity as an officer and agent of Petal, and because Petal derived a significant market advantage from Endicott's wrongdoing.

210.    Shih has been damaged by Endicott's conduct in an amount to be determined at trial, which amount is believed to be not less than $5,000,000.00, and which damages include but are not limited to lost profits, lost business opportunities that were caused by the market advantage gained by Petal which was derived from Endicott's wrongdoing, lost executive salary, and the unconscionable deprivation of Shih's rightful 50% ownership interest in Petal.

211.    By virtue of the foregoing, Shih is entitled to an award of punitive damages against Endicott and Petal.

212.    By virtue of the foregoing, Shih is also entitled to equitable remedies, including a complete accounting from Endicott as to her 50% interest in Petal.

### AS AND FOR A SECOND CLAIM
### FOR RELIEF ADDRESSED TO JASON GROSS AND PETAL:
### <u>AIDING AND ABETTING BREACH OF FIDUCIARY</u>

213.    Plaintiff Shih repeats and re-alleges each of the allegations contained in paragraphs 1 through 212 as though fully set forth herein.

214. Gross knowingly induced and/or substantially assisted Endicott's breaches of fiduciary duties.

215.   That Endicott suggested to Shih in Shih and Endicott's May 16, 2015 Skype call that they bring a Harvard classmate of Endicott's on as a partner in their venture, and that Endicott did thereafter partner with Gross to develop CreditBridge, reasonably indicates that Gross, an attorney, was aware of Endicott's fiduciary duties to Shih as early as May of 2015.

216.   Gross thus participated in Endicott's breaches of fiduciary duties to Shih by developing CreditBridge and Petal with Endicott from May of 2015 to the present without regard for Shih's interest in the venture.

217.   In addition to Shih's email sent directly to Gross in March 2016 that apprised him of Shih's claim to CreditBridge, Gross also received Shih's February 16, 2016 email addressed to Endicott which stated:

> CreditBridge was my business idea which I shared with you on the mutual understanding that we would pursue its development in partnership.  We worked collaboratively on research, business models and concepts and discussed branding, investment opportunities, the division of responsibilities and the possibility of bringing on specialist skills to perform tasks that we could not manage ourselves.
>
> . . .
>
> With the incorporation of CreditBridge in Delaware at the beginning of this month the facts are no longer capable of bearing a charitable interpretation.  Your intent is clearly to cut me out of the business which I conceived of and pursued in good faith with you, and to which I am entitled to 50 per cent ownership.

218.   Thus, Gross participated in Endicott's various breaches of fiduciary duties to Shih by developing, managing, and continuing to promote and issue shares in CreditBridge and Petal after having received actual notice from Shih that CreditBridge was her business idea, that she had worked collaboratively on it with Endicott until he ceased communicating with her, and that she continued to claim a fifty percent ownership interest in the venture.

46

219.    Gross and Endicott then attempted to distance themselves from Shih by changing CreditBridge's name to Petal shortly after receiving Shih's February and March 2016 emails.

220.    Gross benefitted from freezing Shih out of CreditBridge and Petal, as well as Endicott's various other breaches of fiduciary duties to her, as demonstrated by the fact that he (1) now holds himself out as a co-founder of Petal; (2) takes an executive salary from Petal as its CEO; and (3) owns a significant stake in the company.

221.    Prior to becoming "co-founder" of CreditBridge and Petal, Gross worked as a start-up attorney at Arbor Technologies and Gunderson Dettmer.

222.    As a result of his background as a start-up attorney, Gross should have been particularly aware of the fiduciary duties owed by co-venturers, partners, corporate promoters, and attorneys.

223.    Gross's conduct constitutes aiding and abetting Endicott's breaches of fiduciary duties to Shih.

224.    Gross's conduct can be imputed to Petal because he has acted, and continues to act, in his capacity as an officer and agent of Petal, and because Petal derived a significant market advantage from his and Endicott's wrongdoing.

