**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CASSANDRA SHIH,

                              Plaintiff,

                v.

PETAL CARD, INC. f/k/a/
CREDITBRIDGE, INC., ANDREW
ENDICOTT, and JASON GROSS,

                              Defendants.

**ORAL ARGUMENT REQUESTED**

**CIVIL ACTION NO. 1:18-cv-5495**

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

Roberta A. Kaplan
John C. Quinn
Joshua Matz
Martha Fitzgerald (*pro hac vice*)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883

*Counsel to Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND .............................................................................................................. 3

STANDARD OF REVIEW ............................................................................................... 8

ARGUMENT ................................................................................................................... 8

    I.      SHIH FAILS TO STATE A CLAIM AGAINST GROSS.......................................... 8

         A. Alleged Aiding and Abetting a Breach of Fiduciary Duty ..................................... 8

         B. Alleged Breach of Fiduciary Duty........................................................................ 10

         C. Alleged Misappropriation of a Business Idea ....................................................... 11

         D. Unjust Enrichment ................................................................................................ 15

    II.     SHIH FAILS TO STATE A CLAIM AGAINST PETAL CARD, INC. ................... 15

    III.    SHIH FAILS TO STATE A CLAIM AGAINST ENDICOTT. ............................... 16

         A. Endicott Did Not Agree to Be Shih's Business Partner ....................................... 16

            1.   Existence of an Actual Contract.................................................................... 18

            2.   Existence of an Implied in Fact Contract...................................................... 20

            3.   Covenant of Good Faith and Fair Dealing.................................................... 21

            4.   Quasi-Contract Claims................................................................................... 21

         B. Endicott Did Not Breach Any Agreements with Shih by Founding Petal............ 22

         C. Endicott Did Not Owe Shih Any Other Fiduciary Duties .................................... 22

1.  Co-Venturer ................................................................................................... 23

2.  Attorney ......................................................................................................... 23

3.  Fundraising Agent ......................................................................................... 24

4.  Shareholder in Equity .................................................................................... 24

5.  Corporate Promoter/Relationship of Trust and Confidence .......................... 24

CONCLUSION .................................................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

### CASES

Page(s)

*Allaire Corp. v. Okumus*,
433 F.3d 248 (2d Cir. 2006) .................................................................................. 8

*Armstrong v. Sun Printing & Publ'g Ass'n*,
122 N.Y.S. 531 (App. Div. 2d Dep't 1910) ................................................... 24-25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................... 8

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................... 8

*Broughel v. Battery Conservancy*,
No. 07-Civ-7755, 2010 WL 1028171 (S.D.N.Y. Mar. 16, 2010) ......................... 12

*Brown v. Rawlings Fin. Servs., LLC*,
868 F.3d 126 (2d Cir. 2017) ................................................................................ 22

*Case v. Clivilles*,
216 F. Supp. 3d 367 (S.D.N.Y. 2016) .................................................................. 23

*De Sole v. Knoedler Gallery, LLC*,
139 F. Supp. 3d 618 (S.D.N.Y. 2015) .................................................................... 9

*Desny v. Wilder*,
299 P.2d 257 (Cal. 1956) ..................................................................................... 12

*Effie Film, LLC v. Pomerance*,
909 F. Supp. 2d 273 (S.D.N.Y. 2012) .................................................................. 13

*Flickinger v. Harold C. Brown & Co.*,
947 F.2d 595 (2d Cir. 1991) ................................................................................ 10

*Gianino v. Panacya, Inc.*,
No. 00-Civ-1584, 2000 WL 1224810 (S.D.N.Y. Aug. 29, 2000) ......................... 15

*Gottsch v. Eaton & Van Winkle LLP*,
No. 17-Civ-6974, 2018 WL 4609111 (S.D.N.Y. Sept. 24, 2018) ......................... 10

*Hall v. EarthLink Network, Inc.*,
396 F.3d 500 (2d Cir. 2005) ................................................................................ 21

iv

*In re Hausman*,
  921 N.E.2d 191 (N.Y. 2009) ............................................................... 15

*In re Robbins Int'l, Inc.*,
  275 B.R. 456 (S.D.N.Y. 2002) ............................................................ 16

*Johnson v. Nextel Commc'ns, Inc.*,
  660 F.3d 131 (2d Cir. 2011) ............................................................... 11

*JP Morgan Chase Bank v. Winnick*,
  406 F. Supp. 2d 247 (S.D.N.Y. 2005) ............................................. 9, 10

*Kaye v. Grossman*,
  202 F.3d 611 (2d Cir. 2000) ............................................................... 21

*Kowalchuk v. Stroup*,
  873 N.Y.S.2d 43 (App. Div. 1st Dep't 2009) ...................................... 18

*Maas v. Cornell Univ.*,
  721 N.E.2d 966 (N.Y. 1999) ............................................................... 20

*Mandarin Trading Ltd. v. Wildenstein*,
  944 N.E.2d 1104 (N.Y. 2011) ............................................................. 15

*Marcella & Co. v. Avon Prods., Inc.*,
  724 N.Y.S.2d 192 (App. Div. 2d Dep't 2001) ..................................... 21

*Marraccini v. Bertelsmann Music Grp. Inc.*,
  644 N.Y.S.2d 875 (App. Div. 3d Dep't 1996) ..................................... 18

*Matter of Boice*,
  640 N.Y.S.2d 681 (App. Div. 3d Dep't 1996) ..................................... 20

*Matter of Cooperman*,
  633 N.E.2d 1069 (N.Y. 1994) ............................................................. 23

*Mazzaro de Abreu v. Bank of Am. Corp.*,
  525 F. Supp. 2d 381 (S.D.N.Y. 2007) ................................................ 8, 9

*McGhan v. Ebersol*,
  608 F. Supp. 277 (S.D.N.Y. 1985) ................................................. 14, 20

*Miramax Film Corp. v. Abraham*,
  No. 01-Civ-5202, 2003 WL 22832384 (S.D.N.Y. Nov. 25, 2003) ......... 16

*Moran v. Hurst*,
  822 N.Y.S.2d 564 (App. Div. 2d Dep't 2006) ...................................................... 23

*N. Shipping Funds I, LLC v. Icon Capital Corp.*,
  921 F. Supp. 2d 94 (S.D.N.Y. 2013) .................................................................... 25

*Next Commc'ns, Inc. v. Viber Media, Inc.*,
  No. 14-Civ-8190, 2016 WL 1275659 (S.D.N.Y. Mar. 30, 2016) ........................... 12

*Pioli v. Town of Kirkwood*,
  499 N.Y.S.2d 266 (3d Dep't 1986) ...................................................................... 15

*Port Chester Elec. Const. Co. v. Atlas*,
  357 N.E.2d 983 (N.Y. 1976) ................................................................................ 16

*Reif v. Williams Sportswear, Inc.*,
  174 N.E.2d 492 (N.Y. 1961) ................................................................................ 16

*Ring v. Estee Lauder, Inc.*,
  874 F.2d 109 (2d Cir. 1989) ................................................................................ 13

*Roni LLC v. Arfa*,
  903 N.Y.S. 2d 352 (App. Div. 1st Dep't. 2011) ................................................ 11, 23

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
  726 F. Supp. 2d 291 (S.D.N.Y. 2010) .............................................................. 10, 11

*Steinbeck v. Gerosa*,
  151 N.E.2d 170 (N.Y. 1958) ................................................................................ 23

