# DELBELLO DONNELLAN WEINGARTEN
# WISE & WIEDERKEHR, LLP

**Peter S. Dawson, Esq.**
(914) 681-0200 x207
psd@ddw-law.com

COUNSELLORS AT LAW

THE GATEWAY BUILDING
ONE NORTH LEXINGTON AVENUE
WHITE PLAINS, NEW YORK 10601

(914) 681-0200
FACSIMILE (914) 684-0288

**Connecticut Office**
1111 SUMMER STREET
STAMFORD, CT 06905
(203) 298-0000

July 30, 2019

**VIA ECF**
Judge John F. Keenan
United States District Court, Southern District of New York
500 Pearl Street
New York, New York 10007

Re: **Newly Discovered Evidence**
**Shih v. Petal Card, Inc., et al.,**
**United States District Court, SDNY Case No. 18-5495**

Dear Judge Keenan:

We are attorneys for Plaintiff Cassandra Shih ("Plaintiff" or "Shih"). We write in accordance with the Part Rules and Case Management Order that govern this case to bring to the Court's attention newly discovered evidence uncovered through the ongoing Court-directed non-party discovery and Plaintiff's independent investigations. The newly discovered material directly contradicts false narratives presented by Defendants in the moving and reply briefs submitted in support of the motion to dismiss which is now *sub judice* (ECF 68 and 74, respectively). In light of what we have discovered, we respectfully ask that the Court either (1) deny the Defendants' motion, (2) grant Plaintiff leave to serve a supplemental opposition to the motion or take this letter as supplemental opposition to the motion, or (3) grant Plaintiff leave to replead.

**Background**

By this action, Shih seeks redress for the Defendants' misconduct in freezing her out of Petal Card, Inc. ("Petal") when it was a start-up known as CreditBridge. The Amended Complaint (ECF 46) alleges that the origin of Petal was an agreement between Plaintiff Shih and Defendant Endicott ("Endicott") in early 2015 to develop a company that would address a gap in the immigrant consumer credit market through, among other things, the analysis and utilization of foreign financial data.

On November 29, 2018, at an initial pretrial conference, Your Honor directed that party and non-party document discovery proceed, and a Case Management Order was entered by Judge Moses incorporating that directive (ECF 62). Plaintiff then served subpoenas on a number of witnesses with knowledge of Petal's earliest activities as a start-up known as CreditBridge.

Judge John F. Keenan
July 30, 2019
Page 2

Among the subpoenaed parties were Berk Ustun ("Ustun"), an early purported "co-founder" of Petal, later its "Head of Data", and now an "advisor" to the company.  Plaintiff subpoenaed Ustun because Endicott consulted with him about Petal's earliest research and development.  Plaintiff also subpoenaed Endicott's friend, Saish Setty ("Setty") and girlfriend, Yulia Fradkin ("Fradkin"), whom Shih knew to have had knowledge with respect to Petal's origination, as well as an early partner of Endicott's, David Ehrich ("Ehrich").  Documents furnished by Ustun, Setty, Fradkin and Ehrich reveal that many of the statements made and narratives put forth by Defendants in their motion papers are misleading at best, if not patently false.  Although our review is not yet complete, because the motion to dismiss is now before the court and could be decided at any time, we are compelled to bring key facts to the Court's attention.

### 1.   Endicott's Admission that the Idea for Petal was Shih's.

An email exchange between Defendant Endicott and Ustun from May 7-8, 2015 (Ex. 1) **is an admission** that the idea for Petal came from Shih and demonstrates that two of the company's three original purported "co-founders" had direct personal knowledge of that fact.  This exchange obliterates Defendants' claim that Shih "*falsely and implausibly*" asserts "*that she came up with the idea for Petal and gave it to Endicott*."  (Def. Mem., ECF 68 at 1).  On the contrary, the idea for Petal was Shih's, and Shih shared it with Endicott.

In the exchange, Endicott forwards to Ustun the conversation by which he confirmed to Shih that he and Shih were "on the same page overall" with respect to their development of her idea[1] and shares some of Shih and Endicott's work product with Ustun.  Ustun replies by asking, **"Who is Cassie?"** to which Endicott responds:

> ## "This chick I banged a few months ago who came up with the idea.  She lives in New Zealand."

