UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASSANDRA SHIH,

                           Plaintiff,

            v.

PETAL CARD, INC. f/k/a/
CREDITBRIDGE, INC., ANDREW
ENDICOTT, and JASON GROSS,

                  Defendants.

ORAL ARGUMENT REQUESTED


1:18-cv-5495 (JFK) (BCM)


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

Roberta A. Kaplan
John C. Quinn
Martha Fitzgerald
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883

*Counsel to Defendants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................. 3

STANDARD OF REVIEW ............................................................................................. 7

ARGUMENT .................................................................................................................. 7

    I.      SHIH FAILS TO STATE A CLAIM AGAINST GROSS. ........................................ 7

        A.      Alleged Aiding and Abetting Endicott's Breach of Fiduciary Duty ...................... 7

        B.      Alleged Breach of Fiduciary Duties ................................................................. 10

        C.      Alleged Unjust Enrichment ............................................................................. 11

        D.      Alleged Misappropriation and Unfair Competition ........................................... 11

    II.     SHIH FAILS TO STATE A CLAIM AGAINST PETAL CARD, INC. ..................... 17

    III.    SHIH FAILS TO STATE A CLAIM AGAINST ENDICOTT. .................................. 19

        A.      Endicott Did Not Agree to Be Shih's Business Partner ...................................... 20

           1.      Alleged Existence of an Actual Contract ........................................ 21

           2.      Alleged Existence of an Implied-in-Fact Contract ......................... 23

           3.      Alleged Breach of the Covenant of Good Faith and Fair Dealing ................. 24

           4.      Alleged Quasi-Contract Claims ...................................................... 24

        B.      Endicott Did Not Breach Any Agreements with Shih by Founding Petal ............ 25

        C.      Endicott Did Not Owe Shih Any Other Fiduciary Duties. ................................. 25

           1.      Co-Venturer ................................................................................. 26

           2.      Attorney ....................................................................................... 26

           3.      Fundraising Agent ......................................................................... 27

           4.      Corporate Director/Shareholder in Equity ...................................... 27

           5.      Corporate Promoter/Relationship of Trust and Confidence ............. 28

    IV.   SHIH IS NOT ENTITLED TO A CONSTRUCTIVE TRUST OR SPECIFIC
        PERFORMANCE AS A MATTER OF LAW. ................................................. 28

CONCLUSION ............................................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allaire Corp. v. Okumus*,
   433 F.3d 248 (2d Cir. 2006)..................................................................... 7

*Andor Group, Inc. v. Benninghoff*,
   631 N.Y.S.2d 79 (App. Div. 2d Dep't 1995)......................................21-22

*Armstrong v. Sun Printing & Publ'g Ass'n*,
   122 N.Y.S. 531 (App. Div. 2d Dep't 1910)............................................. 28

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................. 7

*Barnes v. Telestone Techs. Corp.*,
   No. CV 8513-VCG, 2013 WL 3480270 (Del. Ch. July 10, 2013) .......................... 28

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................. 7

*Brooks v. Weiser*,
   57 F.R.D. 491 (S.D.N.Y. 1972) ............................................................. 27

*Broughel v. Battery Conservancy*,
   No. 07-Civ-7755, 2010 WL 1028171 (S.D.N.Y. Mar. 16, 2010)............................ 13

*Brown v. Rawlings Fin. Servs., LLC*,
   868 F.3d 126 (2d Cir. 2017).................................................................... 25

*Case v. Clivilles*,
   216 F. Supp. 3d 367 (S.D.N.Y. 2016)..................................................... 26

*CMG Holdings Grp. v. Wagner*,
   No. 15-Civ-5814, 2016 WL 4688865 (S.D.N.Y. Sept. 7, 2016) ............................ 29

*De Sole v. Knoedler Gallery, LLC*,
   139 F. Supp. 3d 618 (S.D.N.Y. 2015)....................................................... 8

*Desny v. Wilder*,
   299 P.2d 257 (Cal. 1956) ....................................................................... 12

*Destiny USA Holdings, LLC v. Citigroup Glob. Markets Realty Corp.*,
   889 N.Y.S.2d 793 (App. Div. 4th Dep't 2009).....................................29-30

*DiPilato v. 7-Eleven, Inc.*,
    662 F. Supp. 2d 333 (S.D.N.Y. 2009)..........................................................................29, 30

*Div. 1181 A.T.U.-N.Y. Emp. Pension Fund By Cordiello v. City of N.Y. Dep't of Educ.*,
    910 F.3d 608 (2d Cir. 2018)....................................................................................18-19

*Educ. Sales Programs, Inc. v. Dreyfus Corp.*,
    65 Misc. 2d 412 (N.Y. Sup. Ct. 1970) ...........................................................................15

*Effie Film, LLC v. Pomerance*,
    909 F. Supp. 2d 273 (S.D.N.Y. 2012) ...........................................................................13

*Entel v. Guilden*,
    223 F. Supp. 129 (S.D.N.Y. 1963).................................................................................27

*Epstein v. Dennison Mfg. Co.*,
    314 F. Supp. 116 (S.D.N.Y. 1969)............................................................................14-15

*Flickinger v. Harold C. Brown & Co.*,
    947 F.2d 595 (2d Cir. 1991)..........................................................................................10

*Gianino v. Panacya, Inc.*,
    No. 00-Civ-1584, 2000 WL 1224810 (S.D.N.Y. Aug. 29, 2000)....................................18

*Gottsch v. Eaton & Van Winkle LLP*,
    No. 17-Civ-6974, 2018 WL 4609111 (S.D.N.Y. Sept. 24, 2018) ...................................10

*Granoff v. Merrill Lynch & Co.*,
    775 F. Supp. 621 (S.D.N.Y. 1991).................................................................................16

*Hall v. EarthLink Network, Inc.*,
    396 F.3d 500 (2d Cir. 2005)..........................................................................................24

*Hanson v. Hanson*,
    No. 18-Civ-0695, 2019 WL 935127 (S.D.N.Y. Feb. 26, 2019) .....................................22

*In re Ades & Berg Grp. Inv'rs*,
    550 F.3d 240 (2d Cir. 2008)......................................................................................28-29

*In re Hausman*,
    921 N.E.2d 191 (N.Y. 2009)..........................................................................................18

*In re Robbins Int'l, Inc.*,
    275 B.R. 456 (S.D.N.Y. 2002).......................................................................................19

*Islip U-Slip LLC v. Gander Mountain Co.*,
    2 F. Supp. 3d 296 (N.D.N.Y. 2014)...............................................................................29

*Johnson v. Nextel Commc'ns, Inc.*,
  660 F.3d 131 (2d Cir. 2011).................................................................................... 11

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*,
  417 N.E.2d 541 (N.Y. 1981)................................................................................... 29

*JP Morgan Chase Bank v. Winnick*,
  406 F. Supp. 2d 247 (S.D.N.Y. 2005)................................................................... 8, 9

*Kaufman v. Cohen*,
  760 N.Y.S.2d 157 (App. Div. 1st Dep't 2003) ................................................... 9, 10

*Kaye v. Grossman*,
  202 F.3d 611 (2d Cir. 2000)................................................................................... 25

*Kirschner v. Bennett*,
  648 F. Supp. 2d 525 (S.D.N.Y. 2009)...................................................................... 9

*Kolbeck v. LIT Am., Inc.*,
  939 F. Supp. 240 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998) ................... 9

*Kowalchuck v. Stroup*,
  873 N.Y.S.2d 43 (App. Div. 1st Dep't 2009) ........................................................ 21

*Maas v. Cornell Univ.*,
  721 N.E.2d 966 (N.Y. 1999)................................................................................... 23

*Mandarin Trading Ltd. v. Wildenstein*,
  944 N.E.2d 1104 (N.Y. 2011)................................................................................. 11

*Marcella & Co. v. Avon Prods., Inc.*,
  724 N.Y.S.2d 192 (App. Div. 2d Dep't 2001)........................................................ 24

*Matter of Boice*,
  640 N.Y.S.2d 681 (App. Div. 3d Dep't 1996) ....................................................... 23

*Matter of Cooperman*,
  633 N.E.2d 1069 (N.Y. 1994)................................................................................. 26

*Mazzaro de Abreu v. Bank of Am. Corp.*,
  525 F. Supp. 2d 381 (S.D.N.Y. 2007).................................................................. 7-8

*McGhan v. Ebersol*,
  608 F. Supp. 277 (S.D.N.Y. 1985).............................................................. 16, 23-24

*MiniFrame Ltd. v. Microsoft Corp.*,
  No. 11-Civ-7419, 2013 WL 1385704 (S.D.N.Y. Mar. 28, 2013),
  *aff'd*, 551 F. App'x 1 (2d Cir. 2013).................................................................... 17

*Miramax Film Corp. v. Abraham*,
    No. 01-Civ-5202, 2003 WL 22832384 (S.D.N.Y. Nov. 25, 2003)...........................................18

*Moran v. Hurst*,
    822 N.Y.S.2d 564 (App. Div. 2d Dep't 2006) ...........................................................................26

*News Am. Mktg., Inc. v. Lepage Bakeries, Inc.*,
    791 N.Y.S.2d 80 (App. Div. 1st Dep't 2005) ...........................................................................18

*Next Commc'ns, Inc. v. Viber Media, Inc.*,
    No. 14-Civ-8190, 2016 WL 1275659 (S.D.N.Y. Mar. 30, 2016)...........................................13

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016).......................................................................................................4

*N. Shipping Funds I, LLC v. Icon Capital Corp.*,
    921 F. Supp. 2d 94 (S.D.N.Y. 2013)...............................................................................22, 28

*Pioli v. Town of Kirkwood*,
    499 N.Y.S.2d 266 (App. Div. 3d Dep't 1986) .........................................................................18

*Port Chester Elec. Const. Co. v. Atlas*,
    357 N.E.2d 983 (N.Y. 1976)....................................................................................................18

*Rainbow Nav., Inc. v. Pan Ocean Nav., Inc.*,
    535 A.2d 1357 (Del. 1987) ..................................................................................................27-28

