UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CASSANDRA SHIH,

                        Plaintiff,                Case No. 18-CV-5495(JFK)(BCM)

        -against-

PETAL CARD, INC., f/k/a CREDITBRIDGE,
INC., ANDREW ENDICOTT, and JASON
GROSS,

                        Defendants.
------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

DelBello Donnellan Weingarten Wise & Wiederkehr, LLP
One North Lexington Avenue, 11th Floor
White Plains, New York 10601
Phone: (914) 681-0200
Facsimile: (914) 684-0288
*Attorneys for Plaintiff Cassandra Shih*

TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………………...ii

PRELIMINARY STATEMENT………...…………………………………………………...1

ALLEGATIONS IN THE SECOND AMENDED COMPLAINT……………………………….6

ARGUMENT…………………………………………………………………………………….12

LEGAL STANDARD ON A RULE 12(b)(6) MOTION TO DISMISS………………………...12

POINT I

       SHIH ALLEGES A LEGAL RELATIONSHIP PURSUANT TO WHICH
       ENDICOTT ASSUMED & BREACHED CONTRACTUAL &
       FIDUCIARY DUTIES………………………………………………………………...13

       A.  A Contract Was Formed to Develop and Incorporate CreditBridge
           and Endicott Accepted the Benefits of the Bargain……………………………….13

       B.  Shih and Endicott Formed a Joint Venture to Create CreditBridge………………….18

       C.  Endicott Breached Fiduciary Duties to Shih………………………………………20

       D.  The Remedies of Specific Performance and Constructive Trust are
           Appropriate and Warranted………………………………………………………..24

POINT II

       THE SAC STATES CLAIMS AGAINST PETAL………………………………...24

POINT III

       THE SAC STATES CLAIMS AGAINST GROSS………………………………...27

POINT IV

       THE SAC ALLEGES QUASI CONTRACTUAL CLAIMS, UNFAIR
       COMPETITION AND MISAPPROPRIATION OF BUSINESS IDEA………………..29

CONCLUSION………………………………………………………………………………...31

TABLE OF AUTHORITIES

Case(s):                                                                                                      Page(s):

*223 Sam, LLC v. 223 15th St., LLC*
    161 A.D.3d 716 (2d Dept. 2018)…………………………………………...…………13

*ABKCO Music Inc. v. Harrisongs Music Ltd.*,
    722 F.2d 988 (2d Cir. 1983)………………………………………………….…………24

*AIG Fin Prods. Corp. v. ICP Asset Mgmt., LLC*,
    108 A.D.3d 446 (1st Dep't 2013)……………………………………………….…… 27

*Ainger v. Mich. Gen. Corp.*,
    476 F. Supp. 1209, 1227-31 (S.D.N.Y. 1979)……………………………….…28, 29

*Am. Cash. Card v. AT&T Corp.*,
    210 F.3d 354 (2d Cir. 2000)……………………………………………...…………25

*Anderson News, LLC v. American Media*,
    680 F.3d 162 (2d Cir. 2012)……………………………………………………...…13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)…………………………………………………………………...12

*Atlantis Information Tech. v. CA, Inc.*,
    485 F.Supp.2d 241 (E.D.N.Y. 2007)………………………………………….…23

*B Lewis Prods. v. Maya Angelou*,
    2005 WL 1138474 (S.D.N.Y. 2005)………………………………………….…14

*Beck v. Motler*,
    54 A.D.2d 61 (3d Dep't 1976)………………………………………………...15

*Bamira v. Greenberg*,
    256 A.D.2d 237 (1st Dep't 1998)…………………………………….…………19

*Bieda v. JCPenney Commc'ns*,
    1995 WL 437689 (S.D.N.Y. 1995)…………………………………………………29

*Bolt Elec., Inc. v. City of New York*,
    53 F.3d 465 (2d Cir. 1995)………………………………………………….…………13

*Broker Genius Inc. v. Seat Scouts*, LLC,
    2019 WL 3000963 (S.D.N.Y. 2019)…………………………………………..…29

*Capizola v. Vantage Int'l.,*
2 A.D.3d 843 (2d Dep't 2003)………………………………………...……18

*Castro v. ITT Corp.*,
598 A.2d 674 (Del. Ch. 1991)…...………………………………………26, 27

*Chain of Manhattan v. Christopher*,
74 A.D.2d 277 (1st Dep't 1980)………………………………………………18

*Cleveland v. Caplaw Enters.*,
448 F.3d 518 (2d Cir. 2006)……………………………………………21, 22

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*,
74 N.Y.2d 475 (1989)……………………………………………………*passim*

*Cozy Goose Hellas v. Cosy Goose USA, Ltd.*,
581 F.Supp.2d 606 (S.D.N.Y. 2008)………………………………...……18, 20

*Croce v. Kurnit*,
565 F. Supp. 884 (S.D.N.Y. 1982)…………………………………...……22

*Davydov v. Shuk*,
23 Misc. 3d 1129 (A) (Kings Cnty 2009)………………………………...…21

*Dickerman v. N. Tr. Co.*,
176 U.S. 181 (1900)……………………………………………………...……22

*EBC I, Inc. v. Goldman Sachs & Co.*,
5 N.Y.3d 11 (2005)…………………………………………………..…20, 23

*Eden v. Miller*,
37 F.2d 8 (2d Cir. 1930)…………………………………………………….…14

*Eden Temporary Services, Inc. v. House of Excellence, Inc.*,
270 A.D.2d 66 (1st Dept. 2000)………………………………………….…25

*ESI, Inc. v. Coastal Power Prod. Co.*,
995 F. Supp. 419 (S.D.N.Y. 1998)…………………………………………21

*Foster v. Kovner,*
44 A.D.3d 23 (1d Dept. 2007)…………………………………………...20

*Fraternity Fund v. Beacon*,
479 F. Supp. 2d 349 (S.D.N.Y. 2007)…………………………………...………27

*Frydman & Co. v. Credit Suisse*,
  272 A.D.2d 236 (1d Dept. 2000)……………………………………...…………………23

*Harris v. Mills*,
  572 F.3d 66 (2d Cir. 2009)……………………………………………………………12

*Heine v. Colton, Hartnik, Yamin, & Sheresky*,
  786 F.Supp. 360 (S.D.N.Y. 1992)………………………………….………………21

*Higgins v. Nomile*,
  130 A.D.2d 828 (3d Dept. 1987)………………………………………...……24

*Ho Myung Moosian Co., Ltd. v. Manitou Mineral Water*,
  665 F.Supp.2d 239 (S.D.N.Y. 2009)……………………………………….……20

*In re Arfa*,
  2015 WL 5610864 (S.D.N.Y. 2015)…………………………………...……28

*In re Kelly*,
  582 B.R. 905 (S.D. Tex. 2018)……………………………………………………8

*In re Mclean Indus*,
  90 B.R. 614 (S.D.N.Y. 1988)………………………………………….…17

*In re Super Trading*,
  22 F.2d 480 (2d Cir. 1927)………………………………………….…25

*In re Tikijian*,
  76 B.R. 304 (S.D.N.Y. 1987)………………………………………….…14

*In re Veeco Instruments*,
  434 F. Supp. 2d 267 (S.D.N.Y. 2006)…………………………………...……27

*J.P. Morgan Chase Bank v. Winnik*,
  406 F. Supp. 2d 247 (S.D.N.Y. 2005)………………………………...……27

*Khodeir v. Sayyed*,
  348 F.Supp.3d 330 (S.D.N.Y. 2018)………………………………….…23

*Kohan v. Nehmadi*,
  130 A.D.3d 429 (1st Dept. 2015)………………………………………21, 23

*Kolchins v. Evolution Markets, Inc.*,
  31 N.Y.3d 100 (N.Y. 2018)………………………………….……………14, 15

iv

*Margady v. Weissman*,
　　74 N.Y.S.2d 280 (N.Y. Sup. 1947)……………………………………………………25

*Matter of Kemp v. Beatley*,
　　484 N.Y.S.2d 799 (1984)……………………………………...………………15

*Matter of Reif (Williams Sportswear)*
　　9 N.Y.2d 387 (1961)…………………………………………….……………25

*May Metro. Corp. v. May Oil Burner Corp.*,
　　290 N.Y. 260 (1943)……………………………………………...…………16

*McLenithan v. McLenithan*,
　　273 A.D.2d 757 (3d Dept.  2000)……………………………...………………21

*Nadel v. Play-By-Play Toys*,
　　208 F.3d 368 (2d Cir. 2000)……………………………………...……………14

*Opternative v. JAND*,
　　2019 WL 624853 (S.D.N.Y. 2019)……………………………………………30

*Palin*,
　　--- F.3d ---, 2019 WL 5152444………………………………………...………27

*PSKW v. McKesson*,
　　121 A.D. 3d 544 (1st Dept 2014)………………………………………………30

*Register.com, Inc. v. Verio, Inc.*,
　　356 F.3d 393 (2d Cir. 2004)……………………………………………...……13

