**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------- X
CASSANDRA SHIH,                     :
                                    :
                Plaintiff,          :
                                    :
        -against-                   :
                                    :
PETAL CARD, INC. f/k/a              :
CreditBridge, Inc., ANDREW          :
ENDICOTT, and JASON GROSS,          :
                                    :
                Defendants.         :
------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  09/23/2020
```

No. 18 Civ. 5495 (JFK)

**OPINION & ORDER**

APPEARANCES

FOR PLAINTIFF:
    Peter S. Dawson, Eliot M. Schuman, DELBELLO DONNELLAN
    WEINGARTEN WISE & WIEDERKEHR, LLP

FOR DEFENDANTS:
    Joshua Matz, Roberta A. Kaplan, John C. Quinn, Martha
    Fitzgerald, KAPLAN HECKER & FINK LLP

**JOHN F. KEENAN, United States District Judge:**

Plaintiff Cassandra Shih ("Shih"), a citizen of New Zealand

and resident of New Jersey, brings suit against Defendants Petal

Card, Inc. ("Petal"), a Delaware credit card company formerly

known as CreditBridge, Inc., and Andrew Endicott ("Endicott")

and Jason Gross ("Gross"), attorneys admitted to practice law in

and residents of New York, (collectively, "Defendants") for

breach of contract, breach of certain fiduciary duties,

misappropriation of business idea, unjust enrichment, and unfair

competition.  Jurisdiction is based on diversity of citizenship

pursuant to 28 U.S.C. § 1332(a).

Before the Court is Defendants' motion to dismiss the Second Amended Complaint ("the SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, the Court finds that the SAC plausibly alleges that Endicott entered into an oral joint venture agreement with Shih, whereby he promised to build a "credit bridging" company with her, and that Endicott breached that partnership when he instead organized and incorporated such a company with his friend, Gross, thereby wrongfully depriving Shih of her interest in the joint venture.  Accordingly, Defendants' motion to dismiss is DENIED as to Shih's claims against Endicott and certain of her claims against Gross and Petal, the new name for the "credit bridging" company that Shih alleges Endicott took for himself.  The motion is GRANTED as to one claim against Gross and one claim against Petal.

## I.  Background

The Court takes the following facts and allegations from the SAC and, for the purpose of this motion, deems them to be true.

In 2014, Shih traveled to New York to complete an internship with the New Zealand Permanent Mission to the United Nations.  (Second Am. Compl. ("SAC") ¶ 13, ECF No. 93.)  While in New York, Shih met and befriended Endicott, a 2012 graduate of Harvard Law School who was working as a corporate attorney at

a large law firm.  (Id. ¶¶ 14–16.)  In July 2014, Shih's
internship ended, and she returned to her native New Zealand.
(Id. ¶ 18.)  After Shih departed New York, she and Endicott kept
in touch, communicating at least once a month or more.  (Id. ¶
19.)

In the summer of 2014, Endicott exited the law firm to take
a job as an investment analyst at a large financial firm.  (Id.
¶ 21.)  During his conversations with Shih, however, Endicott
repeatedly communicated that he was unhappy with his job at the
financial firm.  (Id. ¶ 22.)  Shih communicated to Endicott her
entrepreneurial ambitions and her desire to return to New York
to live and work.  (Id. ¶ 23.)

### A.  Endicott proposes that he and Shih "start a company together"

On or around April 24, 2015, Shih and Endicott exchanged
the following messages via Facebook Messenger:

| Endicott: | Let's start a company together.<br>That does some cool trans-pacific stuff. |
| Shih: | I'm so on board.<br>You got skills? |
| Endicott: | I'm a lawyer and an investment banker.<br>I would say so. |
| Shih: | I mean, how do you see them applying? |
| Endicott: | I can raise financing, set up the company and<br>understand ecommerce[.]<br>Keep the books, do taxes, manage employees[.]<br>I basically just need a product[.] |

> Shih:        Hahaha[.]
>
> Endicott:    I'm not really kidding.  I'm looking for
>              something cool to sell and haven't really been
>              able to find it[.]

(Id. ¶ 27.)  During the conversation, Shih informed Endicott
that New Zealand had a good startup community, but it lacked
startup money.  (Id. ¶ 29.)  "I don't know that money is a huge
issue," Endicott stated, "I think I can get money."  (Id. ¶ 31.)
Shih responded, "Well if you're serious, let's talk more."  (Id.
¶ 32.)

### B.  Shih shares her business idea with Endicott

Over the weekend of April 25–26, 2015, Shih considered
Endicott's proposal and decided that his experience as a New
York-based attorney and investment banker could help her to
incorporate and finance an idea she had for a credit bridging
service for new migrants to the United States.  (Id. ¶ 33.)  The
idea had come to Shih during her time in New York in 2014, when
she observed that she and other expatriates were unable to
obtain credit cards in the United States and frequently
struggled to access credit to purchase cars, secure apartment
leases, open bank accounts, or assist with daily expenses.  (Id.
¶¶ 2, 34–35.)  Shih believed a credit bridging service could
help address this failure of the Fair Isaac Corporation ("FICO")
credit scoring system, and she sought a partner to assist her

with organizing and securing financing for such a company.  (Id. ¶¶ 36-37.)

Trusting Endicott as a friend, and finding it "particularly attractive" that he had offered his legal services and expertise as an attorney, and represented that he had contacts through his investment banking career that could lead to investors in a new company, on or about April 27, 2015, Shih proposed to Endicott her credit bridging idea.  (Id. ¶¶ 38-40.)  The following day, Endicott replied that he thought Shih's idea was "amazing" and "seriously very good," and he immediately began researching the issue of access to credit in the United States and sharing what he found with Shih.  (Id. ¶¶ 42-48.)

On April 28, 2015, Shih and Endicott further discussed Shih's idea via Facebook Messenger.  (Id. ¶ 49.)  Endicott asked Shih to elaborate on the idea, and she described to him a company that could evaluate a customer outside of the FICO context by conducting a more representative assessment of an individual's creditworthiness, thereby enabling the individual to access credit in the United States.  (Id. ¶ 50.)  Shih explained that her company would independently "vet" the creditworthiness of individuals with no U.S. credit history, and it would extend credit or underwrite the risk of a U.S. bank's extension of credit to such individuals to allow them to access credit immediately.  (Id.)  Endicott said he thought "the idea

is viable," "[t]here's a problem, and this would solve that problem," and it was "a good idea." (Id. ¶ 52.) Shih and Endicott concluded their discussion with the following exchange:

> Endicott:   Thanks!
>             Let's create this thing[][.]
>
> Shih:       [N]o worries, you said you wanted to start a business[.]
>
> Endicott:   It will give you an excuse to run around the world some more[.]
>
> Shih:       I do love that[.]
>             I'm currently waiting on security clearance which is massively cramping my style[.]
>
> Endicott:   Haha, sounds rough[.]
>
> Shih:       [Y]ou have no idea. [O]kay anyway do some digging, let me know[.]
>             [I]f all signs are still towards viability then we can start building a small team[.]
>
> Endicott:   [S]ounds good[.]

(Id. ¶ 53.)

### C. Shih and Endicott research and develop Shih's credit bridging concept

In May and June 2015, Shih and Endicott researched and discussed Shih's credit bridging concept via email, Facebook Messenger, Skype, and a shared Dropbox, and they used their collective research to create an investor presentation that Endicott began pitching to investors later that year. (Id. ¶ 56.) On April 29, 2015, Endicott emailed Berk Ustun ("Ustun"), a data scientist and purported "co-founder" of Petal, who later

became its Head of Data and is now an advisor to the company.
(Id. ¶¶ 2, 57.)  In the email, subject lined "FICO Outside the
US," Endicott called the project he was working on "my idea."
(Id. ¶ 57.)  The next day, Endicott emailed Ustun that he may
try to get information from two FICO employees.  (Id. ¶ 59.)
"Obviously not going to tell them my plan," Endicott wrote, "but
these are PR guys anyway and aren't going to go out and steal
the idea."  (Id.)

On or about May 3, 2015, Shih wrote Endicott via Facebook
Messenger to inquire whether he still thought the idea was
viable.  (Id. ¶ 64.)  Endicott responded that he thought it was
and advised Shih that he was continuing to research it and
discuss it with third parties.  (Id. ¶ 65.)  Endicott also
advised Shih that he was talking to people who they might
consider bringing on board as part of their team.  (Id. ¶ 66.)
On or about May 5, 2015, Endicott sent Shih an email requesting
her help with building out a market structure breakdown for the
business.  (Id. ¶ 67.)  Shih provided input, and the two
exchanged various emails in early May 2015 relating to the
credit scoring process and whether their company would lend
money in-house.  (Id. ¶¶ 68, 70-71, 75-76.)

On or about May 7, 2015, Endicott sent an email to a
freelance journalist who had written on the topic of access to
consumer credit in the United States.  (Id. ¶ 72.)  Endicott's

email explained that he was "working with a group that's setting up a venture to tackle the gap in credit available to immigrants in the US due to various causes (e.g., lack of credit scores)" and asked if the journalist had time to speak about one of her articles on the subject. (Id.) Endicott blind copied Shih to the email; he did not blind copy Ustun. (Id. ¶¶ 72-74.) The SAC alleges that Endicott's blind copying Shih demonstrates that his references to a "group" and "venture" consisted of himself and Shih. (Id. ¶ 73.)

