L8H1SHIC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CASSANDRA SHIH,

                    Plaintiff,

          v.                            18 Civ. 5495 (JFK)(BCM)

PETAL CARD, INC., et al.,

                    Defendants.         Remote Argument
------------------------------x
                                        August 17, 2021
                                        11:12 a.m.

Before:

                    HON. BARBARA MOSES,

                                        Magistrate Judge

                         APPEARANCES

BOIES SCHILLER FLEXNER LLP
     Attorneys for Plaintiff
BY:  MARILYN C. KUNSTLER, ESQ.
     KATHERINE ZHANG

DELBELLO DONNELLAN WEINGARTEN WISE & WIEDERKEHR, L.L.P.
     Attorneys for Plaintiff
BY:  PETER S. DAWSON, ESQ.

ALSTON & BIRD LLP
     Attorneys for Defendants
BY:  JOANNA C. HENDON, ESQ.
     KELLEY C. BARNABY, ESQ.
     SCOTT M. O'BRIEN, ESQ.

L8H1SHIC

```
 1            (Case called)

 2            THE LAW CLERK:  Counsel, please state your appearances

 3   for the record, beginning with plaintiff.

 4            MS. KUNSTLER:  Good morning, your Honor.  This is

 5   Marilyn Kunstler, K-U-N-S-T-L-E-R, on behalf of the plaintiff.

 6            THE COURT:  Good morning.

 7            MS. KUNSTLER:  And I'm joined by two colleagues.

 8   Mr. Dawson?

 9            MR. DAWSON:  Good morning, your Honor.  My name is

10   Peter Dawson, also for the plaintiff.

11            THE COURT:  Good morning.

12            MS. KUNSTLER:  And your Honor, I will introduce our

13   colleague, Katherine Zhang, from Boies Schiller Flexner.  She

14   is not yet admitted but has been assisting on the case.

15            THE COURT:  Good morning, Ms. Zhang, and welcome to

16   the Southern District of New York.  I am sure you will be

17   admitted promptly.  Where are you in the process?

18            MS. ZHANG:  I have a swearing-in ceremony for the New

19   York State bar this week and then I'll be completing my

20   application for the Southern District after that.

21            THE COURT:  Okay.  Excellent.  So next time I see you,

22   you will in fact be a member of the bar.

23            Now speaking of members of the bar, which seems to be

24   a topic of conversation today -- oops.  I'm sorry.  Defense

25   counsel, I didn't mean to forget you.
```

L8H1SHIC

1          MS. BARNABY:  Thank you, your Honor.  Kelley Barnaby

2     on behalf of the defendants Petal Card, Andrew Endicott, and

3     Jason Gross, and I'm joined by my colleagues Joanna Hendon and

4     Scott O'Brien.

5          THE COURT:  Who I can't see, and I take it that means

6     that, Ms. Barnaby, that you have the speaking role today.

7          MS. BARNABY:  Correct, your Honor.

8          THE COURT:  All right.  So welcome to all counsel.  I

9     will remind you all that since we are on -- not a Zoom call

10    exactly, a video call, nonetheless, it's helpful if you mute

11    your mic when you're not speaking to cut down on background

12    noise.  It's also extremely helpful if you unmute your mic when

13    you are speaking because I'm not that good a lip reader.

14    Please try not to speak over one another unless you lose audio

15    or lose video, then you should speak up promptly so that we can

16    fix the problem, if possible.

17          I hear a hiss on the line at the moment.  I'm not sure

18    exactly where it's coming from.

19          (Discussion off the record)

20          THE COURT:  All right.  So as I was saying, try not to

21    speak over one another, and keep in mind that this is a public

22    court hearing.  There may be members of the public or the press

23    listening in on our audio line.

24          For all participants, whether you are before the bar,

25    so to speak, virtually speaking, or if you are a member of the

L8H1SHIC

1    public or press, please remember, just as if you were in my

2    courtroom here in the Moynihan courthouse, you are not

3    permitted to make any audio or video recordings of this

4    proceeding at home, nor are you permitted to rebroadcast the

5    proceedings without the Court's permission, which has not been

6    given.

7            Now speaking of members of the bar, what we have

8    before us today are two motions, one by the plaintiff and one

9    by the defendant, each of which challenges certain privilege

10   designations by the opposing party, which are made in whole or

11   in part on grounds that the attorney-client privilege and/or

12   the work product doctrine both raise the interesting and often

13   difficult question of when somebody with a law degree is or is

14   not acting as an attorney for privilege purposes.

15           I would actually like to start, if I could, with the

16   motion filed at Docket No. 177, which is the plaintiff's motion

17   to compel production of documents that the defendant has

18   withheld on privilege grounds.

19           Whoever just turned something off, that was great.

20   The hiss went away.  It was Mr. Dawson, wasn't it?

21           MR. DAWSON:  Yes, it was, and what's interesting is, I

22   believe that I unmuted myself, because I was anticipating that

23   this was what I was going to speak on, and so that may explain

24   the hiss.

25           THE COURT:  Well, let's just keep it the way it is

L8H1SHIC

1    right now because I can hear everybody very well.

2            In any event, in Motion No. 177, the plaintiff

3    challenges certain privilege designations by the defendant and,

4    in particular, challenges the withholding and/or redaction of

5    certain documents on privilege grounds where that privilege

6    designation is based on the status of Mr. Gross as not just a

7    member of the bar but as the "general counsel" for the

8    defendant or its predecessor entity.

9            So I know it's the plaintiff's motion, but whose

10   motion is this on behalf of the defendants?  Ms. Barnaby?

11           MS. BARNABY:  I'll be speaking on this motion.

12   Obviously were responding to Mr. Dawson's motion about whether

13   Mr. Gross was serving in that role as counsel, and here we

14   think that the contemporaneous facts and the testimony by way

15   of declaration that we've submitted meet our burden to

16   demonstrate Mr. Gross's participation and role as counsel for

17   the company.

18           THE COURT:  Well, let me ask you a few questions, if

19   you don't mind, to set the stage --

20           MS. BARNABY:  Absolutely.

21           THE COURT:  -- for us.  I see from Mr. Gross's

22   declaration, which is at Docket No. 178-1, and which is very

23   short, that he graduated from law school in 2012, that he was

24   admitted to the bar of the State of New York in 2013, but that

25   he voluntarily retired from the bar in July of 2017, which was

L8H1SHIC

1    a year and a half before somebody else came in as general

2    counsel of the defendant corporation, now known as Petal,

3    P-E-T-A-L.  So for what period of time, Ms. Barnaby, is

4    Mr. Gross claiming that some of his communications with other

5    Petal executives are privileged?

6         MS. BARNABY:  As has been stated in our log, it's from

7    the period of 2015 to 2017.

8         I would also like to make a quick note that in

9    preparation of his declaration, he was determining when exactly

10   the new general counsel came on board, and it turns out that

11   she was hired in December of 2017, on-boarded in January of

12   2018, and in revising the declaration, you see that there was,

13   as an end result, a typographical error which merged sort of

14   those two periods, to the December 2018, but Ms. Wolf was hired

15   in December 2017 and on-boarded in January 2018.

16        But really, for purposes of the log, what we're

17   focused on is the period of 2015 and 2016.  We did want to be

18   clear about when his role with the company was as this in-house

19   counsel role and so acknowledge in the declaration that that

20   continued until he retired his New York law license in the

21   summer of 2017, but for purposes of the log in particular, the

22   entries are in 2015 and 2016, well within that period in which

23   he was a member of the bar and acting as in-house counsel to

24   the predecessor entity and the entity that becomes Petal.

25   Now --

L8H1SHIC

1          THE COURT:  So you have not withheld anything after he

2     resigned from the bar.

3          MS. BARNABY:  We have not withheld communications,

4     responsive relevant communications where he would be the only

5     person that would potentially serve as an attorney.

6          THE COURT:  Yes.  You put that more precisely than I

7     did.  Thank you.  You have not withheld anything predicated on

8     Mr. Gross's status as an attorney to the company after he lost

9     his license, or gave up his license.

10          MS. BARNABY:  Correct.

11          THE COURT:  Okay.  Next question:  What documents can

12     you point me to, if any, in which Mr. Gross held himself out or

13     the company Petal held him out as its counsel to the public;

14     not internally, not drafts, but to the public, or to

15     regulators?

16          MS. BARNABY:  Well, your Honor, we submit that that --

17     I don't believe that that is exactly the test, about whether

18     it's the public at large, but the case law talks about publicly

19     to the client, whether the attorneys held themselves out

20     publicly to the client -- here, that would be Petal -- but also

21     note that in --

22          THE COURT:  Wait.  I'm sorry.  I'm not sure what you

23     mean.  What do you mean publicly to the client?  You mean he

24     told the client that he was acting as its attorney?

25          MS. BARNABY:  Correct.  Well, the case law does not --

L8H1SHIC

1    I did not see anywhere in the case law that says that there has

2    to be a statement to the broad, full public.

3              What we do have here, though, are communications

4    beyond just the company itself.  He's identified in a contract

5    where the notice is to the general counsel at his home address,

6    and I understand that it's a draft due diligence questionnaire,

7    but that is also in connection with representations to entities

8    outside of the company.

9              THE COURT:  So let me just make sure I'm following

10   along at home here.  Attached to your -- well, not attached,

11   actually.  The draft due diligence questionnaire appears to be

12   attached to the reply brief; is that right?

13             MS. BARNABY:  Yes.

14             THE COURT:  That's the document you're talking about?

15             MS. BARNABY:  Yes.

16             THE COURT:  And was it ever sent to anybody outside of

17   the company?  Was it sent to TAB Bank in final form?

18             MS. BARNABY:  I have not seen the final form that was

19   submitted.

20             THE COURT:  Okay.  And I do note that it identifies a

21   law firm that serves as legal counsel for the company, not

22   Mr. Gross, right?  That's not him.

23             MS. BARNABY:  Well, Mr. Gross did hire and manage

24   legal counsel to advise the company as well, just as is common

25   in many in-house legal relationships with the clients.  He both

L8H1SHIC

1    provided advice and engaged with outside counsel provided to

2    the company.

3            THE COURT:  Okay.  You're telling me that, but that's

4    not in his declaration.  Where in this questionnaire is the

5    part where you say it supports his role as counsel?

6            And Mr. Dawson, don't get too excited when you hear me

7    ask where the evidence is, because when we get to your motion,

8    that's going to be a significant issue.

9            MR. DAWSON:  I'm just following along.  I'm not

10   getting excited.  I'm --

11           THE COURT:  All right.

12           MS. BARNABY:  I apologize.  I have missed the

13   highlighting on my own document so I'm not getting it quickly,

14   but I will get it from my co-counsel here momentarily.

