

October 1, 2021

**VIA ECF**

Hon. Barbara Moses
United States District Court, Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:  **Cassandra Shih vs. Petal Card, Inc., et al., No. 18-CV-5495 (S.D.N.Y.)**

Dear Judge Moses:

We represent Plaintiff Cassandra Shih in this action.  We write in opposition to Defendants' letter motion dated September 28, 2021 (ECF 219) ("Motion") to quash subpoenas issued by Plaintiff to Ernst & Young LLP ("E&Y") and Deloitte & Touche LLP ("Deloitte").  The dispute as framed by Defendants bears little relation to the actual, productive negotiations between Plaintiff and the auditors themselves.  In fact, Defendants sat by for four months while Plaintiff worked with the auditors to agree on initial staged productions, and then moved to quash on one day's notice after not meeting and conferring for six weeks.  The motion should be denied because (1) the subpoenas, particularly as negotiated, seek relevant documents that are not in the possession of Defendants, let alone cumulative of documents produced by them; and (2) Defendants have failed to substantiate any confidentiality or trade secret concerns.

**I.      The Motion Is Premature, As Defendants Failed to Adequately Meet and Confer.**

Plaintiff approached the subpoenas in a practical way, meeting and conferring numerous times with counsel for the auditors and agreeing to production in two stages:  first, the auditors would produce the "working papers," which comprise a discrete collection of materials and communications that are essential back-up to the audited financial statements (*i.e.* the materials needed to verify and understand the statements); second, once Plaintiff reviewed the working papers, she would identify any further relevant materials sought by the subpoena.  This arrangement was agreeable to the auditors, and Defendants agreed at the last meet and confer (on August 18) to conduct a review for trade secrets.  Defendants never shared the outcome of that review, and the Motion does not contend that any trade secrets are contained in the working papers.  Instead, more than six weeks after the last meet and confer, Defendants filed this Motion raising hypothetical disputes regarding documents that are not even contained in the working papers that were already slated for production by the auditors.

**Plaintiff Negotiated the Subpoenas for Over Four Months.**  Plaintiff served the subpoenas on E&Y and Deloitte on April 14 and 22, 2021, respectively.[1]  Plaintiff conferred with

---

[1] Deloitte sent a letter containing objections to the subpoena on May 6, 2021.  E&Y never served objections and has therefore waived any objections. *Ultradent Prod., Inc. v. Hayman*, 2002 WL 31119425, at *4



counsel for E&Y on May 10, May 17, and May 25, and reached agreement that E&Y would produce the working papers for the FY 2019 and FY 2020 audited annual financial statements, subject only to privilege reviews by E&Y and Petal.  E&Y stated that the working papers would be ready for production in mid-July, shortly after delivery of the FY 2020 audited financial report to the client.  Plaintiff likewise met and conferred with Deloitte on May 17, August 16, and August 19, and ultimately reached the same agreement – that Deloitte would produce the working papers for its audits for FY 2017 and 2018 following an internal review and a trade secret and privilege review by Petal, as a first step in complying with the subpoena.

Defendants first demanded that Plaintiff withdraw the auditor subpoenas prior to the June 30 status conference with the Court.  Plaintiff refused to do so, and Defendants did not raise the issue at the June 30 conference or move to quash.  Then, on August 3, Defendants demanded a meet and confer within 48 hours, threatening move to quash "this week," and demanding an agreement that the subpoenas would be "tolled until further notice."  The parties conferred on August 10 and 18.  Plaintiff explained the relevance of the working papers and directed Defendants to portions of the audited financial statements for which the working papers would likely contain further detail.  Defendants confirmed that they did not have copies of any of the working papers and agreed to review them to identify any trade secrets, which they were unable to identify on the call.  Plaintiff conferred again with E&Y on August 5 and 19, and exchanged emails on September 2, 7, and 12.  E&Y confirmed that it provided the working papers to Defendants the week of August 30 and that it provided further materials for "the 'trade secret' review" (scare quotes in original) on September 10.  Deloitte told Plaintiff on September 2 that its internal review was complete and that it expected Petal to complete its privilege review in a week.

**Defendants Filed this Motion Prematurely.**  Defendants never shared the results of their review of either of the auditors' working papers, and never identified for Plaintiff any documents protected by privilege or containing trade secrets.  Nor did they meet and confer about appropriate safeguards for any trade secrets, or to try to resolve any of the issues raised in this Motion.  Had they done so, any number of compromises could have been reached, including to address any purported trade secrets or concerns over date ranges, which is a non-issue because each auditor was apparently engaged for roughly a two-year portion of the applicable time period.  Instead, the Plaintiff first learned of this Motion the day before it was filed, after Defendants had not met and conferred with Plaintiff for six weeks.

## II.    Defendants Have Failed to Carry Their Burden on the Motion.

The Motion should be denied not only because it is premature, but also because Defendants have failed to carry their burden to show that the documents sought are irrelevant, cumulative, or protected by a cognizable privilege.

**Applicable Legal Standard.**  While the party issuing a subpoena must "demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings," "[o]nce the party issuing the subpoena has demonstrated the relevance of the

---

(S.D.N.Y. Sept. 24, 2002) ("Written objections or motions to quash are required to be served within 14 days of service of the Subpoena.").



requested documents, the party seeking to quash the subpoena bears the burden of demonstrating that the subpoena is overbroad, duplicative, or unduly burdensome." *Libaire v. Kaplan*, 760 F. Supp. 2d 288, 291 (E.D.N.Y. 2011). In other words, "[t]he burden of persuasion in a motion to quash a subpoena and for a protective order is borne by the movant." *John Wiley & Sons, Inc. v. Doe Nos. 1-30*, 284 F.R.D. 185, 189 (S.D.N.Y. 2012).

