```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __10/6/21__
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASSANDRA SHIH,

                Plaintiff,

     -against-

PETAL CARD, INC., f/k/a CREDITBRIDGE,
INC., et al.,

            Defendants.

18-CV-5495 (JFK) (BCM)

**ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

The Court conducted a discovery conference on August 17, 2021, with respect to plaintiff's letter-motion to compel the production of certain communications to or from defendant Jason Gross (who was once a lawyer admitted to practice in New York), which were withheld or redacted by defendants on attorney-client privilege grounds, *see* Pl. Letter dated July 28, 2021 (Pl. July 28 Ltr.) (Dkt. No. 177); and (2) defendants' letter-motion to compel the production of certain communications to or from Lane Kauder (who is now plaintiff's husband and a lawyer admitted to practice in New York), which were withheld by plaintiff on work product, spousal privilege, and/or attorney-client privilege grounds. *See* Def. Letter dated July 28, 2021 (Def. July 28 Ltr.) (Dkt. No. 176.) Thereafter, in compliance with this Court's Corrected Order dated August 20, 2021 (Aug. 20 Order) (Dkt. No. 196), the parties submitted certain exemplar documents, as to which privilege was claimed, for *in camera* review, along with revised privilege logs. (Dkt. Nos. 198, 199.) The Court has carefully reviewed the exemplar documents, as well as the parties' legal arguments. For the reasons that follow, plaintiff's motion will be granted in part and denied in part, while defendants' motion will be denied.

## I.     BACKGROUND

Plaintiff Cassandra Shih alleges that she entered into an enforceable oral joint venture agreement with her friend Andrew Endicott (a Harvard Law School graduate then working as an

investment banker in New York) to develop a novel business concept – originated by her and shared with him as her prospective co-founder – for a "credit bridging" company, to be called CreditBridge, which would meet the credit needs of new immigrants and migrants to the United States. *See* Opinion and Order dated September 23, 2020 (Op. & Order) (Dkt. No. 116) at 2-12. In May 2015, after Shih "expressed reservations" about bringing in a third co-founder, Endicott agreed not to give away any equity in CreditBridge without her approval. *Id*. at 9-10. In July of that year, however, Endicott stopped responding to Shih's messages and began working with defendant Elliot Gross (Endicott's Harvard Law School classmate) to finalize the CreditBridge "pitch" materials that he previously worked on with Shih. *Id*. at 13-14. By August, Endicott and Gross were meeting with venture capitalists and describing themselves as the co-founders of the new business, "without ever mentioning" Shih. *Id*. at 14.

In February 2016, Endicott and Gross incorporated their business under the name CreditBridge, Inc., and Endicott locked Shih out of the shared Dropbox account that the two of them had used while developing the initial CreditBridge pitch materials and related work product. Op. & Order at 15-16. On February 16, 2016, Shih sent an email to Endicott, with a copy to Gross, in which she reminded Endicott that it was "my business idea," shared "on the mutual understanding that we would pursue its development in partnership," and accused him of "cut[ing] me out of the business which I conceived of and pursued in good faith with you, and to which I am entitled to 50 per cent ownership." *Id*.  Neither Endicott not Elliot responded at that time. *Id*. at 16.  But on March 23, 2016 (after Shih followed up several times), Endicott sent her an email claiming that the new company was "not based on any of your business ideas." *Id*. at 17.

In September 2016 the company changed its name to Petal Card, Inc. (Petal), and in December of that year Endicott and Gross raised $3.4 million from investors. Op. & Order at 19. In October 2018 Petal formally launched "a credit card product targeting young adults, students,

immigrants, and minorities who have not yet had the opportunity to build credit in the United States." *Id*. By the time Shih filed her Second Amended Complaint (SAC) (Dkt. No. 93) against Endicott, Gross, and Petal, the company had raised $80 million and was "self-valued at more than $200 million." Op. & Order at 19.

On September 23, 2020, the Honorable John F. Keenan, United States District Judge, denied, in substantial part, defendants' motion to dismiss the SAC, holding that:

> [T]he SAC plausibly alleges, at a minimum, an oral joint venture agreement between Shih and Endicott, which Endicott subsequently breached by abruptly and surreptitiously cutting Shih out of the "CreditBridge" enterprise that, consistent with the terms of their partnership, he began pitching to potential investors in July 2015, and later incorporated as CreditBridge, Inc.

Op & Order at 32. Judge Keenan likewise held that the SAC states a claim against Endicott for breach of the covenant of good faith and fair dealing, *id*. at 32-33; breach of fiduciary duty, *id*. at 33-37; misappropriation of business idea, *id*. at 37-40; unfair competition; promissory estoppel; and unjust enrichment, *id*. at 42; and against Gross for aiding and abetting Endicott's breach of fiduciary duty, *id*. at 43-44; breach of his own fiduciary duty as Petal's promotor and officer, *id*. at 44-45; and unjust enrichment. *Id*. at 46-47. As to Petal itself, Judge Keenan sustained Shih's claims for breach of contract (to issue her a 50% ownership interest) and to hold Petal vicariously liable for the tortious conduct of Endicott and Gross. *Id*. at 50-53. He also found that she plausibly alleged claims for declaratory judgment and specific performance. *Id*. at 55, 58.

On October 27, 2020, I issued a supplemental scheduling order (Dkt. No. 122) directing the parties to substantially complete party document production by February 26, 2021; to commence depositions (which had been stayed pending decision on the motion to dismiss, *see* Dkt. No. 62); and to complete fact discovery by June 15, 2021. However, discovery has been contentious, requiring the Court to resolve numerous disputes, and the schedule has been revised

several times. *See* Dkt. Nos. 134, 137, 150, 155, 160, 165, 196, 197.[1] Under the current scheduling order (Dkt. No. 165), party depositions will commence on October 10, 2021, and all depositions will be completed by December 10, 2021.

## II.   PLAINTIFFS' MOTION

Defendants withheld or redacted over 1100 documents on privilege grounds. *See* Pl. July 28 Ltr. at 1. As to many of the redacted or withheld documents, including emails and other communications between Endicott and Gross, as well as their attachments, defendants invoke the attorney-client privilege, asserting that Gross was acting as counsel to Petal and its personnel (including Endicott). *Id*. Ex. A. Plaintiff challenges the assertion of privilege over these documents, noting that business communications do not become privileged simply because one or more or the participants is a lawyer. *Id*. at 2 (citing *In re Cnty. of Erie*, 473 F.3d 413, 421 n.9 (2d Cir. 2007)).