225.    Shih has been damaged by the various breaches of fiduciary duties by Endicott that Gross induced or participated in, in an amount to be determined at trial, which amount is believed to be not less than $5,000,000.00, and which damages include but are not limited to lost profits, lost business opportunities that were caused by the market advantage gained by Petal which was derived from Endicott and Gross's wrongdoing, lost executive salary, and the unconscionable deprivation of her rightful 50% ownership interest in Petal.

226.    By virtue of the foregoing, Shih is entitled to an award of punitive damages against

Gross and Petal.

227.    By virtue of the foregoing, Shih is also entitled to equitable remedies, including a complete accounting from Gross as to her 50% interest in Petal.

## AS AND FOR A THIRD CLAIM FOR RELIEF ADDRESSED
## TO JASON GROSS AND PETAL:  BREACH OF FIDUCIARY DUTY

228.    Plaintiff Shih repeats and re-alleges each of the allegations contained in paragraphs 1 through 227 as though fully set forth herein.

229.    Gross owed Shih a fiduciary duty as a corporate promoter who organized CreditBridge and issued its stock.

230.    Gross owed a fiduciary duty to Shih as a shareholder in and co-founder of CreditBridge.

231.    Gross breached his fiduciary duties to Shih by virtue of the conduct described herein, including but not limited to (1) freezing Shih out of the CreditBridge venture which later became Petal; (2) engaging in self-dealing by wrongfully misappropriating Shih's business concept, CreditBridge, and Shih and Endicott's shared work product, for himself and other partners; (3) refusing to acknowledge Shih as a co-founder of Petal; (4) depriving Shih of her rightful 50% interest in Petal; (5) failing to issue shares to Shih at the incorporation of CreditBridge; and  (6) failing to disclose to CreditBridge's and Petal's shareholders, partners, and investors that the concept for CreditBridge and Petal was originally Shih's, that Shih and Endicott developed the idea together, and that Shih is a rightful shareholder of Petal in equity.

232.    Gross's conduct can be imputed to Petal because he acted, and continues to act, in his capacity as an officer and agent of Petal, and because Petal derived a significant market advantage from Gross and Endicott's wrongdoing, such as by being able to offer Shih's shares to investors.

233.     Shih has been damaged by Gross's conduct in an amount to be determined at trial, which amount is believed to be not less than $5,000,000.00, and which damages include but are not limited to lost profits, lost business opportunities that were caused by the market advantage gained by Petal which was derived from Endicott and Gross's wrongdoing, lost executive salary, and the unconscionable deprivation of her rightful 50% ownership interest in Petal.

234.     By virtue of the foregoing, Shih is entitled to an award of punitive damages against Gross and Petal.

235.     By virtue of the foregoing, Shih is also entitled to equitable remedies, including a complete accounting from Gross, and Petal as to her 50% interest in Petal.

### AS AND FOR A FOURTH CLAIM FOR RELIEF ADDRESSED TO ANDREW ENDICOTT:  BREACH OF ACTUAL OR IMPLIED CONTRACT

236.     Plaintiff Shih repeats and re-alleges each of the allegations contained in paragraphs 1 through 235 as though fully set forth herein.

237.     By virtue of the foregoing, there existed an actual or implied bilateral services contract, and/or a joint venture agreement, between Shih and Endicott pursuant to which they had agreed to contribute their personal services toward the development, organization, and promotion of a company which would independently assess consumers' creditworthiness and extend credit to creditworthy individuals who were otherwise unable to access consumer credit through traditional means.

238.     In particular, Endicott proposed that he and Shih contribute their services towards forming a company subject to the condition that Shih provide a business idea that he considered viable.  Shih accepted Endicott's offer by proposing her credit gap business idea, Endicott independently researched and confirmed its viability, and Shih and Endicott demonstrated their mutual assent by then collaborating to develop that company, which they called CreditBridge.

239.    Implicit in Shih and Endicott's agreement were the terms that each would act as executives of the company, that they would share equally in the equity of the company, and that Endicott would be responsible for issuing the company's shares to himself and to Shih in equal parts.  These terms became express in their May 16 Skype meeting.

240.    Endicott breached the agreement with Shih by failing to issue to Shih 50% of CreditBridge, Inc.'s equity upon its incorporation, and failing to support her appointment as an executive officer in the company.