*Steinbeck v. Steinbeck Heritage Found.*,
  400 F. App'x 572 (2d Cir. 2010) .......................................................................... 24

*Teplitsky v. Karian*,
  No. 014840/2010, 2011 WL 579047 (Sup. Ct. Jan. 31, 2011) .............................. 24

*Thermal Imaging, Inc. v. Sandgrain Sec., Inc.*,
  158 F. Supp. 2d 335 (S.D.N.Y. 2001) .................................................................. 22

*Toledo Fund, LLC v. HSBC Bank USA, Nat. Ass'n*,
  No. 11-Civ-7686, 2012 WL 364045 (S.D.N.Y. Feb. 3, 2012) ............................... 21

*Turner v. Temptu Inc.*,
  No. 11-Civ-4144, 2013 WL 4083234 (S.D.N.Y. Aug. 13, 2013) ............... 11, 12, 21

*Weisman v. Awnair Corp. of Am.*,
144 N.E.2d 415 (N.Y. 1957) ........................................................................... 23

## RULES

Federal Rule of Civil Procedure 12(b)(6) ................................................................... 8

## OTHER AUTHORITIES

Alyssa Stewart Lee et al., *Give Credit Where Credit is Due: Increasing Access to Affordable Mainstream Credit Using Alternative Data*, BROOKINGS (December 2006), https://www.brookings.edu/research/give-credit-where-credit-is-due-increasing-access-to-affordable-mainstream-credit-using-alternative-data/ ........................................................... 13

*Data Point: Credit Invisibles*, CONSUMER FINANCE PROTECTION BUREAU (May 2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf ............... 13

David Bornstein, *Invisible Credit?*, UNREASONABLE (October 14, 2014), https://opinionator.blogs.nytimes.com/2014/10/02/invisible-credit-read-this-now/ ............... 13

Ericca Maas, *Credit Scoring and the Underserved Population*, FEDERAL RESERVE BANK OF MINNEAPOLIS (May 2008), https://www.minneapolisfed.org/publications/community-dividend/credit-scoring-and-the-creditunderserved-population ............................................. 13

*Giving Underserved Consumers Better Access to the Credit System: The Promise of Non-Traditional Data*, INFORMATION POLICY INSTITUTE (July 2005), http://www.perc.net/wp-content/uploads/2013/09/nontrad.pdf ..................................................................... 13

Jason Margolis, *Lending Circles: Helping Immigrants in America Build Credit*, PRI (May 15, 2013) ................................................................................................................. 13

Michael A. Turner et al., *New to Credit from Alternative Data*, PERC (March 2009), http://www.perc.net/wpcontent/uploads/2013/09/New_to_Credit_from_Alternative_Data_0.pdf .............................................................................................................................. 13

Paul DeSaulniers, *Utilizing Alternative Data in the Credit Decisioning Process*, LEXIS NEXIS (June 2008), http://www.sourcemediaconferences.com/CFSI08/pdf/paul.pdf ........................ 13

Rachel Schneider & Arjan Schutte, *The Predictive Value of Alternative Credit Scores*, CENTER FOR FINANCIAL SERVICES INNOVATION (November 2007), https://s3.amazonaws.com/cfsi-innovation-files/wp-content/uploads/2017/02/05053225/The-Predictive-Value-of-Alternative-Credit-Scores.pdf ................................................................................................... 13

*Report to the Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit*, BOARD OF GOVERNORS OF THE FEDERAL RESERVE (August 2007), https://www.federalreserve.gov/boarddocs/rptcongress/creditscore/creditscore.pdf ............... 13

Sara Ashley O'Brien, *Alternative Lenders are Hot—Especially Among Millennials*, CNN BUSINESS (December 18, 2014), https://money.cnn.com/2014/12/18/smallbusiness /alternative-lending-millennials/index.html ........................................................................ 13

**TREATISES**

1 TREATISE ON THE LAW OF CORPS. § 5:14 (3d ed. 2017) ..................................................... 10-11

## PRELIMINARY STATEMENT

The Complaint alleges that over five weeks in mid-2015, while living in New Zealand, Plaintiff Cassandra Shih had two calls with Defendant Andrew Endicott. They also exchanged a few Facebook messages. In these communications, they discussed potentially going into business together, but never agreed to do so. Three years later, Shih filed this suit demanding millions of dollars and half of all shares in Defendant Petal Card, Inc., a Delaware corporation that Endicott co-founded in 2016 with his friend, Defendant Jason Gross. Shih's complaint asserts—both falsely and implausibly—that she came up with the idea for Petal and gave it to Endicott, who stole it and froze her out. On this basis, she seeks to impose liability on anyone connected to the company.

Shih's claims fail as a matter of law. *First*, it is not alleged that Gross ever heard of Shih until eight full months after her discussions with Endicott—and until this litigation, he had never met, spoken, or corresponded with her. He did not owe her any duties or have actual knowledge of duties owed by Endicott. *Second*, the Complaint does not evince idea misappropriation: Shih voluntarily shared her idea at a time when no defendant owed her any duty; her "idea" is neither novel nor concrete; and Endicott and Gross's company is fundamentally different than the one she sketched in preliminary talks with Endicott. *Third*, because Petal did not exist until long after Shih's interactions with Endicott—and did not incorporate any of his alleged duties or agreements as its own—Shih cannot (and does not) allege any improper conduct by Petal itself. *Finally,* it is implausible to conclude from the facts alleged here that Endicott agreed to go into business with Shih or that he formed any other relationship with her giving rise to fiduciary duties.

This last point bears emphasis. Endicott is a former lawyer and investment banker who understands what it takes to form a joint venture. He never took those steps with Shih. Her claims that he entered into an elaborate oral contract—never memorialized and never mentioned again in

writing by either party—are wholly implausible. Instead, their talks remained exploratory. This is most clearly indicated by Shih's failure adequately to allege several fundamental points:

- Although it uses the term "business model" more than twenty times, the Complaint never actually describes how Shih and Endicott's supposed business would work. There is a big difference between *identifying* a problem (*e.g.*, that certain consumers lack access to credit) and actually *solving* that problem with a new technology, process, approach, or business model. Nowhere does the Complaint describe what goods or services this venture would offer, or how they would be procured or distributed. Nowhere does the compliant describe what technology this venture would use, how its leadership team would be comprised, or how it would make money. No reasonable person would impliedly contract to somehow, somewhere, through some undetermined strategy help someone find access to credit.

- Shih is also vague about her supposedly novel idea. The original Complaint focused almost entirely on her suggestion that she and Endicott find some method of helping recent migrants access credit in the United States. *See* Dkt. 1 at ¶¶ 43, 67-70. There, Shih claimed to have proposed a "bridge" service, which would translate foreign credit data into figures intelligible to the FICO system. *See id.* In that pleading, Shih made no mention *whatsoever* of offering credit cards underwritten using domestic data sources; in fact, she opposed doing so and instead favored serving as "a guarantor" to other financial institutions assisting migrant clients. *See id.* at ¶ 68. Now, however, she sings a different song. The First Amended Complaint claims her idea was to "independently assess individuals' creditworthiness and extend credit to creditworthy individuals who were unable to obtain credit from traditional sources." ¶ 4. This version of her story conveniently makes Shih's idea sound more similar to the services that Petal Card, Inc. offers (as described in our original motion to dismiss). But it does so at the expense of detail: the revised account of her "idea" references a concept so general and widely-known in 2015 that it lacks any novelty or originality whatsoever. Shih totally fails to explain *how* the alleged venture would "independently asses individual' creditworthiness" or "extend credit" because those critical components of the alleged business were never actually worked out or agreed upon.