Despite dismissing her to Ustun in such a crude and repugnant way, Endicott would shamelessly continue to use Shih, working with her to develop Petal (as CreditBridge at that time) for over a month after that.  Then, when the venture came to its pitch phase, Endicott stopped responding to her inquiries, and cut off all communication with her.  Defendants duplicitously dismiss this as simply having, "fallen out of touch." (*Id*. at 8).  It wasn't that.  It was a deliberate freeze-out of Endicott's original co-founder.

### 2.   Shih's Work Product, Including her Ideas, Research, Concepts and Business Model Were Used To Develop and Promote Petal.

Defendants' argued that Shih has made no "*showing that Endicott ever actually made use of her 'market research', or any other materials while creating Petal or speaking to investors*", and that, "*her shining example of 'market research' is a PowerPoint presentation that is almost completely blank.*"  (Defs. Reply Mem., ECF 74 at 6.)  But the Amended Complaint specifically

---

[1] This conversation is referenced in the Amended Complaint, ECF 46 ¶¶67, 80.

alleges that, "the slide deck would be finalized utilizing the market research and business models that Shih and Endicott had jointly discussed" and used to pitch to investors (Am. Compl., ECF 46 ¶¶96-97). Now we have newly discovered documentary evidence confirming that to be precisely what happened. Subpoened documents from Setty, Fradkin and Ustun prove that the CreditBridge slide deck was updated and revised just as Shih had alleged her agreement with Endicott contemplated. In July of 2015, it was rebranded as the "Financing Partner Deck" (Ex. 2), and a "Teaser" announcement that Endicott sent to Fradkin (Ex. 3) states that CreditBridge was seeking financing at that time "*to enable rapid growth and product development*". Plaintiff Shih's ideas, research, concepts, and business model are prominently featured in both the "teaser" and the Financing Partner Deck[2], the latter of which was transmitted by Endicott to Fradkin in an email with the subject line "Startup Business Presentation." Particularly:

- The branding on Slide 1 of the Financing Partner Deck. The Amended Complaint specifically alleges that Shih named CreditBridge (Am. Compl., ECF 46 ¶¶88-89). Moreover, Shih had suggested to Endicott in an email that, "Anything that combines the feeling of global connection, flexibility, or migration with credit services will work", which applies to both the name and the slogan, "Financial Tools for a Borderless World".

- Shih conceived of and shared with Endicott virtually every concept set forth on Slide 2, entitled "Opening the American Credit System to Newcomers", including and especially the sections "The Expat Credit Problem", "Credit Gaps with Other Groups", and "CreditBridge Solves the Information Gap". See, for instance, Ex. 4 which traces these concepts to Shih and Endicott's specific discussions.

- Shih's market research is utilized in the "Market Size" and "Geographic Potential" sections of Slide 4, entitled "A Large, Un-Addressed, Rapidly-Growing Market", and the source data for the section "U.S. Foreign Born Population" is drawn from the "CreditBridge- Big Questions (v3)" spreadsheet that was Shih and Endicott's work product (see Am. Compl., ECF 46 ¶74).

- All of the financial figures on Slide 5 incorporate data from the "CreditBridge - Big Questions (v3)" spreadsheet that was Shih and Endicott's work product (*Id*.). For example, Slide 5 identifies the potential customer pool for CreditBridge using the exact same immigrant inflow figure of 723,762 set forth in that spreadsheet.

---

[2] In the interest of brevity, we are not including with this submission the work product that makes up the backup source material for every slide in the Financing Partner Deck, although we supply backup source material and reference the Amended Complaint's allegations for some slides. We are happy to supply further information at the Court's request or with a Supplemental Brief in Opposition to the Motion to Dismiss.

- Slide 7, entitled "Phased Product Development", discusses product offerings and can be traced directly to Shih and Endicott's agreement to develop CreditBridge (see, Ex. 5).

- Slide 8, "Strong Revenue Drivers", identifies that banks could pay for the cost of the service. This can be traced directly to Shih and Endicott's conversations, in which Endicott asked Shih who would pay for the service, to which Shih replied "if we were going to be in a partnership with one particular bank, then the bank | because it benefits them to get these clients". Also see Am. Compl., ECF 46 ¶68.