*Reif v. Williams Sportswear, Inc.*,
    9 N.Y.2d 387 (App. Div. 1st Dep't 1961) ...............................................................................19

*Ring v. Estee Lauder, Inc.*,
    874 F.2d 109 (2d Cir. 1989)....................................................................................................14

*Roni LLC v. Arfa*,
    903 N.Y.S.2d 352 (App. Div. 1st Dep't. 2011) .................................................................11, 26

*Rosner v. Bank of China*,
    349 F. App'x 637 (2d Cir. 2009) ...............................................................................................9

*Sass v. TMT Restoration Consultants Ltd.*,
    953 N.Y.S.2d 574 (Sup. Ct. 2012)..........................................................................................18

*Schroeder v. Cohen*,
    No. 652183/2013, 2017 WL 5668423 (N.Y. Sup. Ct. Nov. 27, 2017) ....................................15

*Schroeder v. Cohen*,
    93 N.Y.S.3d 287 (App. Div. 1st Dep't 2019) .....................................................................15-16

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
   726 F. Supp. 2d 291 (S.D.N.Y. 2010)............................................................................ 10-11

*Steinbeck v. Gerosa*,
   151 N.E.2d 170 (N.Y. 1958)............................................................................................. 26

*Steinbeck v. Steinbeck Heritage Found.*,
   400 F. App'x 572 (2d Cir. 2010) ..................................................................................... 27

*Stratford Grp., Ltd. v. Interstate Bakeries Corp.*,
   590 F. Supp. 859 (S.D.N.Y. 1984).................................................................................. 22

*Teplitsky v. Karian*,
   No. 014840/2010, 2011 WL 579047 (N.Y. Sup. Ct. Jan. 31, 2011) ....................... 28

*Thermal Imaging, Inc. v. Sandgrain Sec., Inc.*,
   158 F. Supp. 2d 335 (S.D.N.Y. 2001).........................................................................25-26

*Toledo Fund, LLC v. HSBC Bank USA, Nat'l Ass'n*,
   No. 11-Civ-7686, 2012 WL 364045 (S.D.N.Y. Feb. 3, 2012) ................................ 24

*Turner v. Temptu Inc.*,
   No. 11-Civ-4144, 2013 WL 4083234 (S.D.N.Y. Aug. 13, 2013).................................. 12, 13

*U.S. Small Bus. Admin. V. Feinsod*,
   347 F. Supp. 3d 147 (S.D.N.Y. 2018)............................................................................ 11, 27

*Universal Indus. Corp. v. Lindstrom*,
   459 N.Y.S.2d 492 (App. Div. 4th Dep't 1983)............................................................... 19

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
   27 F. Supp. 3d 156, 167 (S.D.N.Y. 2015)........................................................................ 1

*Zino Davidoff SA v. Selective Distrib. Int'l Inc.*,
   No. 07-Civ-10326, 2013 WL 1245974 (S.D.N.Y. Mar. 8, 2013)............................. 12

## Statutes

8 Del. C. § 220(a)(1) ........................................................................................................ 27

Fed. R. Civ. P. 12(b)(6)...................................................................................................... 7

## Other Authorities

1 Treatise on the Law of Corps. § 5:14 (3d ed. 2017) ........................................................ 11

*About Us*, Revolution Credit (last visited Oct. 15, 2019),
  https://www.revolutioncredit.com/about-us/ ......................................................... 14

Alyssa Stewart Lee et al., *Give Credit Where Credit is Due: Increasing Access to
  Affordable Mainstream Credit Using Alternative Data*, Brookings (December 2006),
  https://www.brookings.edu/research/give-credit-where-credit-is-due-increasing-access-
  to-affordable-mainstream-credit-using-alternative-data/ .................................................... 13

*Backed – Overview*, Crunchbase (last visited Oct. 15, 2019),
  https://www.crunchbase.com/organization/backed-2 ......................................................... 14

*Backed Inc Company Profile*, Bloomberg (last visited Oct. 15, 2019),
  https://www.bloomberg.com/profile/company/1350313D:US ............................................. 14

Brittany Shoot, *Vouch: The First Social Network for Credit*, Entrepreneur (Nov. 5, 2015),
  https://www.entrepreneur.com/article/251428 ..................................................... 14

*Credit Without Borders*, Credit Without Borders (last visited Oct. 15, 2019),
  https://creditwithoutborders.com/ .......................................................................... 14

*Credit Without Borders: Revolutionizing Car Loans for Uber and Lyft Drivers*,
  AngelList (last visited Oct. 15, 2019),
  https://angel.co/company/credit-without-borders ................................................... 14

*Data Point: Credit Invisibles*, Consumer Financial Protection Bureau (May 2015),
  https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf ............. 14

David Bornstein, *"Invisible" Credit? (Read This Now!)*, N.Y. Times (October 2014),
  https://opinionator.blogs.nytimes.com/2014/10/02/invisible-credit-read-this-now/ ............ 14

*Earnest*, Earnest (last visited Oct. 15, 2019),
  https://www.earnest.com/ ......................................................................................... 14

Ericca Maas, *Credit Scoring and the Underserved Population*, Federal Reserve Bank
  of Minneapolis (May 2008),
  https://www.minneapolisfed.org/publications/community-dividend/credit-scoring-and-
  the-creditunderserved-population ................................................................................ 13

*Expanding the Marketable Universe*, Experian (2011),
  https://www.experian.com/innovation/thought-leadership/expanding-credit-marketing-
  white-paper.jsp ......................................................................................................... 14

*Giving Underserved Consumers Better Access to the Credit System: The Promise of Non-Traditional Data*, INFORMATION POLICY INSTITUTE (July 2005),
http://www.perc.net/wp-content/uploads/2013/09/nontrad.pdf ............................................ 13

Jason Margolis, *Lending Circles: Helping Immigrants in America Build Credit*, PRI (May 2013),
https://www.pri.org/stories/2013-05-15/lending-circles-helping-immigrants-america-build-credit ............................................................................................................................. 14

Jeremy M. Simon & Kelly Dilworth, *VantageScore Turns 10: What It Is, Why It Matters*, CREDITCARDS.COM (June 29, 2016),
https://www.creditcards.com/credit-card-news/vantagescore-credit-score.php .................. 14

LendUp, *LendUp Creates Stand-Alone Company to Accelerate Expansion of Its Growing Credit Card Business, Fueled by New Capital Injection*, PR NEWSWIRE (Jan. 10, 2019, 11:00 ET),
https://www.prnewswire.com/news-releases/lendup-creates-stand-alone-company-to-accelerate-expansion-of-its-growing-credit-card-business-fueled-by-new-capital-injection-300776163.html .................................................................................................. 14

Michael A. Turner et al., *New to Credit from Alternative Data*, PERC (March 2009),
http://www.perc.net/wp-content/uploads/2013/09/New_to_Credit_from_Alternative_Data_0.pdf ............................................................................................. 14

*ModernLend*, ANGELLIST (last visited Oct. 15, 2019),
https://angel.co/company/modernlend ............................................................................... 14

*ModernLend*, CRUNCHBASE (last visited Oct. 15, 2019),
https://www.crunchbase.com/organization/livealpha#section-overview ........................... 14

*Most Innovative Companies: Earnest*, FAST COMPANY (last visited Oct. 15, 2019),
https://www.fastcompany.com/company/earnest ................................................................ 14

Oportun, Prospectus (Form S-1) (July 17, 2019),
https://www.sec.gov/Archives/edgar/data/1538716/000119312519195573/
d692259ds1.htm#toc692259_12 ........................................................................................ 14

*Our Mission*, DESERVE (last visited Oct. 15, 2019),
https://www.deserve.com/about-us/ .................................................................................... 14

Paul DeSaulniers, *Utilizing Alternative Data in the Credit Decisioning Process – CFSI Underbanked Forum*, LEXISNEXIS (June 2008),
http://www.sourcemediaconferences.com/CFSI08/pdf/paul.pdf ........................................ 14

Penny Crosman & Andy Peters, *New Underbanked FICO Score Faces Old Banker Skepticism*, AMERICAN BANKER (Apr. 2, 2015, 4:52 PM ET),
https://www.americanbanker.com/news/new-underbanked-fico-score-faces-old-banker-skepticism ......................................................................................................................... 14

Rachel Schneider & Arjan Schütte, *The Predictive Value of Alternative Credit Scores*, CENTER FOR FINANCIAL SERVICES INNOVATION (November 2007), https://s3.amazonaws.com/cfsi-innovation-files/wp-content/uploads/ 2017/02/05053225/The-Predictive-Value-of-Alternative-Credit-Scores.pdf......................13

*Report to the Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit*, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM (Aug. 2007), https://www.federalreserve.gov/boarddocs/rptcongress/creditscore/creditscore.pdf ...........14

Sara Ashley O'Brien, *Alternative Lenders Are Hot—Especially Among Millenials*, CNN (Dec. 18, 2014, 12:53 PM ET), https://money.cnn.com/2014/12/18/smallbusiness/alternative-lending- millennials/index.html ........................................................................................................14

*The Story of LendUp*, LENDUP (last visited Oct. 15, 2019), https://www.lendup.com/our-story ......................................................................................14

*This Is Upstart*, UPSTART (last visited Oct. 15, 2019), https://www.upstart.com/about...............................................................................................14

*Tremus Inc*, VCFUND.Me DATA (last visited Oct. 15, 2019), https://pseps.com/company/tremus-inc.................................................................................14

*Why Oportun,* OPORTUN (last visited Oct. 15, 2019), https://oportun.com/whyoportun/.........................................................................................14

## PRELIMINARY STATEMENT

Defendant Petal Card, Inc. ("Petal") provides a software platform that simplifies credit card applications and management for U.S. consumers and partner banks. *See* Ex. A; Ex. B.[1] Petal offers consumers a user-friendly platform that guides them through the application process, facilitating a swift credit decision from a partner bank, and enables approved customers to manage their credit card accounts. Working on behalf of a partner bank, Petal uses proprietary statistical algorithms and models to assess an applicant's credit default risk. Petal's proprietary technology automates aspects of underwriting that historically have been done manually. This lowers the underwriting costs, allowing banks to consider in credit card underwriting the digital bank statements of some applicants in addition to traditional credit score and credit bureau data.[2] Because Petal facilitates the banks' access to and evaluation of this additional financial data cost-effectively, it helps some "credit invisibles"—or people without credit scores—qualify for credit.