*Regions Bank v. Wider & Mastroianni, PC*,
　　423 F. Supp. 2d 265 (S.D.N.Y. 2006)………………………………………...…24

*Richbell Info. Servs. v. Jupiter Partners*,
　　309 A.D.2d 288 (1st Dept. 2003)………………………………...……18, 19, 20

*Roni LLC v. Arfa*,
　　963 N.E.2d 123 (N.Y. 2011)…………………………………………......…20, 21

*Rosman v. Shapiro*,
　　653 F. Supp. 1441 (S.D.N.Y. 1987)………………………………………...…22

*Sabre Int'l Sec., Ltd. v. Vulcan Cap. Mgmt., Inc.*,
　　95 A.D.3d 434 (1st Dept. 2012)……………………………………………….29

*Schultz v. Sayada*,
	133 A.D.3d 1015 (3d Dept. 2015)…………………………………………….………18

*SCS Commc'ns v. Herrick*,
	360 F.3d 329 (2d Cir. 2004)…………………………………………………………...19

*Silvercreek Mgmt. v. Citigroup*,
	346 F. Supp. 3d 473 (S.D.N.Y. 2018)……………………………………………....…28

*Spier v. Hyde*,
	92 A.D. 467 (1st Dep't 1904)…………………………………………………………22

*St. John's University v. Bolton*,
	757 F.Supp.2d 144 (E.D.N.Y 2010)……………………………………………....…23

*Talansky v. Schulman*,
	2 A.D. 3d 355 (1d Dept. 2003)……………………………………………………21, 23

*Teachers Ins. v. Tribune Co.*,
	670 F.Supp.491 (S.D.N.Y. 1987)…………………………………………………..16

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*,
	487 F.3d 89 (2d Cir. 2007)………………………………………….……13, 14, 16

*Tsutsui v. Barasch*,
	67 A.D.3d 896 (2d Dep't 2009)………………………………………………….……24

*Universal Indus. Corp. v. Lindstrom*,
	92 A.D.2d 150 (4th Dep't 1983)………………………………………………………25

*U.S. Radiator Corp. v. State of New York*,
	208 N.Y. 144 (1913)………………………………………………………..………26

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*,
	241 F.3d 135 (2d Cir.2001)…………………………………………………………18

*U.S. v. Flom*,
	256 F. Supp. 253 (E.D.N.Y. 2017)………………………………..…………..………28

*Vacold LLC v. Cerami*,
	545 F.3d 114 (2d Cir. 2008)…………………………………………………......…24

*West v. eBay, Inc.*,
	2017 WL 5991749 (N.D.N.Y. 2017)……………………………………….………30

vi

*Zino Davidoff v. Selective Distrib.*,
        2013 WL 1245974 (S.D.N.Y. 2013)…………………………………………………..……30

<u>Statutes:</u>

Fed. R. Civ. P. 8(d)(2)……………………………………………………………………………15

Fed. R. Civ. P. 12(b)(6)……………………………………………………………...……...3, 12

vii

## PRELIMINARY STATEMENT

Defendant Petal Card, Inc. ("Petal") is a credit card company that extends credit to individuals with little or no credit history in the United States (Endicott Mov. Decl. Ex. B). Petal's market is the "credit invisible," targeting young adults, students, immigrants, and minorities (SAC ¶7[1], 226-232; *also see*, Defs. Mem. At p. 1). Plaintiff Cassandra Shih ("Shih"), a native of Wellington, New Zealand, conceived of the company in 2015 after personally observing that her colleagues at the United Nations struggled to obtain U.S. credit due to the requirements of the FICO system. Petal started as a venture between Shih and Defendant Andrew Endicott ("Endicott") that they originally named "CreditBridge." When CreditBridge reached the "pitch phase" and investors and partners endorsed Shih's concepts to Endicott (while Shih was residing in New Zealand), Endicott, an attorney, investment banker, and friend that Shih had trusted to promote and organize CreditBridge, misappropriated their work product and the company for himself and other partners, including Petal's current CEO, Endicott's Harvard Law classmate, Defendant Jason Gross ("Gross"). Shih brings this action against Endicott, Petal and Gross to redress the loss caused by their misconduct, and to account for her interest in CreditBridge, Inc., now Petal, which has raised over $80 million.

This is the Defendants third attempt to dismiss Shih's claims.[2] By correspondence to the Court dated July 30, 2019, Plaintiff identified newly discovered evidence that was material to arguments contained in the Defendants' last motion. By Order dated August 21, 2019, the Court granted Plaintiff leave to further amend, noting that leave should be freely given "when justice so requires" (ECF No. 92 at p. 3). Plaintiff's Second Amended Complaint ("the SAC", ECF No. 93)

---

[1] Citations to ¶ numbers herein refer to the paragraphs in the Second Amended Complaint, ECF No. 93.

[2] The first motion was served but not filed, pursuant to the Court's Part Rules, because it prompted the filing of the Amended Complaint (ECF No. 46).

1565364_3   50020540-001

thus includes key additional details that were discovered through non-party disclosure and Shih's

independent investigations that not only further strengthen her claims, but also destroy false

narratives that Defendants had presented to the Court on the prior motion. These false narratives

are largely, if not entirely, abandoned now. Particularly, among other new facts and allegations:

- The SAC now references a damning email admission made by Endicott to data scientist Berk Ustun, a purported "co-founder" of CreditBridge and Petal. In the email (SAC Ex. A), Endicott acknowledges to Ustun that Shih "came up with the idea" for CreditBridge. Endicott had claimed to Shih in a March 24, 2016 email that CreditBridge had "no connection" to his discussions with Shih, or her ideas (*see*, SAC Ex. G), and the Defendants had argued on their prior motion that it was "false" and "implausible" that Shih came up with the idea behind Petal. (ECF No. 68 at p. 1).[3]

- The SAC now alleges a specific timeline that traces Petal back to its earliest days as a start-up called CreditBridge. It details the communications by which Shih shared its original model with Endicott, as well as Shih and Endicott's development of the model collaboratively to bring their company to a "pitch phase". The timeline leaves no question that after the Defendants froze Shih out, Endicott and Gross proceeded just as Shih and Endicott had agreed they would. On the prior motion Defendants had argued that Endicott "abandoned the concept he had discussed with Shih" (ECF No. 68 at p. 20) to go "in a different direction" with Gross, his law school friend (*Id*. at pp. 6, 20); calling it a "happenstance" (a coincidence!) that Petal was incorporated as CreditBridge, Inc. (*Id*. at p. 22).

- The SAC now demonstrates through Petal's earliest pitch materials Shih's precise contributions to the investor presentations that Endicott and Gross misappropriated and used to attract the company's earliest financing (¶¶114-116 & 137-139). Defendants had claimed on the prior motion that Shih and Endicott's collaborative presentation was "blank" or "largely blank" (ECF No. 68 at pp 6 & 19, ECF No. 74 at p. 6), but non-party discovery has revealed not just how, but when Endicott updated the presentation with Shih's research, and Shih and Endicott's work product. The first complete presentation containing Shih's model was finished on June 7, 2015 (SAC Ex. C), the same day as Endicott's last Skype meeting with Shih, and he then worked through drafts over the next several weeks, all of them describing Shih's model.

- The SAC specifies how Shih's ideas, concepts, market research, and branding are incorporated in the July 2015 CreditBridge Financing Partner Deck (¶139). On the instant motion, Defendants admit that the same investor presentation, (SAC Ex. F), "describes a medium-term product akin to what Petal now offers" (Defs. Mem. at N.6).

---

[3] The SAC also references other, earlier emails between Endicott and Ustun that demonstrate that, before his admission to Ustun, Endicott had falsely claimed to Ustun that he came up with the same idea that he later admitted was Shih's.

2

- The SAC alleges that Petal analyzes foreign credit data, just as Shih's model had suggested, and that Defendant Gross, or another Petal spokesman, has admitted that "[e]ven if you don't have a U.S. bank account, [Petal] can analyze banking data from some major international financial institutions." (*See*, ¶230; *also see*, ECF No. 86, Ex. 9). On the prior motion, Defendants tried to distinguish Petal from Shih's CreditBridge model by claiming that Petal, "does not incorporate any foreign information into its services at all" and "requires substantial U.S. financial records", namely, "a minimum of six months of bank statements" for borrowers to qualify for its credit card (ECF No. 68 at p. 14).

- The SAC includes a number of new facts from which it can be inferred that Gross knew about Shih's role as a founder of Petal, or consciously avoided knowing it, including that Endicott offered contradictory explanations about his relationship with Shih, and that Gross and Endicott created a false origin story for Petal attributing it to Ustun's personal experiences, but Ustun himself describes the process he encountered accessing United States credit as "straightforward".

- Finally, the SAC alleges that Endicott and Gross falsely represented and warranted to investors in a December 2016 Stock Purchase Agreement that no litigation had been threatened against the company or any of its officers and directors (¶¶203-207).