On or about May 7, 2015, Endicott forwarded to Ustun an email exchange between himself and Shih from May 6 and 7, 2015, with the subject line, "Credit to new migrants." (Id. ¶ 78; Ex. A to SAC, ECF No. 93-1.) In the email exchange between Endicott and Shih, Shih stated that she was "glad" Endicott was "warming to the idea of lending money in-house," to which Endicott replied, "Great, we're on the same page overall. I think your concept of bridging would be akin to being a guarantor, which is interesting and would be cheaper than lending itself." (SAC ¶¶ 75-76; Ex. A to SAC.) Endicott's message to Ustun, in which he forwarded his exchange with Shih, simply read "FYI." (SAC ¶ 78; Ex. A to SAC.) Later that day, Ustun replied to Endicott's message by asking, "Who is Cassie?" (SAC ¶ 79; Ex. A to SAC.) Endicott responded, "This chick I banged a few months ago who

came up with the idea.  She lives in New Zealand." (SAC ¶ 80;
Ex. A to SAC.)

> ### D.  Shih and Endicott name their venture CreditBridge and agree to approach potential investors

On or about May 10, 2015, Endicott shared a Dropbox folder
with Shih titled "Credit Bridge Concept" and sent her an
extensive email with the subject line "Big Questions" in which
he proposed a delegation of labor between the two in the
development of their business plan. (SAC ¶¶ 82–83.)  Endicott
asked if Shih had any thoughts on a business name for their
venture and explained that he "will start cataloging people we
could reach out to for financing and share that with you once
it's in good shape." (Id. ¶ 84.)  Endicott forwarded to Ustun
his "Big Questions" email to Shih and wrote, "FYI." (Id. ¶ 85.)
Over the next week, Endicott, Shih, and Ustun performed research
and other tasks related to the "Big Questions." (Id. ¶¶ 86–92.)

On or about May 16 or 17, 2015, Shih and Endicott held a
meeting over Skype to discuss the details of their business
plan, including product development, potential team members and
business partners, how the company would make money, how
profits, losses, and expenses would be shared, venture capital,
and Shih's availability to return to New York for important
pitches or to relocate permanently. (Id. ¶ 93.)  Among other
topics the two discussed, Endicott suggested bringing in a

friend from law school as an additional founding member, but Shih expressed reservations about it and Endicott agreed that he would not promise equity in their venture to anyone without Shih's prior approval.[1]  (Id.)  Endicott accepted responsibility for incorporating the company and the two agreed to share its equity, expenses, profits, and losses in equal proportion. (Id.)  The two agreed that the task of fundraising would be delegated entirely to Endicott due to his background as an investment banker and attorney, and his ability to pitch in person in New York.  (Id.)  And the two agreed that if early fundraising efforts were successful, it would signal that the concept had passed an initial viability "litmus test," whereby Shih would begin planning to relocate to New York permanently. (Id.)

On or about June 6, 2015, Shih and Endicott discussed potential names for their company via Facebook Messenger, and Shih reiterated her preference that the company be called CreditBridge.  (Id. ¶ 107.)  Shortly thereafter, the two held a Skype meeting during which they settled on the name CreditBridge and discussed issues relating to the company such as product

---

[1] The SAC alleges that Gross, who graduated from Harvard Law School the same year as Endicott, is the friend Endicott referenced during the meeting.  (SAC ¶ 166.)  As discussed below, unbeknownst to Shih, Gross appears to have joined Endicott as a co-founder of the business venture in or around July 2015.  (Id. ¶ 136.)

development, team members, consumer behavior, and venture
capital.  (Id. ¶ 108.)  During the meeting, Shih advised
Endicott that work obligations and an upcoming three-week
vacation to the South Island of New Zealand would temporarily
limit her ability to work on CreditBridge.  (Id. ¶ 111.)  Shih
inquired whether Endicott wanted to purchase some of her
interest in CreditBridge so that he could tell investors that he
held a controlling stake in the company, but Endicott rejected
the proposal.  (Id.)  Since it was "your idea," Endicott told
Shih, he did not want to work on CreditBridge without her as his
equal partner.  (Id.)  The two agreed that they would finalize a
business proposal slide deck and take CreditBridge into a "pitch
phase," with Endicott soliciting investment from venture
capitalists and other investors while Shih was on her vacation.
(Id. ¶ 112.)  Endicott agreed to report any significant
developments back to Shih but reminded her that his full-time
investment banking job demanded most of his time so she should
expect some delay as to his progress raising funds.  (Id.)

       Around the same time as their Skype meeting, Endicott sent
Shih an email with the subject line, "Slide Deck," in which he
stated, "here's the slide deck I'm referring to" and attached a
document titled "CreditBridge Business Plan Deck."  (Id. ¶ 113.)
The "CreditBridge Business Plan Deck" contained proposed slides
for Endicott's pitch to investors.  (Id. ¶¶ 114, 117.)  The SAC

alleges that, although the version sent with Endicott's email was incomplete, Shih and Endicott both understood that the slide deck would be finalized utilizing the concepts, market research, and business models that the two jointly discussed—which Endicott did later in day of their Skype meeting.  (Id. ¶¶ 115-16.)

### E.   Endicott and Gross launch CreditBridge, Inc. without Shih

Soon after their June 6, 2015, Skype meeting, Endicott took steps to organize and promote CreditBridge by registering a company website and Twitter account, and launching a logo contest which described the company as "a credit provider for new immigrants/migrants to the United States."[2]  (Id. ¶¶ 121, 124-26.)  Endicott also continued working on the CreditBridge Business Plan Deck, which incorporated Shih's credit bridging business model and Shih and Endicott's joint work product.  (Id. ¶¶ 129-31.)

On or about June 28, 2015, Shih sent a message to Endicott while she was on her vacation to "touch base" about

---

[2] The SAC further alleges that, at the time the SAC was filed, the web address Endicott registered on or about June 11, 2015, redirects visitors to Petal's website, and the logo that he selected from the design contest was used as CreditBridge, Inc.'s primary logo until the company changed its name to Petal in September 2016.  (SAC ¶¶ 122, 127, 201.)

CreditBridge.  (Id. ¶ 119.)  Endicott never responded.  (Id. ¶ 120.)

Beginning in July 2015, Gross's name began to appear on CreditBridge's presentation materials.  (Id. ¶ 136.)  On or around July 13, 2015, Endicott and Gross prepared a "teaser" company announcement that introduced CreditBridge and stated that the company was seeking financing "to enable rapid growth and product development," just as Shih and Endicott had agreed. (Id. ¶ 138.)  The SAC alleges that Shih's ideas, research, and work product are prominently featured in the materials Endicott and Gross used to attract financing, and it sets forth specific examples.  (Id. ¶¶ 139, 143.)  A few days later, Endicott and Gross sent an email to a consumer advocacy nonprofit in which they introduced themselves as "co-founder[s] of a consumer finance venture that is seeking to broaden consumer credit opportunities for new arrivals to the United States (e.g., immigrants)" and they were "in the preliminary phases of launching a business."  (Id. ¶ 140.)  Endicott and Gross's message made no mention of Shih.  (Id.)

On or about August 8, 2015, Shih sent Endicott a message via Facebook Messenger to wish him a happy birthday expecting that her message would prompt an update from him regarding his progress with CreditBridge.  (Id. ¶ 141.)  Endicott did not respond.  (Id.)  Unbeknownst to Shih, however, around that same

time, Endicott, Gross, and Ustun were preparing to meet with
venture capitalists.  (Id. ¶ 142.)  The meeting took place on
August 11, 2015, during which Endicott and/or Gross pitched
Shih's credit bridging model and work product without ever
mentioning her.  (Id. ¶ 143.)  On August 12, 2015, Shih sent
Endicott an email after seeing a Facebook post by Endicott's
girlfriend, Yulia Fradkin ("Fradkin")—whom Shih knew personally
from her time in New York—advertising for a computer scientist,
software engineer, or statistician for CreditBridge.  (Id. ¶¶
144-47.)  Once again, Endicott did not respond.  (Id. ¶ 146.)
Later that month, Shih sent a message via Facebook Messenger to
Fradkin which stated:

> [H]ey Yulia, did you manage to verify Andrew [Endicott]
> is in fact alive and well?
>
> I saw your post about CreditBridge looking for a new
> data person.  I don't know if Andrew mentioned but
> CreditBridge is my idea.  I suggested it to him in April
> and we worked on it for the next few months but I wasn't
> sure if he was still interested?
>
> Can you get him to give me a buzz if you do find him,
> cheers!

(Id. ¶ 147.)  Shortly thereafter, Fradkin replied that Endicott
was "in Turkey right now" and "yeah I think they are trying to
see if there is general investor interest."  (Id. ¶ 148.)  Shih
was grateful to learn that Endicott was pursuing financing
despite having to travel internationally, which helped to
explain why he had not followed up regarding his progress.  (Id.