15           THE COURT:  Okay.  So we have the draft due diligence

16   questionnaire which right now you haven't hooked up; that is,

17   we haven't established that it actually was sent in this form

18   or in some similar form to anybody, right?

19           MS. BARNABY:  Yes.  And your Honor, I can direct you

20   to the page.  The Bates stamp is 122208, and --

21           THE COURT:  For some reason there's no Bates stamping

22   on the document in the form in which I received it.

23           MS. BARNABY:  Huh.  Well, it is in response to

24   Question F.1.  I'm not sure what happened there.  When I

25   printed from the docket, the stamp is on there, but --

L8H1SHIC

1              THE COURT:  I found it.  That's all right.  Never

2      mind.  It says, "Currently Jason Gross serves as our General

3      Counsel.  He is a member of the New York State Bar."  Got it.

4      All right.  But you haven't established that this actually got

5      sent out.  So what's next?  What else have you got?

6              MS. BARNABY:  We also have the second communication --

7      sorry, the -- there is also a document in the production that

8      is not attached that identifies Mr. Gross as the general

9      counsel by way of his address, and we identified that to

10     plaintiff --

11             THE COURT:  Identified him as counsel by way of his

12     address; in other words, his name isn't in the document but it

13     says that legal notices should go to his house?

14             MS. BARNABY:  Correct.  As both the general counsel

15     and his home address.

16             THE COURT:  Ah, so it has the title "General Counsel."

17             MS. BARNABY:  Correct.

18             THE COURT:  And then his home address.  So the general

19     counsel could be anybody living in his house -- his spouse, his

20     mother-in-law -- in theory.

21             MS. BARNABY:  In the broadest theory, yes.  He was the

22     only participant in the company at that time living at that

23     address.  And I think really here, remembering that these are

24     early stages of an early-stage company and so they are working

25     through the process of establishing all of that formality, but

L8H1SHIC

he was participating in that role, and we have contemporaneous

evidence of that supported by his testimony via the

declaration.

       THE COURT:  Well, so turning to his testimony via the

declaration, that's Exhibit A to your August 2nd letter brief,

right?

       MS. BARNABY:  Yes.

       THE COURT:  Okay.  So it is, as I said, very short.

Now short is often a virtue.  I don't mean to criticize short

declarations, at least not generically speaking, but I am

struck by the fact that the meat of it, so to speak, is two

sentences in paragraph 3, where Mr. Gross says that he acted as

general counsel and provided legal advice to the company that

eventually became Petal and to its employees and co-founders,

and "I also determined when to engage outside counsel for the

company and who to engage."  That's pretty vague, and that

doesn't give me any insight into why the documents that were

withheld or redacted fell within the privilege.  In other

words, we have here the classic and difficult situation of a

man who wore at least two hats, correct?  He had business as

well as legal responsibilities.  And when a senior executive

has both business and legal responsibilities, it does get

mirky, and a decision has to be made on a document-by-document,

communication-by-communication basis.  He may have 27

conversations during the day with his business hat on and five

L8H1SHIC

minutes of one with his legal hat on, and the proponent of the
privilege has to establish that those particular five minutes
are privileged.  So is there any way to do this other than
making me read all of the redacted or withheld communications?

MS. BARNABY:  Well, your Honor, the fundamental issue
we saw plaintiffs taking with our log was that they just simply
didn't believe that he even had a role as counsel to the
company, that they were rejecting the idea that he was counsel
to the company under any circumstance, and that's what we have
established, we believe, with competent evidence here.

THE COURT:  Well, I'm not so sure about that.  And I'm
sure you know, because people tend to Google their magistrate
judge's opinions, this is an issue that I addressed relatively
recently in the *Charlestown Capital* case, where I noted, among
other things, that the uncorroborated assertion of an
individual himself that he was acting as counsel generally is
not enough.

MS. BARNABY:  Well, and that's why we identified the
documentation as well, because we understand that it is helpful
to see that there is the simultaneous representation in
historical time point.  I think here, as demonstrated on our
log and the meticulous nature by which we have approached this
issue, that we have not established or claimed a blanket
privilege over all communications between Mr. Gross and others
at the company in the log.  In fact, in many, many situations

L8H1SHIC

1    instead we've redacted instances, and plaintiff claims in their

2    letter briefing that they believe that those were for purposes

3    of discussing regulatory compliance and incorporation issues,

4    which are actually the -- I'm getting a bad network quality

5    notice, so I just want to make sure that I'm still being heard.

6             THE COURT:  I can hear you.  More importantly, can our

7    court reporter still hear you?

8             THE REPORTER:  Yes, I can hear you fine.  Thank you.

9             THE COURT:  Great.  You're good to go, Ms. Barnaby.

10             MS. BARNABY:  Okay.  So my point is that the log and

11    our careful redaction, particularly on the issues that

12    Mr. Dawson is claiming are the reasons that the redacted

13    documents are in question, are the core types of advice that is

14    provided from an in-house legal counsel -- regulatory

15    compliance, formation of entity documents -- and that is the

16    role, and we separated out those instances, and similarly

17    produced a number of documents in whole that involved Mr. Gross

18    or involved others.  This isn't a matter of blanket assertion

19    of privilege but actually was the result of thoughtful

20    application and determination of when he had his attorney hat

21    on and when he had his business hat on.

22             THE COURT:  Okay.  Mr. Dawson, it is your motion.

23             MR. DAWSON:  Yes, it is.

24             THE COURT:  You may proceed.

25             MR. DAWSON:  Well, I suppose I would start with the

L8H1SHIC

| | |
|---|---|
| 1 | point that Ms. Barnaby made a few moments ago, which is that |
| 2 | this is the early stages of an early-stage company.  The |
| 3 | majority of the communications that we're targeting now are |
| 4 | addressed to the early stages of an early-stage company, and |
| 5 | what we have is two partners, both of whom happen to be |
| 6 | attorneys -- Mr. Endicott and Mr. Gross.  And what -- |
| 7 | THE COURT:  Wait.  Don't tell me that Mr. Endicott |
| 8 | also went to Harvard.  My alma mater is getting a rough ride. |
| 9 | MR. DAWSON:  He did indeed. |
| 10 | THE COURT:  Oh. |
| 11 | MR. DAWSON:  I believe they were law school friends. |
| 12 | And I'm just seeing the network sort of -- I'm having maybe the |
| 13 | same issue Ms. Barnaby was having, so I'm going to slow down |
| 14 | and make sure that I'm being heard here. |
| 15 | THE COURT:  I can hear you. |
| 16 | MR. DAWSON:  Okay.  And the concern we have is, these |
| 17 | communications are two partners developing a company, not one |
| 18 | partner designated as the in-house or general counsel and the |
| 19 | other going to him for legal advice.  There's no context |
| 20 | suggesting the latter in anything we've seen.  The defendants |
| 21 | produced 90,000 pages of documents, and none of them so much as |
| 22 | suggest that Jason Gross was in-house counsel for this company |
| 23 | at any time, much less for the two-and-a-half-year period that |
| 24 | they're claiming that he served as in-house counsel.  None of |
| 25 | the non-parties produced documents reflecting that.  The |

L8H1SHIC

LinkedIn bio for Mr. Gross never reflected that, nor did his
signature line.  And then if you look at the context, for
instance, of the redacted documents, they don't suggest that
something's redacted because it's for legal advice.  There's no
"Privileged and Confidential" legends on anything.

THE COURT:  Now how can I look at those redacted
documents?  Did anybody give them to me?

MR. DAWSON:  No.  I mean, we observed that in the
redacted documents that we saw, it did not appear to us that
anything was redacted.  There's no discussion of, you know,
"Turning now to the legal matters," or anything like that in
those documents.  We did not put those in because we noted from
the last conference, I believe, that we felt like your Honor
might have steered us away from going down the road of *in
camera* review and that sort of thing, so we wanted to be
careful, you know, when we were going down that road.

THE COURT:  *In camera* review is where I review the
stuff that was withheld or the portions that were redacted.
For future reference, it would not offend me if, in a situation
like this, you wish to submit a few exemplars of redacted
documents to show me what's been redacted.

MR. DAWSON:  Right.  And we would certainly be willing
to do that.  We were trying to keep the pages down.  But I do
appreciate that.  Maybe that's something we should have done.

The subject matter of what's being redacted or what's

L8H1SHIC

1   being withheld is also striking to us.  In late 2015, into

2   2016, the issuance of stock, issues concerning the issuance of

3   stock, that's what's at play in this case, and that's what's

4   either being redacted or withheld.  The regulatory discussion

5   that Ms. Barnaby referenced is being withheld, and that's

6   something that Mr. Endicott -- regulatory issues -- and

7   Ms. Shih discussed early on.

8           But most significantly, we get to the communications

9   between Mr. Endicott and Mr. Gross about the plaintiff and her

10  claims, and this is what we're especially concerned about.  And

11  this gets back to who these people were and what they were

12  doing at the early stages of the company.  We have two old

13  Harvard Law School buddies who joined together as partners to

14  form this company, and we don't know when Mr. Gross first

15  learned of Ms. Shih, and it may well have been February 16th

16  when our complaint alleges that Ms. Shih wrote to Mr. Gross and

17  Mr. Endicott and said, "CreditBridge was my business idea that

18  I shared with you."  And this is in the second amended

19  complaint, your Honor, at paragraph 293.  "We worked

20  collaboratively on research, business models, and concepts, and

21  discussed branding, investment opportunities, the division of

22  responsibilities, and the possibility of bringing on specialist

23  skills to perform tasks we could not manage ourselves.  With

24  the incorporation of CreditBridge, which had just been

25  incorporated two weeks earlier, in Delaware, at the beginning

L8H1SHIC

1    of this month, the facts are no longer capable of bearing you a

2    charitable interpretation.  Your intent is clearly to cut me

3    out of the business, which I conceived of and pursued in good

4    faith with you and to which I am entitled to 50 percent

5    ownership."  And she sends that email to both Endicott and

6    Gross on February 16, 2016, and it turns --

7            THE COURT:  Let me interrupt you there, counsel.  Her

8    prior development of the concept on which she bases her lawsuit

9    was with Endicott, not Gross, correct?

10           MR. DAWSON:  That's correct, your Honor, yes.

11           THE COURT:  So Gross came into the company that's now

12   Petal later in the picture.

13           MR. DAWSON:  Yes.  What we think happened was this --

14   and this is actually alleged in our second amended complaint.