**The Documents Sought Are Relevant and Not Cumulative of Prior Productions.** As an initial matter, Defendants confirmed that Petal does not have copies of the working papers, meaning that these documents can only be obtained from the auditors themselves. The documents sought by the subpoenas are necessary in order to understand and make use of the audited financial statements, which refer to discretionary decisions by Petal that bear on valuation. For example, the FY 2019 and FY 2020 audited financial statements (PETAL000029699, PETAL000133423)

The working papers will also show the extent to which either auditor relied upon the 409A valuations prepared by outside consultants, as well as the stark difference between the financial package requested by these 409A valuation firms (which Defendants have confirmed consist of just *three documents* for each valuation) versus the extensive information relied on by Deloitte and E&Y, with their far more robust obligations to follow GAAP. This is crucial to a fair assessment of any attempt by Defendants to rely on the 409A valuations, which are conducted for a limited purpose, based on limited information, and subject to management's influence. It is widely recognized that such estimates often significantly undervalue a company's share price. *See, e.g.*, William Cohen, *Valuation Shell Game: Silicon Valley's Dirty Secret*, N.Y. Times, Mar. 8, 2017 ("This type of valuation allows hot, privately owned technology companies — like Uber, Airbnb or Nextdoor — to issue common stock or stock options to employees at a low price and, at the same time, or nearly the same time, sell preferred stock to outside investors at a price that is often three or four times higher."). Indeed, eShares (the company that performed Petal's May 2017 and February 2018 409A valuations) has been described as "eager and willing to provide the work that is legally necessary to justify the granting of stock or options to employees at a price well below the price at which the companies are selling stock to outside investors." *Id.* Production of communications between Petal and its auditors will also confirm certain of Defendants' representations, including that neither E&Y nor Deloitte was engaged for the purpose of preparing for an initial public offering, and may show whether Petal has solicited or received any bids or offers to purchase all or part of the company. Plaintiff has proceeded reasonably by seeking documents that are not in Petal's possession and are most easily produced by the auditors, before

---

[2]                                                                           Contrary to Defendants' overheated claims, Plaintiff seeks the basis for Petal's *provisioning* for fraud losses, not its "methods of screening for and assessing potential fraud." Mot. at 2.



considering whether further production is necessary.

Defendants also make much of the supposedly "voluminous" documents they have produced relating to valuation. Plaintiff's section of the joint letter submitted on October 1, 2021 (ECF 220) outlines a number of deficiencies in Defendants' productions. Among other issues, Defendants have refused to honor a compromise to produce Petal's general ledger and, notwithstanding the Court's Order to produce "all documents" concerning several debt facility transactions (ECF 160), Defendants have produced fewer than half a dozen documents per transaction. In light of these specific and significant deficiencies, Defendants' arguments invoking the number of documents that hit on search terms like "financial" or "valuation" ring hollow.

**Defendants Have Not Demonstrated Any Confidentiality or Trade Secrets Concerns.** Although both E&Y and Deloitte confirmed that they provided the working papers to Defendants' counsel for a privilege and trade secrets review, Defendants' Motion does not state that any confidential or trade secrets materials are contained in the working papers. The two possible conclusions to be drawn from that omission are that either Defendants never bothered to conduct the privilege and trade secrets review that they committed to in the August 18 meet and confer, or they reviewed the working papers and found no documents containing trade secrets or privileged information but decided to move to quash anyway. Either way, Defendants' facial challenge to the subpoenas based on materials that Plaintiff *is not seeking* from the auditors at this time is premature, and Defendants' confidentiality concerns are hypothetical and therefore immaterial. Defendants' complaints about the production of "engagement letters and billing information" is yet another conjectural concern. In fact, E&Y stated that the engagement letter either would be included in the working papers or it would be produced along with them as a way to identify the members of its audit team. Defendants identify no trade secret or other proprietary information that would be contained in their engagement letter with E&Y. In a further flight of fancy, Defendants claim that "there is also a possibility that information from WebBank that *may* be protected from disclosure pursuant to the qualified bank examination privilege, such as documents concerning FDIC examinations, *may* be included in information provided to the auditors." Mot. at 3 n.3 (emphasis added). This concern is entirely theoretical, which is odd given that Defendants have apparently reviewed the working papers. In any event, the bank examiner's privilege belongs to the regulator, not the bank or its customers, and likely does not apply. *See Sharkey v. J.P. Morgan Chase & Co.*, No. 10-cv-3824, 2013 WL 2254553, at *1 (S.D.N.Y. May 22, 2013) ("The bank examination privilege is narrow in scope and 'belongs to the regulatory authority and not to the banks that it regulates.'").

Finally, Defendants have made no showing that the Protective Order (ECF 77), which contains an "attorneys' eyes only" clause (¶ 9), is insufficient to address any confidential information that would be produced by the auditors. Although Defendants raise the specter of disclosure to an "adverse party" that could cause harm to Petal's "core business," they do not claim—nor could they—that the Plaintiff is a competitor.

For the foregoing reasons, the Court should deny Defendants' Motion in its entirety.



Sincerely,

*/s/ Demetri Blaisdell*
Demetri Blaisdell