Defendants respond that "between 2015 and 2017," Gross served not only as a co-founder and officer (ultimately CEO) of the company, but as its "general counsel." Def. Opp. Letter dated Aug. 2, 2021 (Def. Aug. 2 Ltr.) (Dkt. No. 178) at 1. They further assert that they have only withheld (or redacted) documents (or portions of documents) discussing legal advice. *Id*. As support for

---

[1] Since the motions that are the subject of this Order were filed on July 28, 2021, the parties (or affiliated non-parties) have filed five additional discovery motions: to quash a subpoena sent by defendants to plaintiff's husband's bank, seeking his 2020 home mortgage application (Dkt. No. 184, granted on August 20, 2021, *see* Dkt. No. 197); to compel plaintiff's husband and two nonparty companies jointly owned by plaintiff and her husband to produce documents withheld as privileged (Dkt. No. 189, pending); to compel plaintiff, the same two nonparty companies, and a nonparty individual employed by one of the companies to produce documents that, according to defendants, may show that plaintiff Shih is less accomplished and that her current businesses are less successful than her recent public statements suggest (Dkt. No. 204, pending); to compel defendants to produce text messages, documents "sourced from" social media accounts and Endicott's creditbridge.com email account, and documents sufficient to "identify the devices" that Endicott and Gross used to communicate with each other ((Dkt. No. 211, pending); and to quash subpoenas sent by plaintiff to Petal's auditors, Ernst & Young and Deloitte (Dkt. No. 219, not yet fully briefed).

their contention that Gross was the company's general counsel for a period of time, defendants attach his declaration, which states, in pertinent part: "Between 2015 and 2017, I acted as general counsel and provided legal advice to the company that eventually became Petal, and to its employees and co-founders." Gross Decl. (Dkt. No. 178-1) ¶ 3. Gross provides no further description of his legal role. He does note that in July 2017 he voluntarily resigned from the New York bar, *id*. ¶ 2, and that in "December 2018," Petal "hired Shiri Wolf to serve as general counsel." *Id*. ¶ 4.[2]

There is very little corroboration, in the record before the Court, for the claim that Gross served, for a period of time, as counsel to Petal ("and to its employees and co-founders"). Defendants were unable to identify any documents in which the company (or Gross himself) held Gross out to the public or third parties as Petal's counsel.[3] To the contrary: in July 2016, in email conversations with Petal's prospective Head of Growth David Ehrich, Gross repeatedly described Ehrich's draft employment agreement and related documents as having been prepared by and/or discussed with "our lawyers." Pl. Aug. 4 Ltr. Ex. 2. Consequently, plaintiff argues, defendants are not entitled to withhold or redact any documents on attorney-client privilege grounds where the claim of privilege rests on the assertion that Gross was acting as counsel to the business and its personnel. *Id*. at 1-2.

Plaintiff is largely, but not entirely, correct.

---

[2] During argument on the motion, defendants' litigation counsel informed the Court that the December 2018 date was a typographic error, and that Ms. Wolf was "hired in December of 2017 [and] on-boarded in January 2018." Tr. of Aug. 17, 2021 Disc. Conf. (Tr.) (Dkt. No. 201) at 6. Counsel further represented that defendants did not withhold or redact any responsive documents predicated on Gross's status as an attorney after he was no longer a member of the bar. *Id*. at 7.

[3] In discovery, defendants produced an undated draft due diligence questionnaire for TAB Bank which identified Gunderson Dettmer Stowe as outside counsel for CreditBridge, Inc. and also stated, "Currently Jason Gross serves as our General Counsel." Pl. Reply Letter dated Aug. 4, 2021 (Pl. Aug. 4 Ltr.) (Dkt. No. 182), Ex. 1. There is no evidence, however, that the questionnaire was ever submitted to TAB Bank in that (or any) form.

A.      **Standards**

"In diversity cases such as this, where state law governs the claims, the Court looks to state law for determining privilege." *Kleeberg v. Eber*, 2019 WL 2085412, at *6 (S.D.N.Y. May 13, 2019) (collecting cases). "The elements of the attorney-client privilege under New York law are the existence of an attorney-client relationship, a communication made within the context of that relationship for the purpose of obtaining legal advice, and the intended and actual confidentiality of that communication." *Bowne of New York City, Inc. v. AmBase Corp.*, 161 F.R.D. 258, 264 (S.D.N.Y. 1995) (*Bowne II*) (citing *People v. Osorio,* 75 N.Y.2d 80, 82-84, 550 N.Y.S.2d 612, 614-15 (1989)); *see also* N.Y.C.P.L.R. (CPLR) § 4503(a)(1) (the attorney-client privilege protects "evidence of a confidential communication made between the attorney or his or her employee and the client in the course of professional employment").

The purpose of the attorney-client privilege is to "promot[e] full and frank communications between attorneys and their clients," thereby encouraging "observance of the law" and aiding "in the administration of justice." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348 (1985). However, "[b]ecause the privilege shields from disclosure pertinent information and therefore constitutes an obstacle to the truth-finding process, it must be narrowly construed." *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 27 N.Y.3d 616, 624, 36 N.Y.S.3d 838, 842 (2016) (quoting *Matter of Jacqueline F.*, 47 N.Y.2d 215, 219, 417 N.Y.S.2d 884, 886 (1979)) (cleaned up). "Consequently, the party asserting the privilege bears the burden of establishing each element through competent evidence." *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 2020 WL 757840, at *3 (S.D.N.Y. Feb. 14, 2020); *see also Ambac*, 27 N.Y.3d at 624, 36 N.Y.S.3d at 842-43 ("The party asserting the privilege bears the burden of establishing its entitlement to protection by showing that the communication at issue was between an attorney and a client for the purpose of facilitating the rendition of legal advice or services, in the course of a professional

relationship, that the communication is predominantly of a legal character, that the communication was confidential and that the privilege was not waived.") (internal citations omitted).

An attorney-client relationship arises only when the client "contacts an attorney in his capacity as such," for the "purpose of obtaining legal advice or services." *Priest v. Hennessy*, 51 N.Y.2d 62, 68-69, 431 N.Y.S.2d 511, 514 (1980). Thus, the proponent of the privilege must show that the attorney was consulted "for the purpose of obtaining legal advice or services." *Id.*; *see also Spectrum Sys. Int'l Corp. v. Chem. Bank*, 78 N.Y.2d 371, 379, 575 N.Y.S.2d 809, 815 (1991) ("[A] lawyer's communication is not cloaked with privilege when the lawyer is hired for business or personal advice, or to do the work of a nonlawyer."). Where a lawyer provides both legal and business advice, "the court must ascertain which hat the attorney was wearing during the allegedly privileged communication." *Kleeberg*, 2019 WL 2085412, at *6. This problem is particularly acute in the corporate context, because in-house attorneys "may serve as company officers, with mixed business-legal responsibility." *Rossi v. Blue Cross & Blue Shield of Greater New York*, 73 N.Y.2d 588, 592-93, 542 N.Y.S.2d 508, 510 (1989). "Needless to say, the attorney-client privilege attaches only to legal, as opposed to business, services." *U.S. Postal Serv. v. Phelps Dodge Ref. Corp.*, 852 F. Supp. 156, 160 (E.D.N.Y. 1994). Thus, the importance of applying the privilege "cautiously and narrowly is heightened in the case of corporate staff counsel, lest the mere participation of an attorney be used to seal off disclosure." *Rossi*, 73 N.Y.2d at 592-93, 542 N.Y.S.2d at 510.