241.    In the alternative, if the CreditBridge that Shih and Endicott agreed to develop in April through June 2015 were distinct from CreditBridge, Inc., then Endicott breached his contract with Shih by failing to solicit investment in Shih's CreditBridge by investors, as he had agreed to do on Shih's behalf in April through June 2015.

242.    By virtue of Endicott's breach, Shih has been deprived of the use of her novel credit gap business idea, her rightful 50% interest in CreditBridge/Petal, an executive salary, and a say in the direction of the company that she had initially conceived of and co-founded.

243.    Shih has been damaged by Endicott's conduct in an amount to be determined at trial which amount is believed to be not less than $5,000,000.00, and which damages include but are not limited to lost profits, lost business opportunities that were caused by the market advantage gained by Petal which was derived from Endicott's wrongdoing, lost executive salary, the value of the novel credit gap business idea, the deprivation of the use of the novel credit gap business ideas and work product, and the unconscionable deprivation of her rightful 50% ownership interest in Petal.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
## ADDRESSED TO ANDREW ENDICOTT:
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

244.    Plaintiff Shih repeats and re-alleges each of the allegations contained in paragraphs 1 through 243 as though fully set forth herein.

245.    The conduct described herein by Endicott toward Shih constitutes a breach of the covenant of good faith and fair dealing implicit in his agreement with Shih.

246.    In particular, if the CreditBridge company that was the product of Endicott and Shih's collaborative work is somehow different from the CreditBridge company that Endicott incorporated with Gross, as Endicott claimed in his March 2016 email to Shih, then Endicott breached the covenant of good faith and fair dealing implicit in his agreement with Shih by using the market research and business model that Endicott and Shih developed to establish a directly competing company (providing consumer credit for those who cannot access traditional sources of credit after an independent assessment of creditworthiness) to the same demographics (immigrants and young professionals) in the same market (New York) under the exact same name (CreditBridge).

247.    By virtue of Endicott's breach, Shih has been deprived of the use of her credit gap business idea, her rightful 50% interest in CreditBridge/Petal, an executive salary, and a say in the direction of the company that she had initially conceived of.

248.    Shih has been damaged by Endicott's breach in an amount to be determined at trial, which amount is believed to be not less than $5,000,000.00, and which damages include but are not limited to lost profits, lost business opportunities that were caused by the market advantage gained by Petal which was derived from Endicott and Gross's wrongdoing, lost executive salary, the value of the novel credit gap business idea, the deprivation of the use of the credit gap business

ideas and work product, and the unconscionable deprivation of her rightful 50% ownership interest in Petal.

249.     By virtue of the foregoing, Shih is entitled to an award of punitive damages against Endicott.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
## ADDRESSED TO ANDREW ENDICOTT AND PETAL:  PROMISSORY ESTOPPEL

250.     Plaintiff Shih repeats and re-alleges each of the allegations contained in paragraphs 1 through 249 as though fully set forth herein.

251.     Shih divulged her credit gap business concept, and variations of it, to Endicott in strict confidence and in reliance upon Endicott's offer that the two start a company together.

252.     Shih and Endicott then developed the credit gap business concept collaboratively in April, May, and June of 2015.

253.     Shih relied to her detriment upon Endicott's original offer to start a business with her and perform legal and fundraising work on her behalf, his conduct in developing CreditBridge, and his express commitment to proceed with the CreditBridge joint venture on a 50-50% basis that was made during their May 16, 2015 Skype meeting and later reaffirmed by Endicott during their June 6-7, 2015 Skype meeting, as well as upon Endicott's agreement that he would pitch CreditBridge to potential investors and report back to Shih on any significant developments.