- The Complaint remains vague about many other issues on which Shih and Endicott supposedly reached agreement. For example, while offering conclusory allegations of a binding agreement, it never describes (a) what goods or services they might offer; (b) the financial model of the business; (c) the go-to-market strategy; (d) who they would invite to join the team; (e) what technology they would require; (f) how they would obtain funding for the business and from whom; and (f) how they would create, source, and distribute the (undetermined) goods and services they might offer. Many of the most basic ingredients of a business plan are either wholly absent or alleged without particularity.

- Finally, and most damning, Shih remains unable to define her supposed relationship with Endicott. Contradicting her own assertion that the two entered a crystal-clear contract with a firm allocation of roles, the Complaint alternately describes Endicott as Shih's co-venturer, lawyer, promoter, fundraising agent, partner, shareholder, and confidante.

This scattershot pleading confirms the underlying truth: Shih and Endicott never reached a mutual agreement to go into business (or to do anything else). Rather, like so many entrepreneurs, they bounced ideas around, considered developing a potential business, had divergent views, and parted ways. Shih's assertion that this short-lived correspondence entitles her to millions of dollars and half a company is without foundation. The Complaint must therefore be dismissed.

## BACKGROUND[1]

Endicott and Shih met in early 2014, when she was in New York City for an internship with New Zealand's Permanent Mission to the United Nations. ¶¶13-14. They socialized a few times, always in non-professional settings, and occasionally chatted on Facebook Messenger. ¶ 17. Their online banter continued when Shih returned home to New Zealand shortly after first meeting Endicott. ¶ 19. But it slowed to a trickle: they only checked in once or twice per month. ¶ *Id.* Many of these brief exchanges focused on frustration with their respective jobs. ¶¶ 22-23.

Consistent with Endicott's dream of leaving his position at Lazard, he sent Shih a message on April 24, 2015 opining that they should ditch their careers to "start a company together" that "does some cool trans-pacific stuff." ¶ 27. Shih—who had only met Endicott a year earlier and had never dealt with him professionally—jokingly responded, "You got skills?" ¶ *Id.* Endicott retorted, "I would say so," pointing out the work in law and banking that Shih knew he sought to escape. ¶ *Id.* Endicott added that he was "looking for something cool to sell and haven't really been able to find it." ¶ *Id.* Shih wrote back, "Well, if you're serious, let's talk more." ¶ 32.

Three days later, without hearing from Endicott, Shih messaged him an "idea for a credit bridging service that would enable immigrants without a United States credit history to access consumer credit in the United States and build a United States credit history." ¶ 40. She had

---

[1] As required at this stage of the litigation, these facts are drawn from the Complaint and treated as true.

"identified [this] market" during her internship in New York, when she met expats struggling to access credit. ¶¶ 35. Endicott responded positively, saying "let's create this things (sic)" and "it will give you an excuse to run around the world some more." ¶ 53. Shih then replied, "okay anyway do some digging, let me know … if all signs are still towards viability then we can start building a small team." ¶ *Id*. The Complaint asserts that, as of this very moment, the deal was complete: "Shih and Endicott [had] agreed to create a business based on Shih's idea." ¶¶ 54-55.

Over the following weeks, Endicott and Shih traded a handful e-mails with each other and third parties, seeking basic information about credit bureaus and alternative credit rating systems. ¶¶ 44-49, 60, 62, 64. When Shih checked in on May 3, Endicott stated that he was still researching the idea. ¶ 57. On May 5, Endicott recognized the total absence of any business model, noting that he still hoped to "gin[] up a solution" to the credit gap problem. ¶ 60. On May 7, Endicott was "envisaging a company"—meaning that the company did not yet exist—"with access to capital that can independently vet clients." ¶ 66 Shih's concept, though, was very different: "more akin to being a guarantor." ¶ 67. They never shook their uncertainty about how many migrants face a problem with credit access, how to solve that problem, what kinds of services they could try to develop, and what regulatory issues might arise. Nor is there any *particularized* allegation that they discussed any group other than migrants at any point throughout this period (despite Shih's claim in her revised complaint to have looked beyond that group).

This lack of clarity shines through in their e-mails from mid-May 2015. ¶¶ 68-76. Consider, for example, a May 10, 2015 e-mail from Endicott to Shih entitled "Big Questions"[2]:

> A - Borrowers:
> 1. Exactly how may financially stable / wealthy (in home country) immigrants are there?  How many arrive annually?   Need to set up a definition of what we consider to be financial strength (ideally based off some pre-existing industry definition) and view the immigration / population data from there, if possible.

---

[2] This e-mail is attached as Exhibit A and is incorporated into the Complaint by reference. *See* ¶ 72.

B - Risk Assessment:
1. We should attempt to really dig down and figure out what consumer credit information would be available from outside a select country? For simplicity purposes, let's go with New Zealand b/c it's (i) English speaking, (ii) relatively affluent, and (iii) you're familiar with it. Can you figure out what New Zealand laws say about foreign entities pulling credit / consumer finance information? Critically, can consumers opt-into sharing information with outsiders?
2. Relatedly, does New Zealand have quantitative credit scores like FICO in the US? If they do, it will go a long way in convincing investors / banks that we can measure our risk and keep it in check. Also, can they be shared outside NZ (related to question B(1) above)?

C - Regulatory:
1. How much reserve capital are guarantors legally required to hold against their liabilities?
2. What are the start-up burdens (e.g., regulatory filings, capital requirements) associated with setting up an entity like the one we're suggesting? My suspicion is that this idea falls into the "insurance company" category, which is going to carry with it some strict regulatory requirements.

Ex. A. This e-mail, which was sent *weeks* after Shih and Endicott allegedly agreed to be joint venturers, revealed their uncertainty (and lack of agreement) regarding the most fundamental aspects of a potential business. Notably, Endicott referred to "an entity *like the one we're suggesting*," not to an already-existing venture involving him and Shih. *Id.* (emphasis added).

The Complaint next alleges that on May 16, 2015—without any response to the "Big Questions" e-mail—Shih and Endicott held a call on which they finalized "the CreditBridge business plan, including product development, potential team members, employees, and business partners, expenses, how the company would make money including anticipated profits, losses, and expenses and how such profits, losses, and expenses would be shared, consumer behavior, venture capital, [and] Shih's availability to return to New York." ¶ 78(a)-(h). The Complaint does not allege that this agreement was ever memorialized or that Endicott and Shih—both with legal training, one of them a former corporate lawyer—even discussed memorializing it. Instead, in a

textbook example of improper pleading, it asserts a legal conclusion: that Shih and Endicott had "established an implied agreement to create a joint venture." ¶ 81. The Complaint then asserts that on this call, Shih and Endicott decided to look beyond migrants and to consider other barriers to credit. ¶ 78(g). Nowhere does it allege what service they decided to offer, or which barriers they would seek to overcome, or how they would create and market this unspecified product.

On May 20, Shih and Endicott allegedly traded notes about how they might prepare to pitch their idea to investors. ¶ 84. They then held a second, final call on June 6 or 7, to "reaffirmed their commitment to proceed with their CreditBridge joint venture as equal partners." ¶ 91. On this call, they also agreed to "finalize a business proposal slide deck and tack CreditBridge into a 'pitch phase'"—despite the apparent absence of any agreed-upon good or service to offer, and despite the absence of any necessary technology, team members, and identifiable target market. ¶ 93.