- The ideas and concepts contained in Slide 9, "Credit Modeling", and the modelling risks in Slide 11, entitled "Perceived Risks and Realities". Most critically, the concepts that are characterized as "What Makes our Model Different" in "Credit Modeling" are Shih and Endicott's work product. **It was Shih who had specifically identified to Endicott the challenges that expats face in understanding and accessing U.S. credit, and it was Shih who specifically proposed a business model that involved the extraction and utilization of international financial data to address those challenges.**

- The Partner Marketing and Target Customer concepts set forth on Slide 10, "Attracting Quality Borrowers" were components of Shih and Endicott's early business model.

The CreditBridge Financing Partner Deck, and its other versions and variations are newly discovered pursuant to the Court's direction that non-party discovery proceed. These decks are evidence of the connection between the ideas, concepts, and research that Shih contributed to and shared with Endicott pursuant to their agreement to develop CreditBridge, and the joint work product, business models and presentations that were utilized to attract the earliest funding for Petal in 2015.

### 3.   Petal Continues to Use Shih's Ideas and Business Model.

In their motion papers, Defendants claim that, "*Other than Endicott's involvement and the goal of helping people access credit, the 'venture' described in the Complaint bears little resemblance to Petal*" (Defs' Reply Mem., ECF 74 at 1), "*Petal credit cards require that customers have several months of U.S. domestic bank records, which effectively disqualifies the very audience that Shih and Endicott discussed targeting*" (*Id.*), "*Petal seeks to serve individuals in the U.S. who have U.S. banking histories . . . Petal's service requires substantial U.S. financial records (a minimum of six months of bank statements – which, of course, precludes serving new migrants*" (Defs. Mem., ECF 68 at p. 14), and "*Indeed, Petal does not incorporate any foreign information into its services at all*" (*Id.*).

Petal has no doubt evolved since its genesis.  Nevertheless, central to the original business model that Shih developed with Endicott is the concept that foreign banking and credit data would be extracted and utilized to "bridge the gap" to extend U.S. credit to immigrants who had no U.S. credit history.  Newly discovered evidence demonstrates that, contrary to the claims made in Defendants' motion papers, Shih's concept of "bridging the gap" that immigrants face when attempting to secure credit, and her idea to utilize foreign financial data, continue to be central to Petal's business model.  In particular:

- An investor slide deck for Petal furnished by Ehrich (Ex. 6) identifies in its first slide "young adults and immigrants" as "most likely to be credit invisible," and therefore, as Shih envisioned, among Petal's core demographic.

- The opening line of a job posting for "Head of Risk" for Petal (Ex. 7) points to the same core demographic that Shih had identified, introducing Petal by stating "Traditional credit scoring locks nearly 100mm U.S. consumers out of the credit system and disproportionately excludes minorities, young people, and immigrants."

- As recently as March 2019 Defendant Gross, Petal's CEO, authored an article entitled "An invisible market of 70 million" (Ex. 8) that explains how Petal uses alternative financial data to "unlock a hidden market" and offer more people, particularly immigrants, "a safe on-ramp to credit access."  Shih's "bridge" is now Petal's "on-ramp".

- An article posted on Wirecutter on April 30, 2019 entitled "The Best Ways for Immigrants to Build Credit" (Ex. 9) identifies the Petal Card as one of the best options for immigrants to build credit.  The write-up reflects that, contrary to the Defendants' claims in their motion papers, Petal utilizes foreign banking data just as Shih had proposed to Endicott, stating "*Even if you don't have a U.S. bank account, a Petal spokesperson said, the company can analyze banking data from some major international financial institutions, such as HSBC, Royal Bank of Canada, and Deutsche Bank*."

The Wirecutter article caught our attention because it contradicts Defendants' representations to the Court that Petal "does not incorporate any foreign information into its services at all", and has an underwriting requirement of six months of U.S. domestic bank records (Defs. Mem., ECF 68 at p. 14) and (Defs' Reply Mem., ECF 74 at 1).  We visited Petal's website and confirmed that, in addition to the specific banks identified by Wirecutter, Petal extracts financial data from, among others, British and Canadian banking institutions (see Ex. 10).  Also of note is that the minimum requirements for a Petal Card set forth on Petal's own website do not reference the need for six months of U.S. domestic bank records (Ex. 11).

### 4.    The Defendants' Claim that Endicott and Gross Started a Different Company Addressed to Different Issues is Demonstrably False.