*No one* had the idea for Petal's underwriting method, software platform, or business model in 2015. Not Defendants Andrew Endicott or Jason Gross. Certainly not Plaintiff Cassandra Shih. The Second Amended Complaint ("SAC")—Shih's third bite at the apple—alleges no different. Instead, it alleges that over five weeks in mid-2015, while living in New Zealand, Shih periodically chatted online and had two calls with Endicott. They brainstormed how a well-known market failure in migrant credit access might be solved. But they never agreed on a solution, or even the outlines of one, that might comprise a business. Years later, after Endicott and Gross founded their own company, Shih filed this suit demanding millions of dollars and half of all Petal's shares.

The SAC alleges that Shih came up with the idea for Petal and gave it to Endicott, who

---

[1] The Court may take judicial notice of these publicly available websites. *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 27 F. Supp. 3d 156 (S.D.N.Y. 2015).

[2] Petal refers to the incorporation of these alternate data sources in a credit evaluation as "cash flow underwriting."

stole it and froze her out. But this is implausible, and her claims are riddled with legal errors. *First*, Gross did not owe Shih any legal duties or have actual knowledge of duties owed by Endicott; Gross had never allegedly heard of Shih until eight months after her discussions with Endicott, and before this litigation, he had never met, spoken to, or corresponded with her. *Second*, the SAC does not evince idea misappropriation: Shih voluntarily shared an abstract, unoriginal observation about migrant credit access at a time when neither Endicott nor Gross owed her any fiduciary duty. *Third*, because Petal did not even exist until long after Shih's interactions with Endicott, and never assumed any of his alleged duties or agreements as its own, Shih cannot state a claim against Petal. Shih's total disregard of corporate law requirements defeats her claims. *Fourth,* it is implausible to conclude from the allegations that Endicott, a former lawyer and investment banker, agreed in periodic, informal chats to create a business with Shih (or become her fiduciary) despite gaping holes in the material terms of any such agreement. *Finally*, even if Shih has stated some legal claim, she would be entitled only to damages, not the exotic and redundant remedies she demands.

It is particularly notable that Shih seems unable to explain what idea, exactly, she came up with. At first, she had only a vague proposal to somehow help bridge migrant credit histories into the United States. ¶ 40. Then she imagined an entity that would somehow directly offer credit to new migrants, ¶ 50, or that would somehow—through unknown means—"vet" and/or underwrite a bank's extension of credit to migrants. *Id.* But perhaps, instead, her idea was for a business that would serve as a guarantor, ¶ 76, or as a co-signer, SAC Ex. A, or a contractor for multinational corporations, ¶ 77. The SAC casually bandies these possibilities around as Shih's "idea," even though they are radically different, and even though Shih and Endicott never actually agreed on *any* of them (the most basic step two people could take in the direction of building a new business). Nor does the SAC allege exactly what goods or services this hypothetical venture would provide,

how they would be developed, procured, or distributed, what technology this venture would use or where it would come from, who else would join the team, or how it would make money.

This scattershot pleading confirms that Shih and Endicott never reached any agreement to go into business. Rather, like so many entrepreneurs, they bounced ideas around, failed to nail down anything concrete, and parted ways. Shih's assertion that this short-lived exchange entitles her to millions of dollars and half a company is baseless. The SAC should therefore be dismissed.

### BACKGROUND[3]

Endicott and Shih met in the summer of 2014, when she was in New York for an internship with New Zealand's Permanent Mission to the U.N. ¶¶ 13-14. They socialized a few times, always in non-professional settings, until she left two months later. ¶¶ 17-18. After that, they chatted periodically on Facebook Messenger, often commiserating about their respective jobs. ¶¶ 19-23.

On April 24, 2015, Endicott sent Shih a message opining that they should ditch their careers to "start a company together" that "does some cool trans-pacific stuff." ¶ 27. Shih jokingly responded, "You got skills?" *Id.* Endicott retorted, "I would say so," pointing out the work in law and banking that Shih knew he sought to escape. *Id.* Endicott added that he was "looking for something cool to sell and haven't really been able to find it." *Id.* Shih wrote back, "Well, if you're serious, let's talk more." ¶ 32. Three days later Shih spontaneously messaged Endicott an "idea for a credit bridging service that would enable immigrants without a United States credit history to access consumer credit in the United States and build a United States credit history." ¶ 40. Endicott replied, "There might be some hidden obstacles, but if not, then it's worth trying." ¶ 42. The following day, Shih "elaborate[d]" "that her company would independently 'vet' the creditworthiness of individuals who had no U.S. credit histories, and extend credit or underwrite

---

[3] As required at this stage of the litigation, these facts are drawn from the SAC and treated as true.

the risk of a U.S. bank's extension of credit . . . ." ¶ 50; *but see* SAC Ex. A (Shih stating her "original idea was . . . to co-sign the credit of new migrants"). Endicott responded by saying, "let's create this things [sic]" and "it will give you an excuse to run around the world some more." ¶ 53. Shih replied, "okay anyway do some digging, let me know . . . if all signs are still towards viability then we can start building a small team." *Id*. According to the SAC, the deal was set in stone at that very moment: they had "agreed to create a business based upon Shih's idea." ¶¶ 54-55.

As they had discussed, Endicott sought from Shih and third parties basic information about migrant credit access, domestic and international credit bureaus, and alternative credit scoring. ¶¶ 44-48, 57-72. When Shih checked in on May 3, Endicott said he was still researching. ¶ 65. On May 5, Endicott recognized that they had no business model, as he hoped to "gin[] up a solution" to the credit gap issue. ¶ 67. Over the next weeks, they tossed around ideas for potential businesses. Shih proposed to "co-sign the credit of new migrants" with some undetermined fee structure. SAC Ex. A. Rather than the "50 million 'unscoreable' people in the U.S.," she was focused on "skilled migrants." *Id.* She and Endicott then floated a "guarantor" service. ¶ 76. Shih next suggested contracting exclusively with multinational corporations "that bring large numbers of workers into the U.S." ¶ 77. On May 10, Endicott and Shih set out to research several "Big Questions,"[4] including the migrant credit gap's size and what regulatory issues might arise if they tried to address it (Endicott's task) and the credit information available in New Zealand (Shih's task). Ex. C. On May 19, they began researching how to pull foreign credit data (Shih's task) and how U.S. banks might access and use that data (Endicott's task). SAC Ex. B. Endicott created a document[5] reflecting the preliminary information he found and shared it openly with Shih and third parties,

---

[4] This e-mail is incorporated into the SAC by reference. *See* ¶ 83; *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230-31 (2d Cir. 2016).
[5] This "Big Questions (v3)" document, Exhibit D, is incorporated into the SAC by reference. *See* ¶¶ 88, 139(c)-(d).

including his friend Berk Ustun, who later became a co-founder of Petal. *See* ¶¶ 86-91, 58.

Shih and Endicott never shook their uncertainty about what services they would try to develop. Nonetheless, amid that confusion about the fundamentals of their discussion, the SAC alleges that on a May 16 Skype call, Shih and Endicott finalized "the CreditBridge business plan, including product development, potential team members, employees, and business partners, expenses, how the company would make money including anticipated profits, losses, and expenses and how such profits, losses, and expenses would be shared, consumer behavior, venture capital, [and] Shih's availability to return to New York." ¶ 93. It does not allege that this agreement was ever memorialized, or that Endicott, a former corporate lawyer, even discussed memorializing it. It simply asserts a legal conclusion: that Shih and Endicott had "established an implied agreement to create a joint venture." ¶ 99. Nowhere does it allege, for example, what service they decided to offer or how they would create and market it. *See* ¶ 93(g) (acknowledging this indecision).

With their business model, product or service, and target market still undetermined, and without any concrete plan to develop any necessary technology, on May 20, Shih and Endicott allegedly traded notes about how they might prepare to pitch their supposed "venture" to investors. ¶ 100. They then held a second, final Skype call on June 6 or 7, and "reaffirmed their commitment to proceed with their CreditBridge joint venture as equal partners." ¶ 110. They also agreed to "finalize a business proposal slide deck and take CreditBridge into a 'pitch phase.'" ¶ 112.

At this point, during a crucial phase in the life of her alleged joint venture, Shih took a three-week vacation. ¶ 111. The SAC alleges that Endicott was to finalize and sell their business to investors alone (supposedly under Shih's direct control, but also as her equal partner), using the research and models they had discussed. ¶¶ 112, 115. Inconveniently, however, Shih and Endicott lacked any product to pitch or service to offer, other than scattershot ideas about somehow helping

migrants access credit.[6] In reality, while Shih was unavailable, Endicott continued what he had done all along: he gathered and exchanged ideas with friends and experts in the hope of starting his own business. *See* ¶¶ 128-31, 140. One of those friends was Gross. ¶ 136. Months later, using the name CreditBridge as a placeholder, they started Petal: a software platform that helps banks access digital financial statements from other banks to assess creditworthiness and issue credit cards. ¶¶ 156, 148; Ex. A; Ex. B.

Meanwhile, Shih fell off the map. On June 28, while still on vacation, Shih messaged Endicott apologizing for her absence and asking him, "[H]ow's it going?" ¶ 119. When Endicott did not respond, Shih did not press the issue. On August 8, she wished him "happy birthday" on Facebook without even remarking upon their supposed joint venture or his alleged legal obligations to her. ¶ 141. On August 12, after seeing on Facebook that Endicott might be pursuing a startup called CreditBridge, she emailed him to "talk more about it." ¶ 145. When Shih did not hear back, she wondered to a mutual friend whether "he was still interested." ¶ 147. The friend, who did not say she had spoken to Endicott about it, responded that she thought he was "trying to see if there is general investor interest." ¶ 148. Shih then made no efforts—for six full months— to contact Endicott (or anyone else), or to do any work regarding her "idea." *See* ¶¶ 152, 164.