The Defendants are caught in a tangled web of lies told and retold to distance Petal from Shih. On the instant motion, they manufacture a dubious new narrative pursuant to which Petal is now a "software" company that is well-evolved from the company that Shih and Endicott developed. However, the materials Defendants themselves submit describe a company completely consistent with the one Shih describes in the SAC (*see,* Endicott Mov. Decl. Ex B).

The Defendants are not credible, and the motion should be denied. The SAC's allegations, which include direct quotations from Shih, Endicott, Gross and Ustun, and detail their conduct, when taken as true as required on a Rule 12(b)(6) motion, establish a legal relationship between Shih and Endicott creating contractual and fiduciary duties. Shih alleges that Endicott and Shih agreed to collaboratively develop Shih's credit gap concept, which provided for CreditBridge to offer credit services, including credit cards utilizing a "proprietary credit model" to assess risk independent of the traditional U.S. FICO system. They performed

3

that agreement by creating CreditBridge, which is now Petal, and when Endicott incorporated the company as CreditBridge, Inc., it assumed the agreement's benefits and obligations.

Defendants' motion contains four (4) principal arguments which all fail based upon well-settled law: *First*, Defendants argue that "it is implausible to conclude" that Shih and Endicott entered into an agreement or formed a legal relationship (Defs' Mem. at pp. 2, 20-24).  Yet, Shih alleges in detail that Endicott proposed to Shih that they "start a company together", that Shih accepted that offer and shared her credit gap concept with the understanding that they would develop it collaboratively and incorporate. Critically, Endicott induced and deliberately cultivated Shih's trust.  They prepared a business plan, agreed to split their profits and losses equally, and that Endicott would pitch their business plan to his contacts in the New York financial community, and issue to Shih 50% of CreditBridge's shares upon its incorporation. Thus, by his words and conduct, Endicott undertook fiduciary obligations to Shih with respect to CreditBridge by objectively manifesting to her his intent to be her partner, fundraising agent, and attorney. While *Endicott did* pitch CreditBridge to investors and partners, *did* raise financing for CreditBridge, and *did* incorporate CreditBridge, he breached his obligations to Shih when *he did not* issue shares to her, and instead wrongfully froze her out of the company she conceived.

*Second*, Defendants claim Petal evades liability because it "did not even exist until long after Shih's interactions with Endicott", and is a much different company now than the one that Shih and Endicott discussed. Yet, Defendants *admit* that the July 2015 slide deck that Endicott and Shih worked on, which describes Shih's model and contains Shih's work product (¶¶137-139; SAC Ex. F), "describes a medium-term product akin to what Petal now offers" (Defs. Mem. at N. 6), and the SAC sets forth facts demonstrating that *all three* original purported co-founders of CreditBridge, Inc., Endicott, Gross, and Ustun, knew of Shih's role as its true founder. The

4

SAC also alleges that Endicott intended to bind Petal when he agreed to incorporate (¶¶27, 53-54, 93[e]), register its stock (¶93[e]), and issue 50% of its shares to Shih, (*id.*; ¶¶111, 170-71), and that Petal accepted the benefit of his contract with Shih by utilizing her credit bridging model, "CreditBridge" brand, the CreditBridge investor presentations and her work product.

*Third*, the Defendants claim that Gross escapes liability because he had never heard of Shih until eight months after her collaboration with Endicott. The SAC, though, expressly alleges that Gross knew of Shih as early as May 2015 (¶¶234, 290), and alleges facts from which a reasonable inference may be drawn that Gross knew of Shih's role in founding the company. Shih contacted Gross directly four times in February and March 2016, told him that CreditBridge was a "partnership", and offered to "answer any questions" and provide "written documentation" (¶¶170, 177, 184, 197), but Gross, a former start-up attorney, took no action. Other allegations suggest that Gross knew, or consciously avoided knowing Shih's role: *see,* ¶¶170-73, 184-90, 196-98, Gross obeyed Endicott's instruction to "ignore" Shih; ¶¶184-85, urged Endicott to repudiate Shih's claim; ¶¶186 & 197, received contradictory explanations from Endicott about his relationship with Shih; ¶¶198-202, rebranded CreditBridge as Petal to distance it from Shih; ¶¶202-08, falsely represented to Petal's investors that no litigation had been threatened; and ¶¶79-80, 179-80, created a false origin story for Petal that Ustun was "credit invisible" when, in his own words, his access to credit was "straightforward." (Endicott Mov. Decl. Ex. E.)

*Fourth*, Defendants suggest that because Shih's credit gap business concept wasn't sufficiently novel, and because it was only an early stage business idea, her agreement with Endicott to develop it was unenforceable.  Here, the Defendants attempt to justify their wrongful conduct by pointing to the natural evolution of the company that occurred well after Shih was frozen out, in 2018 (see, Endicott Mov. Decl. Ex. B, dated January 2018) and ignore that the idea

5

and contributions that Shih shared with Endicott were the genesis for that company, and were so novel to him at the time, that he was immediately concerned that someone else might take it (¶¶59-60, 353). This point is critical. Although Defendants now assert that Shih's ideas were so ill defined that they evade comprehension, Endicott clearly understood the value of Shih's idea at the time, brought it to other partners, and worried as he developed it that others could steal it.

The motion is premised on an ever-evolving narrative that contradicts, distorts, and ignores the SAC. Shih's claims are detailed, well-pleaded, and sourced on new materials that this Court allowed her to obtain through disclosure. The motion should be denied.

## ALLEGATIONS IN THE SECOND AMENDED COMPLAINT

Shih and Endicott met in New York and became friends in 2014 (¶¶13-17) while Endicott was working as a corporate attorney (¶16), and Shih with New Zealand's mission to the United Nations (¶13). Shih's assignment ended in August 2014 and she returned to New Zealand (¶18). Endicott and Shih remained in contact and shared details about their lives and business goals (¶¶19-23), with Shih communicating to Endicott her entrepreneurial ambitions, and her desire to return to New York to live and conduct a business (¶23).

On April 24, 2015, Endicott proposed to Shih that they "start a company together." (¶¶24-27). Shih asked what skills Endicott would contribute, and he replied, "I'm a lawyer and an investment banker. . . I can raise financing, set up the company and understand ecommerce, keep the books, do taxes, manage employees. I basically just need a product." (*Id*.) Endicott insisted that he was serious and this was not just "lighthearted" banter: "I'm not really kidding. I'm looking for something cool to sell and haven't really been able to find it." (*Id.*). Shih was skeptical about start-up money but Endicott persisted, "I think I can get money." (¶31).

6

Shih determined that Endicott – a trusted friend, Harvard-educated attorney, and New York-based investment banker – would be a perfect partner to develop her "credit bridging" concept (¶¶33-39). Shih observed the problem of access to U.S. credit while at the U.N. in 2014 (¶¶34-35). Endicott's proposal was attractive to Shih, a non-lawyer from New Zealand who was not familiar with American corporate law and financial regulations (¶¶13, 175-79, 202-04), because Endicott specifically offered to render legal services in organizing the company and "raise financing" using his contacts (¶¶26-27, 31, 37-38, 193).

Shih thus proposed to Endicott that they form a company which would enable immigrants without a U. S. credit history to access consumer credit in the U. S. and build a U.S. credit history (¶40). Shih detailed a service that could independently evaluate the creditworthiness of migrants to the U.S. outside of the "FICO credit score" system, to deliver a more representative assessment of that individuals' creditworthiness (¶50). The service would enable more migrants to access credit and establish or improve their FICO score (¶¶50-51, 72-76).

Endicott called Shih's concept "amazing", "seriously very good", and "worth trying" (¶42). After discussing it extensively with Shih and conducting his own research, Endicott told Shih, "I think the idea is viable. There's a problem, and this would solve that problem, and it probably wouldn't be that expensive. . .This is a good idea." (¶52). Shih and Endicott agreed to "create this things (sic)" (¶¶53, 237-38).

The next day, Endicott contacted Ustun and hid Shih's involvement in the venture, telling Ustun that Endicott himself had come up with Shih's idea. Endicott referenced a "plan" to implement it (¶¶57-60), and expressed concern that someone might "steal the idea" (¶¶57-59). By May 2, 2015, Endicott deemed Shih's model a "side project" worth distracting from his

7

career (¶61). On May 3, he confirmed to Shih that her model was viable (¶ 65), and told her that he was talking to people that they might consider bringing on "board as part of the team" (¶66).

Shih explained that her model would be compatible with existing credit scoring systems (¶¶57, 67, 68, 71, 75-77), and used the words "co-signer" and "guarantor" synonymously[4]. Endicott did not initially understand this, but later came to and concluded, "we're on the same page overall" (¶76). He opined that the model was "akin to being a guarantor", but uniquely "interesting" because it "would be cheaper" and had "light[er] capital requirements." (*Id.*) Defendants point to these <u>same</u> attributes – lower underwriting costs and cost-effective evaluation of data – as benefits of modern-day Petal (*see*, Defs. Mem. at p. 1).