¶ 149-50.)  From then on, Shih allowed Endicott to pursue financing for CreditBridge without interference from her, believing that he was carrying out their agreement and that Endicott would follow up, as he said he would, when he had something significant to report.  (Id. ¶ 152.)

### F.  Shih learns that Endicott has launched CreditBridge, Inc. without her

Approximately five months later, in early-February 2016, Endicott and Gross formally incorporated CreditBridge in the State of Delaware.  (Id. ¶ 156.)  On or about February 14, 2016, Shih became aware that Endicott's and Gross's LinkedIn profiles listed their positions as co-founders of CreditBridge, Inc., which, based on statements on the company's website, indicated that Endicott and Gross were pursuing the business model that Shih had disclosed to and developed with Endicott.  (Id. ¶¶ 157-162.)  Shih attempted to access the Dropbox she had shared with Endicott with their work product but discovered that Endicott had removed her access to it.  (Id. ¶ 164.)

On or about February 16, 2016, Shih sent an email to Endicott and Gross at their CreditBridge email addresses.  (Id. ¶ 170.)  The email was directed to Endicott and subject lined "CreditBridge's Future," and in it Shih explained that she was "writing to you to express my concern at the way I have been treated in the formation of CreditBridge."  (Id.)  "CreditBridge

was my business idea which I shared with you on the mutual understanding that we would pursue its development in partnership," Shih wrote.  (Id.)  Shih explained that "[w]hen you did not reply to my attempt to contact you last June I charitably believed that you had put CreditBridge on the backburner," and that she had hoped "we would be able to have an honest conversation about CreditBridge and our roles in its future."  (Id.)  However, Shih explained, the company's recent incorporation led her to believe that Endicott's "intent is clearly to cut me out of the business which I conceived of and pursued in good faith with you, and to which I am entitled to 50 per[]cent ownership."  (Id.)  Neither Endicott nor Gross responded to Shih's message.  (Id. ¶ 171.)

On March 1, 2016, Shih resent her February 16, 2016 email to Endicott in a message to his personal email address.  (Id. ¶ 174.)  Once again, Endicott did not respond.  (Id. ¶ 175.)  On March 2, 2016, Shih sent a private message to Gross's LinkedIn account in which she explained that her earlier email to his CreditBridge email address "warrant[s] your attention and I want you to know that I am available to answer any questions you may have."  (Id. ¶ 177.)  Gross never responded.  (Id. ¶ 178.)

On or around March 23, 2016, Shih sent a lengthy email to Gross alone in which she urged him to respond to her prior messages about CreditBridge and warned him against becoming

"complicit in [Endicott's] unethical conduct." (Id. ¶ 184.)

Approximately six hours later, Endicott emailed Shih and said:

> Hi Cassie,
>
> Thanks for your letter.  It's nice to hear from you
> again.  It's been too long since we've spoken and I hope
> all is well with you.  I'm sorry that our relationship
> ended last year.  I treated you poorly as a friend and
> I want to apologize for ending communication with you so
> abru[p]tly.
>
> Our lack of communication seems to have caused a
> misunderstanding on your part regarding my business,
> CreditBridge.   This  business  has  no  connection
> whatsoever to anything that you and I discussed in the
> past.  Contrary to what you've claimed in your letter,
> CreditBridge is a credit card company and is not based
> on any of your business ideas.
>
> CreditBridge is also just a startup, with no revenue, no
> customers,  no  material  contracts,  and  no  outside
> investors.  I have no income now after leaving my job at
> [the financial firm], and I'm personally funding the
> start-up costs of the business.  Needless to say, I've
> been racking up some pretty scary credit card debt.
>
> I was surprised by how you've portrayed me in your letter
> and I hope we can resume being friends.  You're an
> incredibly intelligent and capable person, and I think
> it's a shame that we did not ever get the chance to work
> together.  I really admire your passion and I encourage
> you to pursue your business ideas just as I've pursued
> mine.  If I can ever be of any help to you, please let
> me know.
>
> I wish you the best of luck with everything!
>
> Regards,
> Andrew

(Id. ¶ 186.)

On or about March 25, 2016, Shih responded to Endicott's

message, copying Gross.  (Id. ¶ 189.)  Shih explained that

"[f]rom the outside it appears that the company we worked on and
CreditBridge Inc are the same company," and she asked Endicott
to answer three questions regarding the origin of CreditBridge,
Inc. and how it differed from the company that Shih and Endicott
had been developing together.  (Id. ¶ 189.)  Neither Endicott
nor Gross ever responded.  (Id. ¶ 190.)

The following month, Shih sent an email to the same
consumer advocacy nonprofit that Endicott and Gross contacted in
July 2015.  (Id. ¶ 196.)  Shih's message—which copied Endicott
and Gross—explained her role in CreditBridge, Inc.'s formation
and offered to provide "written documentation" in support.
(Id.)  Shih asked the nonprofit to notify "any third parties who
are potentially affected," and explained that, "[w]hile I don't
wish for this to get any larger than it has to, I am determined
to pursue a fair resolution . . . including through civil action
against [Endicott] if he continues to refuse to resolve it with
me directly."  (Id.)  Less than two hours later, Endicott
replied to Shih's message, but removed Shih as an addressee.
(Id. ¶ 197.)  In his reply to the nonprofit, which copied Gross
but omitted Shih, Endicott characterized Shih's email as
"frivolous."  (Id.)  "We are following up on our end," Endicott
wrote, "and we ask that you please ignore it.  This is one of
the downsides of a publicly listed email!"  (Id.)  Once again,

however, neither Endicott nor Gross ever sent a response to Shih.  (Id. ¶ 198.)

Soon thereafter, Endicott and Gross halted all, or substantially all, of CreditBridge, Inc.'s marketing efforts, and they began taking steps to re-brand the company.  (Id. ¶¶ 199–200.)  In September 2016, CreditBridge, Inc. changed its name to Petal, but, the SAC alleges, the company continued—and continues—to use and take credit for Shih's credit bridging model and her work product.  (Id. ¶¶ 201–02, 209–21.)  The SAC further alleges that, in December 2016, Endicott and Gross executed a stock purchase agreement in which they issued approximately $3.4 million of the company's stock to investors, while falsely representing that "[t]here is no action, suit, [or] proceeding . . . [that is] to the Company's knowledge, currently threatened in writing against the Company or . . . any officer or director of the Company."  (Id. ¶¶ 203–06.)

On October 2, 2018, Petal officially launched a credit card product targeting young adults, students, immigrants, and minorities who have not yet had the opportunity to build credit in the United States.  (Id. ¶ 7.)  Petal has raised over $80 million in financing and is self-valued at more than $200 million.  (Id. ¶ 226.)

### G.   The Complaint

On June 19, 2018, Shih initiated this action by filing a complaint against Petal, Endicott, Gross, Ustun, and others. (ECF No. 1.)  On October 31, 2018, Shih filed an amended complaint, dropping her claims against all defendants except Petal, Endicott, and Gross.  (ECF No. 46.)  On February 20, 2019, Defendants moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (ECF No. 67.)  On July 30, 2019, while the motion to dismiss was pending, Shih sought leave to file a supplemental opposition brief based on newly discovered evidence she obtained through non-party discovery and her own independent investigations.  (Letter from Peter S. Dawson to Hon. John F. Keenan (July 30, 2019), ECF No. 86.)  The Court denied Shih's request but, with the consent of Defendants, granted her leave to file a second amended complaint with the new information.  (ECF No. 92.)  Shih filed the SAC on September 12, 2019.  (ECF No. 93.)

The SAC asserts eleven total claims for relief.  Against Endicott and Petal, Shih asserts claims for breach of fiduciary duty, breach of actual or implied contract, breach of the covenant of good faith and fair dealing, and promissory estoppel (Counts I, V, VI, and VII, respectively).  Against Gross and Petal, Shih asserts a claim for aiding and abetting breach of fiduciary duty (Count II); and a separate breach of fiduciary

20

duty claim against Gross alone (Count III).  Against all
defendants, Shih asserts claims for breach of corporate
fiduciary duties, misappropriation of business idea, unjust
enrichment, and unfair competition (Counts IV, VIII, IX, and X,
respectively).  Finally, Shih seeks a declaratory judgment
against Petal, establishing her as an equitable shareholder and
determining her interest in the company (Count XI).

On December 9, 2019, Defendants moved to dismiss the SAC in
its entirety for failure to state a claim upon which relief may
be granted.  (ECF No. 102.)  The Court heard the motion during a
telephonic argument on August 27, 2020.

## II.  Legal Standard Governing Rule 12(b)(6) Motions to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires only a
short and plain statement of the claim showing that the pleader
is entitled to relief, in order to give the defendant fair
notice of what the claim is and the grounds upon which it
rests." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 70 (2d
Cir. 2014).  "Consequently, to survive a motion under Rule
12(b)(6), a complaint does not need to contain detailed or
elaborate factual allegations, but only allegations sufficient
to raise an entitlement to relief above the speculative level."
Id.