15   I will summarize.  Endicott said to Gross, there's a law school

16   friend of mine, I was thinking I might want to have him

17   involved.  Then there were discussions, and --

18           THE COURT:  Endicott said to Gross?

19           MR. DAWSON:  No.  Endicott said to Ms. Shih.

20           THE COURT:  Thank you.

21           MR. DAWSON:  There's a law school friend of mine --

22           THE COURT:  Meaning Gross.

23           MR. DAWSON:  Yeah, we think meaning Gross.  Now in

24   retrospect, seeing what happened here, we think that was a

25   reference to Gross.  As it turns out, the documents we've seen

L8H1SHIC

in discovery SHOW that Endicott and Gross are talking about
this CreditBridge idea in late June of 2015, right at the same
time and right after Endicott had been working on it with Shih.
Endicott took the project to Gross because Shih was not ready
to bring on another early-stage founder.  That's what we
believe happened, and that's what the second amended complaint
alleges.  But we don't know what Endicott told Gross about
Shih.  We know what Endicott -- and this is what makes it very
interesting.  We know what Endicott told an early-stage data
scientist who worked on the project about Shih, because that
data scientist, Berk Ustun, the only other early-stage person
we've been able to identify, asked, when he was sent their work
product, the Endicott and Shih work product, he said:  Who is
Cassie?  And Endicott's response was:  Some chick, she's from
New Zealand, it was her idea.  So what did he tell --

       THE COURT:  We're getting a little far afield here,
Mr. Dawson.

       MR. DAWSON:  My point is this:  What did he tell
Gross?  And if February 2016 is the first time that Gross
learned of Ms. Shih, was her role concealed by Endicott the
entire time --

       THE COURT:  Sure.  I get it.  I get it.  I get it.
You want to see those February 16th emails, the redacted
portions of them, because if it's your lucky day, you have
Gross saying to Endicott:  What the heck, man, why didn't you

L8H1SHIC

1    tell me about this chick from New Zealand, we're in trouble

2    here, right?

3            MR. DAWSON:  What the heck, what the heck is the exact

4    discussion that I expect might have happened here.  What the

5    heck.  These are -- not a legal discussion.  What's interesting

6    is this entry, this first entry on February 16, 2016, is not

7    from Endicott to Gross seeking legal advice; it's from Gross to

8    Endicott.  What the heck?  Or maybe it's --

9            THE COURT:  Or, possibly, it's an email from Gross to

10   Endicott saying:  I see that you got essentially a

11   prelitigation email from Ms. Shih.  Let me now put on my legal

12   hat and give you some advice.

13           MR. DAWSON:  Theoretically, except again, we haven't

14   seen anything that actually meets their burden of demonstrating

15   he wore a legal hat.  There's no document by which he held

16   himself out to the public as wearing a legal hat, and all of

17   these circumstances suggest he was not wearing a legal hat.  I

18   mean, there should be a myriad of examples, if he wore a legal

19   hat on and off for two and a half years, that the defendants

20   could bring to us to show, look, this is Mr. Gross acting as

21   in-house counsel on this issue, and this is Mr. Gross acting as

22   in-house counsel on that issue, and we don't have any of that

23   here.  So we don't believe it was a legal hat situation.

24           THE COURT:  Okay.  What else?  Anything else?  I'm

25   just about ready to give you a ruling on this one.

L8H1SHIC

1          MR. DAWSON:  You know, I don't think so, your Honor.

2     I think that's it.  We don't believe they met their burden, and

3     that's the bottom line.  It is their burden to demonstrate that

4     Gross acted as in-house counsel, and we don't think they've

5     done so here.  This is all the makings of an after-the-fact

6     arbitrary determination that's convenient for them now.

7          THE COURT:  And how many documents were withheld on

8     the basis of privilege derived from Gross?  Is it just the

9     excerpts that I have here before me?

10         MR. DAWSON:  No, your Honor.  We think there's -- I

11    mean, there's two and a half years' worth, and at the very

12    least the first 30 pages of their privilege log are withheld on

13    that ground.

14         THE COURT:  So you gave me excerpts, not the full

15    picture of the Gross privilege claims.

16         MR. DAWSON:  That's correct.

17         THE COURT:  All right.  Ms. Barnaby, do you have any

18    brief response?  I never really gave you the opportunity to

19    give your full argument.

20         MS. BARNABY:  Well, certainly we take issue with even

21    the characterization that was spent some time on, what the

22    fundamental issue here is.  Fundamentally this is a litigation

23    about whether plaintiff -- plaintiff having identified a

24    potential problem, having mentioned it to a third party, and

25    whether there was an oral contract and agreement to go into

L8H1SHIC

1    business together.

2            But setting that aside, really, on this point, I think

3    that in our mind, the log demonstrates the exact point that

4    Mr. Dawson questioned:  Where is the evidence that over two and

5    a half years Mr. Gross served as an in-house counsel, legal

6    counsel to his client Petal, and worked with his co-executive

7    as a lawyer?  It's in the log.  That's what we -- that's where

8    you find those documents.  That's the consistent communication

9    there.

10           THE COURT:  How many documents were withheld

11   predicated on Gross's legal role?

12           MS. BARNABY:  I do not have the exact count on me

13   right now.  I acknowledge that there are several pages covering

14   2015 and 2016.

15           THE COURT:  Well, I was given about four pages, and

16   I'm trying to get a sense of how much else is out there that I

17   haven't seen.

18           Mr. Dawson is shuffling through his papers.  That's

19   helpful.  Thank you.

20           MS. BARNABY:  I was also reminded, your Honor, that

21   one of the contracts with an outside vendor -- there were

22   actually two, not just one, and one includes Jason's email

23   address as part of the notice of legal counsel, so again,

24   Mr. Gross being identified specifically in that role.

25           THE COURT:  Does it say "Jason Gross, General

L8H1SHIC

1   Counsel"?

2           MS. BARNABY:  I believe in that instance, it includes

3   his email address and is in the notice of counsel, but it's the

4   other agreement at a similar time that identifies him as --

5   identifies general counsel.

6           THE COURT:  The other agreement.  Sorry.  You've lost

7   me there.

8           MS. BARNABY:  So short answer, I don't believe so.  I

9   believe there's a notice, legal notice goes to Jason Gross, in

10  one agreement, and it's at his -- uses his email address with

11  his name and his home address, and the other agreement says

12  general counsel, identifying his home address --

13          THE COURT:  But not his name.

14          MS. BARNABY:  But not his name.

15          THE COURT:  Okay.  And Mr. Dawson, are you going to

16  give me a page count now?

17          MR. DAWSON:  It's the vast majority of the first 60

18  pages of the log, except there are communications with outside

19  counsel in there as well, so I would need to go and remove

20  those, but largely the first 60 or so pages of the log are

21  Gross, are withheld on the ground that Gross was the legal

22  counsel for Petal.  But --

23          THE COURT:  So that's going to be what?

24          MR. DAWSON:  I don't want to be overencompassing

25  because there are communications by which Petal communicated

L8H1SHIC

1    with outside counsel that theoretically could be privileged

2    and --

3            THE COURT:  And which, more importantly, you are not

4    challenging in the present motion.

5            MR. DAWSON:  Correct.  Correct.

6            THE COURT:  Okay.  All right.  The proponent of the

7    privilege does bear the burden of establishing all of the

8    elements of the privilege through competent evidence.  Both

9    sides know this.  Both sides quote to me various cases, some of

10   them written by me, which say that.

11           With regard to the motion we are now discussing, the

12   motion at Docket No. 177, plaintiff's motion, the defendant has

13   made what I would characterize as a weak showing but not a

14   completely non-existent showing that Mr. Gross was in fact

15   acting, at least at times, with his attorney hat on with

16   respect to the startup company.  Consequently, I am not going

17   to grant the motion to compel based on what is before me now.

18           Mr. Dawson, if you could turn your mic either on or

19   off.  I can't remember which way gives us better sound quality.

20   That's it.  There we go.

21           I reluctantly will accept a small sampling of

22   documents to review, *in camera*, for the purpose of determining

23   whether in fact there appears to be a basis for the privilege.

24   I will permit the challenging party, in this case the

25   plaintiff, to designate for me six -- count them, six --

L8H1SHIC

documents that you want the defendants to produce to me

unredacted or in whole, if the document was wholly withheld,

for my *in camera* review.  Obviously you're going to pick the

ones that you think are the sketchiest.  I will permit the

defendants to identify for me three -- count them, three --

documents which the defendants contend provide a convincing

demonstration that this guy had his lawyer hat on, at least

some of the time.

So Mr. Dawson, if you could advise Ms. Barnaby what

your six candidates are by the end of this week, by Friday; and

then Ms. Barnaby, if you could email both Mr. Dawson's

candidates and your own candidates -- and you should tell him

by Bates number what your candidates are as well so both sides

know what I'm looking at -- and then email all nine of them to

me using my chambers email address, which, if you don't know

it, my law clerk Ms. Baig will provide for you.  I actually

think if you look on the court website on my individual

practices, I think it's listed there, although I can't

remember.  So use the email to send the unredacted or withheld

documents for my *in camera* review.

I would like you all also, Ms. Barnaby, to file on ECF

just a short letter confirming by Bates number that you have

this day supplied to me *in camera* complete and unredacted

copies of the following documents -- this, this, and this.  I

will get those on Monday.  I will take a look at them.

L8H1SHIC

1   Hopefully that will give me enough information so that I can

2   extrapolate to the rest of the documents and to issue a ruling.

3   So we will not have final resolution of the plaintiff's motion

4   today.

5           Shall we turn to the defendants' motion?  The

6   defendants' motion is at Docket No. 176.  Whoever is hissing,

7   please unhiss yourself.  I see you're all muted at the moment.

8   Mr. Dawson, why don't you unmute.

9           No, that wasn't it.

10          Ah, Ms. Kunstler.

11          MS. KUNSTLER:  Your Honor, yes, this is Marilyn

12  Kunstler, and I wanted to introduce the fact that I will be

13  arguing this motion, since there are two motions before your

14  Honor.

15          THE COURT:  Sure.

16          MS. KUNSTLER:  And I can mute or unmute as your Honor

17  chooses.

18          THE COURT:  Well, right now we have good sound

19  quality, at least from my perspective.  But that may change at

20  any moment, in which case I'll let you know and we'll do

21  something different.

22          And it's still Ms. Barnaby, correct, on this motion?

23          MS. BARNABY:  That's correct, your Honor.

24          THE COURT:  Okay.  Interesting pattern seems to be

25  developing.  Whenever somebody turns their microphone on or

L8H1SHIC

off, the sound quality clears up, for a short period of time.

Not being a technical person, I can't diagnose this in the

least.

All right.  With respect to motion 176, which was the

defendants' motion, things are more complicated, because the

individual that everybody is fighting about was at the

beginning of the relevant period Ms. Shih's boyfriend and a law

student.  As I understand it, he then became Ms. Shih's husband

in May of 2017 and was still a law student.  That was of course

a year or little more than a year before this case was filed.