Even where an attorney-client relationship exists, the client may not reflexively withhold every communication with its attorney as privileged. "[N]ot all communications to an attorney are privileged. In order to make a valid claim of privilege, it must be shown that the information sought to be protected from disclosure was a 'confidential communication' made to the attorney for the purpose of obtaining legal advice or services." *Priest*, 51 N.Y.2d 62 at 69, 431 N.Y.S.2d at 514 (internal quotation omitted). "[I]t is the nature of the communication that controls." *NXIVM Corp.*

*v. O'Hara*, 241 F.R.D. 109, 129-30 (N.D.N.Y. 2007). If the communication is not "primarily or predominantly of a legal character," *Spectrum Sys.*, 78 N.Y.2d at 377-78, 575 N.Y.S.2d at 814, it cannot be withheld as privileged. *See also, e.g.*, *Ambac*, 27 N.Y.3d at 624, 36 N.Y.S.3d at 843 (proponent of privilege must establish "that the communication is predominantly of a legal character"); *Saran v. Chelsea GCA Realty P'ship, L.P.*, 174 A.D.3d 759, 760-61, 104 N.Y.S.3d 698, 700 (1st Dep't 2019) (emails with defendants' in-house counsel were not privileged because "nothing stated by in-house counsel in the emails sets him apart as a legal advisor in the discussion") (internal citation omitted).

### B.   Application

Here, defendants have failed to demonstrate that Gross was serving on any regular or sustained basis as legal counsel for Petal or its personnel. His summary declaration is not enough to establish his role. The burden of showing that the attorney-client privilege was properly invoked "can be met only by an evidentiary showing based on competent evidence . . . and cannot be discharged by mere conclusory or ipse dixit assertions." *Charlestown Cap. Advisors*, 2020 WL 757840, at *7 (S.D.N.Y. Feb. 14, 2020) (quoting *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 470 (S.D.N.Y. 1993) (*Bowne I*)) (cleaned up). Since the privilege belongs to – and exits for the benefit of – the client, not the attorney, the existence of the required attorney-client relationship generally must be proved by something more than the attorney's claim that such a relationship existed. *See Priest*, 51 N.Y.2d at 70, 431 N.Y.S.2d at 515 ("[I]ndependent facts beyond the attorney's statements must be shown in order to demonstrate the existence of an underlying attorney-client relationship upon which a claim of privilege could be based."); *Saran*, 174 A.D.3d at 760-61, 104 N.Y.S.3d at 700 (corporate defendants failed to meet their burden, even though communications were with "in house counsel," where "the affidavits of the defendants' CEO and in-house counsel . . . merely state in a conclusory manner that the communications were

confidential and privileged" and identified "no particular communication in which in-house counsel gave legal advice, or in which the defendants' other employees sought legal advice from in-house counsel").

Having reviewed the exemplar documents submitted *in camera* (including those selected by defendants, presumably because they made the strongest case for invocation of the privilege), I conclude that – with a few exceptions – the content of the communications to or from Gross do not "set[ ] him apart as a legal advisor in the discussion." *Saran*, 174 A.D.3d at 761, 104 N.Y.S.3d at 700. For example, one of the redacted communications is a February 16, 2016 email from Gross to Endicott (PETAL 92613) in which he forwarded Shih's February 16, 2016 email (addressed to both of them) and wrote: "Don't reply to this." There is no indication in that brief text that Gross was giving legal (as opposed to business) advice. Nor is there anything inherently legal about Endicott's March 22, 2016 email to Gross (PETAL 7934-35), in which he forwarded a series of earlier Facebook messages between Endicott and Shih because "I want you to see them." No explicit request for legal advice (or indeed any advice) was conveyed. Given the date of the communication, it may well be Endicott and Gross were working together to prepare the email that Endicott sent to Shih the next day, claiming that new company was "not based on any of your business ideas." Op. & Order at 17. But that letter too was written in lay terms, with no legal analysis. Consequently, I am unwilling to presume, on the exceedingly thin record here, that whatever Gross contributed to the drafting process was legal (rather than business) advice.

Another redacted communication is a November 16, 2015 email chain between the two co-founders (PETAL 92351), in which they discussed how to present certain documents, including a potential stock grant, to an individual serving as an "advisor" to the new business. In the redacted portion, Endicott asked whether "we should diligence his MIT docs?" Nothing about the redacted passage marks it as a legal rather than a business question. The same is true of a later series of

communications, dated May 11, 2016 (PETAL 30012), in which Endicott and Gross spent approximately an hour fine-tuning the language of an employment agreement for the same individual. Among other things, Endicott and Gross discussed whether the document used "the right title," whether they had made it "clear that we don't expect him to start making cold calls or doing the other biz dev things you and I do," and whether they had appropriately expressed their "dedication to creating the best credit scoring company on the planet or something." At most, one small segment of this conversation (during which the individual defendants discussed how to characterize the document and Gross gave his opinion "as de facto GC") "set[ ] [Gross] apart as a legal advisor in the discussion." *Saran*, 174 A.D.3d at 761, 104 N.Y.S.3d at 700.

To be sure, some of the communications between Gross and Endicott included discussions of regulations or regulatory developments relevant to their prospective business (PETAL 42167, 92372), but such conversations, which take place commonly among senior executives in regulated industries, are not the province of lawyers alone. In one email conversation, dated January 6, 2016, Gross and Endicott discussed when to retain outside counsel, and Gross (who seemed less eager than Endicott to spend money on lawyers) wrote, "But we're being lazy. Let's do all the research we can ourselves (we went to law school, remember?) and reach out when it's absolutely necessary." (PETAL 107638.) At best, this passage (which defendants redacted as privileged) reflects a discussion as to *whether* one (or both) of them will perform legal services for the enterprise. It does not, however, qualify as "a communication made within the context of [the attorney-client] relationship for the purpose of obtaining legal advice." *Bowne II*, 161 F.R.D. at 264, and therefore must be produced.