254.     Endicott acted in bad faith by (1) freezing Shih out of the Creditbridge joint venture which later became Petal; (2) refusing to communicate with Shih concerning the joint venture after June 2015 and thus breaching his obligation to make full disclosure to her of all material facts concerning the venture; (3) attempting to capitalize on Shih's geographic isolation and visa status by cutting off communications with Shih concerning their venture; (4) bringing on other partners and investors to develop the CreditBridge idea without Shih's knowledge and consent; (5)

engaging in self-dealing by wrongfully misappropriating Shih's concept for himself and other partners; (6) refusing to acknowledge Shih as a co-founder of Petal; (7) depriving Shih of her rightful 50% interest in Petal; and (8) failing to disclose to Creditbridge's and Petal's shareholders, partners, and investors that the concept for CreditBridge and Petal was originally Shih's, that Shih and Endicott developed it as part of a joint venture, and that Shih is a rightful shareholder of Petal in equity.

255.    As a result, Shih has been unconscionably deprived of 50% interest in CreditBridge, and the attendant business opportunities and profits.

256.    Endicott's conduct can be imputed to Petal since he acted in his capacity as an officer or shareholder of Petal, and because Petal has derived a significant market advantage by virtue of his wrongdoing.

257.    Shih has been damaged in an amount to be determined at trial, which amount is believed to be not less than $5,000,000.00.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF
## ADDRESSED TO ALL DEFENDANTS: MISAPPROPRIATION OF BUSINESS IDEA

258.    Plaintiff Shih repeats and re-alleges each of the allegations contained in paragraphs 1 through 257 as though fully set forth herein.

259.    Shih disclosed to Endicott the credit gap business concept that gave rise to CreditBridge and later Petal, and variations thereof, in confidence, and in reliance upon Endicott's express offer that the two start a company together.

260.    Although Endicott claimed that he could attract financing and possessed the legal knowledge and expertise to organize a company and handle payroll, Endicott admittedly had no ideas for a product to sell until Shih disclosed her credit gap business idea to him with the

understanding that the two were starting a company together.

261.    Shih's idea was novel and unique, as demonstrated by the fact that Petal markets itself to consumers who are typically turned away from banks and lenders because of limited credit histories.

262.    Endicott himself found Shih's idea novel and unique, praised it as a good idea, stated, "there's a problem, and this would solve that problem", and confirmed to Shih that there were no other businesses doing what Shih proposed to do in the United States.

263.    Endicott assured Shih that he would not take on other partners or investors without her knowledge and consent.

264.    Endicott, Gross, and Petal have acted in bad faith by freezing Shih out of the CreditBridge joint venture which later became Petal; engaging in self-dealing by knowingly misappropriating Shih's credit bridging business concept; refusing to acknowledge Shih as a co-founder of Petal;  depriving Shih of her rightful 50% interest in Petal; and failing to disclose to CreditBridge's and Petal's shareholders, partners, and investors that the concept for CreditBridge and Petal was originally Shih's, that Shih and Endicott had developed it as part of a joint venture, that Endicott had promised Shih an interest in the company equal to his own, and that Shih is a rightful shareholder of Petal in equity.

265.    By virtue of the foregoing, Endicott, Gross, and Petal have wrongfully misappropriated Shih's credit gap business concept and variations thereof.

266.    As a result, Shih has been deprived of the use of her novel credit gap business concept and variations thereof for business opportunities and any future profits therefrom.

267.    Shih has been damaged in an amount to be determined at trial, which amount is believed to be not less than $5,000,000.00.

## AS AND FOR AN EIGHTH CLAIM FOR RELIEF
## ADDRESSED TO ALL DEFENDANTS: UNJUST ENRICHMENT

268.     Plaintiff Shih repeats and re-alleges each of the allegations contained in paragraphs 1 through 267 as though fully set forth herein.

269.     By virtue of the foregoing, all defendants have unconscionably benefitted at the expense of Shih by keeping and using for themselves the 50% of CreditBridge, Inc. to which Shih is entitled.

270.      Shih has been unconscionably deprived of her interest in CreditBridge, Inc., and the executive compensation and business opportunities which she would have enjoyed.

271.     Defendants have been unjustly enriched at Shih's expense because Defendants have appropriated Shih's 50% interest for themselves, and are now marketing and developing what had been Shih's novel, original and unique ideas for profit, while Shih has been deprived of the ability to market what once was, but no longer is, a novel, original, and unique business idea.