At this point, during a crucial phase in the life of her alleged joint venture, Shih decided to take a three-week vacation. ¶ 92. The Complaint alleges that in the interim, Endicott would sell their business plan to investors alone (supposedly at Shih's behest), using an "incomplete" slide deck that would be finalized "utilizing the market research and business models" they had discussed. ¶¶ 96-97. This slide deck is incorporated by reference and is attached as Exhibit B. It contains 10 slides: one with general data about migrant credit access, one with a three-bullet summary of how "CreditBridge is the solution," and eight that are *totally blank* except for titles. This empty slide deck perfectly captures the state of Shih and Endicott's "business model": a vague notion about migrant credit access with no solution, no product, no technology, and no team.

While Shih was unavailable, Endicott lost interest in working with her. Instead, he decided to pursue a business with his law school friend, Gross. ¶¶ 120-22. Using the name CreditBridge as a placeholder, he and Gross started a credit card company targeted toward American millennials,

students, and others who have not yet established a FICO credit score, using their existing U.S. banking records and payment histories to assess their creditworthiness. ¶¶ 111, 148; Ex. C.

On June 28, while still on vacation, Shih sent Endicott a Facebook message apologizing for her absence and asking him "[H]ow's it going?" ¶ 101. Endicott did not respond and Shih did not press the issue. On August 8, she wished him "happy birthday" on Facebook without any mention of their supposed joint venture or his alleged legal obligations to her. ¶ 110. On August 12, after seeing on Facebook that Endicott might be pursuing a startup called CreditBridge, she emailed him to "talk more about it." ¶ 112. When Shih did not hear from Endicott, she wondered to a mutual friend whether "he was still interested" in her idea. ¶ 114. The friend—who did not say that she had actually spoken to Endicott about this question—responded that she thought Endicott was "trying to see if there is general investor interest." ¶ 115. Shih did not hear from Endicott directly. It appears that Shih then lost interest, as the Complaint does not allege any other efforts to contact Endicott, Gross, or anyone else about this subject for six full months.

Only when public records revealed that Endicott and Gross's newly-incorporated business might succeed did Shih reappear. CreditBridge was incorporated in February 2016. ¶ 120. In February and March 2016, Shih sent notes to Endicott and Gross claiming that "CreditBridge was my business idea which I worked on with Andrew last year on the mutual understanding we would pursue its development in partnership." ¶¶ 132-37. This was the first time she had communicated with Gross; there is no allegation that he even knew who she was (in fact, he did not). Shih's note to Endicott claimed entitlement to "50 per cent ownership." ¶ 132. Her out-of-the-blue note to Gross included a veiled threat of bar sanctions and other future action. ¶ 132. Neither note included any evidence, documents, or details. ¶¶ 132, 134. Nor did either note refer to the existence of any agreement, joint venture, or fiduciary duty—let alone identify the terms of such obligations and

assert that they had been breached. *Id.* On March 24, 2016, Endicott responded to Shih, copying Gross. He apologized for the way they had fallen out of touch and assured her that Petal Card, Inc. was not related to their discussion in 2015. ¶ 138. Shih followed up with some interrogatories, which Endicott did not answer. ¶¶ 141-42. Over two years later, Shih filed this case.

## STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I.   SHIH FAILS TO STATE A CLAIM AGAINST GROSS.

#### A.  Alleged Aiding and Abetting a Breach of Fiduciary Duty

"To state a claim for aiding and abetting breach of fiduciary duty under New York law, a plaintiff must allege: (1) breach by a fiduciary of obligations to another; (2) actual knowing participation by the defendant in the fiduciary's breach of obligations; and (3) damages to the plaintiff." *Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 392 (S.D.N.Y. 2007). The *mens rea* requirement is substantial. "A plaintiff must allege that 'the defendant had actual

knowledge of the primary violator's status as a fiduciary and actual knowledge that the primary violator's conduct contravened a fiduciary duty.'" *Id.* at 393 (citation omitted).

"The burden of demonstrating actual knowledge, although not insurmountable, is nevertheless a heavy one." *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 658 (S.D.N.Y. 2015). "Constructive knowledge—the possession of information that would cause a person exercising reasonable care and diligence to become aware of the fraud—is insufficient." *Id.* Thus, "suspicion, without confirmation, does not satisfy the actual knowledge requirement." *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 255 (S.D.N.Y. 2005).

As we explain below, Shih's claim must fail because Endicott did not owe her any fiduciary duties. But Shih's claim also fails because Gross did not have "actual knowledge" of any such duties. Indeed, despite a conclusory assertion otherwise, *see* ¶ 215, Shih does not allege any facts indicating that Gross even knew she existed before February 2016—or that he had any reason to believe that Endicott owed fiduciary duties to an unnamed co-venturer living across the world.[3]

This leaves only Shih's allegation that she sent Gross e-mails in February and March 2016 opining that Endicott excluded her from the company she believed they had founded together. *See* ¶¶ 132, 137. Mere receipt of these e-mails, however, could not possibly support a claim of actual knowledge. Consider the context. Out of the blue in early 2016, a total stranger sent Gross several e-mails asserting—without any documentary support—that she owned half of the company he had recently formed. All of the notes referred to some kind of "mutual understanding" that Shih and Endicott would "pursue its development in partnership," but did not identify any agreements, contracts, or fiduciary duties. ¶¶ 132, 137. In one note, Shih threatened Gross. *See* ¶ 137. In

---

[3] Shih alleges that Endicott mentioned the possibility of bringing on a friend from law school. *See* ¶ 78(a). But it doesn't follow that Endicott had Gross in mind, or that he had first spoken to Gross about potential involvement in any kind of venture—much less that he had spoken to Gross about Shih and given him actual knowledge that Endicott owed Shih duties.

response, Endicott sent a note denying Shih's claims. *See* ¶ 138. The next day, Shih sent Gross and Endicott a note amounting to an interrogatory. *See* ¶ 141. And that's where the exchange ended.

At most, these e-mails offered Gross cause for "suspicion, without confirmation." *Winnick*, 406 F. Supp. 2d. at 255. They fell miles short of creating actual knowledge that Endicott is, as Shih alleges, Shih's fiduciary. This is especially true given the absence of a written agreement between Endicott and Shih, and the clear written denial from Endicott. To be sure, Shih now argues that a fiduciary duty (and a contract) can be inferred from the full circumstances of her dealings with Endicott in mid-2015. But the existence of any such alleged or implied duty would hardly have been self-evident to Gross, who was not involved in those dealings and who reasonably doubted claims advanced without evidence by a hostile stranger. Shih's claim thus fails as a matter of law.

## B. Alleged Breach of Fiduciary Duty

"To state a claim for breach of fiduciary duty, a plaintiff must allege "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Gottsch v. Eaton & Van Winkle LLP*, No. 17-Civ-6974, 2018 WL 4609111, at *3 (S.D.N.Y. Sept. 24, 2018). Here, Shih contends that Gross owed her fiduciary duties as a promoter and shareholder, and that he violated these duties. *See* ¶¶ 229-30. That is incorrect.

A fiduciary relationship exists "when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991). The analysis "focus[es] on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first," and on whether "that trust is also accepted by the other party." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 726 F. Supp. 2d 291, 306 (S.D.N.Y. 2010). A promoter owes duties to "the promoted corporation, its stockholders, and fellow promoters." 1 Treatise on the Law of Corps.