Finally, Defendants' deliberately mislead the Court by (1) repeatedly suggesting that Endicott and Gross decided to pursue a business separate from the one Endicott had worked on with Shih – a business addressed to "*a different issue*" (Defs. Mem., ECF 68 at p. 25) that was established "*long after Shih's interactions with Endicott*" (*Id*. at 1), and (2) cynically dismissing Plaintiff's allegations (at Am. Compl., ECF 46 ¶¶78a-b, 128, and 215) that Gross was the Harvard Law School classmate that Endicott told Shih he wanted to partner with as early as May 2015 (see Defs. Mem., ECF 68 at N.3, claiming "*it doesn't follow that Endicott had Gross in mind*", and Defs' Reply Mem., ECF 74 at p.3, "*Endicott had hundreds of law school classmates*"). These narratives are patently false.  There is no question now that Endicott and Gross pursued Plaintiff Shih's ideas, business models, and concepts and directly used work product developed by Shih and Endicott.  This is established by the timeline Plaintiff submitted with her opposition to the motion to dismiss (ECF 71 at Appendix) and is further supported by newly discovered materials, including:

- The Financing Partner Deck (Ex. 2), which, as set forth in Point 2 above, contains Shih and Endicott's work product, but identifies Endicott and Gross on Slide 12 as the "CreditBridge Team", with no mention of Shih.

- The "Teaser" (Ex. 3) which effectively summarizes the company that Shih and Endicott developed, but lists Endicott, Gross and Ustun as the purported founding team.

- The use of the website www.credit-bridge.com in the Financing Partner Deck. As Plaintiff's Opposition notes (ECF 71 at p. 9), www.credit-bridge.com was registered just four days after Shih and Endicott discussed it on their last Skype call, and to this day it re-directs visitors to www.petalcard.com .

- An October 2015 email exchange between Endicott and Meghan Heesch (Ex. 12) of the United States Department of Justice in which Heesch states to Endicott, "*I'm so pumped for your new company.  It will truly be a game-changer as immigrants for the first time have a tangible means to reach the American dream.*"

- An information graphic prepared for CreditBridge by Endicott, Gross, and Ustun analyzing visa types, work visa categories, and the geographic distribution of immigrants by state (Ex. 13).

- March 2016 emails (Ex. 14) from Gross and Endicott addressed to Glacier Tax and Arctic International, LLC, firms which focus on non-resident alien tax issues.  In the emails, Gross introduces himself as "*the founder of a company focusing on assisting immigrants to the United States with gaining access to essential services and consumer products.*"

Judge John F. Keenan
July 30, 2019
Page 7

The latter email is particularly noteworthy because (1) it establishes through Gross's own words that in March of 2016, following CreditBridge's February 2016 incorporation (see Am. Compl. ECF 46 ¶120), it remained a company focused on immigrants; (2) Endicott and Gross had both by that date received and deliberately ignored Plaintiff Shih's messages demanding that her rightful interest in CreditBridge be accounted for (*Id*. at ¶¶132-136); (3) less than three weeks later, Endicott would falsely claim to Shih in an email that the company has "nothing to do whatsoever with anything you and I ever discussed [or] any of your ideas" (*Id*. at ¶¶138-140); and (4) this, and communications like it, demonstrate that Gross was actively promoting Shih's company to third parties, partners and investors  while consciously turning a blind eye to Shih's interest.

***

We are still completing our review of non-party productions and expect the materials referenced herein to be only the tip of the iceberg.  There are many non-party documents left to review, not to mention the fact that party documents are still being compiled and have yet to be produced.  However, since the foregoing evidence constitutes admissions by the Defendants (especially Endicott's that the idea for Petal was Shih's alone) which are material to issues now before the Court on the pending motion to dismiss, we respectfully ask that the Court deny the motion.  In the alternative, we respectfully ask that the Court grant Plaintiff leave to serve a supplemental opposition so that these materials may be placed into the record for the Court's consideration on the motion, or deem the material contained herein a supplemental opposition to the motion, or grant Plaintiff leave to amend her Complaint and allege the foregoing admissions and details.

Respectfully Submitted,

/Peter S. Dawson/

Peter S. Dawson

cc:   Magistrate Judge Barbara Moses (via ECF)
      Joshua Matz, Esq.  (via ECF)
      Roberta A. Kaplan, Esq. (via ECF)
      John C. Quinn, Esq. (via ECF)
      Joshua Matz, Esq. (via ECF)
      Martha Fitzgerald, Esq. (via ECF)