Only when public records revealed that Endicott and Gross's newly incorporated business might succeed did Shih reappear. CreditBridge was incorporated in February 2016. ¶ 156. In February and March 2016, Shih sent notes via email and LinkedIn to Endicott and Gross claiming that "CreditBridge was my business idea which I worked on with Andrew last year on the mutual understanding we would pursue its development in partnership." ¶¶ 170, 177, 184. This was the

---

[6] Consistent with this conclusion, the rollouts proposed in the draft investor pitch decks attached to the SAC show vague and shifting ideas for products CreditBridge might offer, and only the later deck from July 2015—not created by Shih—describes a "medium-term" product akin to what Petal now offers. *See* SAC Ex. C at 7; SAC Ex. F at 9.

first time she communicated with Gross; there is no allegation that he knew who she was. Shih

claimed entitlement to "50 per cent ownership." ¶ 170. To Gross, she made a veiled threat of bar

sanctions. ¶ 184. Her messages did not include any evidence, documents, or details. ¶¶ 170, 177,

184. Nor did they refer to any agreement, joint venture, or fiduciary duty—let alone identify the

terms of such obligations or assert a breach. *Id.* On March 24, 2016, Endicott responded to Shih,

copying Gross. He apologized for falling out of touch and assured her that Petal was not related to

their discussions in 2015. ¶ 186. Shih followed up with some questions, which Endicott did not

answer. ¶¶ 189-90. Over two years later, on June 19, 2018, Shih filed this suit. Dkt. 1.

## STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a

plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its

face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). The Court must accept as true all well-pleaded factual allegations in the complaint, and

"draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d

Cir. 2006). However, "the tenet that a court must accept as true all of the allegations contained in

a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I.   SHIH FAILS TO STATE A CLAIM AGAINST GROSS.

#### A.  Alleged Aiding and Abetting Endicott's Breach of Fiduciary Duty

To state an aiding and abetting claim under New York law, "a plaintiff must allege: (1)

breach by a fiduciary of obligations to another; (2) actual knowing participation by the defendant in the fiduciary's breach of obligations; and (3) damages to the plaintiff." *Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 392 (S.D.N.Y. 2007).  As explained below, Shih's claim fails because Endicott neither owed nor breached a fiduciary duty. The claim further fails because Gross neither had "actual knowledge" of nor "participated" in any alleged breach by Endicott.

 "A plaintiff must allege that 'the defendant had actual knowledge of the primary violator's status as a fiduciary and actual knowledge that the primary violator's conduct contravened a fiduciary duty.'" *Id.* at 393 (citation omitted). "The burden of demonstrating actual knowledge" is "a heavy one." *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 658 (S.D.N.Y. 2015). "Constructive knowledge—the possession of information that would cause a person exercising reasonable care and diligence to become aware of the fraud—is insufficient." *Id*. Thus "suspicion, without confirmation" is not actual knowledge. *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 255 (S.D.N.Y. 2005).

Actual knowledge is not alleged here. The SAC alleges that Endicott discussed Shih with Ustun, *see* ¶ 291, but it never alleges that he discussed her with Gross. The closest it comes is an allegation that, in May 2015, Endicott mentioned to Shih that an unnamed law school friend could be a potential partner. *See* ¶ 166. But it doesn't follow that Endicott had Gross in mind—let alone that he had spoken to Gross about Shih and given him *actual knowledge* that Endicott owed Shih fiduciary duties, which Gross conspired to violate. To uphold a claim of actual knowledge on these allegations would be to rid that requirement of any substance.

This leaves only Shih's allegation that she sent Gross messages after CreditBridge was incorporated, opining that Endicott had excluded her from the company and that she had come up with the idea for CreditBridge—a claim that Endicott immediately denied. ¶¶ 170, 177, 184, 186.

These messages do not support an inference that Gross had actual knowledge that Endicott had breached a fiduciary duty. Consider the context. Out of the blue, a stranger contacted Gross asserting—without any documentary support—that she owned half of the company he had recently formed after months of his own hard work, research, and financial investment. Her messages referred to some kind of "mutual understanding" that Shih and Endicott would "pursue its development in partnership," but did not identify, attach, or reference any agreements, contracts, or fiduciary duties. ¶¶ 170, 184. One note even threatened Gross. *See* ¶ 184. And Endicott—Gross's friend and business partner—responded to say that Shih was mistaken.

At most, these messages offered Gross cause for "suspicion, without confirmation." *Winnick*, 406 F. Supp. 2d at 255; *see also Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 248 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998) ("knowledge of accusations . . . without more" is not actual knowledge). They did not put Gross on actual notice of the alleged fact that Endicott owed fiduciary duties to a secret co-venturer living in another hemisphere. The SAC's allegation that Gross, a lawyer experienced in start-ups, "failed to adequately investigate" Shih's claim to half of Petal makes no difference. *See* ¶ 208. "[A] failure to investigate" is simply another form of "constructive notice" that cannot support liability unless Gross already owed Shih a fiduciary duty (which he did not). *Kolbeck*, 939 F. Supp. at 247; *see also Kirschner v. Bennett*, 648 F. Supp. 2d 525, 544 (S.D.N.Y. 2009); *Rosner v. Bank of China*, 349 F. App'x 637, 639 (2d Cir. 2009).

Finally, Gross did not knowingly "participate" in any breach of a fiduciary duty. Knowing participation, or "substantial assistance," "occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 170 (App. Div. 1st Dep't 2003). The SAC alleges that Gross assisted Endicott and Ustun in "embellishing" and "crafting a false origin story" for Petal to erase Shih's

role, thereby concealing and enabling Endicott's breach of duty to her. ¶¶ 179, 182, 295. But the email exchange from which this allegation quotes—which is incorporated into the pleadings by reference—shows that Gross did no such thing. *See* Ex. E. He and Endicott offered minor line edits to Ustun's draft responses to a reporter, who had asked Ustun how, as an immigrant, he had come to obtain credit in the U.S. The emails had nothing whatsoever to do with Petal's "origin story." The SAC alleges no other acts by Gross to substantially assist the breach of a duty to Shih.[7]

Shih claims that a fiduciary duty (and contract) can be inferred from the full circumstances of her dealings with Endicott in mid-2015. But even if it could, the existence of any such implied duty would hardly have been self-evident to Gross, who was not involved in those dealings and reasonably doubted claims advanced without evidence by a hostile stranger. The allegation that Gross somehow participated in a coverup of Endicott's bad acts is a disingenuous portrayal of an innocent email exchange. This aiding and abetting claim fails as a matter of law.

### B. Alleged Breach of Fiduciary Duties

"To state a claim for breach of fiduciary duty, a plaintiff must allege "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Gottsch v. Eaton & Van Winkle LLP*, No. 17-Civ-6974, 2018 WL 4609111, at *3 (S.D.N.Y. Sept. 24, 2018). Here, Shih incorrectly contends that Gross, as Petal's promoter, ¶ 303, shareholder, ¶ 304, and executive and director, ¶ 311, was her fiduciary and that he violated his duties to her.

A fiduciary relationship exists "when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991). The analysis "focus[es] on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence

---

[7] Again, Gross's failure to act cannot be the basis of claim for aiding and abetting a breach of fiduciary duty unless Gross independently owed Shih a fiduciary duty. *See Kaufman*, 760 N.Y.S.2d at 170.

over the first," and on whether "that trust is also accepted by the other party." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 726 F. Supp. 2d 291, 306 (S.D.N.Y. 2010). A promoter owes duties to "the promoted corporation, its stockholders, and fellow promoters." 1 TREATISE ON THE LAW OF CORPS. § 5:14 (3d ed. 2017); *see also Roni LLC v. Arfa*, 903 N.Y.S.2d 352, 355 (App. Div. 1st Dep't. 2011). A corporate director or officer similarly owes duties to the corporation and its shareholders. *See U.S. Small Bus. Admin. V. Feinsod*, 347 F. Supp. 3d 147, 158 (S.D.N.Y. 2018).

It would pervert the very concept of a fiduciary duty to say that Gross owed one to Shih, whom he had never met or spoken to. There is "no evidence that [Shih] reposed trust or confidence in [Gross], . . . or that [Gross] accepted that trust, whether by words or conduct." *Sokol*, 726 F. Supp. 2d at 306 (citation omitted). Gross never agreed to promote Shih's company or to rank among her shareholders. She, in turn, never accepted or relied on him in either capacity.

By the same token, if Gross did somehow owe Shih a duty, he was unaware of that fact at all relevant times. He had never heard of Shih until early 2016 and his receipt of an e-mail from her at that time cannot reasonably be read as imparting actual knowledge that he had secretly been working for her (or her company) the whole time. *See Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (requiring knowledge, not negligence, to show breach of duty).

### C.  Alleged Unjust Enrichment

Shih's claim for unjust enrichment fails here for the same reasons that her fiduciary duty claim fails: the absence of a relationship "that could have caused reliance or inducement." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011). Nowhere does the SAC allege such a relationship between Shih and Gross.

### D.  Alleged Misappropriation and Unfair Competition

Shih's unfair competition claim is based on a purported misappropriation of her "business

model, insight, skills, and work product." ¶ 366. It must therefore be dismissed if she fails to allege misappropriation of a business idea. *See Zino Davidoff SA v. Selective Distrib. Int'l Inc.*, No. 07-Civ-10326, 2013 WL 1245974, at *10 (S.D.N.Y. Mar. 8, 2013) ("'[A]bsent some appropriation of an idea . . .' there is no basis for relief [for unfair competition.]" (citation omitted)). To state a misappropriation claim, Shih must allege "the existence of a legal relationship between the parties in the form of a fiduciary relationship, an express or implied-in-fact contract, or quasi-contract," and "the idea must be novel and concrete." *Turner v. Temptu Inc.*, No. 11-Civ-4144, 2013 WL 4083234, at *9 (S.D.N.Y. Aug. 13, 2013). Here, six distinct reasons require rejection of Shih's misappropriation claims—and derivative unfair competition claims—against Gross and Endicott.