On May 7, 2015, Endicott told a journalist that Shih and Endicott were "setting up a venture to tackle the gap in credit" (¶¶72-74). Endicott blind copied Shih, who told him in her May 8 email that, "I'll have to rely on your knowledge of the US" for "[t]hings like compliance costs . . . as well as a bunch of other things," and to "start thinking about start-up money and possible places to get it." (¶77). Endicott agreed to render Shih an opinion about the cost of regulatory compliance (¶83), and wrote that he "will start cataloging a list of people we could reach out to for financing and share that with you once it's in good shape." (¶84).

Endicott forwarded Shih's May 8, 2015 emails to Ustun, who replied by asking. "Who is Cassie?" (¶¶78-79). Endicott responded:

> **This chick I banged a few months ago who came up with the idea.**
> **She lives in New Zealand.**

Endicott's crude response leaves no question that it was Shih "came up with the idea" for the

---

[4] Defendants call these "radically different" concepts, Defs.' Mem at p. 2, but do not explain what the difference is. *But see*, *In re Kelly*, 582 B.R. 905, 910-914 (S.D. Tex. 2018) (using the terms synonymously, just as Shih did).

1565364_3    50020540-001

model that Endicott himself originally took credit for (¶80, SAC Ex. A). Days later, Endicott shared with Shih a folder called "Credit Bridge Concept" through Dropbox stating "we needed a place to share files beyond just emailing." (¶82). Shih and Endicott then collaborated to research and further develop the business plan, which Endicott noted on May 10 was "the main thing we should be doing now to advance fundraising" (¶84, Endicott Mov. Decl. Ex. C). Endicott undertook the regulatory analysis, and Shih handled risk assessment and market research, a task Endicott called "critical to communicate to basically all our stakeholders that (i) we understand the risks we're taking on and (ii) our revenues/reserves are sufficient to cover those risks." (Endicott Mov. Decl. ¶4, Ex. C).

On May 16, 2015, Shih and Endicott held a Skype meeting wherein they discussed fundraising, product development, profits, losses, and expenses, and the expansion of their business model (¶93). They agreed that Endicott would file the incorporation paperwork and issue to Shih 50% of the company's stock, and represent Shih's interests in negotiations with investors. (¶¶93, 321)[5]. They also agreed to split pre-incorporation expenses equally, and specifically identified website design and hosting, pitch materials, contractors, domestic travel for Endicott, and international travel for Shih as initial expenses (¶93).

Shih and Endicott named their company CreditBridge at Shih's suggestion (¶¶5, 107-108), and in June 2015, Endicott used the parties' work product to draft CreditBridge's investor presentation (¶¶108-116, SAC Ex. C). On or about June 7, 2015, Endicott shared a first draft with Shih (¶¶113-114), and they held a Skype meeting to ensure that Endicott had everything he

---

[5] The decision to allow Endicott to pursue fundraising and present CreditBridge to investors made sense given Endicott's contacts in the finance industry, purported expertise as a corporate attorney, location in New York, and his agreement to "raise financing" and "set up the company" (*see,* ¶¶26-27, 33). In the following weeks, Endicott undertook to render another regulatory opinion, (¶101, SAC Ex. B), and reported to Shih "very constructive conversations with people with financing connections" (¶ 103).

9

needed to pitch the company while Shih was on vacation (¶¶108-118). They clarified the terms under which Endicott was authorized to bind Shih and CreditBridge (¶¶109-110), and agreed that Endicott would report significant developments back to Shih (¶112). That same day, following his Skype meeting with Shih, Endicott updated their investor presentation, the CreditBridge Business Plan Deck, using Shih's model and market research, and their joint work product, and sent it to his girlfriend, Yulia Fradkin, for feedback (¶¶114-116, SAC Ex. C).

Then things changed. Shih went on vacation, and Endicott used that opportunity to exclude her from CreditBridge (¶¶119-120), and replace her with Defendant Gross[6]. When Shih checked on Endicott's progress from her vacation, he ignored her (Id.). However, Endicott's conduct demonstrates that he was continuing to perform Shih and Endicott's agreement to organize and promote CreditBridge without her (¶¶6, 120-135). He registered a CreditBridge Twitter account (¶124); conducted a logo contest in which he described CreditBridge as, "a credit provider for new immigrants/migrants to the United States" whose "ideal customer is professional and financially stable, yet from another country originally" and stated that CreditBridge will "issue credit cards and other forms of financing" (¶¶125-126; SAC Ex. D); registered CreditBridge websites (¶¶6, 132-133); began blogging about consumer credit (¶134); continued work on Shih and Endicott's investor presentation (¶¶129-131, 137). Defendants even concede the July 2015 investor presentation is "akin" to modern day Petal (Defs. Mem. at N. 6).

Thereafter, believing Shih's isolation in New Zealand would prevent her from holding them accountable (¶¶6, 112, 192, 246, 284, 344), Endicott and Gross promoted and incorporated CreditBridge using her credit bridging model, brand name, work product, and pitch materials. (¶¶ 119-155). Shih remained uninformed of Endicott's betrayal until well after June 2015 (see, ¶93,

---

[6] As discussed supra at pp. 2-3, Defendants no longer argue that Endicott "abandoned" the concepts he discussed with Shih to go "in a different direction" with Gross as they did on their prior motion.

10

165-66, 200). On August 11, 2015, Shih noticed that Fradkin, was advertising for CreditBridge staff (¶114-150). The advertisement described CreditBridge as a "finance company dedicated to bridging a gap in the existing consumer lending system with respect to immigrants." (¶144). When Endicott ignored Shih's inquiry about it (¶146), Shih contacted Fradkin directly and stated that "CreditBridge is my idea" and a collaborative project (¶147). Fradkin replied, "yeah I think they are trying to see if there is general investor interest" (¶148), confirming to Shih that Endicott was doing precisely what he had said he would do.

Then, in February 2016, Shih discovered that CreditBridge, Inc. had been incorporated and that Endicott had changed his LinkedIn profile to reflect that he was, "Co-Founder of CreditBridge, Inc." (¶161). Ustun, to whom Endicott had admitted that CreditBridge was Shih's idea (SAC Ex. A), and Gross, were also identified as "Co-Founders" (¶¶156, 168). Shih's access to the Dropbox files that contained her CreditBridge work product had been blocked (¶164).

As soon as Shih discovered Endicott's betrayal, she attempted to resolve the matter privately by contacting both he and Gross. Shih sent repeated written demands to Endicott and Gross in February and March of 2016 and was ignored for six weeks (¶¶170-186). Shih specifically offered to "answer any [of Gross's] questions" and provide "written documentation", as to her claims of a "partnership" with Endicott (¶¶184, 196), but Gross wasn't interested. Meanwhile, Endicott was telling Gross and others that Shih's claims were "frivolous", and to "please ignore [Shih's emails]." (¶¶197-98).

Then, on March 24, 2016, only six hours after Shih had contacted Gross directly, Endicott finally responded (*see*, ¶6, SAC Ex. G). His admits that he "treated Shih poorly", apologizes for "ending communication … so abruptly", acknowledges "past discussions" with Shih, but claims that CreditBridge, Inc. "has no connection whatsoever to anything that you and I

11

discussed." Endicott attempted to distinguish his CreditBridge from Shih's by noting that his "is a credit card company." (¶186). Shih promptly responded by asking Endicott and Gross to clarify how "their" CreditBridge, a credit card company targeting immigrants with the same name, could have no connection to hers (¶189). She never received a response (¶190).

Weeks later, despite having called Shih a "friend" he "admire[s]" with whom he admittedly "discussed" business ideas (¶186), Endicott characterized Shih as a stranger making frivolous claims due to his "publicly listed email" (¶197). Gross was aware of these contradictions, but instead of conducting any investigation, or taking Shih up on her offer to provide him with documentation as to her claims, or asking her any questions, Gross chose to rebrand CreditBridge as Petal (¶¶196-202). He and Endicott then fabricated an origin story for the company based on Ustun's personal experiences (¶180), not Shih's, even though Ustun told Gross that, for him, the credit process "was fairly straightforward" (Endicott Mov. Decl. Ex. E).

Shortly after rebranding as Petal, Gross and Endicott—<u>both attorneys</u>—would falsely represent to investors that "no action . . . [is] currently threatened in writing against the company . . . ".  (¶¶10-11, 203-08). Now, even though Endicott admittedly had no ideas until he had Shih's (¶¶27, 42, 57-60, 80), he and Gross are hailed as pioneers of consumer finance for solving the credit gap problem (¶226) faced by the credit invisible with Shih's "bridging" model.  (¶¶40, 50-62, 72-80, 96, SAC Ex. C & F).  Petal has raised over $80 million.

**ARGUMENT**
**<u>LEGAL STANDARD ON A RULE 12(b)(6) MOTION TO DISMISS</u>**

A motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the complaint. *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic*

12

*Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). There is no "probability requirement at the pleading stage" (*Id.*), all reasonable inferences from the facts as pled must be drawn in favor of the plaintiff. *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995); *Anderson News, LLC v. American Media*, 680 F.3d 162, 185 (2d Cir. 2012).