"[I]n deciding a Rule 12(b)(6) motion to dismiss a complaint, [the Court] is required to accept all 'well-pleaded factual allegations' in the complaint as true." Lynch v. City of New York, 952 F.3d 67, 74–75 (2d Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)). "Although allegations that are conclusory are not entitled to be assumed true, when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 75 (brackets, emphasis, and internal citations and quotation marks omitted). "The court must also 'construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff.'" Id. (quoting Arar v. Ashcroft, 585 F.3d 559, 567 (2d Cir. 2009) (en banc), cert. denied, 560 U.S. 978 (2010)). "The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct." Id. (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)). "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." Anderson News, LLC

v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012), cert. denied, 568 U.S. 1087 (2013).

### III.  Endicott

The SAC asserts eight counts against Endicott.  Each is discussed in turn below.

#### A.  Breach of actual or implied contract (Count V)

"To make out a viable claim for breach of contract a 'complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004).  Under New York law,

> [a] contract implied in fact may result as an inference
> from the facts and circumstances of the case, although
> not formally stated in words, and is derived from the
> "presumed" intention of the parties as indicated by
> their conduct.  It is just as binding as an express
> contract arising from declared intention, since in the
> law there is no distinction between agreements made by
> words and those made by conduct.

Jemzura v. Jemzura, 330 N.E.2d 414, 420 (N.Y. 1975) (internal citations omitted); see also Farina v. Metro. Transportation Auth., 409 F. Supp. 3d 173, 216 (S.D.N.Y. 2019).  "This type of contract still requires such elements as consideration, mutual assent, legal capacity and legal subject matter." Maas v. Cornell Univ., 721 N.E.2d 966, 970 (N.Y. 1999) (citing 1 Williston, Contracts § 1:5, at 22 (4th ed. 1990)).

"To create a binding contract, there must be a
manifestation of mutual assent sufficiently definite to assure
that the parties are truly in agreement with respect to all
material terms." Express Indus. & Terminal Corp. v. New York
State Dep't of Transp., 715 N.E.2d 1050, 1053 (N.Y. 1999).
"[W]here the issue is whether the course of conduct and
communications between the parties have created a legally
enforceable agreement," Kolchins v. Evolution Markets, Inc., 96
N.E.3d 784, 787 (N.Y. 2018) (quoting Zheng v. City of New York,
973 N.E.2d 711, 721 (N.Y. 2012)) (brackets and internal
quotation marks omitted), "it is necessary to look to the
objective manifestations of the intent of the parties as
gathered by their expressed words and deeds," id. (quoting Brown
Bros. Elec. Contrs. v. Beam Constr. Corp., 361 N.E.2d 999, 1001
(N.Y. 1977)) (ellipsis omitted).  "In doing so, disproportionate
emphasis is not to be put on any single act, phrase or other
expression, but, instead, on the totality of all of these, given
the attendant circumstances, the situation of the parties, and
the objectives they were striving to attain." Id. at 787-88
(quoting Brown Bros., 361 N.E.2d at 1001).

"If an agreement is not reasonably certain in its material
terms, there can be no legally enforceable contract." Cobble
Hill Nursing Home, Inc. v. Henry & Warren Corp., 548 N.E.2d 203,
206 (N.Y. 1989).  "However, while a mere agreement to agree, in

which a material term is left for future negotiations, is
unenforceable, the terms of a contract do not need to be fixed
with absolute certainty to give rise to an enforceable
agreement." Kolchins, 96 N.E.3d at 788 (brackets and internal
citations and quotation marks omitted).

The SAC alleges that an actual or implied joint venture
agreement existed between Shih and Endicott, pursuant to which
they agreed to "contribute their personal services toward the
development, organization, and promotion of a company which
would independently assess consumers' creditworthiness and
extend credit to creditworthy individuals who were otherwise
unable to access consumer credit through traditional means."
(SAC ¶ 319.)  The SAC further alleges that, during their May
2015 Skype meeting, Shih and Endicott expressly agreed that they
would equally share the profits, losses, and equity of the
company, and Endicott would be responsible for issuing the
company's shares to himself and Shih in equal parts.  (Id. ¶¶
93, 321.)  The SAC alleges that Endicott breached this agreement
by, among other things, failing to provide Shih with 50% of
CreditBridge, Inc.'s equity upon its incorporation, and failing
to support her appointment as an executive officer in the
company.  (Id. ¶ 323.)  In the alternative, the SAC alleges that
Endicott breached his and Shih's agreement to start a company
together by failing to solicit investment in the joint venture

he had agreed to undertake with Shih, which deprived her of the use of her novel credit gap business idea, among other benefits. (Id. ¶¶ 324-25.)

Defendants argue that Shih's contract and quasi-contract claims must be dismissed because the SAC does not plausibly allege the elements of contract formation, such as agreement on material terms, intent to be bound, shared control, and meaningful contributions by Shih to the venture. Accordingly, Defendants argue, Shih's claims fail, and it is not plausible to infer that Endicott owed her any legal obligations. The Court disagrees.

Construing all reasonable inferences in the light most favorable to Shih, as the Court must at this procedural stage, Lynch, 952 F.3d at 75, the SAC plausibly alleges an implied-in-fact joint venture agreement between Shih and Endicott. "A joint venture . . . is in a sense a partnership for a limited purpose, and it has long been recognized that the legal consequences of a joint venture are equivalent to those of a partnership." Gramercy Equities Corp. v. Dumont, 531 N.E.2d 629, 632 (N.Y. 1988) (citations omitted). "The elements of a joint venture are an agreement of the parties manifesting their intent to associate as joint venturers, mutual contributions to the joint undertaking, some degree of joint control over the enterprise, and a mechanism for the sharing of profits and

26

losses." Clarke v. Sky Exp., Inc., 118 A.D.3d 935, 935 (2d Dep't 2014).

> The ultimate inquiry in determining whether a joint venture exists is whether "the parties have so joined their property, interest, skills and risks that for the purposes of the particular adventure their respective contributions have become as one and the commingled property and interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit."

Solutia Inc. v. FMC Corp., 456 F. Supp. 2d 429, 445 (S.D.N.Y. 2006) (quoting Indep. Energy Corp. v. Trigen Energy Corp., 944 F. Supp. 1184, 1201 (S.D.N.Y. 1996)). "Significantly, the intent of the parties to form a joint venture may be implied from the totality of their conduct." Schultz v. Sayada, 133 A.D.3d 1015, 1016 (3d Dep't 2015).

Here, the totality of the parties' conduct plausibly alleges a legally enforceable partnership agreement between Shih and Endicott:

Offer, acceptance, and consideration. Affording Shih the benefit of every favorable inference, the SAC alleges a sufficiently definite offer by Endicott to, as he phrased it in his May 7, 2015 email to the freelance journalist, "set[] up a venture" with Shih "to tackle the gap in credit available to immigrants in the US due to various causes (e.g., lack of credit scores)." (SAC ¶ 72.) Shih manifested her acceptance of this offer, and she and Endicott provided the necessary

consideration, by working together throughout May and June 2015
to research and develop such a company. Accord Express Indus. &
Terminal Corp., 715 N.E.2d at 1053 ("Generally, courts look to
the basic elements of the offer and the acceptance to determine
whether there is an objective meeting of the minds sufficient to
give rise to a binding and enforceable contract."); Apfel v.
Prudential-Bache Sec. Inc., 616 N.E.2d 1095, 1097 (N.Y. 1993)
("Under the traditional principles of contract law, the parties
to a contract are free to make their bargain, even if the
consideration exchanged is grossly unequal or of dubious
value.").

Agreement on material terms.  "Before a plaintiff may
secure redress for the breach of an agreement, the promise made
by the defendant must be sufficiently certain and specific so
that the parties' intentions are ascertainable." Andor Group v.
Benninghoff, 219 A.D.2d 573, 573 (2d Dep't 1995).  Defendants
argue there were "gaping holes" regarding the nature of Shih and
Endicott's venture, including how it would be established and
each party's respective role in the new company.  The Court is
not persuaded.  Drawing all reasonable inferences in favor of
Shih, the SAC plausibly alleges an agreement between the two to
build a business together which would assess the
creditworthiness of certain types of individuals in order to
provide qualifying customers with access to United States-based

sources of credit.  Indeed, the two agreed to name their new company "CreditBridge," and during Skype meetings in May and June 2015, they discussed and reached agreement on a variety of important topics.  At the early procedural posture of this action, these allegations are "sufficient to raise an entitlement to relief above the speculative level." Keiler, 751 F.3d at 70; see also Cobble Hill Nursing Home, 548 N.E.2d at 206 ("[A]t some point virtually every agreement can be said to have a degree of indefiniteness, and if the doctrine is applied with a heavy hand it may defeat the reasonable expectations of the parties in entering into the contract.").