The case was filed in June of 2018.

In January of 2019, six months or so after the case

was filed, Mr. Kauder, by now married to Ms. Shih, also became

a member of the bar of the State of New York.  Thereafter, I am

told, in the April time period of 2019, he contacted the

defendant entity in a manner which a lawyer for Ms. Shih would

have been ethically prohibited from doing.

I am further told that two months after that, on

June 24th of 2019, he was identified in a written engagement

letter as one of Ms. Shih's lawyers.  And then I'm told in the

motion papers that I have now before me that in fact he was

acting as her attorney from the moment he was admitted to the

bar.

So I have a couple of fact questions, again, for

plaintiff's counsel.  I haven't seen, or if I have seen, I

L8H1SHIC

don't know where I have seen the June 24, 2019 engagement
letter.  Can somebody tell me if I have that and, more
importantly, if he was already acting as Ms. Shih's counsel
from the moment he was sworn in to the bar, what was the
purpose of the engagement letter?

          MS. KUNSTLER:  Your Honor, this is Marilyn Kunstler,
Boies Schiller Flexner, on behalf of the plaintiff.  I do not
believe that the June letter, which we have described as a
consulting arrangement, has been provided to your Honor,
although obviously we'd be happy to do that if your Honor would
like to see it.

          To your Honor's other question, yes, in our view --
and I appreciate the chronology that you set out because we
believe there are very bright-line demarcations here that
describe the privileges that are available that apply to the
plaintiff's communications with her husband that turn on those
bright-line dates.  And when he became admitted in January of
2019, an admitted member of the bar, he was entitled to give
legal advice and the plaintiff was entitled to seek and rely on
legal advice from her husband, and the fact that they were
married does not change that relationship.  So as of June --
pardon me -- January 2019, plaintiff and her husband had both a
spousal relationship, which is continuous from the date of
their marriage, and they had an attorney-client relationship,
and there is nothing saying that those two privileges cannot

1    coexist, particularly in two-way communications between the two

2    of them.  And it might be a good moment to just mention that

3    what the defendants are after here are plaintiff's

4    communications with her husband over a very long period of time

5    relating to the litigation strategy and not the facts of the

6    case.  I want to make sure your Honor was clear about that,

7    which you probably are.

8            THE COURT:  Well, I think you mentioned that a few

9    times in your letter brief, counsel.

10           MS. KUNSTLER:  Exactly.  So the answer to your

11   question was that Mr. Dawson, who was litigation counsel at the

12   time -- and of course he can speak if you'd like to hear from

13   him on this -- did not have communications with his client,

14   Ms. Shih, the plaintiff, that also included the spouse, when he

15   was only a spouse and not yet a lawyer, only after he was

16   admitted.  When he was admitted in January of 2019, he then was

17   an attorney capable of giving her legal advice, and after he

18   had been admitted for six months, Mr. Dawson entered into a

19   consulting agreement with Mr. Kauder, the husband.

20           THE COURT:  But not as a consulting economist or as a

21   consulting physician or as a consulting expert of some sort; as

22   a consulting attorney, correct?

23           MS. KUNSTLER:  That's correct, a consulting attorney.

24   But let me also emphasize, Mr. Kauder has never been litigation

25   counsel of record, and that's a very important distinction.

L8H1SHIC

1          THE COURT:  Let's pause there and define some terms,

2    because I think in the parties' letter briefs, there may be

3    some fuzziness about the use of these terms.  It is your

4    contention, Ms. Kunstler, as I understand it, that Mr. Kauder

5    was acting as Ms. Shih's attorney from the moment he was

6    capable of acting as Ms. Shih's attorney, the moment he passed

7    the bar.

8          MS. KUNSTLER:  Yes.

9          THE COURT:  But he was formally retained as a

10   consulting attorney with regard to this litigation on June 24th

11   of 2019 in a letter that I haven't seen, but that he was never

12   litigation counsel of record, meaning that he was never on the

13   docket of this action.

14         MS. KUNSTLER:  Yes, your Honor, I believe that's

15   correct, although I must admit the technology is causing me to

16   lose some of your syllables.  I don't know if anyone else is

17   having an issue.  Could be broadband on my end.  But I believe

18   that what you said is correct.

19         THE COURT:  Okay.  So you contend that he has been

20   giving Ms. Shih advice, not just advice in general but advice

21   about this case, since he was admitted to the bar, but that he

22   is not litigation counsel of record, and you mean that in a

23   technical sense, that his name is not on the docket here and

24   he's not going to stand up in court before the judge or the

25   jury with respect to this litigation, correct?

L8H1SHIC

1          MS. KUNSTLER:  That is correct.

2          THE COURT:  All right.  Now what changed, if anything,

3     on June 24, 2019?  This is what I am struggling with.  If he

4     was already acting as her lawyer, which people do without

5     engagement letters -- Mr. Gross alleges he did for years, for

6     example -- if he was already acting as her lawyer, what changed

7     on June 24, 2019, and why was it even necessary?

8          MS. KUNSTLER:  Your Honor, if you'd like to hear from

9     Mr. Dawson, who was a party to that engagement letter, he is

10    ready to speak to that issue.  In my opinion --

11         THE COURT:  No.  I'm not taking testimony today.

12    Mr. Dawson could have put in a declaration; he didn't.  So let

13    me hear from you, Ms. Kunstler.

14         MS. KUNSTLER:  All right.  I will tell you.  First of

15    all, I view it as a belt and suspenders, okay?  After that

16    point, they had a formal acknowledgment that Mr. Kauder was

17    both a consulting lawyer, a consulting attorney, and Ms. Shih's

18    husband.  But the nature of the relationship and the

19    communications with Mr. Dawson turned not on his status as a

20    spouse but on his status as an attorney.  That's point one.

21         And point two is it allowed him to look at

22    confidential documents that have restrictions under the

23    confidentiality stipulation in the record, and Mr. Dawson can

24    correct me or we can correct you later if I'm wrong about that.

25         THE COURT:  So I don't remember off the top of my head

L8H1SHIC

1    what the wording of the confidentiality order, the protective

2    order is in this case.  Are you saying, Ms. Kunstler, that

3    until there was a piece of paper that said he was a consulting

4    attorney, it was the belief in your camp that you couldn't show

5    him attorneys' eyes only documents?

6         MS. KUNSTLER:  I think I would correct that slightly,

7    your Honor, to say it was a belt and suspenders.  It was to

8    avoid any question, to make sure it was documented that he

9    could see the confidential documents.

10        THE COURT:  So ever since then attorneys' eyes only --

11   and when we say confidential documents, confidential documents

12   in a two-tiered order generally can go to the client, but

13   attorneys' eyes only documents cannot go to the client, they

14   can only go to -- typically, it's going to be counsel of record

15   in this litigation.  Can you be a little more specific about

16   what Mr. Kauder got and didn't get, both before and after

17   June 24, 2019?

18        MS. KUNSTLER:  Your Honor, I actually believe it is

19   the documents that the client could see.  Mr. Dawson is nodding

20   his head.  It's the documents the client could see.  We did not

21   rely on attorneys' eyes only for that agreement.  It was to

22   make sure that there could be no question down the road.  And

23   this was about the time documents started to be produced.  That

24   is really the precipitating event.

25        THE COURT:  So documents produced by the defendants,

L8H1SHIC

1    to the extent Ms. Shih could see them, starting on June 24th,

2    Mr. Kauder could see them as well.

3              MS. KUNSTLER:  That's correct.

4              THE COURT:  And before that he couldn't?

5              MS. KUNSTLER:  Well, I think before that there really

6    hadn't been much in the way of a production so it hadn't been

7    an issue, and I think it was, as I keep repeating the phrase,

8    belt and suspenders.  It was to make sure there would be no

9    question about his ability to see those documents.

10             THE COURT:  Mm-hmm, because if he was just her husband

11   and not her attorney, there would be some questions.

12             MS. KUNSTLER:  Well, I actually think there probably

13   wouldn't be, because I do believe they had an attorney-client

14   relationship, as I've said, but this was to make sure there

15   could be no question.

16             THE COURT:  All right.  Now about that attorney-client

17   relationship, before it was formalized in this consulting

18   agreement, as we just discussed with regard to the

19   counter-motion, the fact that somebody is a lawyer doesn't mean

20   they're always acting as a lawyer, particularly when they have

21   some other relationship to the party, whether it is as business

22   partner, which was the situation 10 minutes ago, or as husband,

23   which is the situation here.  What admissible evidence have you

24   offered that, particularly prior to June 24, 2019, Mr. Kauder

25   had his attorney hat on and not his husband hat on, or in your

L8H1SHIC

1    view, does it not matter because one way or the other, the

2    communications are confidential and privileged?

3                MS. KUNSTLER:  Your Honor, I believe the answer, if I

4    understood your question correctly -- and I want to make sure I

5    am answering the right question.  I believe what you asked me

6    is:  With regard to communications after January of 2019, when

7    he was formally admitted, what is the evidence that would show

8    that they had an attorney-client relationship at that point in

9    time.  Fair?

10                THE COURT:  Correct.

11                MS. KUNSTLER:  Thank you.

12                THE COURT:  Sure.  Because we saw that as an issue

13    with Mr. Gross, and as you know, even though there was a

14    declaration, I wasn't that impressed by the declaration.  So

15    what have you got?

16                MS. KUNSTLER:  I would say that this situation differs

17    from the Gross situation in two respects: (1) as a matter of

18    law, a spouse is entitled to rely and has an implied

19    attorney-client relationship with another spouse, and we have

20    actually cited cases --

21                THE COURT:  I'm sorry.  You didn't mean that, did you,

22    that a spouse has an implied attorney-client relationship with

23    another spouse just because the spouse happens to be a lawyer?

24                MS. KUNSTLER:  I believe we've cited cases that

25    actually support that point.  That's point one.  So there are

L8H1SHIC

1    legal authorities that support that relationship.  But point

2    two --

3           THE COURT:  So the undisputed fact that he was a

4    spouse and a lawyer -- which I take to be an undisputed fact,

5    that he was admitted to the bar and that he's actually married

6    to her.

7           MS. KUNSTLER:  Correct.

8           THE COURT:  I don't hear anybody disputing those

9    facts.  You think that those two facts, once undisputed, give

10   you a presumption that he was acting with his attorney hat on?