The most difficult questions presented by the documents submitted for *in camera* review arise from Gross's work in preparing various corporate documents necessary to transform the business into a Delaware corporation. On November 10, 2015, Gross emailed a set of draft

documents to Endicott with a cover note stating, "I've drafted everything we need to get the corporation up and running," and advising that copies were in the "'Legal folder of the DB also." (PETAL 41871.)[4]  The attachments include draft versions of a Stock Plan (with a Summary of Stock Grants), an Advisor Agreement, an Action by Consent of Sole Incorporator, an Action by Unanimous Written Consent, a set of Bylaws, a Capitalization Table, a Certificate of Incorporation, two Stock Purchase Agreements (one for Endicott and one for Gross), and an Action by Written Consent of the Stockholders. (PETAL 41872-41882.) Although the drafts were incomplete – blanks were left for dates and certain other information to be added later – they did not include any note, comment, question or interlineation identifiable as a request for or the provision of legal advice.[5]  Later, however, in a January 19-21, 2016 email chain (PETAL 107710), Endicott and Gross discussed "the legal docs" (presumably either the drafts circulated in November or updated versions) and Gross provided his opinion as to certain interpretation and enforcement issues, after which Endicott agreed to sign the documents, once Gross completed a "final review."

"The rule in New York appears to be that a draft document prepared by an attorney is privileged if it contains information provided in confidence by the client and subsequently

---

[4] The transmittal email does not contain any confidential information or legal advice and hence is not itself privileged.  *See Softview Computer Prod. Corp. v. Haworth, Inc.*, 2000 WL 351411, at *15 (S.D.N.Y. Mar. 31, 2000).

[5] According to defendants' privilege log, each draft "reflect[s]" legal advice regarding the incorporation of the business. After reviewing the documents themselves, and finding no such legal advice contained therein, I surmise that defendants' theory is more subtle: that the drafting choices made in the documents (as Gross put it, "the decisions that I made for the company") were driven, at least in part, by legal considerations, such that when Endicott received the drafts, he was – *sub silentio* – being given legal advice by Gross. Such a theory sweeps too broadly, as it would tend to make virtually any draft business document privileged, so long as it was prepared by an attorney whose legal training influenced the contents, structure, or wording of the product. As discussed below, that is not the law in New York.

maintained in confidence." *Bowne I*, 150 F.R.D. at 490.[6] *Accord*, *99 Wall Dev. Inc. v. Allied World Specialty Ins. Co.*, 2019 WL 2482356, at *2 (S.D.N.Y. June 14, 2019); *Koumoulis v. Indep. Fin. Mktg. Grp., Inc.*, 295 F.R.D. 28, 47 n.23 (E.D.N.Y. 2013), *aff'd,* 29 F. Supp. 3d 142 (E.D.N.Y. 2014); *S.E.C. v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 134, 145 (S.D.N.Y. 2004); *Softview Computer Prod. Corp.*, 2000 WL 351411, at *15. "In the absence of such confidential information supplied by the client," however, "the draft document is not privileged merely because the attorney prepared it." *Bowne I*, 150 F.R.D. at 490; *Beacon Hill Asset Mgmt.*, 231 F.R.D. at 145. Thus, in *Bowne I*, the court ordered disclosure of the documents withheld as drafts, because it had "no evidence" as to whether they "contain any client confidences." 150 F.R.D. at 490. Similarly, in *Beacon Hill Asset Mgmt.*, the court ordered the challenged drafts disclosed because Beacon Hill did not "identify which of the attachments, if any, are drafts containing confidential information communicated by BH to counsel and maintained in confidence." 231 F.R.D. at 145. *Cf. Asset Value Fund Ltd. P'ship v. Care Grp., Inc.*, 1997 WL 706320, at *6 (S.D.N.Y. Nov. 12, 1997) (drafts of registration statement held privileged where the underlying information "was provided to the attorney in confidence and has been maintained in confidence," and where, "in the end, TCG decided not to file a registration statement based on the fact that it wanted to maintain the privacy of the information").

Here, as in *Bowne I and Beacon Hill Asset Mgmt.*, nothing in defendants' privilege log, the Gross declaration, or the documents themselves shows that the drafts contain any "client confidences." Indeed, the documents in draft form are "generic corporate documents," as to which some courts hold that the attorney-client privilege simply does not apply. *See*, *e.g.*, *Oasis Int'l*

---

[6] Citing *Kenford v. Cnty. of Erie,* 55 A.D.2d 466, 469, 471, 390 N.Y.S.2d 715, 719 (4th Dep't 1977) and *Matter of Bekins Storage Co.,* 118 Misc.2d 173, 179, 460 N.Y.S.2d 684, 691 (Sup. Ct. N.Y. Cnty. 1983).

*Waters, Inc. v. United States*, 110 Fed. Cl. 87, 98 (Fed. Cl. 2013) ("no privilege applies when an attorney drafts generic corporate documents, such as by-laws, promissory notes, security agreements, incorporation documents, partnership documents and tax information") (internal quotation marks and citations omitted); *United States v. Eghbal*, 2009 WL 10671386, at *4 (C.D. Cal. June 4, 2009) (holding that "mandatory corporate governance documents" drafted by attorney, including an "Operating Agreement, Consent Certificate, Organizer Document, Statement of Information and Minutes," are "simply not protected by the attorney-client privilege"). I therefore conclude that defendants have not met their burden of showing that these drafts are privileged. However, my review of the discussion in PETAL 107710 convinces me that this conversation (unlike, for example, the discussion in PETAL 30012, most of which could easily have taken place between two business colleagues with no legal background whatsoever) was "primarily or predominantly of a legal character." *Spectrum Sys.*, N.Y.2d at 377-78, 575 N.Y.S. 2d at 814. In particular, I note that in PETAL 107710 Gross provides his view on what is clearly a legal question: whether certain of the contracts under discussion are "binding" on a certain entity.

As to the exemplars, then:  defendants have properly withheld PETAL 107710, and may redact the portion of PETAL 30012, time-stamped 3:45-56 to 4:10:11, in which Gross spoke "[a]s de facto GC." The remaining documents are not protected by the attorney-client privilege and must be produced.

Defendants are to apply the rulings incorporated in this decision to all of the communications between Endicott and Gross that were withheld as privileged on the basis that Gross was acting as counsel for Petal or its personnel. Unless (i) the parties to the communication affirmatively indicate their understanding that Gross is speaking in his capacity as counsel ("de facto" or otherwise), or (ii) the content of the communication is such that it could not reasonably

be expected to take place *except* between attorney and client, the document must be promptly produced.