272.     Defendants have also been unjustly enriched by wrongfully depriving Shih of her apportionment of the shares, profits, and other compensation that she would otherwise have received, and instead themselves sharing in those shares, profits and compensation.

273.     Equity and good conscience requires the defendants to pay restitution to Shih in an amount to be determined at trial, which amount is believed to be not less than $5,000,000.00.

## AS AND FOR AN NINTH CLAIM FOR RELIEF
## AGAINST PETAL: DECLARATORY JUDGMENT
## THAT CASSANDRA SHIH IS AN EQUITABLE
## SHAREHOLDER IN PETAL AND DETERMINATION OF HER INTEREST

274.     Plaintiff Shih repeats and re-alleges each of the allegations contained in paragraphs 1 through 273 as though fully set forth herein

275.    By virtue of the foregoing, there exists a justiciable controversy between the Plaintiff and the Defendants with respect to Shih's rights in Petal.

276.    In particular, Shih contends that she is entitled to a fifty-percent equitable interest in Petal by virtue of her partnership and joint venture agreement with Endicott, as well as principles of equity.

277.    Accordingly, Shih is entitled to a declaratory judgment determining her to be an equitable shareholder of Petal entitled to a fifty percent (50%) equity interest in the company and directing Petal to issue shares in the company to Shih accordingly, or, alternatively, an order determining the extent of Shih's equitable interest in Petal and directing Petal to issue shares in the company to Shih accordingly.

**WHEREFORE**, the Plaintiff demands a trial by jury and that judgment be entered in her favor, as follows:

(a)  On the First Claim for Relief, against defendants Endicott and Petal awarding compensatory damages in an amount to be determined at trial, which amount is believed to be not less than $5,000,000.00, together with punitive damages, and directing that Endicott and Petal provide a complete accounting to Shih of her 50% interest in Petal;

(b)  On the Second Claim for Relief, against defendants Gross and Petal awarding compensatory damages in an amount to be determined at trial, which amount is believed to be not less than $5,000,000.00, together with punitive damages, and directing that Gross and Petal provide a complete accounting to Shih of her 50% interest in Petal;

(c)  On the Third Claim for Relief against defendants Gross and Petal awarding compensatory damages in an amount to be determined at trial, which amount is believed to be not

less than $5,000,000.00, together with punitive damages, and directing that Gross and Petal provide a complete accounting to Shih of her 50% interest in Petal;

(d)     On the Fourth Claim for Relief, against defendant Endicott awarding compensatory damages in an amount to be determined at trial, which amount is believed to be not less than $5,000,000.00;

(e)   Alternatively, on the Fifth Claim for Relief, against defendant Endicott awarding compensatory damages in an amount to be determined at trial, which amount is believed to be not less than $5,000,000.00, together with punitive damages in an amount to be determined at trial;

(f)   On the Sixth Claim for Relief, against defendants Endicott and Petal awarding compensatory damages in an amount to be determined at trial, which amount is believed to be not less than $5,000,000.00;

(g)   On the Seventh Claim for Relief, against defendant Endicott, Gross, and Petal awarding compensatory damages in an amount to be determined at trial, which amount is believed to be not less than $5,000,000.00;

(h)   On the Eighth Claim for Relief, against all defendants, awarding compensatory damages in an amount to be determined at trial, which amount is believed to be not less than $5,000,000.00;

(i)   On the Ninth Claim for Relief, determining Cassandra Shih to be an equitable shareholder of Petal entitled to a fifty percent (50%) equity interest in the company and directing Petal to issue shares in the company to Shih accordingly, or, alternatively, an order determining the extent of Shih's equitable interest in Petal and directing Petal to issue shares in the company to Shih accordingly, together with

(j)  such other and further relief as the Court may deem just and proper.

Dated: White Plains, New York
      October 31, 2018

**DELBELLO DONNELLAN
WEINGARTEN WISE & WIEDERKEHR, LLP**

By: \_\_\_\_\_/psd/_____
       Peter S. Dawson (PD1618)
*Attorneys for Plaintiff*
1 North Lexington Avenue
White Plains, New York 10601
Phone: (914) 681-0200