§ 5:14 (3d ed. 2017); *see also Roni LLC v. Arfa*, 903 N.Y.S.2d 352, 355 (App. Div. 1st Dep't.

2011).

It would pervert the very concept of a fiduciary duty to say that Gross owed one to Shih,

whom he had never met or spoken to. There is "no evidence that [Shih] reposed trust or confidence

in [Gross], . . . or that [Gross] accepted that trust, whether by words or conduct." *Sokol*, 726 F.

Supp. 2d at 306 (citation omitted). Gross never agreed to promote Shih's company or to rank

among her shareholders. She, in turn, never accepted or relied on him in either capacity.

By the same token, if Gross did somehow owe Shih a duty, he was unaware of that fact at

all relevant times. He never heard of Shih until early 2016 and his receipt of an e-mail from her at

that time cannot reasonably be read as imparting actual knowledge that he had secretly been

working for her (or her company) the whole time. *See Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d

131, 138 (2d Cir. 2011) (requiring knowledge, not negligence, to show breach of duty).

### C. Alleged Misappropriation of a Business Idea

"To succeed on a misappropriation of an idea claim under New York law, a party must

prove (1) the existence of a legal relationship between the parties in the form of a fiduciary

relationship, an express or implied-in-fact contract, or quasi-contract; and (2) the idea must be

novel and concrete." *Turner v. Temptu Inc.*, No. 11-Civ-4144, 2013 WL 4083234, at *9 (S.D.N.Y.

Aug. 13, 2013). Here, four reasons independently require rejection of Shih's misappropriation

claim. For the sake of convenience, we address her claims against Gross and Endicott together.

*First*, as explained above, Shih cannot demonstrate the existence of a "legal relationship"

with Gross. *Turner*, 2013 WL 4083234, at *9. And as explained below, the same is true of her

alleged legal relationship with Endicott. This is sufficient to require dismissal.

*Second*, even if Shih did subsequently develop a legal relationship with Endicott or Gross, there is no reasonable basis for concluding that one existed on April 27, 2015, when she shared her supposedly original idea with Endicott (but not with Gross, who has never received any ideas from her). *See* ¶ 40. As courts have long recognized, "The idea man who blurts out his idea without having first made his bargain has no one but himself to blame for the loss of his bargaining power." *Desny v. Wilder*, 299 P.2d 257, 270 (Cal. 1956). Appearing to recognize this problem, Shih asserts that she disclosed her idea "in strict confidence and in reliance upon Endicott's offer that the two start a company together." ¶ 251. But that is no answer at all. New York law imposes liability for misappropriation only if a legal relationship exists *when the idea is disclosed*—and the brief, lighthearted Facebook exchange on April 24 did not create any such relationship. *See* ¶¶ 27-35. Even if one arose later, that would not retroactively create misappropriation liability.

*Third*, Shih's idea was not "novel and concrete." *Turner*, 2013 WL 4083234, at *9. "The test for novelty is rather stringent [and] the idea must show true invention and not a mere adaptation of existing knowledge." *Broughel v. Battery Conservancy,* No. 07-Civ-7755, 2010 WL 1028171, at *4 (S.D.N.Y. Mar. 16, 2010). "An idea is not novel if it was 'already in use in the industry at the time of plaintiff's submission.'" *Id.* at *4. "On a motion to dismiss, a court may find that an idea is not novel if it is simply a variation on a theme that already existed." *Next Commc'ns, Inc. v. Viber Media, Inc.*, No. 14-Civ-8190, 2016 WL 1275659, at *5 (S.D.N.Y. Mar. 30, 2016).

Here, Shih alleges misappropriation of her "credit gap idea." ¶ 6. But this idea was neither concrete nor novel. To start with concreteness, it remains a mystery exactly what good or service Shih had the idea to offer. The notion that people have a hard time accessing credit, and that it would be nice to find other ways of offering credit, is not "concrete" in any normal sense of the term. Identifying a widely-recognized problem and then failing to identify any particular solution

12

does not confer legal protection sufficient to sustain misappropriation liability.

Moreover, Shih's idea—that a credit gap exists and that we should consider looking outside the FICO system—is not "original." Although Shih repeatedly characterizes this idea as "novel," *e.g.*, ¶¶ 242, 243 248, 261, she alleges no facts to support that conclusion apart from Endicott's praise when she floated this point on Facebook, ¶ 262. That absence is telling. Plenty of sources, of whose existence the Court may take judicial notice, reveal widespread discussion by mid-2015 of credit access issues and the need to look outside the FICO system to address them:[4]

- *Giving Underserved Consumers Better Access to the Credit System: The Promise of Non-Traditional Data*, INFORMATION POLICY INSTITUTE (July 2005)[5]
- Alyssa Stewart Lee et al., *Give Credit Where Credit is Due: Increasing Access to Affordable Mainstream Credit Using Alternative Data*, BROOKINGS (December 2006)[6]
- Rachel Schneider & Arjan Schutte, *The Predictive Value of Alternative Credit Scores*, CENTER FOR FINANCIAL SERVICES INNOVATION (November 2007)[7]
- Ericca Maas, *Credit Scoring and the Underserved Population*, FEDERAL RESERVE BANK OF MINNEAPOLIS (May 2008)[8]
- Michael A. Turner et al., *New to Credit from Alternative Data*, PERC (March 2009)[9]
- Jason Margolis, *Lending Circles: Helping Immigrants in America Build Credit*, PRI (May 15, 2013)
- David Bornstein, *Invisible Credit?*, N.Y. TIMES (October 14, 2014)[10]
- *Data Point: Credit Invisibles*, CONSUMER FINANCE PROTECTION BUREAU (May 2015)[11]

In addition, these issues were discussed in congressional testimony,[12] industry conferences,[13] and consumer outlets.[14] The "observation of the public use of the idea by a third party totally precludes plaintiff's claims." *Ring v. Estee Lauder, Inc.*, 874 F.2d 109, 110 & n.1 (2d Cir. 1989).

---

[4] *See Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 298 (S.D.N.Y. 2012) (on the law of judicial notice).
[5] http://www.perc.net/wp-content/uploads/2013/09/nontrad.pdf
[6] https://www.brookings.edu/research/give-credit-where-credit-is-due-increasing-access-to-affordable-mainstream-credit-using-alternative-data/
[7] https://s3.amazonaws.com/cfsi-innovation-files/wp-content/uploads/2017/02/05053225/The-Predictive-Value-of-Alternative-Credit-Scores.pdf
[8] https://www.minneapolisfed.org/publications/community-dividend/credit-scoring-and-the-creditunderserved-population
[9] http://www.perc.net/wp-content/uploads/2013/09/New_to_Credit_from_Alternative_Data_0.pdf
[10] https://opinionator.blogs.nytimes.com/2014/10/02/invisible-credit-read-this-now/
[11] https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf
[12] https://www.federalreserve.gov/boarddocs/rptcongress/creditscore/creditscore.pdf
[13] http://www.sourcemediaconferences.com/CFSI08/pdf/paul.pdf
[14] https://money.cnn.com/2014/12/18/smallbusiness/alternative-lending-millennials/index.html

*Finally*, Shih's misappropriation claim cannot succeed because Endicott and Gross never made use of her idea. *See McGhan v. Ebersol*, 608 F. Supp. 277, 286 (S.D.N.Y. 1985) ("A plaintiff cannot recover for misappropriation of ideas unless the ideas are actually used by a defendant."). Shih was concerned with ensuring that people like herself—migrants who boasted a good credit history at home—could access credit here. She therefore focused on how to "bridge" foreign credit score information (which is not included in FICO scores) into the United States. *See* ¶¶ 40. To that end, she suggested serving as a guarantor for migrants and claims to have proposed outreach to those with "language obstacles." *See* ¶¶ 67-70, 78(g). In contrast, as revealed by judicial notice of Petal's website, Petal seeks to serve people *within* the U.S. who have U.S. banking histories but still lack adequate access to the credit system. Ex. C. It does so by analyzing U.S. bank account history to assess creditworthiness. Petal's service requires substantial U.S. financial records (a minimum of six months of bank statements)—which, of course, precludes serving new migrants. Indeed, Petal does not incorporate any foreign credit information into its services at all. Petal then offers credit cards directly to consumers, rather than merely translating foreign information for use by other financial services providers. Needless to say, offering credit cards is a massive undertaking in its own right and a materially different business concept.