*First*, as explained above, Shih cannot demonstrate the existence of a "legal relationship" with Gross. *Id.* at *9. And as explained below, the same is true of her alleged legal relationship with Endicott. This is sufficient to require dismissal.

*Second*, there is no reasonable basis for concluding that a legal relationship with either Endicott or Gross existed on April 27, 2015, when Shih shared her "idea" with Endicott (but not with Gross, who has never received any ideas from her). *See* ¶ 40. As courts have long recognized, "[t]he idea man who blurts out his idea without having first made his bargain has no one but himself to blame for the loss of his bargaining power." *Desny v. Wilder*, 299 P.2d 257, 270 (Cal. 1956). Appearing to recognize this problem, Shih asserts that she disclosed her idea "in strict confidence and in reliance upon Endicott's offer that the two start a company together." ¶ 341. But that is implausible and irrelevant. New York law imposes liability for misappropriation only if a legal relationship exists *when the idea is disclosed*. The brief, lighthearted Facebook exchange on April 24 did not create any such relationship. *See* ¶¶ 27-32. Shih's own conduct reflects that; she never objected to Endicott sharing her "idea" with others. *See* ¶¶ 72, 91; SAC Ex. A. Even if a legal

12

relationship arose later, that does not retroactively create misappropriation liability.

*Third*, Shih's idea was not "novel." *Turner*, 2013 WL 4083234, at *9. In misappropriation, "idea" is a term of art, and is not the same as "idea" in common parlance.[8] "The test for novelty is rather stringent; the idea must show true invention and not a mere adaptation of existing knowledge." *Broughel v. Battery Conservancy,* No. 07-Civ-7755, 2010 WL 1028171, at *4 (S.D.N.Y. Mar. 16, 2010). Whether the defendant subjectively believed an idea was novel is immaterial; there is no legal "novelty" if it is "already in use in the industry at the time of plaintiff's submission," *id.*, or "if it is simply a variation on a theme that already existed," *Next Commc'ns, Inc. v. Viber Media, Inc.*, No. 14-Civ-8190, 2016 WL 1275659, at *5 (S.D.N.Y. Mar. 30, 2016).

Shih's "idea"—that a credit gap somehow might be solved by looking outside the traditional credit scoring system—falls far short of novelty. Plenty of sources, of whose existence the Court may take judicial notice,[9] reveal widespread discussion by mid-2015 of that very issue:

- *Giving Underserved Consumers Better Access to the Credit System: The Promise of Non-Traditional Data*, INFORMATION POLICY INSTITUTE (July 2005)[10]
- Alyssa Stewart Lee et al., *Give Credit Where Credit is Due: Increasing Access to Affordable Mainstream Credit Using Alternative Data*, BROOKINGS (December 2006) ("Mainstream lenders can use 'alternative' or 'nontraditional' data, including payment obligations such as rent, gas, electric, insurance, and other recurring obligations, to evaluate the risk profile of a potential borrower. . . . [This] can bridge the information gap on financial risk for millions of Americans.")[11]
- Rachel Schneider & Arjan Schütte, *The Predictive Value of Alternative Credit Scores*, CENTER FOR FINANCIAL SERVICES INNOVATION (November 2007)[12]
- Ericca Maas, *Credit Scoring and the Underserved Population*, FEDERAL RESERVE BANK OF MINNEAPOLIS (May 2008)[13]

---

[8] Endicott's emails suggesting that Shih had given him an "idea," or that he had an "idea" others could steal, ¶¶ 59, 80, therefore have no bearing on the misappropriation analysis.

[9] *See Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 298 (S.D.N.Y. 2012) (on the law of judicial notice).

[10] http://www.perc.net/wp-content/uploads/2013/09/nontrad.pdf

[11] https://www.brookings.edu/research/give-credit-where-credit-is-due-increasing-access-to-affordable-mainstream-credit-using-alternative-data/

[12] https://s3.amazonaws.com/cfsi-innovation-files/wp-content/uploads/2017/02/05053225/The-Predictive-Value-of-Alternative-Credit-Scores.pdf

[13] https://www.minneapolisfed.org/publications/community-dividend/credit-scoring-and-the-creditunderserved-population

- Michael A. Turner et al., *New to Credit from Alternative Data*, PERC (March 2009)[14]
- Jason Margolis, *Lending Circles: Helping Immigrants in America Build Credit*, PRI (May 2013)[15]
- David Bornstein, *"Invisible" Credit? (Read This Now!)*, N.Y. TIMES (October 2014)[16]
- *Data Point: Credit Invisibles*, CONSUMER FINANCIAL PROTECTION BUREAU (May 2015)[17]

These topics were also discussed in congressional testimony,[18] industry conferences,[19] and consumer outlets.[20] And other businesses publicly explored cashflow underwriting and credit score alternatives by 2015, including Backed,[21] Earnest,[22] LendUp,[23] ModernLend (now Credit Without Borders),[24] Oportun,[25] RevolutionCredit,[26] SelfScore (now Deserve),[27] Upstart,[28] VantageScore,[29] and Vouch.[30] That Endicott might have felt Shih had expressed something novel, *see* ¶¶ 352-53, makes no difference. The "observation of the public use of the idea by a third party totally precludes plaintiff's claims." *Ring v. Estee Lauder, Inc.*, 874 F.2d 109, 110 & n.1 (2d Cir. 1989).

*Fourth*, Shih's idea was not "concrete." An idea is "concrete" enough to be misappropriated only if "it could be utilized without any substantial further development or

---

[14] http://www.perc.net/wp-content/uploads/2013/09/New_to_Credit_from_Alternative_Data_0.pdf

[15] https://www.pri.org/stories/2013-05-15/lending-circles-helping-immigrants-america-build-credit

[16] https://opinionator.blogs.nytimes.com/2014/10/02/invisible-credit-read-this-now/

[17] https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf

[18] https://www.federalreserve.gov/boarddocs/rptcongress/creditscore/creditscore.pdf

[19] http://www.sourcemediaconferences.com/CFSI08/pdf/paul.pdf

[20] https://money.cnn.com/2014/12/18/smallbusiness/alternative-lending-millennials/index.html

[21] https://www.bloomberg.com/profile/company/1350313D:US; https://www.crunchbase.com/organization/backed-2

[22] https://www.earnest.com/; https://www.fastcompany.com/company/earnest

[23] https://www.lendup.com/our-story; https://www.prnewswire.com/news-releases/lendup-creates-stand-alone-company-to-accelerate-expansion-of-its-growing-credit-card-business-fueled-by-new-capital-injection-300776163.html

[24] https://angel.co/company/modernlend; https://www.crunchbase.com/organization/livealpha#section-overview; https://creditwithoutborders.com/; https://angel.co/company/credit-without-borders

[25] https://www.sec.gov/Archives/edgar/data/1538716/000119312519195573/d692259ds1.htm#toc692259_12; https://oportun.com/whyoportun/

[26] https://www.revolutioncredit.com/about-us/

[27] https://pseps.com/company/tremus-inc; https://www.deserve.com/about-us/

[28] https://www.upstart.com/about

[29] https://www.americanbanker.com/news/new-underbanked-fico-score-faces-old-banker-skepticism; https://www.experian.com/innovation/thought-leadership/expanding-credit-marketing-white-paper.jsp; https://www.creditcards.com/credit-card-news/vantagescore-credit-score.php

[30] https://www.entrepreneur.com/article/251428

research on the part of the recipient." *Epstein v. Dennison Mfg. Co.*, 314 F. Supp. 116, 126 (S.D.N.Y. 1969). It must be disclosed "in sufficient detail and [with] such definiteness that there is no doubt as to what is disclosed." *Id.*; *see also Schroeder v. Cohen*, No. 652183/2013, 2017 WL 5668423, at *16 n.23 (N.Y. Sup. Ct. Nov. 27, 2017) (holding "generic and vague industry concepts" are not concrete). Shih's idea failed this test when she disclosed it to Endicott in April 2015. She expressed a hope to somehow help people like herself—migrants who boasted a good credit history abroad—to access credit and build a credit history in the U.S. *See* ¶ 40; *see also* ¶ 50 (suggesting, the day *after* her first disclosure, that the service should in some undetermined fashion vet an individual's creditworthiness, or perhaps extend credit, or perhaps underwrite the risk). She offered no plan to accomplish this; it is one thing to identify a problem in the world, but businesses are built on solutions that turn a profit. So there was nothing to misappropriate. *See* ¶ 67 (Endicott on May 5 trying "to start ginning up a solution" to the credit gap Shih noted in April).

Indeed, despite the SAC's frequent use of the phrase "business model," Shih and Endicott *never* settled on any business model or product before their short, exploratory conversations ended. They merely kicked around high-level ideas for tackling the credit gap that Shih (and many others) had identified. These possibilities included guaranteeing credit, ¶ 76, co-signing credit, SAC Ex. A, guaranteeing leases, *id.*, and partnering with multinational corporations to assist employees in obtaining credit, ¶ 77. None of these vague ideas—each for a *very* different kind of company— was susceptible of misappropriation. *See Educ. Sales Programs, Inc. v. Dreyfus Corp.*, 65 Misc. 2d 412, 417 (N.Y. Sup. Ct. 1970) ("[Because t]he details of presentation and marketing changed considerably from September to November[, c]learly it was quite malleable and not in such fixed and concrete form as to indicate a protectible idea."). "Plaintiff['s] idea[] amount[s] to nothing more than a collection of broad concepts;" she does not allege "how those concepts were actually

employed in practice." *Schroeder v. Cohen*, 93 N.Y.S.3d 287, 288 (App. Div. 1st Dep't 2019).