## POINT I
## SHIH ALLEGES A LEGAL RELATIONSHIP PURSUANT TO WHICH ENDICOTT ASSUMED & BREACHED CONTRACTUAL & FIDUCIARY DUTIES

The SAC details how Endicott expressly assumed contractual and fiduciary duties to Shih, offering to use his skills and contacts as "an attorney and investment banker" to "set up the company" and "raise financing" on her behalf in exchange for Shih's business idea (¶¶27, 31, 52-53). He accepted her idea and then accepted her contributions to investor presentations that he used (¶¶68-122) while never disclaiming that he was Shih's "partner" on their "venture" (¶¶72-74, 93, 96, 111, 170), or her "attorney" (¶¶27, 76, 83, SAC Ex. G), or her co-promoter and "fundraising" agent (¶¶27, 31, 84, 93[h], 103, 109-15). Endicott was Shih's trusted "friend" (¶¶17, 39, 186), who misappropriated her ideas, work product, and company.

### A.    A Contract Was Formed to Develop and Incorporate CreditBridge and Endicott Accepted the Benefits of the Bargain

To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004). Where parties intend to be bound, the failure to reduce their promises to a writing is immaterial. *223 Sam, LLC v. 223 15th St., LLC* 161 A.D.3d 716, 717 (2d Dept. 2018). Although there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms, not all terms of a contract need be fixed with absolute certainty. *Tractebel Energy Marketing, Inc. v. AEP Power*

13

*Marketing, Inc*., 487 F.3d 89, 94 (2d Cir. 2007) *citing Express Indus & Terminal Corp. v. N.Y. State Dep't of Transp*., 93 N.Y.2d 584, 589 (1999). In determining whether there was an intent to be bound, "disproportionate emphasis is not to be put on any single act, phrase or other expression, but instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Kolchins v. Evolution Markets, Inc*., 31 N.Y.3d 100, 106-08 (N.Y. 2018) (citation omitted).

An offer that "extend[s] to plaintiff the power to accept" will be enforced. *Kolchins v. Evolution Markets*, 128 A.D.3d 47, 58 *aff'd* 31 N.Y.3d 100. An offer includes whatever the offeree is "reasonably justified in understanding to be included," because the goal of contract law is to fulfill the parties' "reasonable expectations." *In re Tikijian*, 76 B.R. 304, 316 (S.D.N.Y. 1987); *Cobble Hill v. Henry & Warren*, 74 N.Y.2d 475, 483-85 (1989).

Here, Endicott offered to "start a company" with Shih, proposed to use his skill and contacts as "an attorney and investment banker" to "raise financing" and extended to Shih the power to accept the offer through performance by providing "a product" (¶27); *B Lewis Prods. v. Maya Angelou*, 2005 WL 1138474, at *6 (S.D.N.Y. 2005) (*citing* Restat. (Second) of Contracts § 34 and 1 Corbin §4.1, "The fact that one party, with the knowledge and approval of the other, has begun performance is nearly always evidence that the parties regard the contract as consummated and intend to be bound thereby."). The SAC alleges that Shih performed by providing the credit gap concept – exactly what Endicott was asking for when he said "I basically just need a product" (¶27), and Endicott validated Shih's idea as consideration (¶¶41-52) (*Nadel v. Play-By-Play Toys*, 208 F.3d 368, 374-379 [2d Cir. 2000], *Eden v. Miller*, 37 F.2d 8 [2d Cir. 1930]); through words, "Thanks! Let's create this thing . . . it will give you an excuse to run around the world some more" (¶53), and conduct (¶¶56-99). In fact, Shih's acceptance,

14

together with Endicott's "forward-looking statement about the next stage of the parties' continuing relationship" is evidence of an objective manifestation of intent to be bound sufficient to overcome a motion to dismiss under New York law. *Kolchins v. Evolution Markets*, 31 N.Y.3d 100, 108. Shih's response only reinforces that point (¶53) ("you said you wanted to start a business . . . if all signs are still towards viability then we can start building a small team.")[7].

Since Endicott *did* consider Shih's idea viable (¶¶42, 52), "I think [your] idea is viable. There's a problem, and this would solve that problem, and it wouldn't be that expensive"), Shih reasonably expected an interest, position, and compensation from the company equal to Endicott's own (¶321); *Matter of Kemp v. Beatley*, 64 N.Y.2d 63, 72-75 (1984) (discussing reasonable expectations of members of close corporations). After all, Endicott said, "Let's start a company," referencing no one but himself and Shih (¶321); *see, Beck v. Motler*, 54 A.D.2d 61 (3d Dep't 1976) *aff'd* 42 N.Y. 2d 932. Shih and Endicott would later expressly confirm these expectations (¶¶93[d], 93[e], 110, and 111).

Shih and Endicott then performed under their agreement to develop Shih's credit gap concept, bringing the company to a "pitch phase". In the process, Endicott invited (Endicott Mov. Decl., Ex. C)[8] and received more details about Shih's credit bridging model (¶¶ 68, 75-77, 82-86, 92-96, 100-01, 107-16), rendered informal legal opinions (¶¶76, 83, 100-01), catalogued and approached "people with financing connections" (¶¶84, 103), created the investor presentation with Shih (¶¶109-16, SAC Ex. C), and used it to promote and incorporate CreditBridge (¶¶119-60, Ex. F). The only contract term that Endicott did *not* perform was to include Shih when he incorporated. Defendants retrospectively claim there were "gaping holes in

---

[7] As Shih noted, Endicott would not be bound unless he deemed her idea viable; working on a non-viable business is inconsistent with reasonable expectations (¶320).

[8] This email and Shih's acceptance is an alternative basis for finding a contract. Fed. R. Civ. P. 8(d)(2).

15

the material terms" of the parties' agreement (Defs. Mem. at 2), but "to walk away . . . after enjoying the benefits of the bargain defeats the reasonable expectations of the parties and . . . is a misuse of the definiteness doctrine." *Cobble Hill v. Henry & Warren* 74 N.Y.2d 475, 485.

Tellingly, Endicott did not mention any missing material terms when he repudiated the agreement in his March 24, 2016 email (SAC Ex. G). Instead, he falsely claimed that CreditBridge has "no connection whatsoever to anything that you and I discussed in the past" because it "is a credit card company," (*Id.*, ¶¶ 186-95). Endicott's rights were not hindered by any holes in material terms. Instead, the "gaping holes" that Endicott only now identifies relate to "practical implementation". *Tractebel Energy v. AEP Power*, 487 F.3d 89, 95-97 (2d Cir. 2007). Even so, Shih and Endicott *did* decide the terms that Defendants claim are missing; Shih provided the model that targeted U.S.-based credit invisibles (¶¶62, 93[g], 96). Shih and Endicott were the only founders of the company, (¶93[a-e]), with technology supplied by contractors (¶¶89-91). To the extent there were any other open terms, the parties were bound to negotiate them in good faith. *Teachers Ins. v. Tribune Co.*, 670 F.Supp.491, 499 (S.D.N.Y. 1987) ("To consider the existence of open terms as fatal would be to rule, in effect, that preliminary binding commitments cannot be enforced, and this is not the law").

Moreover here, Shih and Endicott were actually performing their agreement's material terms. The SAC need not allege more, "[A] contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement." *May Metro. Corp. v. May Oil Burner Corp.*, 290 N.Y. 260, 264, (1943). "[A]t some point virtually every agreement can be said to have a degree of indefiniteness," but "parties ... should be held to their promises." *Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483.

16

Defendants argue that as a former corporate lawyer, Endicott purportedly knew that "these arrangements involve months of complex negotiations and detailed written agreements", and that by Shih's account, Endicott "apparently decided to skip all that." (Def. Mem. at p. 20). Yet, Endicott seems to have "skipped all that" with Gross too, since Gross is identified on CreditBridge promotional material (that contains Shih's work product) as early as July, 2015 (¶¶136-139, SAC Ex. F). Essentially, Defendants claim that Endicott knew the bounds of the law well enough to skirt it, and Endicott's March 24, 2016 email (SAC Ex. G) suggests that is precisely what he was trying to do. But to give any degree of credence to such a pretentious and self-serving argument would usurp the role of the Court. The start-up world is not immune from judicial review to ensure that those in it are treated fairly and equitably. It is for the Court to determine whether Endicott's conduct and statements manifested an intent to be bound.

The Defendants then claim that Shih should have known that Endicott would not be bound to their agreement without a formal writing because "startup culture is famous for open, informal collaboration" (Def. Mem. at p. 24). They offer no support for this sweeping assertion, and with this argument ask the Court to impermissibly draw inferences against Shih.

To the extent any of Endicott's communications were ambiguous, as between Shih, the non-lawyer from New Zealand with no experience in American startup culture, and Endicott, the Harvard graduate, corporate attorney, and investment banker that Shih relied upon, Shih enjoys the benefit of every inference. Endicott's secret intentions not to be bound are immaterial because, by actually bringing CreditBridge to a "pitch phase", Endicott objectively manifested to Shih an intent to be bound. *See, In re Mclean Indus*, 90 B.R. 614 (S.D.N.Y. 1988); *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp*., 74 N.Y.2d 475, 483 (1988).