Intent.  "Because the creation of a joint venture imposes significant duties and obligations on the parties involved, the parties must be clear that they intend to form a joint venture, which is a fiduciary relationship, and not a simple contract." Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc., 765 F. Supp. 2d 403, 412 (S.D.N.Y. 2011) (internal quotation marks omitted); see also Andor Group, 219 A.D.2d at 573.  Defendants argue that Endicott never agreed to start a business with Shih, and the parties' conduct does not evidence an intent or promise by him to do so.  The Court is not persuaded.  Not only is this argument—which is essentially an affirmative defense—inappropriate on a motion to dismiss, it crumbles in the face of Endicott's own statements to Shih: for example, "Let's start a

29

company together," (SAC ¶ 27); "Let's create this things [sic],"
(id. ¶ 53); and "Great, we're on the same page overall," (id. ¶
76).  It also crumbles in light of his statements to others: for
example, to the freelance journalist in which Endicott said he
was "working with a group that's setting up a venture to tackle
the gap in credit available to immigrants in the US," (id. ¶
72); or to Ustun in which Endicott forwarded his discussions
with Shih even after he had admitted to Ustun that Shih was the
one "who came up with the idea," (id. ¶¶ 78–80, 85, 91).  These
documentable facts, to say nothing of the SAC's other detailed
allegations regarding the content of Shih and Endicott's oral
discussions, plausibly allege that Endicott intended a joint
venture with Shih to capitalize on her idea of a credit bridging
service. Accord Schultz, 133 A.D.3d at 1016–17 (finding "the
evidence of the whole of their relationship amply demonstrates
that they entered into a joint venture"); Griffith Energy, Inc.
v. Evans, 85 A.D.3d 1564, 1565–66 (4th Dep't 2011) (affirming
trial court's finding of intent based on the defendant's
conduct); Czernicki v. Lawniczak, 74 A.D.3d 1121, 1125 (2d Dep't
2010) (finding the parties' conduct evidenced an intent to enter
into an oral partnership agreement); see also Brown Bros. 361
N.E.2d at 1002 ("[W]here a finding of whether an intent to
contract is dependent . . . on other evidence from which
differing inferences may be drawn, a question of fact arises.").

Shared control and meaningful contributions. Defendants
argue that Shih never acted like she was involved in a joint
venture or had decision-making authority.  Instead, they argue,
Shih did "nothing" as Endicott and Gross created what is now
Petal.  Once again, the Court is not persuaded.  Contrary to
Defendants blanket assertions wholly at odds with the facts
alleged, the SAC includes specific allegations regarding Shih's
influence over the joint venture when, for example, she appears
to have persuaded Endicott to consider "lending money in-house,"
(SAC ¶¶ 71, 75-76), or that "it's not too early to start
thinking about start-up money and possible places to get it,"
(id. ¶¶ 77, 84).  The SAC also alleges that Shih expressed
reservations about bringing on new partners after Endicott
suggested bringing in a friend from law school (alleged to be
Gross), to which "Endicott agreed that he would not promise
equity in their venture to anyone without Shih's prior
approval."  (Id. ¶ 93.)  Finally, regarding Shih's meaningful
contributions, Defendants would have the Court not only ignore
the SAC's allegations regarding where the joint venture's credit
bridging concept originated, but also Shih's research and
analysis during May and June 2015, (id. ¶¶ 56-76), and the SAC's
comprehensive overview of how her contributions are prominently
featured in the materials Endicott and Gross used to attract
financing, (id. ¶¶ 137-139).

Accordingly, the SAC plausibly alleges, at a minimum, an oral joint venture agreement between Shih and Endicott, which Endicott subsequently breached by abruptly and surreptitiously cutting Shih out of the "CreditBridge" enterprise that, consistent with the terms of their partnership, he began pitching to potential investors in July 2015, and later incorporated as CreditBridge, Inc.

### B. Breach of the covenant of good faith and fair dealing (Count VI)

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 773 N.E.2d 496, 500 (N.Y. 2002). This implied covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995) (internal quotation marks omitted), and it "encompass[es] any promises which a reasonable person in the position of the promisee would be justified in understanding were included," 511 W., 773 N.E.2d at 500-01 (internal quotation marks omitted). "[S]o long as the promisee is allowed to reap the benefits of the contract, the implied covenant of good faith does not require the promisor to take actions contrary to his own economic interest." Travelers Indem. Co. of Illinois v. CDL

Hotels USA, Inc., 322 F. Supp. 2d 482, 494 (S.D.N.Y. 2004).
"New York law," however, "does not recognize a separate cause of
action for breach of the implied covenant of good faith and fair
dealing when a breach of contract claim, based upon the same
facts, is also pled." Harris v. Provident Life & Acc. Ins. Co.,
310 F.3d 73, 81 (2d Cir. 2002).

Defendants argue this claim must be dismissed because it is
duplicative of Shih's breach of contract claim.   The Court
disagrees.   Here, in addition to plausibly alleging Endicott's
breach of their joint venture agreement by withholding from Shih
her rightful interest in CreditBridge, Inc., the SAC
alternatively—and plausibly—alleges that, if CreditBridge, Inc.
is not the company of Shih and Endicott's partnership, Endicott
nevertheless breached the implied covenant by using Shih's idea,
their joint efforts, and her work product to establish a
directly competing company under the exact same name.   (SAC ¶
334.)   Accordingly, at this stage, the SAC's implied covenant
claim is not duplicative, but rather, is permitted as an
alternative pleading pursuant to Federal Rule of Civil Procedure
8(d)(3).

### C.  Breach of fiduciary duties

"To state a claim for breach of fiduciary duty, a plaintiff
must plausibly allege facts demonstrating 'breach by a fiduciary
of a duty owed to plaintiff; defendant's knowing participation

33

in the breach; and damages.'" Galvstar Holdings, LLC v. Harvard
Steel Sales, LLC, 722 F. App'x 12, 15 (2d Cir. 2018) (summary
order) (quoting SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329,
342 (2d Cir. 2004)).  "A fiduciary relationship 'exists between
two persons when one of them is under a duty to act for or to
give advice for the benefit of another upon matters within the
scope of the relation.'" EBC I, Inc. v. Goldman, Sachs & Co.,
832 N.E.2d 26, 31 (N.Y. 2005) (quoting Restatement (Second) of
Torts § 874, cmt. a).  "Broadly stated, a fiduciary relationship
is one founded upon trust or confidence reposed by one person in
the integrity and fidelity of another.  It is said that the
relationship exists in all cases in which influence has been
acquired and abused, in which confidence has been reposed and
betrayed." Galvstar Holdings, 722 F. App'x at 15 (quoting Penato
v. George, 52 A.D.2d 939, 942 (2d Dep't 1976)).

### 1.  Co-venturer fiduciary duties (Count I)

"Under New York law, parties who enter into a joint venture
owe each other fiduciary obligations." Herman v. Duncan, No. 17
Civ. 3325 (PGG), 2019 WL 2137335, at *15 (S.D.N.Y. May 16,
2019).  "[C]oventurers, like co-partners, owe each other the
finest loyalty and the utmost good faith throughout the course
of the enterprise." Zeising v. Kelly, 152 F. Supp. 2d 335, 347
(S.D.N.Y. 2001); see also Meinhard v. Salmon, 164 N.E. 545, 546
(N.Y. 1928).

As discussed above, the SAC plausibly alleges an oral joint venture between Shih and Endicott to build a company together called CreditBridge, which was to provide access to credit to certain individuals in the United States who were otherwise unable to access it through traditional means.  Accordingly, Shih and Endicott owed each another "the duty of the finest loyalty[;] . . . [n]ot honesty alone, but the punctilio of an honor the most sensitive," Meinhard, 164 N.E. at 546, which Endicott betrayed by misappropriating the venture for himself and concealing his disloyalty from Shih in order to wrongfully exclude her from CreditBridge, Inc. and withhold her rightful interest in the company.  At this time, the Court need not resolve whether the SAC also plausibly alleges Endicott's breach of certain other fiduciary duties, such as those owed by an attorney, corporate promoter, or agent.  (SAC ¶¶ 248-282.)

## 2.  Corporate fiduciary duties (Count IV)

"In general, officers and directors owe fiduciary duties, including a duty of loyalty and a duty of care, to a corporation and its shareholders." United States Small Bus. Admin. v. Feinsod, 347 F. Supp. 3d 147, 158 (E.D.N.Y. 2018).  "The duty of care requires officers and directors to perform their duties 'in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances.'" Id. at 159 (quoting N.Y. Bus. Corp. Law §§

715(h) (officers), 717(a) (directors)).  "[T]he duty of
loyalty[] derives from the prohibition against self-dealing that
inheres in the fiduciary relationship." <u>Norlin Corp. v. Rooney,
Pace Inc.</u>, 744 F.2d 255, 264 (2d Cir. 1984).

The SAC alleges that Shih and Endicott were equal owners
and <u>de facto</u> shareholders in the enterprise later incorporated
as CreditBridge, Inc., and that Endicott (and Gross) wrongfully
deprived Shih of her interest in the company, which is now known
as Petal.  (SAC ¶¶ 235, 270).  Accordingly, the SAC alleges,
Endicott (and Gross) breached corporate fiduciary duties owed to
Shih as a <u>de facto</u> shareholder by failing to include her in
issuances of CreditBridge, Inc. stock and executive
compensation.  (<u>Id.</u> ¶¶ 310-12.)  As discussed above, the SAC
plausibly alleges an agreement between Shih and Endicott to
build and share ownership of a company indistinguishable from
CreditBridge, Inc.  This is sufficient, at this procedural
stage, to plausibly support a claim for breach of corporate
fiduciary duties:  If Shih was entitled to shares of
CreditBridge, Inc., Endicott breached duties of loyalty and care
in his capacity as an officer and director by consciously
withholding from Shih her rightful interest in the company. <u>See
Feinsod</u>, 347 F. Supp. 3d at 165 (allowing breach of corporate
fiduciary duty claim to move forward where "plaintiff has

plausibly alleged that defendants' actions lacked good faith and legitimate corporate purpose").