11          MS. KUNSTLER:  Well, that in addition to -- well, I

12   think that is a fair basis to start with, that there can be an

13   implied relationship, and we give the factors, including

14   gratuitous legal services that are being provided, based on a

15   relationship other than a paying relationship, or a formal

16   engagement, as one of the factors to finding that there is in

17   fact an attorney-client relationship.  And we cite that in --

18          THE COURT:  Then what the heck was he doing calling up

19   Petal Card?

20          MS. KUNSTLER:  I will address that in a moment.

21          And the second piece of evidence, your Honor -- I will

22   say, if your Honor would like to see it, we can provide an

23   affidavit -- it's clear, again, picking up a point the

24   defendant just made, based on our log, that the client, our

25   client, Ms. Shih, was relying very heavily, even before he was

L8H1SHIC

admitted, on his advice.  He's a trusted advisor to her even

before he was admitted.  There really is no question that she

considered herself to have an attorney-client relationship with

her husband that became an official attorney-client

relationship as of January 2019, and we'd be happy to provide

an affidavit if your Honor would like to see that.

THE COURT:  The time for that has kind of come and

gone.

MS. KUNSTLER:  Well, we think that the

circumstances -- the evidence that's already in the record

shows the level of her reliance on him for legal advice.

THE COURT:  All right.  Let me back up.  I'm sorry.

MS. KUNSTLER:  I know there was a question that you

asked that I didn't answer, and I apologize.  Would you mind

repeating the question.  I want to answer it correctly.

THE COURT:  Well, the second part of the question that

I haven't given you a chance to answer yet is:  What the heck

was he doing calling Petal Card in April?

MS. KUNSTLER:  So your Honor, let me take a moment to

address that point.  On that point, first, we are of the view

that the contact with Petal was actually not a prohibited

contact.  So that's where we start from.  This was, as we

understand it, a contact via a portal, a public portal.

Sometimes those are answered by bots.  It was some kind of a

communication with customer support.  It was a very low-level

L8H1SHIC

contact, very limited interaction that could, your Honor, fall

well within a normal investigation activity by a lawyer.

That's our view.  We don't think that it actually rises to the

level of a prohibited contact.  And the defendants provide the

language from the rule which is communicating about the subject

of the representation with a party the lawyer knows to be

represented.  This is such a low-level contact, we don't think

it rises to the level of communicating with someone who's

actually in the company who knows about the litigation, about

the litigation.  But --

THE COURT:  What did he actually do?

MS. KUNSTLER:  It's not entirely clear to me, your

Honor.  I believe that he had a chat, possibly through a bot,

with the portal that Petal had established.

THE COURT:  If he had gone to a better law school, he

probably wouldn't have done that.

MS. KUNSTLER:  Your Honor, the point that I think I'm

winding up to really express is that even if that were true --

and I think this is our real bottom line -- we don't think it

was prohibited, but even if it were true, it does not mean he

is not a lawyer, it does not mean that he does not have a

privileged relationship with his wife, that he does not have an

attorney-client relationship with his wife.  He is of course

not -- and I'll repeat the phrase -- litigation counsel of

record in this case, and it does not have any effect on the

L8H1SHIC

privilege to which he and the plaintiff are entitled in their

relationship.  Even if it is a disciplinary or professional

responsibility problem, it does not mean he is not a lawyer and

it does not mean that they aren't capable of having privileged

communications.

THE COURT:  Okay.  So I'm going to just reiterate that

back to you.  You don't think that he violated the rules of

professional conduct, and if he did, that doesn't make him not

a lawyer; that makes him a lawyer in trouble with the grievance

committee.

MS. KUNSTLER:  Correct.  I think that's a fair --

THE COURT:  All right.  Let me back you up.  And I

will give Ms. Barnaby a chance to make her broader argument in

a moment, but let me just back you up.  Maybe this is the tail

wagging the dog, but there are nine documents on the privilege

log which are alleged to be work product that are dated before

Ms. Shih was married to Mr. Kauder, before he was a member of

the bar, and two years -- actually more than two years --

before this litigation was commenced.  What is your admissible

evidence that these documents (a) were created in anticipation

of litigation by Ms. Shih -- I take your point that you don't

have to have a lawyer involved when there's a federal work

product question, but what is your admissible evidence that the

documents were created by a party in anticipation of litigation

and that that privilege was not waived by sharing the documents

L8H1SHIC

1    with Mr. Kauder, some guy she was dating at the time, not a

2    relationship which had any legal guarantees of confidentiality

3    and trust?

4               MS. KUNSTLER:  Your Honor, let me direct you -- first

5    of all, let me answer that, if I -- again, I want to make sure

6    I'm answering the right question.  There is admissible evidence

7    in the record, and I can give you the Bates number, and I'm

8    happy to provide it to your Honor.

9               THE COURT:  So it's not in the record.  You're saying

10   it's in discovery.

11              MS. KUNSTLER:  I'm sorry.  It's in the case.  It's

12   been produced to the defendants, all right?  Starting -- and

13   I'll give you a Bates number.  This is a redacted document.

14   S-H-I-H, SHIH, 0000 -- I think that's four zeroes -- 3669.

15   This is a -- I guess it's a chat between Ms. Shih and

16   Mr. Kauder, and they have been discussing the issue that she's

17   facing with regard to the discovery that CreditBridge had been

18   established and her claim and what she should do about it, and

19   you can see in this document the build-up to actually

20   formulating a potential litigation strategy.  This is a

21   confidential communication under the work product doctrine.

22              THE COURT:  I'm sorry.  What makes it confidential?

23   That they were dating, that makes it confidential?  They could

24   put it on Facebook.  That's done all the time.

25              MS. KUNSTLER:  He could have but he didn't, and that

L8H1SHIC

actually distinguishes one of the cases that they rely on.  He could have but he didn't.  There was no risk here that this would be shared with opposing counsel or get into the hands of a hostile party.  Now --

THE COURT:  Look, Ms. Kunstler, the cases you're referring to about when work product is and isn't raised by sharing the document with a third party, I'm familiar with those cases.  They do contain the language you're alluding to, but they don't involve boyfriends and girlfriends.  They involve accountants; they involve business partners; they involve folks who were in a joint venture with you; they involve folks who are in some kind of -- not a social relationship with you but a legal relationship with you, which gives some assurance that they really are on your side with regard to the legal matter.  Do you have a boyfriend-girlfriend case?

MS. KUNSTLER:  I think, your Honor, with all due respect, they were married a year later.  They considered themselves --

THE COURT:  I hadn't even met my husband a year before I married him.  Maybe that's too much information, but --

MS. KUNSTLER:  In their view, they had a confidential relationship.  These were confidential communications that would never be shared outside of the two of them.  He is a law student.  She is turning to him for legal advice.  They are

L8H1SHIC

1    formulating a litigation strategy.  The first entry on the log

2    is his legal research that he is providing to her in

3    confidence.  That's the very first entry on the log.  And that

4    is dated -- I'll give you the exact date because I have it

5    here -- February 8, 2016, which is the time of this text

6    exchange, where you can see they are building up to a

7    litigation strategy.  Unlike Wolf, where they were the

8    defendant and there was an incoming demand letter, she's the

9    plaintiff, so there's not going to be an incoming demand

10   letter.  She's generating the claim.  She's relying on her

11   trusted partner to assist her.  He's a consultant.  The rule

12   does not exclude boyfriends or fiancés from being consultants.

13   She is the party.  She is generating the documents that she's

14   sharing in a confidential relationship with her husband -- with

15   her --

16             THE COURT:  Boyfriend.

17             MS. KUNSTLER:  -- trusted partner.

18             THE COURT:  Were they living together at the time,

19   counselor?  Forgive me for asking for too much information.

20             MS. KUNSTLER:  That I do not know the answer to.

21             THE COURT:  All right.  Did they have any children

22   together at the time?

23             MS. KUNSTLER:  I know that she was in New Zealand and

24   that they were busy planning their future.

25             THE COURT:  Busy planning their future.  Okay.

MS. KUNSTLER: They were -- they were busy planning their future.

THE COURT: You keep saying, "You can see." Of course I can't see, not having seen any portion of this document.

All right. I think we've spent as much time as is going to be productive on the nine documents that predate both the marriage and the admission to the bar.

With respect to the post-marriage period, let me just summarize for you what I think your view is. At the moment he married her, she and he were both entitled to claim the spousal privilege, which was not waived by the addition of a third party on their communications if the third party was a lawyer. And vice versa; the attorney-client was not waived by the addition of a spouse into the communications. That I think is your theory for the period of time between the marriage and the admission to the bar.

After the admission to the bar, your theory is, I think, that Mr. Kauder himself should be credited, for privilege purposes, as being one of Ms. Shih's attorneys and that I should take your word for it with respect to all of these communications that he had his attorney hat on and not his husband hat on. And that takes us pretty much through the present day, since he remains both an attorney and her husband and that nothing changed substantively with the consultative agreement being signed in June of 2019.

L8H1SHIC

1    MS. KUNSTLER:  Your Honor, I want to -- I believe that

2    your last statement I believe captures our position.  I want to

3    circle back, if I could, to make sure I understood, because we

4    haven't really discussed the time period between the marriage

5    and his admission to the bar.  I'm not sure I understood your

6    summary.  During that time -- go ahead, if you'd like to

7    restate it.

8    THE COURT:  No.  It's your position that I'm trying to

9    get right, so why don't you tell me.

10   MS. KUNSTLER:  All right.  During that period,

11   Mr. Kauder and Ms. Shih were married, so they had a spousal

12   relationship.  The spousal privilege went throughout that

13   period and, in fact, goes through to today.  For communications

14   that included a third party --

15   THE COURT:  Like a lawyer.

16   MS. KUNSTLER:  -- like a lawyer, we have not claimed

17   spousal.  I wanted to make sure that clarified.  We have

18   made -- we have flyspecked our log -- and I can't begin to tell

19   you the burden, but I won't go into that -- to remove

20   references to spousal privilege where there's a third party.

21   There are not very many of those.  They are chiefly when she

22   was looking for an attorney as soon as -- right after they got

23   married, that she started looking for an attorney and looked

24   for an attorney at Buckley Sanders and she was referred to

25   another lawyer and then came to her litigation counsel.  We

L8H1SHIC

1    have not claimed spousal privilege for communications between

2    Ms. Shih and her husband that included a third party.

3              THE COURT:  What you have claimed, I think, with

4    regard to that category, is the attorney-client privilege.

5              MS. KUNSTLER:  Correct.  And if we have claimed

6    attorney-client, we have identified the attorney, and we've

7    bent over backwards -- because this was a request the

8    defendants made -- to identify the attorney.  For example, if

9    Ms. Shih forwarded a communication from her litigation counsel

10   to her spouse, that does not destroy the privilege.  That's

11   clear in the law.  That's never been challenged.  You can

12   forward things from your lawyer to your spouse without

13   destroying the privilege.