## III.    DEFENDANTS' MOTION

Plaintiff withheld over 1,000 emails and other communications with Kauder, relying on the work product doctrine (461 documents), the spousal privilege (854 documents), and the attorney-client privilege (391 documents). *See* Def. Jul. 28 Ltr. at 1-3; *id*. Ex. A (Pl. Priv. Log Excerpts); *see also* Pl. Opp. Letter dated Aug 2, 2021 (Pl. Aug. 2 Ltr.) (Dkt. No. 179), at 1.[7] Additionally, plaintiff withheld, as attorney-client privileged, another approximately 500 emails and other communications involving (i) plaintiff, (ii) Kauder, and (iii) plaintiff's litigation counsel of record. Pl. Aug. 2 Ltr. at 1 n.1. These documents did not initially appear on plaintiff's privilege log; however, plaintiff undertook to list them in a supplemental log. *Id*.

The dates of the withheld documents range from February 8, 2016 through November 23, 2020. During that period, three significant events occurred. In May 2017, plaintiff and Kauder were married. *See* Pl. Aug. 2 Ltr. at 1. Kauder was at that time a law student. On January 14, 2019, Kauder was admitted to the New York bar. Def. July 28 Ltr. at 2; Pl. Aug. 2 Ltr. at 3. Approximately five months later, on June 24, 2019, plaintiff, her counsel of record Peter S. Dawson, and Kauder signed a written engagement letter confirming that Kauder was retained by Dawson's firm, Wise & Wiederkehr, LLP (W&W), as a "consulting attorney" reporting directly to W&W in connection with this action. Eng. Ag. (Dkt. No. 199-2) at 1. The letter further provided that "all communications between [Kauder] and the client or [Kauder] and [W&W] shall be confidential, and shall be made solely for the purpose of assisting [W&W] in our representation of

---

[7] Most of the withheld documents were withheld on more than one ground. *See* Pl. Priv. Log Excerpts at ECF pages 2-7.

the client." *Id*. Kauder also agreed to be bound by the Protective Order previously issued by the Court. *Id*. at 2.

On August 20, 2021, I directed plaintiff to produce the withheld documents dated prior to her marriage, ruling that no privilege applied. Aug. 20 Order ¶ 2(a). Additionally, I directed the parties to submit a total of nine exemplar documents withheld on privilege grounds, all dating from the period January 14-June 24, 2019, for *in camera* review. *Id*. ¶ 2(b).

As to the post-marriage documents, defendants mount three challenges to Shih's privilege claims. First, they argue that Kauder's communications with her, even if prepared in anticipation of or for purposes of this litigation, cannot be protected by the work product doctrine because the doctrine does not protect communications among family members "without an attorney to direct the work." Def. July 28 Ltr. at 2. Second, they contend that communications between plaintiff and her husband during the summer of 2017, when he was a summer associate at Buckley Sandler LLP, are not protected by spousal privilege to the extent they were sent via his "buckleysandler.com" email account, as to which he had no expectation of confidentiality. *Id*. Third, they claim that communications involving Kauder cannot be protected by the attorney-client privilege, because (i) he was not plaintiff's attorney; and (ii) to the extent the communications also included one or more of plaintiff's attorneys of record, Kauder's presence constituted a waiver of the attorney-client privilege that would otherwise protect those communications from discovery. *Id*. at 3-4; *see also* Def. Reply Letter dated Aug. 4, 2021 (Def. Aug. 4 Ltr.) (Dkt. No. 181) at 2 ("[T]he presence of Mr. Kauder on otherwise-privileged communications destroys any applicable privilege.").

As to the work product doctrine, plaintiff responds that under federal law the doctrine can and does apply "without attorney involvement, and certainly does not require communications from an attorney." Pl. Aug. 2 Ltr. at 2. As to the spousal privilege, plaintiff states that the use of

Kauder's law firm email account did not waive the privilege because he had a reasonable expectation of confidentiality in his work computer and email. *Id.* at 3. As to the attorney-client privilege, plaintiff argues (i) that Kauder became her *de facto* attorney upon his admission to the bar, because she relied on him for legal advice, and thus that her confidential communications with him for that purpose were privileged from January 14, 2019 forward; and (ii) that the privilege protecting her communications with her counsel of record was not waived by Kauder's presence (either before or after he was admitted to the bar) because, to the extent he was not himself acting as plaintiff's attorney, he attended in his capacity as her agent. *Id.*

Once again, plaintiff is largely correct.

## A.     Standards

### 1.     Work Product Doctrine

"While state law governs the question of attorney-client privilege in a diversity action, federal law governs the applicability of the work product doctrine." *Allied Irish Banks v. Bank of America, N.A.*, 240 F.R.D. 96, 105 (S.D.N.Y. 2007). The work product doctrine protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). The text of Rule 26(b)(3)(A) itself states that work product protection applies to materials prepared by a party or her "attorney, consultant, surety, indemnitor, insurer, or agent." Similarly, the case law makes it clear that "it is not in fact necessary that the material be prepared by or at the direction of an attorney." *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 394 (S.D.N.Y. 2015) (collecting cases).[8] Rather, "three

---

[8] In their letter-application, defendants rely on *Bice v. Robb,* 511 Fed. Appx. 108 (2d Cir. 2013), for the proposition that the work product doctrine does not apply to a document prepared "without an attorney to direct the work." Def. July 28 Ltr. at 2. As *Wultz* points out, however, *Bice* devoted but a single sentence to the issue, and was itself a non-precedential summary order. 304 F.R.D. at 394; *see also Lapaix v. City of New York*, 2014 WL 11343854, at *3 (S.D.N.Y. Aug. 15, 2014) (*Bice* "should not be interpreted to impose a categorical rule of attorney involvement that would

conditions must be satisfied in order to establish work product protection.  The material in question must: (1) be a document or tangible thing, (2) which was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for its representative." *Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp.*, 1999 WL 378337, at *5 (S.D.N.Y. June 10, 1999) (quoting *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16, 41 (S.D.N.Y. 1984)); *accord*, *Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 492 (S.D.N.Y. 2019); *Allied Irish Banks, P.L.C. v. Bank of Am., N.A*., 252 F.R.D. 163, 173 (S.D.N.Y. 2008). The "representative" may be "an 'attorney, consultant, surety, indemnitor, insurer, or agent.'" *Skillsoft*, 1999 WL 378337, at *5 (quoting Fed. R. Civ. P. 26(b)(3)). "The burden of establishing all three elements of the work product doctrine rests with the party invoking it." *Id.*

### 2.    Spousal Privilege

The spousal privilege – sometimes called the marital communications privilege – is codified in New York at CPLR § 4502(b) and "protects private and confidential communications between spouses from disclosure." *In re Reserve Fund Sec. & Deriv. Litig.*, 275 F.R.D. 154, 157 (S.D.N.Y. 2011) (citation omitted). The elements of the privilege are "(a) a communication, (b) induced by the marital relationship, (c) made in confidence, (d) during the marriage, if it is, (e) not waived and (f) not subject to an exception" *Callahan v. Coventry*, 39 Misc.3d 1228(A), 971 N.Y.S.2d 69 (Co. Ct. Suffolk Cnty. 2013). That the communication was made in confidence is "presumed," *Reserve Fund Sec. & Deriv. Litig.*, 275 F.R.D. at 157, but the proponent of the privilege otherwise "bears the burden of establishing all of the essential elements involved." *Id*. (quoting *United States v. Acker*, 52 F.3d 509, 514-15 (4th Cir. 1995)).