There is thus no basis for Shih's claim that Endicott or Gross misappropriated her idea. It is true that her idea and Petal's business both involve credit issues facing groups disadvantaged by the existing credit system—but that is the extent of their similarity. Petal serves a different market featuring fundamentally different services and products than Shih considered, and it involves complex algorithms, solutions to compliance issues, and relations with other financial institutions, which Shih never even contemplated. As any entrepreneur knows, businesses are built on the

14

development of solutions to particular problems. Petal relies on distinct ideas to solve a distinct problem. Its founders did not appropriate—or misappropriate—Shih's idea.[15]

### D.  Unjust Enrichment

Shih's claim for unjust enrichment fails here for the same reasons that it failed as to the shareholder and investor defendants: the absence of a relationship "that could have caused reliance or inducement." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011). Nowhere does the Complaint allege such a relationship between Shih and Gross.

## II.  SHIH FAILS TO STATE A CLAIM AGAINST PETAL CARD, INC.

Petal did not exist until eight months after Endicott's exchanges with Shih in Spring 2015. Undeterred, Shih seeks to hold Petal liable for alleged wrongdoing by Endicott and Gross. At several points, she claims that Endicott and Gross's conduct before Petal's incorporation "can be imputed" to Petal because they "acted, and continue[] to act" as its officers, shareholders, and/or agents. ¶¶ 209, 224, 232, 256. Elsewhere, she just asserts that Petal acted before it even existed. ¶ 264. These arguments all rest on errors of corporate or commercial law that warrant dismissal.

First, an entity that does not exist cannot act or have agents. *See Gianino v. Panacya, Inc.*, No. 00-Civ-1584, 2000 WL 1224810, at *7 (S.D.N.Y. Aug. 29, 2000); *Pioli v. Town of Kirkwood*, 499 N.Y.S.2d 266, 267 (App. Div. 3d Dep't 1986). And here, Shih does not (and could not) allege that Petal was a *de facto* corporation prior to February of 2016. *See In re Hausman*, 921 N.E.2d 191, 193 (N.Y. 2009) (requiring, *inter alia*, a certificate of incorporation to invoke this doctrine).

---

[15] In response to our original motion to dismiss, Shih revised her complaint to allege that at the very end of her talks with Endicott, they started to think about offering credit cards and targeting markets other than migrants. But this convenient recollection still does not save her misappropriation claim. The only "idea" she is alleged to have offered is looking outside the FICO system to address credit access issues. That idea is neither concrete nor original—and stated at so high a level of generality, it does not make the venture she discussed with Endicott the same as Petal, any more than it makes the venture she discussed with Endicott the same as Experian, Equifax, TransUnion, VantageScore Solutions, LexisNexis, Clarity Services, FactorTrust, Oportun, Affirm or Social Finance (especially given the overwhelming allegations that nearly all of their discussions were focused on migrants alone).

Second, corporations are "legal entities distinct from their managers and shareholders and have an independent legal existence." *Port Chester Elec. Const. Co. v. Atlas*, 357 N.E.2d 983, 986 (N.Y. 1976). Therefore, the liabilities of corporations and their managers are distinct. And here, Shih could not show that Petal is an alter ego of Gross or Endicott, justifying any form of veil piercing or reverse veil piercing. *See Miramax Film Corp. v. Abraham*, No. 01-Civ-5202, 2003 WL 22832384, at *7 (S.D.N.Y. Nov. 25, 2003). Nor could she argue that Petal is liable for actions by Endicott and Gross on a contract theory, since there is no allegation either that Petal expressly or impliedly adopted any of their agreements or that Endicott or Gross ever intended to bind Petal when they formed those agreements. *See Reif v. Williams Sportswear, Inc.*, 174 N.E.2d 492, 494 (N.Y. 1961); *In re Robbins Int'l, Inc.*, 275 B.R. 456, 468 (S.D.N.Y. 2002). Thus, even if her claims against Gross and Endicott were meritorious, liability against Petal does not follow. For that reason, Shih's first, second, third, sixth, seventh, and eighth claims must be dismissed at least as to Petal, and Shih's ninth claim must be dismissed entirely.

### III.     SHIH FAILS TO STATE A CLAIM AGAINST ENDICOTT.

At bottom, this is a case about two people: Shih and Endicott. Shih alleges that Endicott promised to go into business with her, induced her to share a novel idea, and then broke his promise. These allegations, however, are implausible, and they fail to state a claim.

#### A.  Endicott Did Not Agree to Be Shih's Business Partner.

Shih first met Endicott in 2014 while she was working as a bureaucrat at the U.N. They interacted a mere handful of times—never in a commercial setting—before she returned home to New Zealand. After she arrived back in New Zealand, with no clear plan to return to the United States, she sometimes chatted with Endicott on Facebook Messenger. She alleges that in just five weeks, Endicott made an extraordinary, legally binding promise to launch a joint venture with her.

16

He did so, she claims, in a handful of Facebook messages and two Skype calls. Even though Endicott was a former corporate lawyer, who knew that these arrangements often involve months of negotiations and detailed written agreements, he apparently decided to skip all that. In fact, she alleges, he was willing to bind himself to Shih even though they never agreed on exactly what product or service they would offer, how they would offer it, who would be on their leadership team, where necessary technology would come from, who they would employ, or how they would obtain and use capital. (Notably, the Complaint does not allege what answers they supposedly reached to any of these questions—it simply asserts in a conclusory manner that they had somehow worked everything out.) Then, after he had supposedly agreed to all this, Endicott abruptly absconded with their unincorporated venture. Finally, eight months later, Shih sent Endicott a handful of messages complaining about his decision not to pursue their alleged partnership, not a single one of which references any contracts, joint ventures, or fiduciary duties.

It is not plausible to infer from these allegations that Endicott formed a binding legal obligation with Shih. Instead, the Complaint shows (and the truth is) that Endicott and Shih had a few exploratory talks about what it would take to create a business offering "bridge" services to migrants. As entrepreneurs often do in such conversations, Endicott expressed early excitement about the possibility of working with Shih and indicated interest in addressing a particular problem (here, migrant credit services). They identified key questions and began hammering out what a potential business might look like. And that's it. This may not be neat and pretty, but it's how the start-up world works: highly ambitious people exchanging ideas and dreaming up businesses, all on the understanding that there's no contract until the relationship is given binding form. To the extent Shih believed otherwise, she was mistaken. There was never any meeting of the minds.