*Fifth*, Shih's misappropriation claim cannot succeed because Endicott and Gross never made use of her idea. *See McGhan v. Ebersol*, 608 F. Supp. 277, 286 (S.D.N.Y. 1985) (requiring actual use). Shih initially made a vague point to Endicott: that migrants outside the traditional U.S. credit scoring system struggle to access credit, and there ought to be some means to independently assess their creditworthiness or otherwise assist them in obtaining credit. That is not the same as the fully operational business that is Petal, any more than it is Experian, Equifax, TransUnion, VantageScore, LexisNexis, Clarity Services, FactorTrust, Oportun, Affirm, Social Finance, or countless other businesses that have sought to do the same thing for years. Shih, a former U.N. intern with no alleged experience in finance or computer science, does not suggest she played *any* role in developing the novel, concrete ideas at the heart of Petal's business—*i.e.*, the statistical models and algorithms it uses to assess default risk, and the coding and design of its user interface and automated underwriting processes. At most, she claims she suggested one generic idea—using "salary and financial information" provided by multinational employers—which is *not* what Petal does, but merely "similar" and a "precursor" to it. ¶ 218. That is insufficient.[31] *See Granoff v. Merrill Lynch & Co.*, 775 F. Supp. 621, 629 (S.D.N.Y. 1991) (rejecting misappropriation claim where Plaintiff's idea and Defendants' financial product share a "common thread," but Defendants offer a different service).

*Finally*, the SAC alleges that Endicott, and later Petal, developed their proprietary ideas *without* Shih. Endicott, not Shih, is alleged to have started researching data modeling. *See* ¶ 89 (Endicott seeking suggestions on data modeling); ¶ 188(ix) ("Endicott discussed methodologies for calculating credit scores with Ustun . . . ."); SAC Ex. B. While the SAC characterizes this

---

[31] It also reflects a simplistic understanding of underwriting, since nearly *all* underwriters use "salary and financial information." The question is how to affordably obtain and review it, and how to weigh it in assessing risk.

research as Shih and Endicott's "collaborative work product," *see* ¶¶ 87-88, 139(c)-(d), those documents, incorporated into the SAC by reference, show she did not materially contribute. *See* Ex. C (Endicott assigning himself "Question A" to research); ¶ 89 (Endicott emailing Berk for suggestions on data modeling "to answer Question A"); Ex. D (the Big Questions (v3) document reflecting Endicott's research to answer Question A, including the 723,762 immigrant inflow figure). Then Petal, not Shih, allegedly finished Endicott's work. ¶ 217 ("Petal uses a credit scoring system that it invented . . . ."); ¶ 220 ("[Petal] created and tested its system of assessing creditworthiness . . . ."); ¶ 176 (acknowledging Shih had not developed a "proprietary credit model," which requires "data analysts"). This defeats her misappropriation and unfair competition claims. *See MiniFrame Ltd. v. Microsoft Corp.*, No. 11-Civ-7419, 2013 WL 1385704, at *8 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 551 F. App'x 1 (2d Cir. 2013) (dismissing where "the Complaint itself allows that [defendant] may have 'otherwise obtained' the necessary technology").

In short, Shih made an unoriginal, armchair observation about a market failure in migrant credit access, did a few weeks of preliminary research using publicly available sources on the topic of international credit scoring, and riffed about possible kinds of solutions in a handful of communications with Endicott. And that's it. She has done nothing since, even as others (including Endicott) built a company with proprietary technology, unique solutions to specific problems, and an organizational infrastructure far beyond anything raised in Shih's Facebook messages. These allegations do not support a claim for misappropriation of a business idea or unfair competition.

## II.       SHIH FAILS TO STATE A CLAIM AGAINST PETAL CARD, INC.

Petal did not exist until eight months after Endicott's exchanges with Shih in 2015. Undeterred, Shih seeks to hold Petal liable for alleged wrongdoing in 2015 by Endicott and Gross. At several points, she claims that Endicott and Gross's conduct before Petal's incorporation "can

be imputed" to Petal because they "acted, and continue[] to act" as its agents, officers, and/or board members. ¶¶ 285, 298, 306. Elsewhere, she asserts that Petal somehow acted before it even existed. ¶ 356. These arguments rest on errors of corporate and commercial law that warrant dismissal.

*First*, principals generally can be held liable only "for the acts of their agents performing within the scope of their apparent authority." *News Am. Mktg., Inc. v. Lepage Bakeries, Inc.*, 791 N.Y.S.2d 80, 80 (App. Div. 1st Dep't 2005). But an entity that does not exist cannot act at all, let alone grant its agents actual or apparent authority. It thus cannot be held liable vicariously for the behavior of its non-existent agents. *See Gianino v. Panacya, Inc.*, No. 00-Civ-1584, 2000 WL 1224810, at *7 (S.D.N.Y. Aug. 29, 2000); *Pioli v. Town of Kirkwood*, 499 N.Y.S.2d 266, 267 (App. Div. 3d Dep't 1986). And here, Shih does not (and could not) allege that Petal was a *de facto* corporation—capable of having agents—prior to February of 2016. *See In re Hausman*, 921 N.E.2d 191, 193 (N.Y. 2009) (requiring a certificate of incorporation to invoke this doctrine).

*Second*, Shih has not shown that Petal is an alter ego of Gross or Endicott, justifying any form of veil piercing or reverse veil piercing. *See Miramax Film Corp. v. Abraham*, No. 01-Civ-5202, 2003 WL 22832384, at *7 (S.D.N.Y. Nov. 25, 2003). Corporations are "legal entities distinct from their managers and shareholders and have an independent legal existence." *Port Chester Elec. Const. Co. v. Atlas*, 357 N.E.2d 983, 986 (N.Y. 1976). Their liabilities are therefore distinct. Alter ego liability applies only when "one [entity] exercises complete domination over the other sufficient to warrant piercing the corporate veil." *Sass v. TMT Restoration Consultants Ltd.*, 953 N.Y.S.2d 574, 575 (Sup. Ct. 2012) (holding that "overlapping ownership, a common officer, and common office space and facilities" is insufficient); *accord Div. 1181 A.T.U.-N.Y. Emp. Pension Fund By Cordiello v. City of N.Y. Dep't of Educ.*, 910 F.3d 608, 618 (2d Cir. 2018) ("The alter ego doctrine . . . considers whether 'two enterprises have substantially identical management, business

purpose[s], operation[s], equipment, customers, supervision, and ownership.'" (citation omitted)).

Here, Gross was not a stockholder in the "venture" that Shih allegedly created with Endicott, but he does hold stock in Petal. *See* ¶ 156. That alone defeats an alter ego theory. *See Reif v. Williams Sportswear, Inc.*, 9 N.Y.2d 387, 392-93 (App. Div. 1st Dep't 1961). Further, Petal has over ninety employees worldwide, outside investors and Board Directors, and a management system that differs mightily from a "system" consisting of Shih and Endicott trading Facebook messages. Petal has proprietary technology, its own equipment, and an organizational structure far beyond anything that Shih alleges discussing with Endicott. And while Petal operates in the consumer financial services industry, it relies on a business model unlike what Shih and Endicott discussed. There is no legal warrant for treating Petal as an alter ego of either Endicott or Gross.

*Third*, Shih cannot argue that Petal is liable for actions by Endicott and Gross on a contract theory. A corporation can be bound by pre-incorporation agreements only if they were formed with the intent to bind the corporation, *see id.* at 494; *In re Robbins Int'l, Inc.*, 275 B.R. 456, 468 (S.D.N.Y. 2002), and only if the corporation expressly adopts them or knowingly accepts their benefits, *see Universal Indus. Corp. v. Lindstrom*, 459 N.Y.S.2d 492, 494 (App. Div. 4th Dep't 1983). "[A] positive, authorized act is normally essential." *Reif*, 9 N.Y.2d at 392. But the SAC does not plausibly allege any such agreement between Shih and Endicott or Gross. Nor does it allege that Endicott or Gross intended to bind Petal, or that Petal adopted any agreement.

Thus, even if her claims against Gross and Endicott were meritorious, liability against Petal does not follow. For that reason, Shih's claims one through ten must be dismissed at least as to Petal, and Shih's eleventh claim must be dismissed entirely.

## III.   SHIH FAILS TO STATE A CLAIM AGAINST ENDICOTT.

At bottom, this is a case about two people: Shih and Endicott. Shih alleges that Endicott

promised to go into business with her, induced her to share a novel idea, and then broke his promise. These allegations, however, are implausible and fail to state a claim for relief.

### A. Endicott Did Not Agree to Be Shih's Business Partner.

Shih met Endicott in 2014 while she served as a U.N. bureaucrat. They interacted a mere handful of times that summer, never in a commercial setting, before she left for New Zealand with no clear plan to return. Over the following months, they occasionally chatted on Facebook. Shih alleges that in one of these chats, Endicott made an extraordinary, unprompted, and legally binding promise to launch a joint venture with her. She claims that he solidified this promise over a few more online chats and two Skype calls. Endicott was a former corporate lawyer who knew these arrangements often involve months of complex negotiations and detailed written agreements. But by Shih's account, he apparently decided to skip all that. In fact, she alleges, he was willing to bind himself to Shih even though they never agreed on the product or service they would offer, how they would offer it, where the necessary technology would come from, how they would obtain and use capital, who would be on their leadership team, or who they would employ. Then, after they had supposedly agreed to proceed, Shih entirely ceased her efforts to develop the business, while Endicott purportedly absconded with their unincorporated venture. Shih barely followed up. She did virtually nothing that somebody who had founded a business would do in her position. Instead, she went dark for eight months, reappearing only with a "Happy Birthday" message and then again when she learned that Endicott had incorporated a business in the consumer credit space—though in messages that did not mention any contract, joint venture, or fiduciary duty.