17

Defendants ask the Court to infer against Shih's intent to contract, and incorrectly argue that Shih never followed up with Endicott on his fundraising efforts (Defs.' Mem. at p. 23). But mutual assent is a question of fact for the jury (*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 145 [2d Cir.2001]), and Shih attempted to contact Endicott <u>nine times</u> about the status of CreditBridge.  His silence does not relieve him of his obligations to Shih. *See, Capizola v. Vantage Int'l.*, 2 A.D.3d 843, 845 (2d Dept. 2003) ("This condition, if it was a condition to the issuance of … stock, ceased to exist because [silence] thwarted it."); *Chain of Manhattan v. Christopher*, 74 A.D.2d 277 (1st Dep't 1980) ("[W]here silence] is inconsistent with honest dealings and misleads another, then the silence may be deemed an acquiescence.").

Accordingly, the SAC's allegations are sufficient to set forth a contract and state claims for breach of contractual duties.

## B.    Shih and Endicott Formed a Joint Venture to Create CreditBridge.

A complaint asserting the legal relationship of a joint venture must allege the requisite indicia thereof, namely: (1) acts manifesting the intent of the parties to be associated as joint venturers; (2) mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill, or knowledge, (3) a measure of joint proprietorship and control over the enterprise, and (4) a provision for the sharing of profits and losses.  *Richbell Info. Servs. v. Jupiter Partners*, 309 A.D.2d 288, 298 (1st Dept. 2003); *also see, Cozy Goose Hellas v. Cosy Goose USA, Ltd.*, 581 F.Supp.2d 606, 621 (S.D.N.Y. 2008). An oral agreement is sufficient to create a joint venture, and the parties' intent can be implied from the totality of their conduct. *Richbell,* 309 A.D.2d 288. at 298; *Schultz v. Sayada*, 133 A.D.3d 1015, 1016 (3d Dept. 2015).

Here, Shih and Endicott manifested their intent to proceed as joint venturers through performance (¶¶56-118).  They even called themselves "partners" on a "venture" (¶¶72, 93, 96,

18

110-11); *SCS Commc'ns v. Herrick*, 360 F.3d 329, 341 (2d Cir. 2004). Both contributed to CreditBridge (¶¶50-53, 76, 80, 92), and the SAC traces Shih's particular contributions to the CreditBridge Financing Partner Deck (¶¶137-139, SAC Ex. F) that Endicott used to attract investment. Shih and Endicott agreed to split profits and losses equally (¶¶ 77, 93, 111), and the SAC alleges that both asserted control[9] over the enterprise – Shih by, among other things, delivering the model (¶¶40, 50-53), and performing market assessments that were, in Endicott's words, "critical" to communicating their vision to investors and stakeholders (Endicott Mov. Decl. ¶4; Ex. C) and Endicott by, among other things using his contacts to "catalogue" a list of investors and "start thinking about start-up money and possible places to get it." (¶¶77, 84).

The totality of Endicott's statements and conduct evidence performance on behalf of the joint venture, *Richbell,* 309 A.D.2d 288 at 298, until the very moment when Endicott coincidentally received "very constructive feedback from people with financing connections" (¶¶86-101). Even after cutting off contact with Shih, Endicott's conduct remained consistent with a joint venture agreement and acting on its behalf. He registered CreditBridge websites within days of his last contact with Shih as they had agreed, launched the Twitter account, blogged about immigrant access to consumer credit, developed the investor presentation, pitched CreditBridge, and began hiring staff (¶¶121-144). Shih's conduct was similarly consistent with someone who intended and understood that she was participating in a joint venture. She followed up with Endicott's progress even while she was on vacation, checked in on him in early August 2015, and immediately contacted both Endicott and Fradkin when she discovered that Fradkin was advertising for CreditBridge staff (¶¶141-148).

---

[9] Although Defendants dispute the elements of intent to form a joint venture and control, these are questions of fact for a jury. *Bamira v. Greenberg*, 256 A.D.2d 237 (1st Dep't 1998).

19

1565364_3   50020540-001

There is no merit to the Defendants' argument that Shih and Endicott were required to have agreed on all details of the final service that CreditBridge would offer. A joint venture is a nebulous concept with undefined boundaries, *Cozy Goose Hellas,* 581 F.Supp.2d at 618, and there is no requirement that the parties agree on a final business plan or final product. All that is required is a "joint undertaking" to pursue a common purpose, *Richbell*, 309 A.D.2d at 298; the parties can "hammer out details subsequently", provided they've agreed to pursue the joint undertaking itself. *See*, *Foster v. Kovner,* 44 A.D.3d 23, 28 (1st Dept. 2007) *citing Richbell,* 309 A.D.2d at 298. Defendants seek to avoid liability claiming that the manner in which Shih's idea was implemented differs from the joint venture that Shih and Endicott had already undertaken. But the SAC clearly alleges that modern-day Petal evolved from Shih and Endicott's joint undertaking to pursue a common purpose to develop Shih's credit gap model into a viable business. Shih and Endicott were doing that until he decided to abandon his obligations to Shih and pursue the venture with Gross and others.

The SAC sufficiently alleges a joint venture.

### C.    Endicott Breached Fiduciary Duties to Shih.

To state a claim for breach of fiduciary duty under New York law a Plaintiff must allege the existence of a duty, a breach of that duty, and damages. *Ho Myung Moosian Co., Ltd. v. Manitou Mineral Water*, 665 F.Supp.2d 239, 258 (S.D.N.Y. 2009). A fiduciary relationship, exists when one party is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation, *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 20-21 (2005), or "when confidence is reposed on one side and there is resulting superiority and influence." *Roni LLC v. Arfa*, 18 N.Y.3d 846, 848 (N.Y. 2011).  The inquiry is fact specific. *Id.*

20

Endicott owed Shih a fiduciary duty as a <u>joint venturer</u>, *see, ESI, Inc. v. Coastal Power Prod. Co*., 995 F. Supp. 419, 434-435 (S.D.N.Y. 1998), <u>co-promoter</u>, *Roni LLC v. Arfa*, 18 N.Y.3d 846, 848, (finding allegations that promoter defendants organized LLC entities, planned business venture, and solicited financing, were sufficient to establish a fiduciary relationship), <u>attorney</u>, *see*, *Talansky v. Schulman*, 2 A.D. 3d 355, 359-360 (1d Dept. 2003) (finding material issues of fact were raised as to whether "Defendant was offering his services" by describing himself "as a lawyer and successful investment advisor", <u>agent for securing CreditBridge financing</u>, *see, Cleveland v. Caplaw Enters.*, 448 F.3d 518 (2d Cir. 2006), <u>shareholder in equity</u>, *see, Davydov v. Shuk*, 23 Misc. 3d 1129 (A) (Kings Cnty 2009) (discussing equitable shareholders and holding, "[t]he operation of a competing business by one shareholder without the knowledge and consent of the other shareholder, would constitute a breach of [shareholder] fiduciary duty as a matter of law"), and due to their informal <u>relationship of trust and confidence</u>, *Kohan v. Nehmadi*, 130 A.D.3d 429 (1st Dept. 2015).

The SAC expressly alleges the key element to the finding of a fiduciary relationship – a reposal of trust and confidence (¶¶4, 39, 165, 189, 239, 246, 251, 254). Moreover, Endicott induced Shih's reliance by offering to apply his legal skills to Shih's company (¶27), and agreeing to analyze "regulatory questions." (¶83).

Formality is not essential to the formation of an attorney-client relationship; rather "it is necessary to look at the words and actions of the parties" *McLenithan v. McLenithan*, 273 A.D.2d 757, 758-59 (3d Dept.  2000). "[E]ven if a formal attorney-client relationship does not exist, an attorney may owe a fiduciary duty to persons . . . with whom he deals." *Heine v. Colton, Hartnik, Yamin, & Sheresky*, 786 F.Supp. 360, 368 (S.D.N.Y. 1992). The SAC alleges such a duty here by virtue of Shih's reasonable reliance upon Endicott in matters of New York

21

corporate law, as she was a layman located in New Zealand, and he had offered his legal skills, s*ee, Croce v. Kurnit*, 565 F. Supp. 884 (S.D.N.Y. 1982), *aff'd*, 737 F.2d 229 (2d Cir. 1984) (fiduciary duty arises when a lawyer deals with persons who he has reason to believe, or should have reason to believe, rely on him) and *Rosman v. Shapiro*, 653 F. Supp. 1441, 1445 (S.D.N.Y. 1987) (finding it reasonable for each shareholder to believe corporate counsel was his personal attorney where attorney represented corporation with only two equal shareholders).