### D.   Misappropriation of business idea (Count VIII)

"In order for an idea to be susceptible to a claim of misappropriation, two essential elements must be established: the requisite legal relationship must exist between the parties, and the idea must be novel and concrete." Turner v. Temptu Inc., 586 F. App'x 718, 722 (2d Cir. 2014) (summary order) (quoting McGhan v. Ebersol, 608 F. Supp. 277, 284 (S.D.N.Y. 1985)).  "The legal relationship between the plaintiff and defendant may be either a fiduciary relationship, or based on an express contract, an implied-in-fact contract, or a quasi-contract." Id. (quoting McGhan, 608 F. Supp. at 284).  Regarding the element of novelty, "[t]he primary issue is whether plaintiff had an enforceable property right in the idea [she] disclosed to defendant." Am. Bus. Training Inc. v. Am. Mgmt. Ass'n, 50 A.D.3d 219, 222 (1st Dep't 2008).

Defendants argue that Shih's idea for a credit bridging service was not novel or concrete enough to be misappropriated, and even if it was, neither Endicott nor Gross ever made use of her idea.  The Court disagrees.

Novelty.  "[W]hen one submits an idea to another, no promise to pay for its use may be implied, and no asserted agreement enforced, if the elements of novelty and originality

37

are absent, since the property right in an idea is based upon

these two elements." Downey v. Gen. Foods Corp., 286 N.E.2d 257,

259 (N.Y. 1972); see also Am. Bus. Training, 50 A.D.3d at 222–

23. However,

> where the idea at issue was disclosed to the defendant,
> and the defendant, following its disclosure, entered
> into a contract to pay the plaintiff for it . . . the
> plaintiff need not establish that the idea was novel;
> the circumstances establish that the plaintiff provided
> something of value to the defendant, and therefore the
> plaintiff is entitled to the benefit that the contract
> provided for, in exchange for that consideration.

Am. Bus. Training, 50 A.D.3d at 223 (emphasis in original)

(discussing the holding in Apfel, 616 N.E.2d at 1098). "[A]

party who claims that an idea was misappropriated need not

establish that the idea was novel and original if its value to

the defendant was established by the creation of a contract

between the parties following disclosure of the idea to the

defendant." Id. (emphasis omitted).

As discussed above, the SAC plausibly alleges an agreement

between Shih and Endicott to build a company based on Shih's

credit bridging idea. Even if the Court were to credit

Defendants' argument that Shih's idea was not sufficiently

novel—which is belied by Endicott's own actions and statements

in response, his concern that someone else would steal the idea,

and his remarkable admission to Ustun that Shih was the one "who

came up with the idea"—the well-pleaded allegation of an

implied-in-fact contract following Shih's disclosure satisfies
the novelty requirement of this claim.

Concreteness.  Defendants argue that Shih's idea was not
concrete enough to be misappropriated because her idea merely
identified a problem in the world—it did not involve a
sufficiently detailed or defined solution to the problem.  The
Court is not persuaded.  Here, the SAC alleges a solution:
After Endicott asked Shih to elaborate on her idea, and before
the two agreed to create CreditBridge together, Shih described
to him a company that would independently "vet" the
creditworthiness of individuals and would extend credit or
underwrite the risk of a U.S. bank's extension of credit to such
individuals.  (SAC ¶ 50.)  Indeed, Endicott's own responses that
"the idea is viable" and "[t]here's a problem, and this would
solve that problem" plausibly allege a concrete idea for a
company the two subsequently began working to bring to life.

Use of the idea.  Defendants argue that Endicott built
CreditBridge, Inc. without Shih's help using his own work
product and proprietary ideas.  The Court is not persuaded.  Not
only is this type of counterfactual argument inappropriate on a
motion to dismiss, the SAC very clearly and plausibly alleges
the opposite: that Endicott took and used Shih's idea.  Indeed,
Endicott worked with Shih in the beginning to develop the idea
into a business in which others would want to invest, but

instead of terminating their oral agreement—which he could have done at any time—Endicott simply cut off communication with Shih and seized the venture for himself.

### E.  Unfair competition (Count X)

"The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 197 (2d Cir. 2001) (quotation marks omitted); see also Bytemark, Inc. v. Xerox Corp., 342 F. Supp. 3d 496, 505 (S.D.N.Y. 2018).

As discussed above, the SAC plausibly alleges a claim for breach of the covenant of good faith and fair dealing that is not duplicative of Shih's breach of contract claim, as well as standalone claims for idea misappropriation and breach of fiduciary duty, against Endicott.  Accordingly, the SAC's unfair competition claim against him is likewise sufficient—and it may not be dismissed as duplicative at this time—because the SAC plausibly alleges, as an alternative theory of liability, Endicott's unfair use of Shih's idea, their joint efforts, and her work product to establish a directly competing company.

### F.   Promissory estoppel (Count VII)

"To make out a claim for promissory estoppel, a plaintiff must [plausibly allege] (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the promisee, and (3) unconscionable injury to the relying party as a result of the reliance." Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 301 (2d Cir. 1996); see also Hanson v. Hanson, No. 18 Civ. 695 (KPF), 2019 WL 935127, at *9 (S.D.N.Y. Feb. 26, 2019).

Defendants argue that the SAC's promissory estoppel claim must be dismissed as both duplicative and because Shih does not plausibly allege a clear and unambiguous promise by Endicott on which she foreseeably relied.   The Court disagrees.

Under New York law,

> [a]lthough the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter, where there is a bona fide dispute as to the existence of a contract or the application of a contract in the dispute in issue, a plaintiff may proceed upon a theory of quasi contract as well as breach of contract, and will not be required to elect his or her remedies.

Sabre Int'l Sec., Ltd. v. Vulcan Capital Mgmt., Inc., 95 A.D.3d 434, 438-39 (1st Dep't 2012) (brackets and internal citations and quotation marks omitted).   As discussed above, a bona fide dispute exists as to the existence of an oral joint venture agreement between Shih and Endicott.   The SAC's promissory

41

estoppel claim is permitted at this procedural stage as an alternative pleading.

### G.   Unjust enrichment (Count IX)

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006) (quotation marks omitted). "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000) (quoting City of Syracuse v. R.A.C. Holding, Inc., 258 A.D.2d 905, 906 (4th Dep't 1999)).  "While a party generally may not simultaneously recover upon a breach of contract and unjust enrichment claim arising from the same facts, it is still permissible to plead such claims as alternative theories." Singer v. Xipto Inc., 852 F. Supp. 2d 416, 426 (S.D.N.Y. 2012).

As discussed above, the SAC plausibly alleges that Endicott was directly enriched at Shih's expense and that she is entitled to restitution as a result.  Accordingly, the SAC's unjust enrichment claim is permitted at this time.

## IV.  Gross

The SAC asserts six counts against Gross.  Each is discussed in turn below.

### A.  Aiding and abetting breach of fiduciary duty (Count II)

"To state a claim for aiding and abetting breach of fiduciary duty under New York law, a plaintiff must allege: (1) breach by a fiduciary of obligations to another; (2) actual knowing participation by the defendant in the fiduciary's breach of obligations; and (3) damages to the plaintiff." Mazzaro de Abreu v. Bank of Am. Corp., 525 F. Supp. 2d 381, 392 (S.D.N.Y. 2007).

Defendants argue that Gross did not aid and abet Endicott's breach of fiduciary duties because Endicott did not owe any duties to Shih and, even if he did, the SAC does not plausibly allege Gross's actual knowledge of nor his participation in any breach by Endicott.  The Court disagrees.

As discussed above, the SAC plausibly alleges co-venturer fiduciary duties owed by Endicott to Shih, which he breached by wrongfully misappropriating their venture for himself and excluding her from it.  Affording Shih the benefit of every reasonable inference, the SAC plausibly alleges Gross's actual knowledge of and participation in Endicott's breach based on (1) Shih's February 16, 2016 email to Endicott and Gross in which

she stated that "CreditBridge was my business idea which I shared with you [Endicott] on the mutual understanding that we would pursue its development in partnership"; (2) Shih's March 23, 2016 email to Gross alone, together with Endicott's quick— and only—response to Shih in which Endicott acknowledged a relationship with her ("I'm sorry that our relationship ended last year") and apologized for "treat[ing] you poorly as a friend" and "ending communication with you so abru[p]tly"; and (3) Shih's April 20, 2016 email to the consumer advocacy nonprofit in which she explained her role in CreditBridge, Inc.'s formation, and to which Endicott replied—removing Shih, but copying Gross on the message—characterizing Shih's email as "frivolous" and telling the nonprofit that "[w]e are following up on our end" when in fact, neither Endicott nor Gross ever contacted Shih again.  These allegations, at this procedural stage, plausibly allege Gross's knowledge of partnership duties owed by Endicott to Shih, and Gross's actual knowing participation in Endicott's willful refusal to treat Shih with "the finest loyalty and the utmost good faith." Zeising, 152 F. Supp. 2d at 347.