14             THE COURT:  Unless you're in a divorce case.  That

15   would be a problem.

16             MS. KUNSTLER:  Fortunately that's not our situation.

17             THE COURT:  Right.

18             All right.  So with regards to this period of time, if

19   it's a three-way communication or a forwarded communication

20   involving an attorney other than Mr. Kauder, your theory is

21   that those communications are privileged under the

22   attorney-client privilege, and this is before he's a member of

23   the bar, but he's her husband, and therefore sharing those

24   communications with the husband doesn't destroy the privilege.

25             MS. KUNSTLER:  That is correct.  And we've bent over

L8H1SHIC

1    backwards to try to identify the lawyer if in fact that spousal

2    communication also contained an attorney-client element because

3    it's derived from Ms. Shih's communications with an actual

4    lawyer.

5          THE COURT:  Right.  And then once he's a member of the

6    bar, your view is, to use your metaphor, you have both a belt

7    and suspenders.  The belt is the attorney-client privilege, and

8    the suspenders are the spousal privilege, or perhaps vice

9    versa, that the two reinforce each other, that the presence of

10   the spouse does not destroy the attorney-client privilege, nor

11   does the presence of the attorney destroy the spousal

12   privilege, and therefore, everything is copacetic.

13         MS. KUNSTLER:  Not exactly.  I apologize, again, your

14   Honor, for trying -- believe me, we've been trying to refine

15   this for exactly this reason, to avoid any confusion.

16         Even after he became a member of the bar, if he is

17   interacting in a three-way communication with, for example,

18   litigation counsel, we do not claim spousal privilege over that

19   three-way communication.

20         THE COURT:  You claim only the attorney-client

21   privilege.

22         MS. KUNSTLER:  Correct.  Because she has an

23   independent attorney-client relationship with her husband and

24   she has an independent attorney-client relationship with her

25   litigation counsel, and then there is a consulting agreement,

L8H1SHIC

1    and that communication is within the attorney-client privilege,

2    but we do not claim spousal for those three-way communications.

3         THE COURT:  What about for two-way communications

4    between husband and wife during this period of time; do you

5    claim both?

6         MS. KUNSTLER:  Yes.  Two-way communications, only

7    between the two of them, where she's forwarding something to

8    him or she's sending a message that incorporates legal advice,

9    that is spousal, because it's just the two of them, it's

10   confidential, and meets the parameters of a spousal privilege.

11   So in those cases --

12        THE COURT:  But do you also claim attorney-client for

13   those because she has --

14        MS. KUNSTLER:  Correct.  No.  Well, okay.  Sorry.  The

15   demarcation would be January of 2019.  Before January 2019, if

16   it incorporates advice from another lawyer, it can be

17   privileged as well as spousal, and we've identified the lawyer.

18   After January 2019, if it's a two-way communication, yes,

19   spousal, attorney-client, work product would all apply to those

20   two-way private communications just between the two of them.  I

21   know it's confusing, and I appreciate your Honor's bearing with

22   us as we walk through this.

23        THE COURT:  All right.  I appreciate that.

24        Now what about the documents that aren't on the log at

25   all?  It appears -- I think you're both talking about the same

L8H1SHIC

1    thing.  My original direction, repeated a couple of times, was:

2    The parties need not log communications with their litigation

3    counsel of record after a certain date.  I don't remember what

4    date I gave you.  I believe, Ms. Kunstler, that you took the

5    position or interpreted that to mean -- something that came as

6    a surprise to your opponent -- that you didn't have to log

7    those communications even if someone other than counsel of

8    record were on them, i.e., Mr. Kauder.  Are you now logging

9    those documents?

10             MS. KUNSTLER:  Yes, your Honor, we have logged those

11   documents.  Again, when we read your Honor's original

12   instruction, we believed that the fact that Mr. Kauder was an

13   attorney and thus within the privilege, even as to

14   communications with litigation counsel, meant that they did not

15   have to be logged, but we understand that your Honor's -- and

16   I -- as is plain in our letter, I answered your Honor's

17   question thinking I was answering your Honor's question.  But

18   in any event, the bottom line is, we have logged those

19   documents, and we have provided that log to the defendants.

20             THE COURT:  I haven't seen it yet, right?

21             MS. KUNSTLER:  You have not seen it yet.  There is now

22   a log of those documents, and it starts in -- I believe the

23   first entry is July of 2019.  Actually, the first entry is

24   June.  It's starts with the consulting agreement, your Honor.

25             THE COURT:  And the consulting agreement itself has

L8H1SHIC

1    been produced?

2              MS. KUNSTLER:  Yes, it has.

3              THE COURT:  Okay.  You've waited a long time,

4    Ms. Barnaby, to speak in favor of your own motion.  I'm sorry

5    to have kept you waiting.

6              MS. BARNABY:  Well, I think that this entire process

7    really illustrates why we're here today, which is that we are

8    wrestling with the fundamental question of what is Mr. Kauder's

9    role, and through an iterative process we have more clarity

10   now, but that does not resolve the question.  And I know

11   Ms. Kunstler raised the point that fundamentally this is aimed

12   at litigation, core litigation communications, but I want to be

13   clear that that's not what this is about.  This is about

14   fundamentally understanding what Mr. Kauder's role is here,

15   particularly in light of the fact that he's been identified in

16   initial disclosures as a key fact witness for plaintiff on the

17   core issues.

18             THE COURT:  Let me stop you there and explore that a

19   little bit with you, because you've mentioned that possibly a

20   few times in your letter briefs.  I'm not sure what you think

21   flows from that.  Are you taking the position that because

22   someone is potentially a key fact witness that they're not

23   entitled to claim attorney-client privilege if they were

24   otherwise entitled to do so, or are you taking the position

25   that you're going to have to invoke the attorney witness rule,

L8H1SHIC

which doesn't really fit here because the attorney witness rule

would arguably prohibit Mr. Kauder from standing up in court on

behalf of Ms. Shih, but I don't think applies in a situation

where someone is behind the scenes her counselor?  So what does

flow?  Are you taking the position that he's going to have to

turn over a bunch of privileged documents when he has his

deposition taken because they refreshed his recollection?  I'm

trying to tease this out here.

MS. BARNABY:  Sure.  I think it creates all nature of

complexities, but also, here, it was figuring out -- it took us

a long time to figure out that these four periods are the

periods that the plaintiff is asserting.  And in particular,

there are a number of communications, communications that were

produced from early on, discussions between Ms. Shih and

Mr. Kauder, that go to the question of when is he shielding

communications with the assertion of privilege and when is he

producing information in his fact witness hat, so to speak,

that they find beneficial to their case?  So this is, we

believe, a question that will come up in testimony, will come

up on the -- from the perspective of subject matter waiver,

come up from the perspective of how does he fit in and what

role is he taking here.

But I want to also back up and address these four

different periods, and I'm going to take it from the closest

period in time and start peeling back the layers.

L8H1SHIC

1          So we start, as your Honor has identified, in the

2   period where he's married, a lawyer, and has signed on to this

3   consulting agreement.

4          THE COURT:  So post June 24th of 2019.

5          MS. BARNABY:  2019.  And what we take from there and

6   peel back one layer, so we've removed the consulting agreement

7   to this period of time between 2017 and June 2019, where we're

8   being told, without any evidence to support this claim, that he

9   is serving as her attorney in this period, and I want to note a

10  couple of things on that front.  One, we have Mr. Kauder in

11  fact produced his communication with Petal during that time

12  period.  It is a five- or six-email exchange with someone in

13  customer service, actually asking specifically about issues

14  that have been raised and questioned in discovery about whether

15  there's a requirement of six months of US bank records.  So not

16  to get you bogged down in the facts, your Honor, here for the

17  merits, but the point is, in April of 2019, Mr. Kauder is

18  contacting a known represented party and asking questions about

19  issues that are being explored now in discovery.  And --

20         THE COURT:  Well, but is the answer to that that it

21  means he's not a lawyer or is the answer to that, as I

22  suggested with Ms. Kunstler, he could very well be a lawyer but

23  if so, he's a lawyer in potential trouble?

24         MS. BARNABY:  It could mean that he's a lawyer in

25  potential trouble, but I think, your Honor, that it is

L8H1SHIC

1    competent evidence demonstrating that he was not viewing

2    himself as an attorney for Ms. Shih at that point in time,

3    because I'm not going to ascribe to him a negative assumption

4    that he was purposely flouting his ethical obligations.  Now so

5    to us, that is demonstrative of the fact that he was not

6    viewing himself as an attorney.  And I want to also note that

7    in fact that's consistent with what Ms. Kunstler presented in

8    her responses to your questions, because I wrote down -- she

9    noted that the plaintiff has been relying heavily, even before

10   Mr. Kauder was admitted, on his advice, and she said that that

11   shows that the plaintiff is relying on Mr. Kauder as an

12   attorney relationship.  I think it's the opposite.  If she's

13   been relying on him for his advice since he was a law school

14   student and her boyfriend, we have nothing that he demonstrates

15   that the nature of the relationship changed just because he

16   passed the bar.  And instead we have demonstrative evidence

17   showing that he's not acting as a lawyer, instead contacting a

18   represented party on issues that are the subject of discovery.

19          THE COURT:  Well, Ms. Kunstler says that if the same

20   individual is both a party's spouse, which is undisputed here,

21   and a lawyer admitted to practice, which is undisputed here,

22   after January of 2019, that the law will in effect presume that

23   the lawyer/spouse was acting as legal counsel for the

24   non-lawyer spouse.  What say you to that?

25          MS. BARNABY:  I have not seen the plaintiff put

L8H1SHIC

1    forward any of that case law, and in fact the *Sosnow* case says

2    the opposite, at least on the agency front, that one does not

3    presume that a spouse is an agent simply because of the

4    marriage, and that was in the context of a privilege question

5    and how the -- whether the presence of a spouse disrupted the

6    attorney-client privilege.  So I think that goes too far.  And

7    the core issue here is also that it's plaintiff's burden to

8    demonstrate these points, and as your Honor has noted during

9    the conversation today, there is a lack of any evidence to

10   support that burden.  There's no declaration from either --

11         THE COURT:  That's why I'm asking if there's a

12   presumption, because the presumption could possibly take the

13   place of admissible evidence on this.

14         MS. BARNABY:  We don't believe that there is such a

15   presumption, and from everything I've heard today and seen in

16   the documents, it appears that the nature of the relationship,

17   from the time that Mr. Kauder was a law school student and her

18   boyfriend, to the present, hasn't changed, at least until he

19   signed an agreement with Mr. Dawson.  So he --

20         THE COURT:  All right.  But however, after he marries

21   her, he is a spouse.