---

conflict with Rule 26(b)(3)"). Consequently, like the *Wultz* court, I respectfully "decline to follow this aspect of *Bice*." 304 F.R.D. at 394.

The presumption of confidentiality can be rebutted by a showing that the spousal communications were transmitted through an email account that "could be 'read[ ] or otherwise monitored by third parties,'" such that the sending spouse had no "reasonable expectation of privacy" in his emails. *Reserve Fund Sec. & Deriv. Litig.*, 275 F.R.D. at 159 (quoting *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 258-59 (Bankr. S.D.N.Y. 2005)). In assessing whether a spouse has a reasonable expectation of privacy when using his employer's email system, courts in New York use the widely adopted four-factor test set forth in *Asia Global Crossing*: "(1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?" 322 B.R. at 257.

### 3.     Attorney-Client Privilege in the Presence of a Spouse

In New York, the attorney-client privilege is not waived "[w]here a client discloses a prior attorney-client communication to a spouse." *Matter of Sosnow*, 16 Misc.3d 1106(A), 841 N.Y.S.2d 826 (Table) (Sur. Ct. Nassau Cnty. 2007); *accord*, *Lorber v. Winston*, 2012 WL 5904522, at *14 (E.D.N.Y. Nov. 26, 2012) ("Winston's disclosure of the [attorney-client privileged] Probation Memo to Eve is protected by the marital communications privilege, since at the time of the disclosure, their marriage was still viable. Accordingly, the disclosure of the Probation Memo is a privileged communication and no waiver is applicable."); *Solomon v. Sci. Am., Inc.*, 125 F.R.D. 34, 38 (S.D.N.Y. 1988) (no waiver where "the only persons to whom the privileged communication was shown to have been disclosed were plaintiff's wife and another of his attorneys").

The analysis is somewhat more complicated when the disclosure to the spouse is made instantly; that is, when the spouse is present for the communication between the client and her attorney. Under New York law, the question in such a case is whether "the spouse is an agent of

the client." *Sosnow*, 841 N.Y.S. 2d at 826. (citation omitted). The test is a relaxed one, however, "defined by the client's reasonable expectation of confidentiality, not the absolute legal niceties of agency law." Jared S. Sunshine, *Clients, Counsel, and Spouses: Case Studies at the Uncertain Junction of the Attorney-Client and Marital Privileges*, 81 Alb. L. Rev. 489, 500 (2018) (hereinafter *Clients, Counsel, and Spouses*); *see also People v. Osorio*, 75 N.Y.2d at 84, 550 N.Y.S.2d at 613 ("The scope of the privilege is not defined by the third parties' employment or function, however; it depends on whether the client had a reasonable expectation of confidentiality under the circumstances."). The New York courts ordinarily find that the client's spouse was in fact an agent – and thus that his presence did not destroy the privilege – so long as a fairly minimal showing is made that the client reposed trust and confidence in her spouse and expected the communication to remain confidential notwithstanding his presence. *See, e.g.*, *Sosnow*, 841 N.Y.S. 2d at 826 (upholding attorney-client privilege as to communications between Sosnow and her counsel in the presence of her husband Nagler because Nagler "was able to provide information and advice" to Sosnow and "it would be unreasonable to discern any expectation on the part of [ ] Sosnow or her attorneys other than that their conversations in the presence of [ ] Nagler would remain strictly confidential"); *Charal v. Pierce*, 1981 U.S. Dist. LEXIS 17497, at *28-29 (E.D.N.Y. Nov. 3, 1981) ("Mr. Charal's presence did not destroy the privileged nature of Mrs. Charal's communication with her attorney" because "Mrs. Charal understood the January 5, 1981 conference among herself, her husband, and her attorney to be confidential" and "relied on her husband of 45 years for advice, as no doubt he did on her in other matters").[9]

---

[9] The New York courts frequently reach similar results where the third party is the client's adult child or other close family member. *See, e.g.*, *Stroh v. Gen. Motors Corp.*, 213 A.D.2d 267, 268, 623 N.Y.S.2d 873, 874-75 (1st Dep't 1995) (presence of defendant Maychick's daughter did not destroy attorney-client privilege between Maychick and her counsel where the daughter "put [Maychick] sufficiently at ease to communicate effectively with counsel" and was therefore acting as her mother's agent, such that Maychick had a "reasonable expectation of confidentiality" notwithstanding the daughter's presence); *Matter of Est. of Weinberg*, 133 Misc.2d 950, 952, 509

B.      **Application**

1.      **The Work Product Doctrine Is Not Limited to Work Directed by a Licensed Attorney**

Plaintiff is entitled to withhold communications with Kauder that were prepared in anticipation of this litigation or for trial as work product regardless of whether he himself was acting as her counsel at the time, and without any showing that another attorney "direct[ed] the work." Def. July 28 Ltr. at 2. As noted above, there are three elements required to invoke the work product doctrine: that the material in question be "a document or tangible thing," that it have been "prepared in anticipation of litigation," and that it have been "prepared by or for a party, or by or for its representative." *Parneros*, 332 F.R.D. at 492. With regard to communications dated after Shih and Kauder were married and withheld on this ground (some created by Kauder and communicated to Shih; others created by Shih and communicated to Kauder), defendants do not seriously dispute any of these three elements. Rather, they argue – relying primarily on *Bice* – that

---

N.Y.S.2d 240, 242 (Sur. Ct. N.Y. Cnty. 1986) (daughter's role in discussions between her father and his attorneys "was one of agent for him" because she "enjoyed his complete confidence and functioned as his alter ego"), *modified sub nom. Matter of Beiny*, 129 A.D.2d 126, 517 N.Y.S.2d 474 (1st Dep't 1987). *People v. Allen*, 104 Misc.2d 136, 427 N.Y.S.2d 698 (Sup. Ct. Westchester Cnty. 1980), which held without analysis that a three-way conversation among the client, his criminal defense attorney, and his wife was not privileged because "communications between husband and wife made in the known presence of a third person are not confidential," 104 Misc.2d at 137, 427 N.Y.S.2d at 699, is not only an outlier in terms of its result, *see Clients, Counsel, and Spouses*, 81 Alb. L. Rev. at 501, but appears not to have considered whether the wife functioned as an informal agent for her husband, thereby preserving the attorney-client privilege with his counsel. *Skillsoft*, also relied upon by defendants for this point, *see* Def. Aug. 4 Ltr. at 3, is inapposite because of the extremely attenuated business relationship between the client, Skillsoft, and the alleged agent, Chen, an employee of the investment bank Warburg Pincus, who reported to Warburg Pincus managing director Gross, who served on the Skillsoft board of directors and who brought Chen with him to a Skillsoft board meeting (at which legal advice was discussed) to take notes that neither he nor any other Skillsoft director ever read. On these facts, the *Skillsoft* court concluded that Chen's presence was not "necessary for the client to obtain informed legal advice," 1999 WL 378337, at *4, and thus that her notes were not privileged. *Id*. at *5. They were, however, properly withheld as work product, "because they summarize the confidential legal advice of SkillSoft's attorneys concerning pending litigation." *Id*. at *6.