17

### 1.  Existence of an Actual Contract

Shih first alleges the existence of an *actual* contract. To plead "the existence of an enforceable agreement," Shih must allege "an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." *Kowalchuk v. Stroup*, 873 N.Y.S.2d 43, 46 (App. Div. 1st Dep't 2009). "That meeting of the minds must include agreement *on all essential terms*." *Id.* (emphasis added). "[D]efiniteness as to material matters is of the very essence in contract law . . . [and] a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *Marraccini v. Bertelsmann Music Grp. Inc.*, 644 N.Y.S.2d 875, 877 (App. Div. 3d Dep't 1996).

Shih asserts that lighthearted Facebook conversations in late April 2015 created a contract between Endicott and Shih. Specifically, she says that Endicott legally bound himself as her co-venturer when, while complaining about his then-current job, he messaged Shih: "Let's start a company together. That does some cool trans-pacific stuff." ¶¶ 27, 238-39. She then asserts she "accepted [his] proposal," forming a binding contract, when she noted that migrants struggle to obtain credit in the United States and told Endicott to "do some digging" and "let [her] know" if he wanted to work with her. ¶¶ 53-55, 238. But there was neither offer nor acceptance here. Shih acknowledged Endicott's uncertainty in real time, asking him to "let her know." ¶ 53. Sure enough, Endicott noted one week later that he was "continuing to research" this idea, ¶ 57, and Shih added a few days after that they were merely "envisaging a company," ¶ 66. No contract had been formed. Moreover, there was no discussion of (or agreement on) *any* material terms of this alleged contract—as the Complaint itself acknowledges. *See* ¶ 239.

Shih next asserts that the "implicit" terms of their agreement became "express" during a Skype call on May 16, 2015. *Id.* She alleges that, on this call, they finalized all manner of terms, from the scope of the business to the division of labor between Shih and Endicott. ¶¶ 78, 81. This

is implausible. It defies credulity that two professionals—one with legal training—would reach such an elaborate contract, yet never memorialize it or reference it in subsequent communications. Further, the allegations in the Complaint confirm that Endicott and Shih had not agreed on key aspects of this supposed venture, let alone the material terms of a contract creating it. Mere days before the Skype call, they exchanged e-mails debating central aspects of any potential business, including whether a company should lend money to migrants (Endicott) or serve as a guarantor (Shih). ¶¶ 66-67. At that time, Endicott sent Shih a document entitled "Big Questions," posing a battery of basic, unanswered questions in their embryonic plan and referring only to "setting up an entity *like the one we're suggesting*." ¶ 70; Ex. A (emphasis added). Shih only first responded to part of this e-mail *after* the May 16 call that, according to her, created a joint venture covering all these issues and resolving all material terms. ¶ 81. And even then, there is no indication of what their business model would be, including what product they would offer, what technology they would use, what market they would target, and what team they would build. It is thus implausible to conclude that the May 16 call produced an agreement on the material terms of any venture.

Finally, Shih alleges that this contract was "reaffirmed" orally on a Skype call around June 6, 2015. ¶ 91. The Complaint adds that she and Endicott agreed to collaborate on a slide deck for him to use in pitches with investors. ¶¶ 93-97. But here, too, the Complaint makes no sense. The majority of "Big Questions" remained unanswered. Shih had just announced her intent to take a prolonged vacation. Their core business model was still in flux. *Compare* ¶ 78(g) (alleging interest in non-migrants) *with* Ex. B (slides focused solely on migrants). Neither of them had memorialized any part of their supposed agreement, or had *discussed* doing so. And the slide deck itself—the supposed magnum opus of their collaboration—was 80% blank. This was no coincidence. The details and terms of their supposed venture were missing here, as in all their written

19

correspondence, because they had never defined or agreed to any material terms of a potential venture. To this date, it remains unclear what product Shih believes their venture was going offer. She seeks to conceal that massive gap by alleging (with no elaboration) agreement on many other points, but a business isn't a business without a product, a market, a distribution plan, a team with relevant skills, or an inkling of how it will develop necessary technology. The venture described in the Complaint had none of these things. There *couldn't* have been a joint venture agreement.

### 2.  Existence of an Implied-in-Fact Contract

Unable to allege an actual contract, Shih claims that Endicott's conduct evinces an implied one. "[A] contract may be implied in fact where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *Matter of Boice*, 640 N.Y.S.2d 681, 682 (App. Div. 3d Dep't 1996). But even when implied, a contract is only formed upon mutual assent as to all material terms. *See Maas v. Cornell Univ.*, 721 N.E.2d 966, 970 (N.Y. 1999). Shih's implied-in-fact theory thus fails for all the same reasons given above.

In addition, "industry custom and usage" confirm the absence of any such implied contract. *See McGhan*, 608 F. Supp. at 285. Startup culture is famous for open, informal collaboration. Countless ideas and business plans are tossed around without binding obligations. Imposing a broad view of implied-in-fact contracts on the startup field would stifle conversation, chill innovation and free thought, and create liability absent genuine agreement.

In the end, Endicott abandoned the concept he had discussed with Shih and went in another direction. The business that Endicott created, which extends credit to American "credit invisibles" who lack FICO credit scores, *see* Ex. C, differs in every respect that matters from Shih's theory of assisting new migrants by bridging foreign credit history. Further, the Complaint reveals that Shih did not act as though she had a contract. A person expecting to share half of a new business would

not vanish for weeks on vacation when she believed her partner was embarking on the first, critical phases of fundraising. ¶ 92. She would not wait weeks (and then months) to follow up on any progress—nor would she do so through Facebook messages wishing him happy birthday, ¶ 110. Certainly, she would not drop the matter entirely for six months without taking *any* further steps. ¶¶ 115-23. These allegations show that *neither* party believed they were bound to each other.[16]

### 3.   Covenant of Good Faith and Fair Dealing

A covenant of good faith and fair dealing does not exist without a contract. *See Marcella & Co. v. Avon Prods., Inc.*, 724 N.Y.S.2d 192, 193 (App. Div. 2d Dep't 2001). Further, this claim is based on the same facts as the breach of contract claims and seeks no separate relief. It must be dismissed as duplicative. *Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 508 (2d Cir. 2005).

### 4.   Quasi-Contract Claims

Shih's promissory estoppel claim against Endicott "sounds in contract theory" and "must be dismissed because it is redundant of [her] breach of contract claim." *Toledo Fund, LLC v. HSBC Bank USA, Nat'l Ass'n*, No. 11-Civ-7686, 2012 WL 364045, at *5 (S.D.N.Y. Feb. 3, 2012). Moreover, as explained above, Shih has not plausibly alleged a "clear and unambiguous promise" by Endicott on which she foreseeably relied. *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000).

For unjust enrichment, Shih claims that Endicott benefited by taking her idea and using it to build a company from which he excluded her. But this is not supported by plausible allegations. Endicott was not enriched at Shih's expense, but instead by his own efforts to develop a different business. *See Kaye*, 202 F.3d at 616 (defendant must have "actually" benefited "specific[ally] and direct[ly]"). Given that Shih told Endicott her idea in the absence of a promise or agreement, she cannot claim that it was "unjust" for Endicott to decide against building a business with her.

---

[16] For all these reasons, the Complaint does not plausibly allege "a specific agreement" between Shih and Endicott "to carry out an enterprise" that "evidences their intent to be joint venturers." *Turner*, 2013 WL 4083234, at *6.