It is not plausible to infer from these allegations that Endicott owed Shih any legal obligation. Instead, the SAC shows (and the truth is) that Endicott and Shih had a few exploratory exchanges about U.S. migrants needing easier access to credit. As entrepreneurs often do in such

conversations, Endicott expressed early excitement about trying to solve this problem. Endicott identified key questions, and he and Shih floated multiple ideas on what a potential business might look like. But that's it. This may not be neat and pretty, but it's how the start-up world works: highly ambitious people exchanging ideas and dreaming up businesses, all on the understanding that there's no contract until the relationship is given binding form. To the extent Shih believed otherwise, she was mistaken. There was never any meeting of the minds.

### 1.  Alleged Existence of an Actual Contract

To state a contract claim, Shih must allege "an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." *Kowalchuck v. Stroup*, 873 N.Y.S.2d 43, 46 (App. Div. 1st Dep't 2009). "That meeting of the minds must include agreement on all essential terms." *Id.* For a contract to be enforceable, "the promise made . . . must be sufficiently certain and specific so that the parties' intentions are ascertainable." *Andor Group, Inc. v. Benninghoff*, 631 N.Y.S.2d 79, 80 (App. Div. 2d Dep't 1995). There is no contract where there is "an agreement to agree, which leaves material terms of a proposed contract for future negotiation." *Id.* The SAC alludes to two possible actual contracts here, neither of which are plausibly alleged.

First, Shih claims that Endicott's Facebook messages formed a binding "agree[ment] to create a business based upon Shih's idea." ¶ 54; *see also* ¶ 320. According to the SAC, Endicott legally bound himself to this endeavor when, while complaining about this then-current job, he messaged Shih: "Let's start a company together. That does some cool-trans-pacific stuff." ¶¶ 24, 27. Shih then purportedly "accepted [his] proposal" when, days later, unprompted, she noted that immigrants struggle to obtain credit. ¶¶ 40, 55. Of course, these exchanges, which are riddled with exploratory language, reflect neither an offer nor acceptance. Endicott's supposed "offer" to start a "cool-trans-pacific" company was not a "certain and specific" promise to Shih to develop a

business based on whatever idea Shih next proposed. *Andor Group, Inc.*, 631 N.Y.S.2d at 80. And Shih never accepted; she responded in tentative terms, telling Endicott to "do some digging" and "let her know . . . if all signs are still towards viability." ¶ 53. A week later, Endicott was "continuing to research [the issue] and discuss it with third parties." ¶ 65. Again, no acceptance.

Further, Shih and Endicott never discussed any material terms of this alleged contract, as the SAC itself acknowledges. *See* ¶ 321. They certainly did not evince a "mutual agreement to contribute personal services toward the development of a company" in April 2015, ¶ 55, as they never referenced a plan to contribute *any* personal services. These exchanges cannot amount to a contract. They were, at most, "an agreement to agree." *Andor Group, Inc.*, 631 N.Y.S.2d at 80.

Shih next suggests that, after a few more online interactions and a Skype call in mid-May, she and Endicott formed a joint venture, ¶¶ 99, 321, the scope of which was made "even more specific" on a June 7 call, ¶ 118. To claim a joint venture, Shih must allege: "(i) . . . a specific agreement to carry on an enterprise [that] (ii) manifest[s] the intent of the parties to be joint venturers; (iii) a contribution by each joint venturer of property, financing, skill, knowledge, or effort . . . ; (iv) some degree of joint control over the enterprise; and (v) a provision for the sharing of profits and losses." *Hanson v. Hanson*, No. 18-Civ-0695, 2019 WL 935127, at *7 (S.D.N.Y. Feb. 26, 2019). Intent in this context is a high bar: "the parties must be clear that they intend to form a joint venture, which is a fiduciary relationship, and not a simple contract," and "it is not enough [to] agree[] to act in concert to achieve some stated economic objective." *N. Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F. Supp. 2d 94, 102 (S.D.N.Y. 2013). Likewise, allegations of "joint control," i.e., shared "power over decision-making," are "essential" to the claim. *Stratford Grp., Ltd. v. Interstate Bakeries Corp.*, 590 F. Supp. 859, 863 (S.D.N.Y. 1984). The "absence of any one of these elements is fatal." *Icon Capital*, 921 F. Supp. 2d at 102.

Shih's joint venture claim fails because she and Endicott did not plausibly manifest an intent to be joint venturers, nor did they share joint control over any enterprise. Shih herself never acted like she was involved in a joint venture or had decision-making authority. Instead, she did nothing as Endicott (and Gross) created what is now Petal. The SAC vaguely alleges an early "delegation of labor . . . between Shih and Endicott," but does not specify what title, control, or managerial role, if any, Shih had. ¶ 99(a). Instead, it alleges that Endicott routinely reached out to third parties to research and develop the venture, ¶¶ 57, 72, 94, and Endicott was solely responsible for organization and fundraising, ¶ 93(e), (h). As for Shih, though she initially agreed to find a data scientist to assist with product development, ¶ 93(a), Endicott, not Shih, did that work, *see* ¶ 91. She also offered to research banking and consumer credit services in Asia (which has nothing to do with Petal), ¶ 93(g), but is not alleged to have done so. When she heard that Endicott sought employees for their purported venture without her permission, she reacted not by asserting any control over his conduct, but by wondering to a friend if he was "still interested" in working with her. ¶ 147. When for *months* Endicott offered no updates on his purported fundraising efforts, she never asked him about it. *See* ¶¶ 141, 152. There was no contract here, and Shih knew it.

## 2.  Alleged Existence of an Implied-in-Fact Contract

Unable to allege an actual contract, Shih claims that Endicott's conduct evinces an implied one. ¶ 319. "[A] contract may be implied in fact where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *Matter of Boice*, 640 N.Y.S.2d 681, 682 (App. Div. 3d Dep't 1996). But even when implied, a contract is formed only upon mutual assent as to all material terms. *See Maas v. Cornell Univ.*, 721 N.E.2d 966, 970 (N.Y. 1999). Shih's implied-in-fact theory thus fails for all the same reasons given above.

In addition, "industry custom and usage" confirm the absence of any such implied contract.

*See McGhan*, 608 F. Supp. at 285. Startup culture is famous for open, informal collaboration. Countless ideas and business plans are tossed around without binding obligations. Imposing a broad view of implied-in-fact contracts on the startup field would stifle conversation, chill innovation and free thought, and create liability absent genuine agreement.

In the end, Endicott and others put in time, effort, and money, ¶ 186, to create a financial technology company focused on underwriting with data sources that Shih did not propose, ¶ 218, using technology Shih never contemplated, ¶ 176, to provide an automated, software-based credit card application service that Shih never suggested. As they did all this, Shih did nothing, let alone anything evincing some contract with Endicott. A person expecting to share half of a new business would not vanish for weeks on vacation when she believed her partner was embarking on the first, critical phases of fundraising. ¶ 112. She would not wait weeks (then months) to follow up on any progress—nor would she do so through Facebook messages wishing him happy birthday. ¶ 141. Certainly, she would not drop the matter entirely for six months without taking any further steps. ¶¶ 148-52, 164-65. These allegations show neither party believed they were bound to each other.

### 3. Alleged Breach of the Covenant of Good Faith and Fair Dealing

A covenant of good faith and fair dealing does not exist without a contract. *See Marcella & Co. v. Avon Prods., Inc.*, 724 N.Y.S.2d 192, 193 (App. Div. 2d Dep't 2001). Further, this claim is based on the same facts as the breach of contract claims and seeks no separate relief. It must be dismissed as duplicative. *Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 508 (2d Cir. 2005).

### 4. Alleged Quasi-Contract Claims

Shih's promissory estoppel claim against Endicott "sounds in contract theory" and "must be dismissed because it is redundant of [her] breach of contract claim." *Toledo Fund, LLC v. HSBC Bank USA, Nat'l Ass'n*, No. 11-Civ-7686, 2012 WL 364045, at *5 (S.D.N.Y. Feb. 3, 2012).

Moreover, as explained above, Shih has not plausibly alleged a "clear and unambiguous promise" by Endicott on which she foreseeably relied. *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000).

For unjust enrichment, Shih claims that Endicott benefited by taking her "idea" and using it to start a company from which he excluded her. Yet Endicott was not enriched at Shih's expense, but instead by his own efforts. *See id.* at 616 (defendant must have "actually" benefited "specific[ally] and direct[ly]"). Shih told Endicott her "idea" in the absence of an agreement. It was not "unjust" for Endicott to start a different business, using a different idea, without her.

**B.  Endicott Did Not Breach Any Agreements with Shih by Founding Petal.**

Shih mistakenly presumes that if Endicott agreed to go into business with her, but then instead went into business with Gross, she is entitled to half of the company he created with Gross. As explained, Petal's business model is fundamentally different from the varied concepts Shih and Endicott tossed around; the happenstance that it was incorporated using the name "CreditBridge," which Shih claims to have invented, does not change that. Indeed, given that Shih's "venture" was never made concrete, memorialized, incorporated, funded, operationalized, or vested with any life, it is an exercise in legal fantasy (and a violation of corporate law) to say that this venture *became* Petal with Shih still attached. "[T]he law of contract damages limits the injured party to damages based on his actual loss caused by the breach." *Brown v. Rawlings Fin. Servs., LLC*, 868 F.3d 126, 131 (2d Cir. 2017). In other words, Shih can recover whatever damages she can prove based on Endicott's supposed breach—*i.e.*, his decision not to develop a business with her. It does not mean that her losses can be equated with Endicott's and Gross's independent gains. Shih's failure to adhere to this principle infects her contract claims and warrants their dismissal.

**C.  Endicott Did Not Owe Shih Any Other Fiduciary Duties.**

As noted above, "a fiduciary relationship may be found when one [person] is under a duty

to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Thermal Imaging, Inc. v. Sandgrain Sec., Inc.*, 158 F. Supp. 2d 335, 343 (S.D.N.Y. 2001). Yet "[m]ere reposal of one's trust or confidence in a party . . . does not automatically create a fiduciary relationship; the trust or confidence must be accepted as well." *Roni LLC*, 903 N.Y.S. 2d at 355.