Endicott also owed fiduciary duties as Shih's co-promoter and fundraising agent. Corporate promoter contracts are "fiduciary in nature." *Spier v. Hyde*, 92 A.D. 467 (1st Dep't 1904); *see,* Defs.' Mem. at p. 11 ("A promoter owes duties to . . . fellow promoters."), *see also, Dickerman v. N. Tr. Co.*, 176 U.S. 181 (1900) ("A promoter is one who brings together the persons who become interested in the enterprise, aids in procuring [investment], and sets in motion the machinery which leads to the formation of the corporation itself."). Agency arises from a "manifestation of consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006). An agency relationship is "highly factual," and exists where there is an agreement to act on another's behalf subject to their control. *Id.* at 518-22.

The SAC is more than sufficient to allege a promoter's agreement with respect to CreditBridge, and Shih gave consent to Endicott to fundraise on her behalf by disclosing her model only after he specifically offered to "raise financing" and "get money" (¶¶27, 31, 38). Shih subjected Endicott to her control by directing him to "start thinking about start-up funding and places to get it" (¶77), "advance fundraising" (¶84), and by specifying terms to which he could bind her in contracts (¶109).  Endicott consented to act by proposing to "start a company" (¶27); offering to "raise financing" (¶27); insisting he can "get money" when Shih told him she

22

lacked capital (¶31); telling Shih that he would "advance fundraising" for Shih's "credit bridging idea" by creating a "presentation" from their joint work product (Endicott Mov. Decl., Ex. C), and "start cataloguing" financing leads and "share that with [Shih]" (*Id.*). He thereafter reported back to Shih "very constructive conversations" (¶103). The SAC thus alleges that Shih consented to allow Endicott to act as her agent for CreditBridge fundraising purposes, and Endicott's total disloyalty is no defense to his breach of agency obligations. *See, Khodeir v. Sayyed*, 348 F.Supp.3d 330, 342 (S.D.N.Y. 2018).

Indeed, factors considered by the courts when evaluating fiduciary relationships weigh heavily in favor of finding one between Shih and Endicott here. Particularly: (1) Shih reasonably believed based upon Endicott's words and conduct that he was acting on her behalf and that, with respect to CreditBridge, Shih and Endicott's interests were aligned. *See, EBC I, Inc.*, 5 N.Y.3d at 11, 20-21, (where complaint was held to have alleged a relationship of higher trust in part because, as occurred here, the defendant induced the plaintiff to repose trust and confidence in defendant's special knowledge and expertise). (2) Shih was particularly vulnerable because CreditBridge was conceived as an American company located in New York, Endicott was in New York, and Shih was in New Zealand. *See*, *St. John's University v. Bolton*, 757 F.Supp.2d 144, 168 (E.D.N.Y 2010). (3) Shih and Endicott were friends and enjoyed an ongoing social relationship prior to the formation of CreditBridge. *Frydman & Co. v. Credit Suisse*, 272 A.D.2d 236, 237 (1d Dept. 2000), *Kohan*, 130 A.D.3d at 429. (4) Plaintiff alleges an obvious disparity in knowledge with respect to New York corporate organization and start-up financing. *See, e.g.*, *Atlantis Information Tech. v. CA, Inc.*, 485 F.Supp.2d 224, 231 (E.D.N.Y. 2007), and that Endicott had held himself out to have such superior knowledge, *see, Talansky*, 2 A.D. 3d at 359.

23

And finally, (5) Endicott invited, encouraged, and accepted Shih's trust. *See, Regions Bank v. Wider & Mastroianni, PC*, 423 F. Supp. 2d 265, 270 (S.D.N.Y. 2006).

The SAC therefore alleges not just a legal relationship, but that Endicott owed Shih the highest duty of good faith and undivided loyalty, which he breached by incorporating Petal as CreditBridge with other partners, and failing to issue stock to its founder, Shih.

### D.    The Remedies of Specific Performance and Constructive Trust are <ins>Appropriate and Warranted.</ins>

Specific performance and the imposition of a constructive trust are appropriate remedies for the contract and fiduciary duty claims alleged by the SAC. "New York courts routinely award specific performance in cases involving the conveyance of stock in privately held corporations." *See*, *Vacold LLC v. Cerami*, 545 F.3d 114, 130 (2d Cir. 2008). The requirements for a constructive trust are flexible - the Court can impose one where equity so requires, but particularly where there is a confidential relationship, a promise, a transfer in reliance thereon, and unjust enrichment. *Higgins v. Nomile*, 130 A.D.2d 828, 828-829 (3d Dept. 1987). The SAC alleges all of those elements here. A constructive trust is also appropriate because CreditBridge, Inc. arose from opportunities and information Endicott obtained as Shih's co-promoter, partner, joint venturer, and attorney. *See, Tsutsui v. Barasch*, 67 A.D.3d 896, 899 (2d Dep't 2009); *also see, ABKCO Music Inc. v. Harrisongs Music Ltd.*, 722 F.2d 988 (2d Cir. 1983) ("a constructive trust on the 'fruits' of ABKCO's [wrongful] acquisition [of defendant/counterclaimant's music rights] was a proper remedy.").

**POINT II**
**THE SAC STATES CLAIMS AGAINST PETAL**

The SAC states claims against Petal because (1) as promoters-turned-executives, Endicott and Gross's knowledge and tortious conduct is tantamount to Petal; (2) Petal accepted the

24

benefits of Endicott's contract with Shih by using her credit bridging model, investor presentations, and work product; and (3) Shih is an equitable shareholder of Petal.

It has long been New York law that a corporation will be treated as an "alter ego of the promoters." *Matter of Reif (Williams Sportswear)* 9 N.Y.2d 387, 393 (1961) ("But, under the most favorable reading of its own affidavits, respondent is liable as the "alter ego" of persons bound by the collective bargaining agreement."). The SAC alleges that Endicott and Gross, as co-promoters and incorporators, were bound by Endicott's agreement with Shih, and Petal, their alter-ego, is also bound. Shih need only allege facts sufficient to show "that the corporate form was used to commit a wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act in contravention of the Plaintiff's legal rights," *Am. Cash. Card v. AT&T Corp.*, 210 F.3d 354 (2d Cir. 2000). Here, it is the incorporation – the creation of the corporate form – without accounting for Shih's interest, that constitutes the wrongful dishonest and unjust act.

In addition, Petal's acceptance of the benefits of pre-incorporation contracts at incorporation gives rise to corporate liability. *Eden Temporary Services, Inc. v. House of Excellence, Inc.*, 270 A.D.2d 66, 67 (1st Dept. 2000). Shih's assets – in the form of the business concept, market research, and the business plan she helped develop that attracted the earliest funding for Petal – were acquired by Petal in consideration for shares of stock that were never delivered. These allegations are sufficient to state a claim against Petal. *See, Universal Indus. Corp. v. Lindstrom*, 92 A.D.2d 150 (4th Dep't 1983) *Margady v. Weissman*, 74 N.Y.S.2d 280 (N.Y. Sup. 1947). This is so whether Petal authorized it or not; adoption does not require a formal resolution of from Petal's board. *In re Super Trading*, 22 F.2d 480, 482-83 (2d Cir. 1927) *citing Morgan v. Bon Bon Co.*, 222 N.Y.22, 26 (1917) ("The knowledge of the promoters,

who subsequently became the directors and shareholders, is the knowledge of the corporation that the benefits received under the agreement were to be accepted with burdens imposed by it.")

Petal also implicitly ratified or acquiesced to Shih's agreement because Gross was on "notice" and continued to make use of Shih's credit bridging model and brand, and the work product generated in furtherance of Shih's CreditBridge. Ustun, the third recognized "co-founder" of Petal, also knew that the model for the company was Shih's idea, because Endicott told him so (SAC Ex. A). Although Defendants claim that Petal now relies on a business model unlike what Shih and Endicott discussed (Defs. Mem. at p. 19), they contradict that point by admitting that Shih's July 2015 CreditBridge model is "akin" to modern day Petal (*Id.* at N. 6).

Defendants' suggestion that Petal could divest Shih of her shareholder interest despite accepting the benefits of her agreement with Endicott is at odds with longstanding New York corporate law. *See, U.S. Radiator Corp. v. State of New York*, 208 N.Y. 144, 149 (1913) *quoting Flour City v. Shire*, 88 A.D. 401, 405 (4th Dept. 1903) ("[I]mmediately upon the acceptance [of the benefits of Shih's contract]….[Shih] became entitled to and vested with [her] interests or shares,...it is too well settled to permit of doubt that [stock] certificates [are] merely representative of and not the real interest in the property and assets of the corporation constituting its actual capital stock."). Nor is there merit to the claim that Shih is not a shareholder because her name does not appear on Petal's stock ledger (Defs. Mem. at pp. 27-28). Her name does not appear on the ledger because the Defendants didn't put it there. The authorities Defendants cite are grossly misleading because they address inspection and voting rights (Defs.' Mem. p. 27-28, *citing Rainbow Nav. v. Pan Ocean Nav.*, 535 A.2d 1357 (Del. 1987) ("Delaware law provides that the stock ledger shall be the only evidence as to who are the stockholders **entitled to examine the stock ledger**") (bolded text omitted by Defendants).