### B.  Breaches of promoter fiduciary duties (Count III) and corporate fiduciary duties (Count IV)

"It is well settled that both before and after a corporation comes into existence, its promoter acts as the

fiduciary of that corporation and its present and anticipated shareholders." Roni LLC v. Arfa, 74 A.D.3d 442, 444 (1st Dep't 2010), aff'd, 963 N.E.2d 123 (N.Y. 2011). "Ascertaining the existence of a fiduciary relationship 'inevitably requires a fact-specific inquiry.'" Roni, 963 N.E.2d at 125.

The SAC alleges that Gross owed fiduciary duties to Shih based on his position as a corporate promoter of CreditBridge, Inc. and his role as an executive and director of the company, which Gross subsequently breached by, among other things, failing to provide Shih with her rightful 50% ownership interest. As discussed above, the SAC plausibly alleges that (1) Shih was an anticipated shareholder of CreditBridge, Inc., but when the company was incorporated, she was wrongfully deprived of her rightful interest in it; and (2) Gross knowingly participated in denying Shih any ownership interest in CreditBridge, Inc. or Petal. Accordingly, at this early stage of the litigation, the SAC adequately alleges Gross's breach of promoter fiduciary duties and the corporate fiduciary duties of loyalty and care, which he owed to Shih in her capacity as an anticipated or de facto shareholder of CreditBridge, Inc.

### C. Misappropriation of business idea (Count VIII)

Defendants argue that Shih's misappropriation claim against Gross must be dismissed because the SAC does not plausibly

45

allege the required legal relationship between Gross and Shih when Shih shared her idea with Endicott.  The Court agrees.

Shih's claim is essentially that she shared her idea with Endicott, who then used it to start CreditBridge, Inc. with Gross.  Accordingly, Gross's liability arises out of his role in the company and its development.  But by the time Gross became involved in the endeavor to where he could have owed any duties to Shih, Endicott had already appropriated Shih's idea and was discussing it with others.  Indeed, the SAC alleges that, well before their May 16, 2015 Skype conversation during which Shih and Endicott allegedly formalized their agreement and Endicott suggested bringing on a friend from law school as an additional founding member, Shih was fully aware that Endicott was discussing her idea with others.  (SAC ¶ 65-66 (on or about May 3, 2015, Endicott advised Shih that he was discussing her idea with third parties), ¶ 72 (on or about May 7, 2015, Endicott emailed the freelance journalist, blind copying Shih), ¶ 91 (Endicott forwarded to Shih his May 13, 2015 email to Ustun).) Count VIII, as against Gross, must be dismissed.

### D.  Unfair competition (Count X)

Defendants argue that this claim, as against Gross, must be dismissed for the same reasons as Shih's misappropriation of business idea claim against him.  The Court disagrees.

46

"A claim of unfair competition does not necessarily require a showing of misappropriation of a . . . commercially novel idea that is produced by one party," but instead "may apply in cases involving . . . the misappropriation of a party's work product." Sokol Holdings, Inc. v. BMB Munai, Inc., 726 F. Supp. 2d 291, 302 (S.D.N.Y. 2010) (collecting cases).  Here, the promoter and corporate fiduciary duties Gross owed to Shih discussed above, together with the SAC's allegations that Petal "continues to implement the fundamental components" of Shih's idea and work product, (SAC ¶¶ 212–19), plausibly allege an unfair competition claim against Gross. See Telecom Int'l, 280 F.3d at 197 (explaining that an unfair competition claim may exist where a defendant misappropriates the fruit of a plaintiff's labors through abuse of a fiduciary relationship).

### E.  Unjust enrichment (Count IX)

Defendants argue that this claim must be dismissed because there was no relationship between Gross and Shih that could have caused reliance or inducement.  The Court disagrees.  "The essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." Mandarin Trading Ltd. v. Wildenstein, 944 N.E.2d 1104, 1110 (N.Y. 2011); see also Sokol Holdings, 726 F. Supp. 2d at 303 ("The essence of a claim for unjust enrichment is that one party has parted with

47

something of value that has been received by another at the
first party's expense."). Accepting the SAC's allegations as
true, this claim is sufficient for the same reasons as Shih's
allegations of aiding and abetting liability against Gross: the
SAC plausibly alleges that Gross knew of Shih's rightful claim
to half of CreditBridge, Inc. By taking no action to return to
Shih her rightful interest in the company, which in turn would
have reduced Gross's own interest, Gross has been unjustly
enriched at Shih's expense.

### V.  Petal

The SAC asserts ten counts against Petal. Each is
discussed in turn below.

### A.  Breach of actual or implied contract (Count V)

Under New York law, "[a] corporation may bind itself to the
terms of a preincorporation contract if it knowingly accepts the
benefits referable to the contract." Universal Indus. Corp. v.
Lindstrom, 92 A.D.2d 150, 152 (4th Dep't 1983); see also Reif v.
Williams Sportswear, Inc., 174 N.E.2d 492, 494 (N.Y. 1961) ("It
is a familiar principle that a corporation will be liable on a
contract of its promoters only if adopted, either expressly or
by acceptance of benefits referable to that contract."); Cont'l
Indus. Grp., Inc. v. Equate Petrochemical Co., 586 F. App'x 768,
771 (2d Cir. 2014) (summary order) (explaining Reif sets forth
the test by which a corporation may be liable on a pre-

incorporation contract).  Knowing acceptance "gives rise to
corporate liability in addition to any individual liability."
Universal Indus. Corp., 92 A.D.2d at 152.

The parties vigorously dispute whether CreditBridge, Inc.
and/or Petal are sufficiently similar to the "CreditBridge" of
Shih and Endicott's joint venture, such that Endicott's
agreement with Shih to, among other things, issue to her a 50%
ownership interest, constitutes a pre-incorporation contract
that Petal must honor.  At this early procedural stage, however,
the Court must assume the veracity of the SAC's allegations,
including its assertions that Petal—"a credit card company that
extends credit to individuals with little to no credit history
in the United States, primarily targeting young adults,
students, immigrants, and minorities," (SAC ¶ 1)—is the same
company that Shih and Endicott agreed to develop—"a company
which would independently assess consumers' creditworthiness and
extend credit to creditworthy individuals who were otherwise
unable to access consumer credit through traditional means,"
(id. ¶ 319).  As discussed above, the SAC plausibly alleges idea
misappropriation by Endicott.  Accordingly, the SAC plausibly
alleges that CreditBridge, Inc.—through one of its founders,
Endicott—knowingly accepted certain benefits from Shih and
Endicott's joint venture agreement, such as Shih's business idea
and her meaningful contributions to the partnership.  Taking the

SAC's allegations as true, CreditBridge, Inc.'s failure to issue to Shih 50% of the company's equity constitutes breach of Shih and Endicott's pre-incorporation agreement, which, at this stage, may be imputed to Petal. See, e.g., Reif, 174 N.E.2d at 494–95; Eden Temp. Servs., Inc. v. House of Excellence Inc., 270 A.D.2d 66, 67 (1st Dep't 2000) (holding pre-incorporation oral agreement was ratified where corporation continued to accept the benefits of the contract after the company's formation).

### B. Vicarious liability for Endicott's and Gross's alleged misconduct (Counts I, II, IV, VII, VIII, IX, and X)

The SAC alleges that Petal is vicariously liable for Endicott's and Gross's (1) individual breaches of fiduciary duties (Counts I and IV) and aiding and abetting such breaches (Count II); (2) promissory estoppel (Count VII); (3) idea misappropriation (Count VIII); (4) unjust enrichment (Count IX); and (5) unfair competition (Count X).  Shih argues that liability may be imputed to Petal because she was an "equitable shareholder" of the company, and because Petal was the alter ego of Endicott and Gross.  Defendants counter that Shih's "equitable shareholder" argument is baseless as no court has ever held a corporation liable under similar facts, and her alter ego theory of liability is not plausibly alleged because Petal was not a sham company or incorporated solely to commit fraud.

"In a diversity case, we apply the choice of law rules of
the forum state—in this case New York—to determine what law
governs alter ego or piercing the corporate veil analysis." <u>Am.
Fuel Corp. v. Utah Energy Dev. Co.</u>, 122 F.3d 130, 134 (2d Cir.
1997).  "New York choice of law rules provide that generally the
law of the state of incorporation determines when the corporate
form will be disregarded and liability will be imposed on
shareholders." <u>Fillmore E. BS Fin. Subsidiary LLC v. Capmark
Bank</u>, 552 F. App'x 13, 15 (2d Cir. 2014) (summary order)
(internal quotation marks omitted).  Because Petal is a Delaware
corporation, Delaware law governs whether it may be held
vicariously liable as the alter ego of Endicott and Gross.