22         MS. BARNABY:  Correct.

23         THE COURT:  So they're entitled, at least for certain

24   communications, to rely on the spousal privilege, are they not?

25         MS. BARNABY:  They are entitled to, but not when the

L8H1SHIC

1    spouse is participating as a third party in communication with

2    counsel.  So -- and they have not demonstrated -- they note in

3    their papers an exception for agency, but they must prove that

4    he is serving as her agent, and they've put forward no evidence

5    of that, and that was not the claim that was presented.  So

6    when he is a spouse participating in communication, which makes

7    them three-way communications, we think it destroys both the

8    spousal privilege and the attorney-client privilege.

9              Now we can peel back to before he's married and before

10   he's a lawyer, and I think this is the most fundamental period

11   of time, where it's clear that there is no basis for asserting

12   a privilege or protection of any of these documents.

13             THE COURT:  These are the nine early documents.

14             MS. BARNABY:  These are the nine.  And to the extent

15   that they are also redacted documents from this period -- and

16   we have some confusion about the status of redactions.  There

17   was a new log provided to us last night, and we've not had an

18   opportunity to review that for purposes of today's hearing.

19   But at that period in time, he was her boyfriend only.  There

20   is no, recognized in the law, boyfriend-girlfriend privilege.

21   That is not the kind of confidentiality that is recognized in

22   the law.  To the extent that a party can create papers that may

23   be covered by work product -- and I note that the *Kamal* case

24   identifies that there's a split of authority as to whether an

25   attorney needs to be involved.  I don't think that's a settled

L8H1SHIC

question.  And we believe that the weight of the authority

supports involvement or preparation to provide to an identified

counsel.  But here, that's not what's happening.  She's working

with an independent third party, a friend of hers.  Yes, they

have a close relationship.  It's not a legally recognized

protected relationship, and her providing information to him

does not get work product coverage.  I know Ms. Kunstler speaks

about -- and you questioned in fact whether providing

information to an accountant is akin to providing information

to a boyfriend.  Not only, as you recognized, are those

relationships different, but I think that from my review of the

cases, my understanding is in those situations, where

information, work product was being asserted over information

shared with a friendly party, you back up to the facts and you

see it's in the context of working with an attorney for

purposes of litigation.  So here, this is years before

litigation is filed, years before litigation counsel of record

is engaged, and we've just got two friends talking about what

plaintiff's interest is in this business, that she claims she

came up with.  So I think if we build back up, we see no basis

for any assertion of work product privilege over those nine

documents, and without those, without that assertion, those

must be produced.  When they're married and he's not a lawyer,

to the extent that he is on three-way communications, the

attorney-client privilege is broken by his participation and

L8H1SHIC

 1    those documents should be produced.  And then while he's

 2    married and a lawyer, we don't have any evidence that he was in

 3    fact acting as her attorney in that period and so we don't

 4    believe that the privilege would extend to him and his

 5    participation as well.

 6              THE COURT:  Ms. Kunstler.

 7              MS. KUNSTLER:  Yes, your Honor.  Let me start with the

 8    nine documents before they were married.  The documents that I

 9    referenced earlier that have been introduced in this case talk

10    about hiring lawyers, looking for lawyers.  She was in New

11    Zealand at the time.  She was communicating with her boyfriend,

12    or fiancé, who was a law student, who was vigorously conducting

13    legal research for the purpose, and there's no doubt that this

14    was done in anticipation of litigation; otherwise, this would

15    not have been done.  So that factor is passed.  This material

16    was compiled; the research was conducted for the purpose of

17    litigation, and these documents that are already produced show

18    that they are talking about hiring a lawyer.  When they got

19    married -- and it wasn't that long a time period; that's

20    exaggeration -- one of the first things they did when she got

21    to the United States was start looking for a lawyer.  And she

22    started with Buckley Sanders, where her then summer associate

23    husband was working.  Those communications are privileged work

24    product.  As a summer associate, he's part of the privilege

25    that would attend to communications with Buckley Sanders

L8H1SHIC

attorneys.  There are 11 of those documents.  Those are all

work product and privileged, because she was actively looking

for a lawyer.  Those referrals led her to Mr. Dawson, who is

her litigation counsel, and there are virtually no other

three-way communications between her return to the United

States and their marriage in May of 2017 and the 2019 three-way

communication with Mr. Dawson.  There are none.  If I can go

back and confirm that on the log for your Honor.

It's a non-issue.  There are none.  There are

communications with Buckley Sanders, including him as a summer

associate.  They were referring her to another lawyer.  Her

communications with that lawyer were separate, without her

spouse.  Her early communications with Mr. Dawson did not

include her spouse.  There are no three-way communications that

include her husband as spouse until January of 2019.  So it's a

non-issue.

Finally, the record is replete with her reliance on

her husband -- her husband's status, his advice.  There is law

that we have cited, even though it sounds like opposing counsel

may not have focused on it, that demonstrates that an implied

attorney-client relationship exists, including if there are

gratuitous legal services being provided without pay for

someone that you have a relationship with.  So we think that

the issues that they are raising are really nonissues, they're

all bolstered by the record, and that all of our claims -- our

L8H1SHIC

work product and spousal and attorney-client -- are all

justified, and we've bent over backwards to document them in

the log.

THE COURT:  All right.  Thank you both very much.  I'm

in a position to give you a ruling as to some but not all of

the time period at issue.

With respect to the nine documents -- that is to say,

with respect to documents withheld prior to either the marriage

or the admission to the bar -- those documents are going to

have to be produced.  I have some question as to whether the

plaintiff has established that these documents were prepared in

anticipation of litigation, which is always the first question

with respect to work product.  The lack of lawyers involved --

that is, an actual lawyer admitted to the bar -- is not fatal,

as I understand the federal rule, but I have some question as

to whether the plaintiff has adequately established that these

documents were created in anticipation of litigation.  I have

counsel's assertion that this is the case, I am told that the

content of the documents would corroborate this, but I don't

have any evidence.  I don't have anybody's declaration, for

example.  That would have been a relatively simple matter.  But

I don't rest my decision with respect to those nine documents

on this point, because even if I assume for purposes of ruling

on the motion that Ms. Shih's work product during this period

of time was in anticipation of litigation, I cannot find, in

L8H1SHIC

the absence of a speck of admissible evidence, that the work
product protection was preserved when she forwarded those same
documents to Mr. Kauder, who at that point was, as far as I can
tell from the record, a boyfriend living on a different
continent.  They were not married; they did not have any
legally protected relationship.  They would not be married for
15 months.  I certainly cannot, as a United States magistrate
judge, make an assumption that a man and a woman who get
married 16 months later are in a relationship of trust and
confidence with sufficient guarantees, 15 months prior, to
warrant the protection of the work product doctrine, which,
like all privileges, is an impediment to the search for truth
and therefore must be narrowly construed.  So I am certainly
not going to read a boyfriend-girlfriend codicil into the
federal law of work product, and no actual evidentiary showing
having been made here that the relationship was the sort of
relationship which permits sharing of work product without
waiving it, I cannot find that that happened here.  So those
documents will have to be produced.

        Once Ms. Shih and Mr. Kauder are married, the spousal
privilege applies.  I am uncertain as to whether the
attorney-client privilege also replies, which is going to be
necessary for some but not all of the withholdings before me.
Here, I have the same problem that I had with the motion going
in the other direction, which is we have someone who was

L8H1SHIC

wearing two hats; we have an assertion made by counsel that he

was wearing his attorney hat, at least with respect to the

withheld communications.  We don't have any admissible evidence

of that fact, unless we have a presumption that's going to do

the work of admissible evidence.  Since I agreed to look at the

corresponding documents involving Mr. Gross *in camera*, I'm

going to do the same here with respect to the period of time

after the marriage and after Mr. Kauder was admitted to the bar

but before the consulting agreement was signed.  So I will

permit the challenging party -- in this case, Ms. Barnaby, your

client -- to designate six documents from that period of time

that you want me to look at *in camera*, and I will permit

Ms. Shih to designate three additional documents that show the

nature of the relationship and the attorney-client hat being on

at the same time frame.  Please let each other know what your

designations are by Friday, and plaintiff's counsel will send

the documents to me by email by Monday, with a cover letter on

ECF merely identifying which documents have been produced, and

I will take a look at those before I make any decisions with

respect to the period of time after the marriage and prior to

the consulting agreement.

        With respect to the period of time after the

consulting agreement, I would like to see that consulting

agreement, please.  I would like that if it's not privileged

and not confidential.  Is there any reason that can't be

L8H1SHIC

1    attached, Ms. Kunstler, to your letter and placed on the public

2    docket?

3                MS. KUNSTLER:  I don't believe so, your Honor.

4                THE COURT:  Sorry.  I didn't hear you.

5                MS. KUNSTLER:  I believe we can provide that to your

6    Honor.  The other side has the document.

7                THE COURT:  Okay.  That's fine.  So provide that to me

8    at the same time that you're providing me *in camera* documents,

9    and I will take that portion of the motion under submission.  I

10   will probably not give you a ruling on that portion of the

11   motion until I've also gone through the *in camera* documents

12   with respect to the middle time period.  And I'll try and turn

13   that around as quickly as I can, but the first thing I need is

14   some additional documents from the parties.  But I did not get

15   to, during our argument today -- and I'm not sure whether we

16   need to or not -- I know, Ms. Barnaby, you have some remaining

17   concerns about the amount of detail provided on the privilege

18   log.  Did you want to give me 30 seconds on that?  Because I

19   didn't really ask you about that earlier.

20               MS. BARNABY:  Sure.  Yes, your Honor.  The concern is

21   really with the ability to identify the contents of the subject

22   matter of documents, and particularly you could see in your

23   example that documents that are attachments have no subject

24   matter information provided, there's no email subject, and no

25   title of the document.  And then we do have concern --

L8H1SHIC

1          THE COURT:  The attachments in particular, that's your

2     concern?

3          MS. BARNABY:  I think the attachments are exemplary of

4     an overarching issue with missing sufficient detail on the

5     subject matter on the log.

6          THE COURT:  Well, there do seem to be a lot of blank

7     subject matter items in the subject matter column.

8     Ms. Kunstler, do you want to explain to me why that's not a

9     problem.

10          MS. KUNSTLER:  I want to make sure I'm looking at the

11     right document.

12          THE COURT:  Sure.

13          MS. KUNSTLER:  This is Exhibit A to --

14          THE COURT:  It's Exhibit A to Docket No. 176, a

15     July 28th letter from Alston & Bird.

16          MS. KUNSTLER:  All right.  Yes, okay.

17          First of all, let me make a couple of comments.  We

18     have revised this log again, and if your Honor would bear me a

19     slight diversion, the original instruction from your Honor was

20     that the parties were to meet and confer before the

21     supplemental log was submitted.  And the defendants chose --

22     there was a change of counsel right after the last conference.