*none* of the communications were properly withheld as work product because the work was not "directed by a licensed attorney." Def. July 28 Ltr. at 2. In fact, since Kauder himself became a "licensed attorney" on January 14, 2019, any work product that he created thereafter arguably met the fourth element posited by defendants. The dispositive point, however, is that there is no such fourth element. *See Wultz*, 304 F.R.D. at 394 (ultimately holding that the challenged documents did not qualify for work product protection because they were not prepared in anticipation of litigation); 8 Wright & Miller, *Federal Practice and Procedure* § 2024 (3d ed.) ("The 1970 amendment also extended the work product protection to documents and things prepared for litigation or trial by or for the adverse party itself or its agent. Prior to the adoption of Rule 26(b)(3), some cases had held that documents of this kind were not within the immunity, but the protection exists under the rule.").

Moreover, the face of plaintiff's privilege log shows that the Kauder/Shih communications withheld on work product grounds were prepared – either *by* the party herself or *for* the party by her husband Kauder – in anticipation of this litigation or for use in it, thus meeting the test set forth in *United States v. Adlman*, 134 F.3d 1194, 1198 (2d Cir. 1998) (work product must have been created "'because of' existing or expected litigation"), and its progeny. *See*, *e.g.*, *United States v. Petit*, 438 F. Supp. 3d 212, 214 (S.D.N.Y. 2020) ("courts in the Second Circuit ask whether the document at issue was created 'because of' anticipated litigation, rather than if the document was 'created primarily to assist in litigation'") (citation omitted). Similarly, it is clear from the contents of the nine exemplar documents submitted for *in camera* review with regard to defendants' motion (six chosen by defendants and three by plaintiff) that all of them were created "because of" this litigation and some of them (*e.g.*, PRIV00542, PRIV00820, PRIV00848, prepared after Kauder was admitted to the bar) also include his "mental impressions, opinions, conclusions, [and] legal theories" concerning this litigation. Fed. R. Civ. P. 26(b)(3)(B).

I therefore conclude that plaintiff has satisfied her burden of showing that the communications between herself and Kauder that she withheld on work product grounds were properly so withheld.

### 2. The Spousal Privilege Does Not Protect Emails Sent Via Kauder's Law Firm Email Account

Defendants are correct that the spousal privilege does not protect the emails sent to and from Kauder in the summer of 2017 over his buckleysandler.com email account. *See* Pl. Priv. Log Excerpts at ECF page 2-4 (PRIV00013-PRIV00091). Although the confidential nature of a marital communication may be presumed in the absence of any contrary evidence, *Reserve Fund Sec. & Deriv. Litig.*, 275 F.R.D. at 157, here it is undisputed that the communications took place over an employer's system. Defendants, seeking to rebut the presumption on this basis, cite numerous cases applying the *Asia Global Crossing* factors and holding that the use of an employer's email account negated any reasonable expectation of confidentiality and thus vitiated the privilege. *See*, *e.g.*, *Reserve Fund Sec. & Derivative Litig.*, 275 F.R.D. at 164 ("Because Bent II had no reasonable expectation of privacy in emails he sent over RMCI's system, they were not sent 'in confidence' and are not protected by the marital communications privilege"); *Peerenboom v. Marvel Entm't, LLC*, 148 A.D.3d 531, 531-32, 50 N.Y.S.3d 49, 49-50 (1st Dep't 2017) ("Perlmutter lacked any reasonable expectation of privacy in his personal use of the email system of Marvel, his employer, and correspondingly lacked the reasonable assurance of confidentiality that is an essential element of the attorney-client privilege"); *Miller v. Zara USA, Inc*., 151 A.D.3d 462, 462-63, 56 N.Y.S.3d 302, 303 (1st Dep't 2017) ("plaintiff lacked any reasonable expectation of privacy in his personal use of the laptop computer supplied to him by defendant Zara . . . his employer, and thus lacked the reasonable assurance of confidentiality that is foundational to attorney-client privilege").

"[T]he cases in this area tend to be highly fact-specific and the outcomes are largely determined by the particular policy language adopted by the employer." *Reserve Fund Sec. &*

*Derivative Litig.*, 275 F.R.D. at 160. Here, however, plaintiff has not submitted "the particular policy language adopted by the employer" to the Court. Nor has she presented *any* evidence concerning *any* of the four relevant factors: whether the employer had a policy banning or restricting personal email use; whether it monitored employee use of its computers or email system; whether third parties had a right of access to the computers or system; and whether the employees were notified of those use and monitoring policies. *Asia Global Crossing*, 322 B.R. at 257. *See* Pl. Aug. 2 Ltr. at 3 (asserting without evidence that Kauder had a private office, exclusive use of "his desk," no employer monitoring, and "lack of access by third parties"). Plaintiff has therefore failed to show that either spouse had an expectation of confidentiality (as against the firm) with respect to their email communications using that address. *See Reserve Fund Sec. & Derivative Litig.*, 275 F.R.D. at 165 n.6 ("[G]iven RMCI's email policy, personal email sent over that system is not confidential and cannot be said to have been sent 'in confidence.' Accordingly, the emails are not subject to the marital communications privilege, whether that privilege is asserted by the husband or the wife.").