### B.  Endicott Did Not Breach Any Agreements with Shih by Founding Petal.

Shih presumes that if Endicott agreed to go into business with her, but then instead went into business with Gross, she is entitled to half of the company he created with Gross. That belief is without foundation. As explained above, Petal Card, Inc. is a completely different business than the one that Shih and Endicott explored. The happenstance that it was incorporated using the name "CreditBridge"—which Shih claims to have invented—does not mean that Petal is, in fact, the very same venture that Shih and Endicott purportedly created. Indeed, given that this "venture" was never memorialized, incorporated, funded, operationalized, or vested with any life, it's an exercise in legal fantasy to say that this venture *became* Petal with Shih still attached. Accordingly, Shih's claim of entitlement to Petal based on Endicott's alleged breach is entirely baseless.

By way of illustration, if Adam and Bob agree to go into business together, but Adam loses interest and creates a new business with Charlie, Bob is not entitled to half of Adam and Charlie's company as damages. Instead, "the law of contract damages limits the injured party to damages based on his actual loss caused by the breach." *Brown v. Rawlings Fin. Servs., LLC*, 868 F.3d 126, 131 (2d Cir. 2017) (citation omitted). In this hypothetical, that means Bob can recover whatever damages he can prove based on Adam's decision not to carry out the terms of their agreement to go into business. It does not mean that Bob's losses can be equated with Adam and Charlie's gains. Shih's failure to adhere to this principle infects her contract claims and warrants their dismissal.

### C.  Endicott Did Not Owe Shih Any Other Fiduciary Duties.

As noted above, "a fiduciary relationship may be found when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Thermal Imaging, Inc. v. Sandgrain Sec., Inc.*, 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001). Yet

"[m]ere reposal of one's trust or confidence in a party . . . does not automatically create a fiduciary relationship; the trust or confidence must be accepted as well." *Roni LLC*, 903 N.Y.S. 2d at 355.

### 1. Co-Venturer

This duty can arise only from a joint venture agreement. *See, e.g.*, *Steinbeck v. Gerosa*, 151 N.E.2d 170, 179 (N.Y. 1958); *Weisman v. Awnair Corp. of Am.*, 144 N.E.2d 415, 418 (N.Y. 1957). Because the Complaint fails plausibly to allege such an agreement, this claim must be rejected.

### 2. Attorney

Endicott could have owed Shih this duty only if they formed an attorney-client relationship. *See Matter of Cooperman*, 633 N.E.2d 1069, 1071 (N.Y. 1994). Although Shih claims she "relied" on Endicott's legal expertise, *see* ¶ 177, "[t]he unilateral belief of a plaintiff alone does not confer upon . . . her the status of a client." *Moran v. Hurst*, 822 N.Y.S.2d 564, 566 (App. Div. 2d Dep't 2006). Courts typically look for "[a] fee arrangement, a written contract, [or] an informal pattern of gratuitous legal services." *Case v. Clivilles*, 216 F. Supp. 3d 367, 379 (S.D.N.Y. 2016).

The Complaint, by contrast, alleges only that Endicott suggested to Shih in informal conversation that he *was* a lawyer, and that his legal background might help them understand regulatory issues that might arise. ¶¶ 25-27. This is the entire basis for her claim, *see* ¶¶ 33, 38, 179, and it is plainly insufficient. Shih never alleges that Endicott agreed to act or acted as *her* lawyer. Even if Endicott had agreed to assist with particular tasks in developing a business, such as incorporation or the issuance of stock, *see* ¶¶ 175-76—which is not plausibly alleged here—this would not establish that he either agreed to represent the business itself *or* that he agreed to simultaneously represent a prospective partner. Further, Shih could not have been under the misimpression that Endicott was her personal lawyer. The Complaint describes Endicott's intent

23

to start his own company, using his legal and financial training to benefit himself and his enterprise. ¶¶ 20-28. As a matter of law, these allegations do not evince an attorney-client relationship.

### 3.   Fundraising Agent

Shih next alleges that Endicott was her fundraising agent. But Endicott could have become Shih's agent only if she, as the principal, requested that he act on her behalf, he accepted, and they both understood that Shih was in control of his subsequent efforts. *See Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x 572, 575 (2d Cir. 2010). According to the Complaint, however, they were "equal partners," not principal and agent. *See* ¶¶ 59, 91, 168, 195, 204. Further, while Shih asserts in conclusory fashion that Endicott agreed to raise money on her behalf, ¶¶ 191-92, she alleges no facts showing that he agreed to follow her orders or to act at her behest. To the contrary, she alleges that Endicott spoke freely with whomever he chose about fundraising—and did so without Shih's awareness or approval. *See* ¶¶ 71, 86, 115. Further, Shih made no effort to control his activities. *See* ¶ 119. These allegations do not make out a principal-agent relationship.

### 4.   Shareholder in Equity

Shih claims that she and Endicott were "equal owners and equal *de facto* shareholders in the CreditBridge company that they created," and that Endicott owed her a duty "as an executive and *de facto* shareholder." ¶¶ 195-96. But as explained above, the Complaint fails to plausibly allege that they created a company together or agreed to serve as shareholders in a venture based on Shih's idea. *See Teplitsky v Karian*, No. 014840/2010, 2011 WL 579047 (Sup. Ct. Jan. 31, 2011).

### 5.   Corporate Promoter/Relationship of Trust and Confidence

A promoter assists "in the forming and establishing of a company at any period prior to the company becoming fully incorporated." *Armstrong v. Sun Printing & Publ'g Ass'n*, 122 N.Y.S.

531, 533 (App. Div. 2d Dep't 1910). Shih alleges that Endicott served as a promoter of their joint venture and thus owed her a duty a co-promoter. ¶¶ 185-86. But for the reasons already stated, the Complaint fails adequately to allege that Endicott ever agreed to act as Shih's partner or promoter in developing a business, or that he accepted any trust that Shih reposed in him. For the same reasons, Shih's claim based on a relationship of "trust and confidence" does not succeed. *See N. Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F. Supp. 2d 94, 104 (S.D.N.Y. 2013).

*     *     *     *     *

Shih claims that she is entitled to half of Petal.  But she didn't contribute the original idea at the heart of Petal's business model. She didn't contribute time, money, or energy to the daunting task of transforming that idea into an actual business. And she played no role in developing that fledgling business into a growing company that offers a nationwide consumer financial product and now employs 55 people. Instead, she engaged in tentative discussions with Endicott that went nowhere and had no lasting impact other than confirming to Endicott that credit access is a vital issue. Yet this wasn't a secret. In mid-2015, many people were seeking solutions to the well-recognized difficulties that some groups encounter in accessing credit. Shih and Endicott discussed one credit access issue that never materialized into a solution or a business. Endicott, Gross, and others discussed a different issue—and then actually *solved* it by constructing a business model that became Petal. This isn't illegal. It's how the start-up world operates. Imposing liability on Endicott for his preliminary, early-stage discussions with Shih—which never resulted in a written agreement, any record of a purported oral agreement, any actual business venture, or any conduct by the parties consistent with creating a new business—would chill ordinary and productive entrepreneurial conduct. Given the inadequacy and implausibility of Shih's allegations, the proper outcome is dismissal of her case.

25

**CONCLUSION**

For the foregoing reasons, Defendants respectfully submit that the Complaint should be dismissed with prejudice.

Respectfully submitted,

/s/  Roberta A. Kaplan

December 10, 2018

Roberta A. Kaplan
John C. Quinn
Joshua Matz (*pro hac vice*)
Martha Fitzgerald (*pro hac vice*)
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883

*Counsel to Defendants*