### 1.  Co-Venturer

This duty can arise only from a joint venture agreement. *See, e.g.*, *Steinbeck v. Gerosa*, 151 N.E.2d 170, 179 (N.Y. 1958). But the SAC fails plausibly to allege such an agreement.

### 2.  Attorney

Endicott could have owed Shih this duty only if they formed an attorney-client relationship. *See Matter of Cooperman*, 633 N.E.2d 1069, 1071 (N.Y. 1994). Although Shih claims she "relied" on Endicott's legal expertise, *see* ¶ 251, "[t]he unilateral belief of a plaintiff alone does not confer upon . . . her the status of a client." *Moran v. Hurst*, 822 N.Y.S.2d 564, 566 (App. Div. 2d Dep't 2006). Courts typically look for "[a] fee arrangement, a written contract, [or] an informal pattern of gratuitous legal services." *Case v. Clivilles*, 216 F. Supp. 3d 367, 379 (S.D.N.Y. 2016).

None of those elements are present here. The SAC alleges only that Endicott suggested to Shih in informal conversation that he *was* a lawyer, and that his legal background might help them understand regulatory issues that might arise. ¶¶ 25-27. This is insufficient. Shih never alleges that Endicott agreed to act or acted as *her* lawyer. Even if Endicott had agreed to assist with certain tasks in developing a business, such as incorporation or the issuance of stock, *see* ¶¶ 249-50, this would not establish that he either agreed to represent the business itself *or* that he agreed to simultaneously represent a prospective partner. Further, Shih could not have been under the misimpression that Endicott was her personal lawyer. The SAC alleges Endicott's intent to start his own company, using his legal and financial training to benefit himself and his enterprise. ¶¶ 20-

28. As a matter of law, these allegations do not evince an attorney-client relationship.

### 3. Fundraising Agent

Shih next alleges that Endicott was her fundraising agent. But Endicott could have become Shih's agent only if she, as the principal, requested that he act on her behalf, he accepted, and they both understood that Shih was in control of his subsequent efforts. *See Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x 572, 575 (2d Cir. 2010). According to the SAC, however, they were "equal partners," not principal and agent. *See* ¶¶ 56, 110, 242, 270, 280. Further, while Shih asserts in conclusory fashion that Endicott agreed to raise money on her behalf, ¶¶ 266-67, she alleges no facts showing that he agreed to follow her orders or to act at her behest. To the contrary, she alleges that Endicott spoke freely with whomever he chose about fundraising—and did so without Shih's oversight, approval, or awareness. *See* ¶¶ 103, 148-52. This claim therefore fails.

### 4. Corporate Director/Shareholder in Equity

The SAC misstates basic principles of corporate law to claim Endicott (and Gross) breached duties owed to Shih in the corporate context. To be sure, Endicott and Gross, as executives of Petal, are fiduciaries to Petal's shareholders. *See Feinsod*, 347 F. Supp. 3d at 158. Shih, however, cannot credibly maintain that she is a Petal shareholder, either at law or in equity.

Federal courts look to the law of the state of incorporation to determine stockholder status. *See Brooks v. Weiser*, 57 F.R.D. 491, 494 (S.D.N.Y. 1972); *Entel v. Guilden*, 223 F. Supp. 129, 131 (S.D.N.Y. 1963). Petal was incorporated in Delaware, ¶ 9, whose law defines a stockholder as "a holder of record stock in a stock corporation, or a person who is the beneficial owner of shares of such stock held either in a voting trust or by a nominee on behalf of such person." 8 Del. C. § 220(a)(1). Courts do not consider evidence beyond a corporation's stock ledger to determine stockholder status unless the ledger is "blank or non-existent," which is not alleged as to Petal.

*Rainbow Nav., Inc. v. Pan Ocean Nav., Inc.*, 535 A.2d 1357, 1358-59 (Del. 1987). Shih alleges that she was never issued Petal stock. *See* ¶ 312. As Petal's ledger necessarily does not include Shih as a shareholder, she is not a legal holder of Petal's record stock. Nor does Shih allege she is a beneficial owner of Petal stock. *See Barnes v. Telestone Techs. Corp.*, No. CV 8513-VCG, 2013 WL 3480270, at *2 (Del. Ch. July 10, 2013).

Neither is Shih owed duties as an equitable shareholder. Shih claims she was a "*de facto* shareholder[] in the CreditBridge company," and Endicott owed her a duty "[a]s an executive and *de facto* shareholder." ¶¶ 270-71. But the SAC fails to plausibly allege that they agreed to serve as shareholders in a venture based on Shih's idea. *See Teplitsky v. Karian*, No. 014840/2010, 2011 WL 579047 (N.Y. Sup. Ct. Jan. 31, 2011). We know of no case that transforms a non-shareholder of a nonexistent business into a "shareholder in equity" after a business is incorporated.

### 5. Corporate Promoter/Relationship of Trust and Confidence

A promoter assists "in the forming and establishing of a company at any period prior to the company becoming fully incorporated." *Armstrong v. Sun Printing & Publ'g Ass'n*, 122 N.Y.S. 531, 533 (App. Div. 2d Dep't 1910). Shih alleges that Endicott served as a promoter of their joint venture and thus owed her a duty as a co-promoter. ¶¶ 259-60. But for the reasons already stated, the SAC fails adequately to allege that Endicott ever agreed to act as Shih's partner or promoter in developing a business, or that he accepted any trust that Shih reposed in him. For the same reasons, Shih's claim based on a relationship of "trust and confidence" does not succeed. *See Icon Capital Corp.*, 921 F. Supp. 2d at 104.

### IV. SHIH IS NOT ENTITLED TO A CONSTRUCTIVE TRUST OR SPECIFIC PERFORMANCE AS A MATTER OF LAW.

For four reasons, Shih has not properly alleged an entitlement to a constructive trust. *First*, as explained above, the SAC does not allege *any* elements of that claim, namely (1) "a confidential

or fiduciary relationship" with any Defendant, (2) "a promise" by any Defendant, (3) "a transfer" from Shih "made in reliance on that promise," and (4) "unjust enrichment." *See In re Ades & Berg Grp. Inv'rs*, 550 F.3d 240, 245 (2d Cir. 2008). *Second*, because Shih brings a breach of contract claim, her constructive trust claim is "precluded." *Islip U-Slip LLC v. Gander Mountain Co.*, 2 F. Supp. 3d 296, 307-8 (N.D.N.Y. 2014). *Third*, a constructive trust is only to be imposed if "equity and good conscience" demand it. *In re Ades & Berg Grp. Inv'rs*, 550 F.3d at 245. It would hardly be fair to give Shih half of a fully operational business that she played no role in incorporating, developing, managing, or operating. *Finally*, constructive trusts are available only if a "legal remedy—*i.e.*, monetary damages—would be inadequate to make [the plaintiff] whole." *Islip U-Slip LLC*, 2 F. Supp. 3d at 307-08. Beyond conclusory statements, *see* ¶¶ 327-28, the SAC does not allege why the $5,000,000 in compensatory damages and additional punitive damages she seeks could not make her whole, *see* SAC Demands. Indeed, far from alleging "that these remedies at law will be insufficient to compensate for [her] loss," *CMG Holdings Grp. v. Wagner*, No. 15-Civ-5814, 2016 WL 4688865, at *10 (S.D.N.Y. Sept. 7, 2016), she instead suggests they would be adequate compensation, *see, e.g.*, ¶¶ 307, 313, 326, 337, 357-58.

Likewise, Shih fails to make out a claim for the "extraordinary remedy" of specific performance. *See Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 544 (N.Y. 1981). "[A] contractual relationship or proprietary interest must exist" to warrant specific performance, *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 345 (S.D.N.Y. 2009), yet as explained above, there was no such relationship or interest here. Further, "specific performance will not be ordered where money damages would be adequate to protect the expectation interest of the injured party." *Destiny USA Holdings, LLC v. Citigroup Glob. Markets Realty Corp.*, 889 N.Y.S.2d 793, 798 (App. Div. 4th Dep't 2009) (citation omitted). Money damages are inadequate

"where the subject matter of a particular contract is unique and has no established market value." *Id.* (citation omitted). That is not the case here; "in plaintiff['s] own words, [Petal] has an established market value." *DiPilato*, 662 F. Supp. 2d at 345; *see* ¶ 226 ("[Petal] now values itself at over $200 million."). And as noted, the SAC itself alleges that monetary damages are sufficient compensation. *See, e.g.*, ¶¶ 313, 326, 337.

*     *     *     *     *

Shih claims that she is entitled to half of Petal. But even accepting her allegations as true, she didn't contribute the original ideas at the heart of Petal's business. She didn't solve any problem or even take a meaningful step in the direction of doing so. She didn't contribute time, money, or energy to the daunting task of transforming any idea into a business. And she played no role in developing that fledgling business into a growing company that now provides access to a nationwide consumer financial product and employs almost 100 people. Instead, she engaged in tentative discussions with Endicott that went nowhere and had no lasting impact other than confirming that credit access is a vital issue. This wasn't a secret. By mid-2015, many people were seeking solutions to well-recognized gaps in consumer credit access. Shih and Endicott discussed a high-level migrant credit access issue that never materialized into a solution or business. Endicott, Gross, and others discussed various credit access issues—and then, as the SAC alleges, *solved* them by constructing the proprietary technology and business model that became Petal. This isn't illegal. It's how the start-up world works. Imposing liability on Endicott for preliminary discussions with Shih—which never resulted in a written agreement, any record of a purported oral agreement, any actual business venture, or any conduct by the parties consistent with creating a new business—would chill ordinary and productive entrepreneurial conduct. Given the inadequacy and implausibility of Shih's allegations, the proper outcome is dismissal of her case.

30

**CONCLUSION**

For the foregoing reasons, Defendants respectfully submit that the Complaint should be dismissed with prejudice.

Respectfully submitted,

/s/  Roberta A. Kaplan

October 15, 2019

Roberta A. Kaplan
John C. Quinn
Martha Fitzgerald
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883

*Counsel to Defendants*