26

Instead, to determine stock's "lawful owner . . . an inquiry into the specifics [is] necessary." *Castro v. ITT Corp.*, 598 A.2d 674 (Del. Ch. 1991). Here, Endicott knew Shih was a shareholder and Gross failed to inquire into the specifics. The SAC thus alleges that they breached corporate duties by failing to protect her stake in stock issuances (¶¶302-17); *In re Veeco Instruments*, 434 F. Supp. 2d 267, 278 (S.D.N.Y. 2006) quoting *David B. Shaev v. Armstrong*, 2006 WL 391931, at *5 (Del. Ch. 2006)) ("[That a] board had notice of serious misconduct and simply failed to investigate . . . survive[s] a motion to dismiss").

## POINT III
## THE SAC STATES CLAIMS AGAINST GROSS

The SAC alleges that Gross breached duties to Shih as a promoter and executive—and that he is also liable for Endicott's breaches because Gross excluded Shih while knowing she was a co-promoter and shareholder. Gross himself was a promoter and executive (¶¶ 136, 156), so there is no heightened pleading requirement - Shih need only plead facts to allow an inference of more than a "sheer possibility" that Gross knew of her role. *See Palin*, --- F.3d ---, 2019 WL 5152444, at *3; *also, J.P. Morgan Chase Bank v. Winnik*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005), *AIG Fin Prods. Corp. v. ICP Asset Mgmt., LLC*, 108 A.D.3d 446-47 (1st Dep't 2013); *Fraternity Fund v. Beacon*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) ("actual knowledge" can be established through facts from which the reasonable inference of culpability is plausible.)

The SAC contains such facts. It can be reasonably inferred that Gross knew Shih was Endicott's co-founder because Endicott wanted to partner with Gross before he excluded Shih (¶¶ 93[a]), 166), did so right after excluding her (¶¶ 113-39), and Gross was a startup attorney (¶ 181) with a prior relationship with Endicott (*see*, Defs. Mem. at p. 6). It can also be reasonably inferred that Ustun told Gross about Shih because Ustun knew that Endicott initially took credit for inventing Petal's model (¶¶ 57-61) but later admitted Shih "came up with the idea" (¶80,

27

SAC Ex. A), and because Gross attributed Petal to Ustun's experience (¶180) even though Ustun' credit experience was "straightforward" (*see,* Endicott Mov. Decl., Ex. E). "It strain[s] credulity for a sophisticated [startup] attorney [like Gross] to deny awareness of well-settled principles of fiduciary duty," *In re Arfa*, 2015 WL 5610864, at *5 (S.D.N.Y. 2015).

In addition, the SAC alleges that Shih contacted Gross <u>four</u> times and explained that she created CreditBridge in "partnership" (¶¶170, 177, 184, 197), and Gross never even asked to see the "written documentation" she offered (¶¶170-90). This, of course, enabled Gross to retain more stock for himself as well as a larger role in the company (¶236); *Silvercreek Mgmt. v. Citigroup*, 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018) (discussing opportunity and financial motive). Defendants even concede that Gross felt "threatened" (Defs. Mem. p. 9) by Shih's warning that he was "complicit in Endicott's misconduct" (¶184), and immediately thereafter Endicott repudiated his agreement with Shih (¶185-86). Gross conducted no investigation even after Endicott gave conflicting explanations about Shih (¶¶186, 197); *see*, *U.S. v. Flom*, 256 F. Supp. 253, 270-71 (E.D.N.Y. 2017), *aff'd*, 763 Fed. Appx. 27 (2d Cir. 2019) (failure to question suspicious circumstances suggested willingness to turn blind eye to the high probably of securities fraud and was sufficient to warrant jury charge).

Later, Endicott could not make a single distinction between Shih's CreditBridge and "his" CreditBridge (¶189-90). Gross's response: rebrand CreditBridge as Petal (¶¶198-202) and create a false origin story (¶¶79-80, 179-90). Gross then misled investors by representing that no lawsuit was threatened even though Shih had threatened "civil action" (¶¶196-208). These facts are more than sufficient to allow for the reasonable inference that Gross' culpability is plausible. *Also see*, *Ainger v. Mich. Gen. Corp.*, 476 F. Supp. 1209, 1227-31 (S.D.N.Y. 1979), 632 F.2d

28

1025 (2d Cir. 1980) (executive had intent to defraud, a *higher* standard than actual knowledge, by failing to investigate known threat of lawsuit before issuing stock to investors).

Defendants' reliance on *Sokol Holdings* is misplaced; *Sokol* pertains to the informal duty of trust and confidence, but Shih's claim against Gross is for breach of formal duties (¶¶302-09).

## POINT IV
## THE SAC ALLEGES QUASI CONTRACTUAL CLAIMS, UNFAIR COMPETITION AND MISAPPROPRIATION OF BUSINESS IDEA

Shih's *quasi contract* claims (promissory estoppel, ¶¶340-347, and unjust enrichment, ¶¶359-364) do not fail because they sound in contract theory (*see*, Def. MOL at p. 21). While an enforceable contract can preclude recovery in *quasi contract* for events arising out of the same subject matter, where, as here, Defendants dispute the existence of a contract, Shih may pursue both *quasi contract* and breach of contract remedies. *Sabre Int'l Sec., Ltd. v. Vulcan Cap. Mgmt., Inc*., 95 A.D.3d 434 (1st Dept. 2012). Moreover, Defendants impermissibly go outside of the SAC to argue that Endicott was enriched "through his own efforts", and ask the court to infer against Shih at the pleading stage to find that Shih gave Endicott her business model in the absence of an agreement, which Shih disputes. The SAC thus states claims in *quasi-contract*.

The SAC also alleges idea misappropriation and unfair competition. An idea misappropriation claim has only two elements: (1) the requisite legal relationship between the parties, and (2) novelty and concreteness. *Bieda v. JCPenney Commc'ns*, 1995 WL 437689, at *7 (S.D.N.Y. 1995) (J. Keenan). "The legal relationship required may be either a fiduciary relationship, . . . an express [or] implied-in-fact contract, or a quasi-contract." *Id.* The SAC alleges all three relationships. Moreover, the question of whether Shih's idea was novel is a fact question, *Bieda*, 1995 WL 437689, at *7, as is whether Defendants used and obtained it from Shih. *Broker Genius Inc. v. Seat Scouts*, LLC, 2019 WL 3000963, at *6 (S.D.N.Y. 2019).

29

The Defendants point to dozens of articles about the credit gap problem (Defs. Mem. pp. 13-14), but those materials only constitute commentary on the problem. They do not present the uniquely cost-efficient guaranty-like structure that Shih presented to Endicott (¶76; *see also,* ¶¶52, 80), *PSKW v. McKesson*, 121 A.D. 3d 544 (1st Dept 2014). It is the transactional structure that was novel; Shih does not allege that she invented Petal's algorithm (¶217) as Defendants' straw man argument claims. In Endicott's own words, "there's a problem, and [Shih's idea] would solve that problem, and it probably wouldn't be that expensive." (¶52). These allegations go beyond the "sheer possibility" that her model was novel and concrete when she disclosed it.

Finally, the SAC states a claim for unfair competition even if the court does not find idea misappropriation. *See*, *West v. eBay, Inc.*, 2017 WL 5991749, at *6 (N.D.N.Y. 2017) (noting that the tort of unfair competition is "a broad and flexible doctrine."). Here, Shih can state an unfair competition claim by alleging "some appropriation of an idea **or knowledge in which [Shih] had a property interest or a contractual arrangement creating such an interest**." *Zino Davidoff v. Selective Distrib.*, 2013 WL 1245974, at *10 (S.D.N.Y. 2013). The Defendants cite to *Zino Davidoff v. Selective*, but mislead the Court by omitting the bolded text (*see*, Defs. Mem. at p. 12). "The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." *Opternative v. JAND*, 2019 WL 624853, at *6 (S.D.N.Y. 2019) (J. Keenan). Here, Shih alleges an interest in her own work product, a contract; misappropriation through, among other things, breach of fiduciary duty; and that Defendants prevented Shih from accessing her work product while using it to create Petal. The SAC thus states a claim for unfair competition.

30

## CONCLUSION

The SAC plausibly states legal relationships sufficient enough to warrant further discovery to determine whether Defendants froze Plaintiff out from the fruits of a business spawned by an idea that Defendants admit was hers.  Accordingly, for all of the foregoing reasons, and because all inferences must be drawn in her favor on this motion, Plaintiff Cassandra Shih respectfully submits that the Court should deny the Defendants' motion to dismiss in its entirety.

Dated: White Plains, New York
       November 19, 2019

Respectfully submitted,

 /s/  Peter S. Dawson
       Peter S. Dawson
       Eliot M. Schuman
DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
One North Lexington Avenue, 11th Floor
White Plains, New York 10601
Phone: (914) 681-0200
*Attorneys for Plaintiff Cassandra Shih*

31

1565364_3   50020540-001