"Delaware courts take the corporate form . . . very
seriously," <u>Case Fin., Inc. v. Alden</u>, No. 1184-VCP, 2009 WL
2581873, at *4 (Del. Ch. Aug. 21, 2009), disregarding it "only
in exceptional circumstances," <u>Mobil Oil Corp. v. Linear Films,
Inc.</u>, 718 F. Supp. 260, 270 (D. Del. 1989).  Nevertheless,
"[u]nder Delaware law, the corporate veil may be pierced, 'in
the interest of justice, when such matters as fraud,
contravention of law or contract, public wrong, or where
equitable consideration among members of the corporation require
it, are involved.'" <u>Gristede's Foods, Inc. v. Madison Capital
Holdings LLC</u>, 174 A.D.3d 455, 456 (1st Dep't 2019) (quoting

Pauley Petroleum Inc. v. Cont'l Oil Co., 239 A.2d 629, 633 (Del. 1968)).

"[C]ourts have disregarded the legal distinction between a business entity and the individuals who hold ownership interests in that entity, if maintaining the distinction would 'produce injustices or inequitable consequences.'" Sky Cable, LLC v. DIRECTV, Inc., 886 F.3d 375, 385 (4th Cir. 2018). "In such circumstances, a court may 'pierce the veil' separating the entity and its constituent members and treat the entity and its members as identical." Id. "Just as traditional veil piercing permits a court to hold a member liable for a company's actions, reverse veil piercing permits a court to hold a company liable for a member's actions if recognizing the corporate form would cause fraud or similar injustice." Id. at 387. Determining whether to disregard the corporate form "requires a fact intensive inquiry." Alden, 2009 WL 2581873, at *4.

Affording Shih the benefit of every reasonable inference, the SAC plausibly alleges that Endicott and Gross wrongfully utilized their absolute control over CreditBridge, Inc., (SAC ¶¶ 156, 202 (alleging Endicott and Gross controlled 100% of the company's board of directors)), to unjustly deprive Shih of her rightful interest in the company. This allowed Petal to allocate a greater portion of its common stock to Endicott, Gross, and others, and to misappropriate Shih's valuable

contributions to the very creation of the company, all in
contravention of Shih and Endicott's agreement, the fiduciary
duties she was owed, and Shih's property interest in her idea
for a credit bridging service.  Indeed, "[i]n Delaware, to
prevail under an alter ego theory, a plaintiff is not required
to show actual fraud but must show a mingling of the operations
of the entity and its owner plus an overall element of injustice
or unfairness." Sky Cable, 886 F.3d at 389 (internal quotation
marks omitted).  Accordingly, the SAC plausibly alleges facts
upon which Delaware courts may recognize Petal's alter ego
liability for the tortious conduct of Endicott and/or Gross
alleged in Counts I, II, IV, VII, VIII, IX, and X. See id. at
387–88 (holding Delaware law would recognize reverse veil-
piercing in certain situations and noting that "in Delaware,
disregarding the corporate fiction 'can always be done if
necessary to prevent fraud or chicanery'") (emphasis in
original); but see Gristede's Foods, 174 A.D.3d at 456–57
(holding "a garden variety breach of contract" claim does not
permit veil-piercing under Delaware law).

### C. Breach of the covenant of good faith and fair dealing (Count VI)

The SAC alleges that Petal inherits liability flowing from
Endicott's breach of the covenant of good faith and fair
dealing.  Defendants argue this claim must be dismissed as

duplicative of Shih's breach of contract claim.  The Court
agrees with Defendants.

"[W]hen a complaint alleges both a breach of contract and a
breach of the implied covenant of good faith and fair dealing
based on the same facts, the latter claim should be dismissed as
redundant." Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 125 (2d
Cir. 2013).  Here, Petal's liability arises out of Shih and
Endicott's agreement to equitably share ownership of the credit
bridging company they agreed to build together.  If there was an
agreement between the two that Endicott breached by withholding
Shih's share of the company, Petal may be liable for breach of
contract as discussed above, and any alleged breach of the
implied covenant is redundant. See id.  If there was no
agreement, Endicott cannot have breached the implied covenant.
See Travelers, 322 F. Supp. 2d at 493-94.  If, however, there
was an agreement, but Endicott did not breach it by denying Shih
an interest in CreditBridge, Inc., but under which he did
destroy the fruit of Shih's bargain, liability still cannot be
imputed to Petal: Endicott's misuse of Shih's idea and work
product to start a competing company is not a sufficient
"injustice" to permit alter ego liability, cf. Gristede's Foods,
174 A.D.3d at 456-57, nor can it serve as a basis for liability
under a shareholder theory where Shih would not be an equitable

or de facto shareholder of the competing company, CreditBridge,
Inc.  Count VI, as against Petal, must be dismissed.

### D.  Declaratory judgment (Count XI)

The Declaratory Judgment Act provides that "[i]n a case of
actual controversy within its jurisdiction . . . any court of
the United States . . . may declare the rights and other legal
relations of any interested party seeking such declaration." 28
U.S.C. § 2201(a).  The Act thus "confers on federal courts
'unique and substantial discretion in deciding whether to
declare the rights of litigants.'" Peconic Baykeeper, Inc. v.
Suffolk Cnty., 600 F.3d 180, 187 (2d Cir. 2010) (quoting Wilton
v. Seven Falls Co., 515 U.S. 277, 286 (1995)).

Shih requests a declaratory judgment determining her to be
an equitable shareholder of Petal entitled to a 50% equity
interest in the company.  As discussed above, an "actual
controversy" exists between the parties.  Accordingly,
declaratory judgment may "serve a useful purpose in clarifying
and settling the legal relations in issue" or "terminate and
afford relief from the uncertainty, insecurity, and controversy
giving rise to the proceeding." Bristol-Myers Squibb Co. v. SR
Int'l Bus. Ins. Co., 354 F. Supp. 2d 499, 506 (S.D.N.Y. 2005)
(quotation marks omitted).  Count XI survives.

**VI.   Constructive Trust and Specific Performance**

In addition to compensatory damages, Shih requests that she be awarded a constructive trust and specific performance. Defendants oppose the requests.

**A.   Constructive trust**

"New York law requires four elements to prove a constructive trust: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." In re Ades & Berg Grp. Inv'rs, 550 F.3d 240, 245 (2d Cir. 2008). "A constructive trust is a remedy, not a cause of action, and is to be imposed only in the absence of an adequate remedy at law." Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 419 (S.D.N.Y. 2010) (internal quotation marks omitted); see also Abraham v. Am. Home Mortg. Servicing, Inc., 947 F. Supp. 2d 222, 235 (E.D.N.Y. 2013) ("It is well established that the existence of a contract precludes a claim for a constructive trust.").

Defendants argue that Shih's demand for a constructive trust should be dismissed because it is duplicative of her breach of contract claim, it would be unfair to award Shih half of a fully operational business, and monetary damages are adequate to make Shih whole.  In her opposition, Shih does not contest that monetary damages would be adequate.  Accordingly, the Court agrees with Defendants that Shih's demand for a

constructive trust may be dismissed. <u>See</u> <u>Hanson</u>, 2019 WL 935127, at *11 ("Plaintiff argues, and the Court agrees, that Defendant cannot state a claim for a constructive trust remedy because Defendant has counterclaimed for money damages and thus has an 'adequate remedy at law.'").

### B. Specific performance

"In general, specific performance will not be ordered where money damages 'would be adequate to protect the expectation interest of the injured party.'" <u>Sokoloff v. Harriman Estates Dev. Corp.</u>, 754 N.E.2d 184, 188 (N.Y. 2001). "Specific performance is a proper remedy, however, where 'the subject matter of the particular contract is unique and has no established market value.'" <u>Id.</u> "In determining whether money damages would be an adequate remedy, a trial court must consider, among other factors, the difficulty of proving damages with reasonable certainty and of procuring a suitable substitute performance with a damages award." <u>Id.</u>

Defendants argue that Shih's demand for specific performance should be dismissed because the SAC alleges a $200 million market value for Petal and monetary damages are sufficient compensation for the same reasons as in Shih's demand for a constructive trust. At this early procedural stage, however, the Court will not dismiss Shih's demand for specific performance without first allowing discovery on the issue. <u>See</u>

Vacold LLC v. Cerami, 545 F.3d 114, 130 (2d Cir. 2008) ("New York courts routinely award specific performance in cases involving the conveyance of stock in privately held corporations."); but see Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 262 (2d Cir. 2002) ("[B]efore the 'extraordinary' equitable remedy of specific performance may be ordered, the party seeking relief must demonstrate that remedies at law are incomplete and inadequate to accomplish substantial justice.").

**VII.  Conclusion**

For the reasons set forth above, Defendants' motion to dismiss the Second Amended Complaint is DENIED except as to Plaintiff's sixth claim for relief addressed to Defendant Petal Card, Inc., eighth claim for relief addressed to Defendant Jason Gross, and her demand for a constructive trust, all of which are dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

The Clerk of Court is directed to terminate the motion docketed at ECF No. 102.

**SO ORDERED.**

Dated:   New York, New York
         September 23 , 2020

                                    John F. Keenan
                              United States District Judge