23     We fully expected to engage in a meet-and-confer with opposing

24     counsel right after the last conference.  There was a change in

25     counsel.  We understand that.  New counsel chose not to meet

L8H1SHIC

1   and confer before July 21st.  Instead, they chose to meet after

2   they got the log, which, by the way, which ultimately occurred

3   on July 26, two days before the letters were due.  So it's been

4   a little bit of a whack-a-mole, "gotcha" game that we have

5   found ourselves in, frankly.

6          Now a lot of these entries have been revised.  We have

7   endeavored to address the issues that we see coming up in their

8   letters.  We did not have, frankly, a meet-and-confer in which

9   we tried to resolve issues regarding the log.  The

10  meet-and-confer was really just asking us questions about X, Y,

11  or Z positions but not trying to actually resolve anything.

12  Some of the entries are actually misquoted in their letter.  We

13  do have the nature of the legal advice.  We have provided the

14  subject lines of the emails where they're available.  We have

15  identified the authors of documents.  We have identified the

16  sources of the legal advice if there's an attorney involved.

17  We've bent over backwards to do that.  Identifying the names of

18  the documents is not required under the rule and would get us

19  into, I can assure your Honor -- I imagine your Honor can

20  understand, we are logging five years of work product related

21  to this litigation.  These are not transactional documents that

22  are actually related in any way to the events of the case in

23  2015 and 2016.  These are litigation documents from 2018, 2019,

24  2020, 2021.  Those documents' names reveal privileged

25  information.  We've done our very best to provide the nature,

L8H1SHIC

1    without disclosing a privilege, of the communication,

2    discovery, non-party discovery, draft briefs, etc.

3            THE COURT:  Well, I'll tell you what.

4            MS. BARNABY:  This is ignoring the first two years of

5    the log and the --

6            THE COURT:  Ladies.

7            MS. BARNABY:  We don't need to get bogged down in

8    history.

9            THE COURT:  Ms. Barnaby, Ms. Barnaby, I didn't call on

10   you.  I didn't call on you, Ms. Barnaby.  Just hold your fire,

11   please.

12           I think having heard what I've heard so far and having

13   heard that there is a revised log that I haven't seen yet --

14   correct?

15           MS. KUNSTLER:  That's correct, your Honor.

16           THE COURT:  Why don't you submit that on Monday.

17           MS. KUNSTLER:  Would you like to see the whole log?

18           THE COURT:  No, I don't think so.  But the portions

19   that appear as Exhibit A to Docket 176, which are the Kauder

20   portions, if I could see the corresponding portions as revised,

21   that would be helpful.

22           MS. KUNSTLER:  Okay.  And your Honor, I should

23   probably point out, in case it's not evident, that blanks --

24   some of these items that are blank are documents that were

25   produced.  So the attachments were all produced; the privileged

L8H1SHIC

1    email was withheld.  The blanks are documents they have.  So

2    rather than try to describe them or claim a privilege that

3    obviously they wouldn't apply since they have the documents,

4    those are blank.

5              THE COURT:  Well --

6              MS. KUNSTLER:  That's the explanation for the blanks,

7    in case it wasn't clear.

8              THE COURT:  Hold on.  Hold on.  Let me make sure I'm

9    understanding that, because I surely did not up until now.

10             So looking at Exhibit A again, technically Docket

11   176-1, which is the portion of the privilege log in its then

12   current form that was submitted to me on July the 28th, I see

13   on the first page, a little more than halfway down the page,

14   there is an item which is PRIV 13, a bunch of intervening rows

15   and then 13, but a couple of columns over, that same document

16   is also identified with a Bates number, indicating a production

17   number.  What's happening there?  Was that document produced,

18   withheld, redacted or what?

19             MS. KUNSTLER:  Okay.  I will explain to you -- and I

20   had to learn a little bit about the technology myself.  So for

21   that entry, PRIV 13 --

22             THE COURT:  Yes.

23             MS. KUNSTLER:  -- there is a -- two columns over, as

24   you note, there is a production number of 6115, if I'm reading

25   it correctly.

L8H1SHIC

1          THE COURT:  Correct.

2          MS. KUNSTLER:  That document was included as a slip

3     sheet in the production.  So it was slip sheeted saying

4     "Privileged Document Withheld," and we have logged it and we've

5     described the document.  It is work product, and the

6     description has I'm sure changed.  It says now, earlier,

7     "Communication between spouses regarding seeking legal advice,"

8     and this is in June of 2017, "and retaining counsel," and I'm

9     sure Mr. Kauder is at Buckley and in fact it is to his Buckley

10    Sanders email where he, as a summer associate, is considering

11    bringing this case -- or they're talking about bringing this

12    case to the attention of Buckley Sanders for potential

13    litigation counsel.

14         THE COURT:  So this particular document, PRIV 13, was

15    withheld.

16         MS. KUNSTLER:  Correct.  And a slip sheet was included

17    and the slip sheet got a Bates number.

18         THE COURT:  All right.  Now go down a couple of items

19    to PRIV 18, 19, etc.  I see a whole slew of them there which

20    are identified as email attachments are given production

21    numbers and then are not further described in the right-hand

22    column.

23         MS. KUNSTLER:  Those documents were all produced.

24    And --

25         THE COURT:  They were produced.

L8H1SHIC

1      MS. KUNSTLER:  The covering email, being privileged,

2  was withheld, but the documents were produced.

3      THE COURT:  So looking at your log, if the document

4  has a production Bates number, how can we tell, other than

5  going to the production itself, which of course I can't do, and

6  looking to see if it's an actual production number or a

7  slip-sheeted page, whether that document was produced or not?

8      MS. KUNSTLER:  So I worked with the vendor on that

9  exact problem, and the way you can tell is that if it has a

10  production number with a privilege description, that is a

11  document that was produced as a slip sheet, not in whole.  If

12  it has a Bates number and there's no privilege designation or

13  description, they let the document speak for itself; that is a

14  document that was produced.

15      THE COURT:  So PRIV 18 through PRIV 21 were produced.

16      MS. KUNSTLER:  That's correct.  The covering email was

17  withheld as privileged but the attachments were produced.  So

18  the evidence was produced.

19      THE COURT:  PRIV 22 was withheld.

20      MS. KUNSTLER:  Yes, because that is, unlike the other

21  attachments, work product.  It is a memorandum and analysis

22  prepared by the client, and she's identified.  The author is

23  there, Cassie Shih, memorandum and analysis of the issues

24  prepared by a party in anticipation of litigation in connection

25  with seeking legal advice from Buckley about representing her

L8H1SHIC

1    in this very case.

2            THE COURT:  All right.  Last question and then we're

3    going to have to wrap this up, because I have another

4    obligation.  PRIV 1 through PRIV 9, which were withheld, why

5    don't they have a production number, even if it was only slip

6    sheeted?

7            MS. KUNSTLER:  Not every document that is privileged

8    ended up with a slip sheet.  So this goes to how the production

9    was assembled, and if a document was withheld and not part of

10   the -- and actually, Mr. Dawson handled this so I would defer

11   to him if I'm saying something incorrect here.  These are

12   documents that were withheld that did not need slip sheets

13   because they weren't included in the actual production.  And

14   you can see the first item is in fact a legal memorandum

15   prepared by Mr. Kauder.  I know your Honor has ruled.  If

16   there's an opportunity to provide additional evidence in any

17   sort --

18           THE COURT:  No.  That ship has sailed.

19           MS. KUNSTLER:  All right.  I understand your Honor's

20   ruling.

21           THE COURT:  Okay.  So I'll take a look at the same

22   portions of the log in their revised form.  You'll submit that

23   to me with all the other materials we just discussed on Monday.

24   But you will produce those first nine documents.

25           MS. BARNABY:  For what's produced on Monday, in terms

L8H1SHIC

1    of the additional log, I just wanted to note that there are

2    items also attached to our reply briefing, so if the updated

3    log could include all of the selections, which are

4    representative samples of the issue.

5              THE COURT:  You're talking about Exhibits -- what is

6    it now E and F?

7              MS. BARNABY:  Yes.  So -- and 181-1.

8              THE COURT:  I think we can leave it there.  So that I

9    see the current version of everything that Ms. Barnaby was

10   complaining about in this motion.

11             All right.  And with that, counsel --

12             MS. BARNABY:  Could we have a date by which they have

13   to produce the first nine documents.

14             THE COURT:  Well, I don't imagine it would take very

15   long.  Ms. Kunstler, a week?

16             MS. KUNSTLER:  I'm reluctant to invoke my own

17   vacation, but I will be out of the office.  But I will work

18   with my colleagues and see if we can make that date.

19             THE COURT:  Yes.

20             MS. HENDON:  Judge Moses?

21             THE COURT:  Just a moment.  Just a moment.

22             Just for ease of reference, until I know when things

23   are going to be done, let's have those documents produced on

24   Monday, by Monday, next Monday, which is also the deadline for

25   the *in camera* submissions and the letters on the document.

L8H1SHIC

```
1              Ms. Hendon, who are you and what can I do for you?
2              MS. HENDON:  I am Ms. Barnaby's co-counsel.  I do not
3       want to take more than 60 seconds.  I wanted to request that we
4       raise a housekeeping matter so we don't have to reconvene
5       tomorrow, for the Court's consideration, and it's this:  Last
6       weekend on the Court's docket Mr. Kauder made a motion to quash
7       one of defendants' subpoenas.  Mr. Kauder and defendants fully
8       briefed that, and plaintiff, who had not objected to the
9       subpoena and had eschewed an interest in the evidence
10      underlying that subpoena, put in a letter, unauthorized.  We
11      wrote a letter to the Court asking that the Court either allow
12      us until tomorrow to respond to what became a kind of final
13      word on all matters from plaintiff with respect to a counter
14      defendants' motion to quash, or that the Court respectfully
15      strike plaintiff's letter, something I do not expect the Court
16      to do.  Because we had asked for until tomorrow to respond to
17      that letter briefly, we would have to call chambers and bother
18      your staff and get everyone on the phone to have this
19      conversation.  You may not be in a position to answer --
20             THE COURT:  Okay.  You can have until tomorrow to put
21      in a letter, but that doesn't mean I'm going to take either
22      that letter or the prior letter.  I'm simply allowing you to
23      file the matter.  You can put it in tomorrow, and then I'm
24      going to decide what I'm actually going to read, okay?
25             MS. HENDON:  Thank you.
```

L8H1SHIC

1              THE COURT:  Thank you very much.

2              ALL COUNSEL:  Thank you, your Honor.

3                            o0o