However, as to each of her communications with Kauder over his buckleysandler.com email address, plaintiff has also asserted the work product doctrine, which is not so easily lost. *See Lapaix*, 2014 WL 11343854, at *2 ("Generally, work product protection is not waived automatically by disclosure of the work to a third party; rather it is waived only when documents are used in a manner contrary to the doctrine's purpose, when disclosure substantially increases the opportunity for potential adversaries to obtain the information." (quoting *Schanfield v. Sojitz Corp. of Am.,* 258 F.R.D. 211, 214 (S.D.N.Y. 2009) (internal quotation marks omitted)); *United States v. Stewart*, 287 F. Supp. 2d 461, 464-69 (S.D.N.Y. 2003) (disclosure of privileged attorney-client e-mail to daughter waived attorney-client privilege but did not waive work product protection, because by "forwarding the e-mail to a family member, Stewart did not substantially

increase the risk that the Government would gain access to materials prepared in anticipation of litigation"). Here, defendants do not contend that Kauder's use of his law firm email account waived the work product doctrine as to those emails, and make no argument that by disclosing the challenged emails to the firm (which he was apparently trying to interest in taking his wife's case, *see* Tr. at 42, 54, 64), he "substantially increase[d] the opportunity for potential adversaries to obtain the information." *Lapaix*, 2014 WL 11343854, at *2. Consequently, although Shih may not rely on the spousal privilege with respect to these emails, she may continue to withhold them from production based on the work product doctrine.[10]

### 3. Kauder's Presence Did Not Destroy the Attorney-Client Privilege Between Shih and her Counsel of Record

As noted above, most New York courts apply a relaxed agency test to the question whether the participation of a spouse in an otherwise-confidential attorney-client communication destroys the privilege. *See Sosnow*, 841 N.Y.S. 2d at 826; *Charal v. Pierce*, 1981 U.S. Dist. LEXIS 17497, at *28-29. Applying that test here, I am persuaded that the client – Shih – relied on her legally-trained spouse – Kauder – for advice and assistance with regard to the prosecution of this lawsuit. I note, for example, that among Kauder's private emails to Shih (submitted to me *in camera*) is one dated April 3, 2019 (PRIV 000820) in which he explicitly provides his wife with some "quick thoughts" as to technical legal points, relating to discovery, for her to discuss with attorney Dawson. In another email dated April 15, 2019 (PRIV000848), Kauder shares with Shih what appears to be a draft communication with Dawson, in which he discusses what "Cassie wants" and invites Dawson to "let Cassie know" whether he (Kauder) can assist with legal research. It

---

[10] During argument on the motion, Shih's counsel claimed that the emails to and from Kauder via his buckleysandler.com email were also attorney-client privileged. Tr. at 54-55. On her log, however, plaintiff does not invoke the attorney-client privilege as to these documents. *See* Pl. Priv. Log Excerpts at ECF pages 2-4.

therefore appears that Kauder was acting on plaintiff's behalf, not merely to provide moral support, but as a trusted advisor, a go-between, and a researcher on demand. Moreover, as in *Sosnow*, "it would be unreasonable to discern any expectation on the part of [Shih] or her attorneys other than that their conversations in the presence of [Kauder] would remain strictly confidential." 841 N.Y.S.2d at 826.[11] I therefore conclude that, regardless of his bar admission or formal retention as plaintiff's counsel,[12] Kauder's presence, as Shih's informal agent, did not destroy any otherwise-applicable attorney-client privilege protecting her communications with her counsel of record.

### 4.   Plaintiff Need Not Withdraw Her Claim of Attorney-Client Privilege Regarding her Challenged Communications with Kauder

Finally, defendants argue that "[p]laintiff *cannot* claim attorney-client privilege" over "any" of the communications with Kauder, Def. July 28 Ltr. at 3 (emphasis in the original), for a hodge-podge of reasons, including that Shih's counsel of record denied that Kauder was acting as her lawyer during a June 30, 2021 discovery conference; that Kauder contacted Petal directly on April 4, 2019, which would have been unethical had he been acting as Shih's counsel; and that some of the communications withheld on attorney-client privilege grounds pre-dated Kauder's admission to practice. *Id*. at 1, 3.

As to the first point, defendants appear to have misinterpreted the (somewhat unclear) language used by one of Shih's attorneys of record during the June 30 hearing, when she explained that Kauder was not "representing the plaintiff in this litigation." Tr. of June 30, 2021 Conf. (Dkt. Nos. 167, 176-2) at 18; *see also* Pl. Aug. 2 Ltr. at 3 (explaining that although Kauder "is not

---

[11] The communications I have reviewed *in camera* show that Kauder made considerable efforts to label his communications as confidential, going so far as to call one of them (PRIV 000848) "privileged and confidential super secret comms."

[12] During argument on the motion, plaintiff's counsel represented that "[t]here are no three-way communications" among Shih, her counsel of record, and her husband "until January of 2019," when he was admitted to the bar. Tr. at 55.

representing Plaintiff before the Court in this matter," that "does not mean Plaintiff was not relying on legal advice from her husband"). The documents submitted to me *in camera* confirm that he did act informally as her counsel from time to time after his admission to the bar on January 14, 2019 (and, more formally, as consulting counsel after June 23, 2019).[13] In any event, the awkward phrasing used by Shih's litigation counsel on June 30 neither waives the attorney-client privilege, if otherwise applicable, nor raises any broader questions about the "quality and credibility" of Shih's remaining privilege assertions.  Def. July 28 Ltr. at 1.

Similarly, Kauder's arguably improper *ex parte* contact with Petal employees in April 2019 (after he was admitted) has little bearing on the present motion, which turns (in part) on whether Shih communicated with Kauder in his capacity as a lawyer, for the purpose of obtaining legal advice, see *Priest*, 51 N.Y.2d at 68-69, 431 N.Y.S.2d at 514, but which does not require me to decide whether, during that same period, Kauder complied with all of his ethical obligations in that same capacity. I note as well that, at least insofar as can be determined from the privilege log excerpts submitted to the Court in connection with the present motion, plaintiff does not rely entirely on the attorney-client privilege to withhold any of her communications with Kauder after the date of his bar admission. I therefore decline to require plaintiff to "produce a revised log" without making any claim of attorney-client privilege with respect to Kauder.

## IV.    CONCLUSION

Plaintiff's motion (Dkt. No. 177) is GRANTED IN PART. Defendants shall review the Endicott-Gross communications withheld on attorney-client privilege grounds and produce those

---

[13] Kauder could not, of course, act as Shih's counsel before he was admitted to the bar. Thus, to the extent their two-way communications before that date were withheld on attorney-client privilege grounds, the claim of privilege is "derived from Plaintiff's communications with other attorneys, including litigation counsel of record." Pl. Aug.2 Ltr. at 3. In other words, Kauder "is not the attorney whose presence protects the documents from disclosure." Def. July 28 Ltr. at 3.

that do not fall within the categories described in Part II(B) above. Production shall be made within two weeks of today's date.

Defendants' motion (Dkt. No. 176) is DENIED.  Although plaintiff is not entitled to claim the spousal privilege with respect to emails exchanged with Kauder through his buckleysandler.com email address, the disallowance of this particular privilege claim does not appear to require the production of any additional documents, because the affected communications are also protected by the work product doctrine.

Dated: New York, New York
       October 6, 2021

                              SO ORDERED.

                              _____
                              **BARBARA MOSES**
                              **United States Magistrate Judge**