USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/12/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASSANDRA SHIH,

          Plaintiff,

-against-

PETAL CARD, INC., f/k/a CREDITBRIDGE, INC., et al.,

          Defendants.

18-CV-5495 (JFK) (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

By letter-motion dated September 7, 2021 (Def. Moving Ltr.) (Dkt. No. 204), defendants Petal Card, Inc. (Petal), Andrew Endicott, and Jason Gross sought an order compelling plaintiff Cassandra Shih and three non-parties – two of her businesses and an individual employed by one of them – to produce documents that defendants believe will be useful to them in proving that certain statements recently made by plaintiff, "touting her accomplishments as a businesswoman, a 'tech' CEO, and a repeat founder of start-up businesses," are false. Def. Ltr. at 1. On November 9, 2021, I denied the motion from the bench, with a written decision to follow. This opinion sets forth the reasons for my ruling.

**I.    BACKGROUND**

In her Second Amended Complaint (SAC) (Dkt. No. 93), plaintiff Shih alleges that in April 2015 she entered into an enforceable oral joint venture agreement with defendant Endicott to develop a novel business concept – originated by her and shared with him as her prospective co-founder – for a "credit bridging" company that would meet the credit needs of new immigrants and migrants to the United States. SAC ¶¶ 24-55. The two worked collaboratively on the project from April through June 2015, agreeing (among other things) that they would call their company "CreditBridge," that they would be 50-50 partners, that they would search for a data scientist to assist with product development, and that Endicott (a law school graduate then working as an

investment banker) would be initially responsible for fund-raising, but that he would not promise equity to anyone else without Shih's express approval. *Id*. ¶¶ 56-118. During the same period, Endicott explained to data scientist Berk Ustun, whom he was recruiting, that Shih "came up with the idea" for the business. *Id*. ¶ 80.

However, in July 2015 (after he registered the web address www.creditbridge.com), Endicott stopped communicating with Shih and instead, unbeknownst to her, began working separately with Ustun and defendant Gross – Endicott's law school classmate – to finalize the CreditBridge pitch deck and other materials he had previously worked on with plaintiff. *Id.* ¶¶ 119-155. By August 2015, Endicott and Gross were meeting with venture capitalists without mentioning Shih. *Id*. ¶¶ 142-43. In February 2016, Endicott and Gross incorporated the business under the name of CreditBridge, Inc. (later changed to Petal Card, Inc.), and named themselves its co-founders. *Id*. ¶¶ 156-63. Endicott also shut Shih out of the Dropbox folder they had used to develop their shared work product. *Id*. ¶ 164. In March 2016 (after initially ignoring several messages from Shih), Endicott sent her an email denying that his new company was "based on any of your business ideas." *Id*. ¶¶ 165-186. However, he did refused to answer Shih's follow-up email asking him to explain how his new company was "different from the business that we were working on," and restricted her access to his Facebook page. *Id*. ¶¶ 187-91.

Plaintiff filed suit on June 19, 2018, and filed her SAC on September 12, 2019, naming Petal, Endicott, and Gross as defendants. By then, Petal had raised $80 million and was self-valued at $200 million. SAC ¶¶ 192-226. Plaintiff seeks damages and other relief on a variety of contract and tort theories, most of which survived defendants' motion to dismiss the SAC.[1]

---

[1] Plaintiffs' surviving claims are for: (1) breach of fiduciary duty, against Endicott and Petal; (2) aiding and abetting breach of fiduciary duty, against Gross and Petal; (3) breach of "promotor" fiduciary duty, against Gross; (4) breach of "corporate" fiduciary duty, against all defendants; (5) breach of contract (actual or implied), against Endicott and Petal; (6) breach of the covenant of good faith and fair dealing, against Endicott; (7) promissory estoppel, against Endicott; (8)

After Endicott shut Shih out of the nascent credit bridging company, plaintiff turned to other business endeavors. In 2017 and 2018, she operated a tea company called Radiant Lifestyle LLC d/b/a Athena Teas (Radiant), and in 2019 she founded a travel company called Tripsha Inc. (Tripsha), which employs Kerry Botensten as Head of Trips. Def. Ltr. at 1. In June of this year, Tripsha and Shih were spotlighted in generally positive terms by two online publications.[2] In September, according to defendants, plaintiff gave a presentation to would-be investors in Tripsha during which she called herself a "former key investment analyst on $200M+ projects" and "represented that Tripsha was earning revenue and covering its costs." Def. Ltr. at 1 & Ex. G.[3]

### A.     The First Subpoenas

In February 2021, defendants served non-party subpoenas (the First Subpoenas) on Radiant, Tripsha, and Botensten (collectively the Non-Parties), and on two additional individuals

---

misappropriation of business idea, against Endicott and Petal; (9) unjust enrichment, against all defendants; (10) unfair competition, against all defendants; and (11) declaratory relief (that Shih is an "equitable shareholder" of Petal), against all defendants. *See* Op. & Order (Dkt. No. 116) at 20-55, 58.

[2] In an interview published in Disrupt Magazine, Shih described Tripsha as "an online marketplace for group trips" which, "similar to Airbnb or Etsy," provides a site where individuals can post what they are offering – in this case "trips they're organizing that other people can then discover and ask to book." Def. Ltr. Ex. E. She acknowledged that it was "a small startup," and said that a "big part" of being the CEO of a small startup is "to check in regularly with the team and make sure they have what they need." *Id*. She added that her mornings were generally "structured around recurring calls and emails with team members" and that afternoons were "reserved for external-facing work like partnerships and marketing." *Id*. Another article, in Authority Magazine, identified Tripsha as "a website for discovering unique group trips" and quoted Shih as saying (among other things) that after her first visit to New York "I knew that I wanted to come back one day to build a company that could reach a lot of people. Fast forward to today and here I am, an entrepreneur working on a global travel platform, so I feel fulfilled in that early promise to myself." Def. Ltr. Ex. F Asked what she wished someone had told her before she started her business, Shih responded, "If I could go back to square one, I'd spend most of my time on demand validation and watching how potential customers behave before writing any code." *Id*.

[3] This representation, according to defendants, was made when Shih stated, in response to an audience question, that Tripsha takes a 10% commission, which "covers all of our operating costs, our credit card fees and things like that." Def. Moving Ltr. at 2-3.

associated with Tripsha. The First Subpoenas sought, *inter alia*, documents concerning the owners, employees, and financing of Radiant and Tripsha, including (for example) documents relating to any "investment" or "potential investment" in, any "financing" or "fundraising" of, and any "pitches or presentations" about Tripsha or Radiant. *See* First Botensten Subp. (Dkt. No. 143-1, at ECF pages 29-39) ¶¶ 9-14; First Radiant Subp. (*id*. at ECF pages 80-88) ¶¶ 14-15; First Tripsha Subp. (*id*. at ECF pages 102-09) ¶¶ 14-15. Defendants also sought documents relating to representations (by Shih or others) concerning Shih's "experience as an entrepreneur," "employment history," "professional experiences," and "role" in the businesses she created. First Botensten Subp. ¶¶ 28-31; First Radiant Subp. ¶¶ 6, 8-11; First Tripsha Subp. ¶¶ 6, 8-11.

On April 21, 2021, defendants sought an order compelling the subpoena recipients to produce responsive documents, arguing they were entitled to probe plaintiff's post-CreditBridge "serial entrepreneurial efforts" in order to (i) understand her *modus operandi*, that is, "how she conducts herself when she genuinely believes she is starting a business with someone – not just brainstorming ideas, but actually starting and launching a business venture," (ii) obtain evidence of industry customs in the "startup community," and (iii) investigate plaintiff's "professional background," which according to defendants she put "directly at issue" in this action. Def. Ltr. dated April 21, 2021 (Def. April 21 Ltr.) (Dkt. No. 143) at 2-3. After further briefing (Dkt. Nos. 146, 147, 148) and a discovery conference, *see* Tr. of May 3, 2021 Conf. (May 3 Tr.) (Dkt. No. 151), the Court directed the subpoena recipients to produce responsive, non-privileged documents dated or created on or before February 15, 2019. Order dated May 4, 2021 (May 4 Order) (Dkt. No. 150) ¶ 1. As the Court explained during the conference, all three of defendants' relevance theories weakened with the passage of time, *see* May 3 Tr. at 13-15, such that otherwise-responsive documents post-dating February 15, 2019 (a cutoff date originally negotiated between plaintiff and

defendants with respect to certain party document requests) would be "too remote in time to be within the scope [of] proportional discovery." *Id*. at 37.

### B.     The Second Subpoenas and Fifth RFP

In July 2021, after a change in counsel, defendants served another set of subpoenas (the Second Subpoenas) on Radiant, Tripsha, and Botensten, and served their Fifth Request for the Production of Documents (Fifth RFP) on Shih. Like the First Subpoenas, the Second Subpoenas and the Fifth RFP seek discovery concerning the owners, employees, and financing of Radiant and Tripsha, including documents concerning "the investment of money" or "commitment by any person to invest money in" Tripsha or Radiant, and "all decks, pitch books, models, presentations, memoranda, videos or other material created or used for that purpose." Second Tripsha Subp. (Dkt. No. 204-1) ¶¶ 8, 9, 13-14; Second Radiant Subp. (Dkt. No. 204-2) ¶¶ 5-6, 10-11; Second Botensten Subp. (Dkt. No. 204-3) ¶¶ 8-9, 13-14; Fifth RFP (Dkt. 204-4) Nos. 15-16, 20-21, 28-29.

Defendants also seek the federal, state, and local tax returns filed by Tripsha, Radiant, and Shih, and detailed financial and operational information concerning both companies, including their "vendors," their receipt of "revenue" from any source, their "expenses," and "every trip or travel service" that Tripsha has "booked or provided." Second Tripsha Subp. ¶¶ 2, 7, 9, 11-12; Second Radiant Subp. ¶¶ 4, 7-9; Second Botensten Subp. ¶¶ 2, 7, 10, 11-12; Fifth RPF Nos. 12, 14, 17-19, 22, 25-27. Finally, defendants seek documents concerning Shih's work as a "key investment analyst on 200M+ projects," any "demand validation" work or code writing that she performed for Tripsha, her "calls and emails" with her "team" at Tripsha, the "external-facing work" that she has performed for Tripsha, and (for reasons not clear to the Court) her ownership and sale of "a café." Second Tripsha Subp. ¶¶ 1, 4-6; Second Radiant Subp. ¶¶ 1-3; Second Botensten Subp. ¶¶ 1, 3-6; Fifth RPF Nos. 1, 3-9. The time period for the Second Subpoenas and the Fifth RFP is "January 1, 2019 to the present." Second Subps. Inst. 1; Fifth RFP Inst. 1.

## C. The Motion to Compel

After Shih and the Non-Parties objected to the Second Subpoenas and the Fifth RFP, defendants filed the letter-motion now before the Court. Defendants are no longer seeking *modus operandi* evidence; rather, they assert, they are entitled to probe plaintiff's post-CreditBridge businesses and discover the details of her work for them (as well as her accomplishments before she founded them) in order to "corroborate, or undermine" the public statements that plaintiff has made about her "experience and success as a 'tech' entrepreneur'" and "cross-examine Plaintiff on these matters at trial." Def. Moving Ltr. at 1. Defendants' theory is that plaintiff has inflated her accomplishments and successes in order to "burnish her image" and thereby "bolster her claims in this lawsuit," *id*. at 1; that the discovery they seek will help them "prove [plaintiff's] statements false," *id*. at 3; and that they will likely need to do so because plaintiff refused to stipulate that she would not introduce any trial evidence concerning her "alleged record of accomplishments, from January 2017 forward, as a businesswoman, a CEO, and a repeat founder of companies." *Id*. at 1.

In response, the Non-Parties argue that the discovery sought is duplicative of the First Subpoenas, precluded by this Court's May 4 Order, "vastly overbroad," and (particularly as to Botensten, whose "only connection to this litigation is that she happens to work for an entity owned by Plaintiff") violative of Fed. R. Civ. P. 45(d)(1). Nonparty Opp. Ltr. (Dkt. Nos. 207 and 210) at 1-4. Plaintiff additionally contends that statements she has made "in the ordinary course of building and promoting her other businesses" are not relevant to the issues in this action; that permitting the intrusive discovery sought – solely for the purpose of seeking potential impeachment material – is improper; and that seeking that discovery by means of multiple subpoenas served on her nonparty businesses and their employees constitutes harassment. Pl. Opp. Ltr. (Dkt. No. 208) at 3-4.

In reply, defendants repeat that the information they seek is relevant to (i) "matters on which Plaintiff intends to testify" and (ii) "her credibility," explaining that plaintiff herself is "the

6

crucial witness" as to what happened between her and Endicott in 2015 and arguing that "[w]hether [she] has exaggerated or misrepresented . . . her experience and contributions to her current ventures" will be "highly probative as to whether she has done so with respect to the venture she claims to have founded with Mr. Endicott." Def. Reply Ltr. (Dkt. No. 212) at 1-2. Similarly, during a discovery conference on October 6, 2021, defendants' counsel emphasized that plaintiff's credibility will be "critical" at trial, because the precise content of Shih's oral conversations with Endicott in 2015 "is going to be a matter of a swearing contest." Tr. of Oct. 6 Conf. (Dkt. No. 234) (Oct. 6 Conf.) at 10-11. Counsel denied that the purpose of the contested discovery is "general impeachment," but agreed that defendants hoped to use the fruits of that discovery "to establish that she's exaggerating now and, therefore, she may be lying about what happened in 2015." *Id*. at 12-13; *see also id*. at 11 ("[I]t's our view that she has exaggerated and will lie about the conversations with Andrew Endicott.").

II.   ANALYSIS

    A.   Law of the Case

To the extent the Second Subpoenas are duplicative of the First Subpoenas, seeking substantially the same categories of documents, they are improper, because the discoverability of those documents has already been litigated once, resulting in the Court's ruling that they are "too remote in time to be within the scope [of] proportional discovery." May 3 Tr. at 37. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2006 WL 2642192, at *2 (S.D.N.Y. Sept. 13, 2006) (quashing subpoena where the documents sought were "the same or similar to the documents sought in defendants' prior motion to compel," which the court had denied, thereby determining "that these documents are not likely to lead to the discovery of relevant evidence").

Defendants argue that they are entitled to subpoena the same documents a second time, notwithstanding this Court's prior ruling, because the discovery is now sought "on different

grounds," namely, to impeach plaintiff's statements "touting her accomplishments," Def. Moving Ltr. at 3, and is justified by "newly discovered facts," namely, the contents of plaintiff's June 2021 press interviews. *Id*. at 4. I disagree. It is true that defendants did not use the words "credibility" or "impeachment" when litigating the First Subpoenas in April of this year. Nor, of course, did they attach or quote from plaintiff's most recent interviews, which had not yet been published. However, they asserted in April – much as they do now – that "Ms. Shih has put her professional background directly at issue" in this action, and that (based on "[d]iscovery obtained to date") she "represents herself as a seasoned business professional who [has] played an integral role in multiple startups." Def. April 21 Ltr. at 2; *see also* Def. Moving Ltr. at 1 (asserting that plaintiff has been "touting her accomplishments as a businesswoman, a 'tech' entrepreneur, and a repeat founder of startups" since "at least as early as September 2019"). Moreover, defendants argued in April – much as they do now – that these facts entitled them to discovery concerning both "Ms. Shih's experiences" and "her representations of them through the present." Def. April 21 Ltr. at 2. On this record, I am not persuaded either that the present motion is based on materially new facts or that it advances a genuinely fresh theory of relevance.

### B.     Proportionality

Nor am I persuaded that the discovery sought is "proportional to the needs of the case," considering (among other things) "the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Even before the 2015 amendments to the Federal Rules of Civil Procedure added the quoted language to Rule 26(b)(1), district courts had "broad discretion to limit discovery in a prudential and proportionate way." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012), *aff'd sub nom. Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134 (2014). Thus, although the credibility of a witness (whether or not a party) is always relevant, in a broad sense,

8

to the parties' claims and defenses, courts have historically been wary of discovery sought solely for impeachment purposes. As Judge Francis explained in *Davidson Pipe Co. v. Laventhol & Horwath*, 120 F.R.D. 455 (S.D.N.Y. 1988), the mere possibility of obtaining impeachment evidence cannot be enough to justify discovery into matters otherwise unrelated to the parties' claims and defenses, because "the areas to be probed to test a witness' credibility are virtually limitless." *Id*. at 462 (quoting *Burns v. Phillips,* 50 F.R.D. 187 (N.D. Ga. 1970)). "It would obviously be intolerable for the party seeking disclosure to embark on an examination of every statement ever made by a witness in the hope of unearthing a falsehood." *Id*. at 463.[4]

More recently, in *Securities and Exchange Comm'n v. Collector's Coffee Inc.*, 338 F.R.D. 309 (S.D.N.Y. 2021), Judge Gorenstein made the same point:

> [W]hile impeachment discovery may be relevant, "there must be some limit to the general purposes of establishing credibility and gathering information for impeachment." *Ellis v. Hobbs Police Dep't*, 2019 WL 5697787, at *6 (D.N.M. Nov. 4, 2019). If not, a party's effort to seek impeachment material would "justify nearly unlimited discovery with respect to every witness or party in every case," *id*., thereby vitiating the proportionality requirement. *Accord Taylor v. AFS Techs*., *Inc*., 2010 WL 11515549, at *2 (D. Ariz. June 1, 2010) (quashing subpoena to non-party as disproportionate where it appeared that plaintiff's "sole objective in obtaining information from Defendants' prior employers was his hope that such information will reveal false statements by Defendants that he can use to impeach their credibility in this litigation"). Such proportionality concerns are particularly acute where, as here, a party seeks deposition testimony from a non-party witness who lacks any firsthand knowledge of the events at issue in the case. *See, e.g.*, *Concord Boat Corp. v. Brunswick Corp*., 169 F.R.D. 44, 49 (S.D.N.Y. 1996) ("the

---

[4] *Davidson Pipe* was a securities fraud action in which the plaintiff operated offshore companies, the income from which was not subject to U.S. taxation as long as it remained offshore. 120 F.R.D. at 459. After one of plaintiff's officers testified that offshore funds were used to provide cash "Christmas gifts" in the U.S. to employees of Davidson's customers, but that plaintiff did not report these gifts, defendants moved to compel a second Davidson officer to furnish additional information about the transactions. After considering a number of factors, including whether the moving party had "a foundation for its inquiry," *id*. at 563, the court permitted defendants to ask the second officer whether Davidson "falsified tax returns or customs declarations in the course of their operation of the offshore companies," but prohibited questions about "commercial bribery" (even though there was a "basis for suspecting" improper payments), because bribery is not a crime of deception and therefore would be "of little value for impeachment." *Id*. at 463-64.

9

status of a witness as a non-party to the underlying litigation entitles the witness to consideration regarding expense and inconvenience") (punctuation omitted).

*Id*. at 319.[5]

In this case, defendants seek to probe two businesses – both founded well after plaintiff's last communication with Endicott – in hopes that the material they discover will reveal that one or more of the broad statements she has made about them (for example, her suggestion that Tripsha earns enough revenue to cover its costs) or herself (for example, her somewhat ambiguous reference to "writing . . . code") proves false. Defendants believe that if they can catch plaintiff in a lie about her companies, her history, her talents, or her accomplishments, they will be well positioned to demonstrate her "propensity for falsehoods" to the jury and thereby impeach her credibility and undermine her anticipated testimony about her interactions with Endicott in 2015. Def. Reply Ltr. at 2 (quoting *Altmann v. New Rochelle Pub. Sch. Dist.*, 2017 WL 66326 at *8 (S.D.N.Y. Jan. 6, 2017)).[6] However, the finances and operations of Radiant and Tripsha – neither of which offers goods or services even remotely related to those offered by Petal – are otherwise

---

[5] *SEC v. CCI* was a civil enforcement action against CCI for defrauding investors. Holt, a former CCI employee, testified at deposition that she fed false information about CCI to the SEC through three lawyers who represented her during the agency's pre-filing investigation. 338 F.R.D. at 314. Defendants then sought to question those lawyers, at deposition, "in hopes that the attorneys may contradict Holt's version of the events, thus enabling them to gather impeachment material on Holt." *Id*. at 317. After conducting a proportionality analysis (and determining the extent to which the attorney-client privilege had been waived), Judge Gorenstein permitted defendants to question one of the three lawyers, but limited the questioning to information "directly related to the allegations in the SEC's amended complaint." *Id*.

[6] *Altman* was not a discovery case at all. It was an employment discrimination case brought by a teacher who alleged that she was terminated because of her national origin. Ruling on the parties' pretrial *limine* motions, the court held that the defendant school district could cross-examine plaintiff at trial about the fact that she falsified her employment application by concealing a previous termination by another school district. 2017 WL 66326, at *9. However, since "the reasons for her termination are irrelevant to the issues in this case," the court limited the cross-examination to "the fact of the termination and failure to disclose it," unless plaintiff "open[ed] the door" during her testimony. *Id*.

wholly irrelevant to this action.[7] This case is thus quite different from *City of New York v. Group Health Inc.*, 2009 WL 10736876 (S.D.N.Y. May 6, 2009), and *Condit v. Dunn*, 225 F.R.D. 100 (S.D.N.Y. 2004), upon which defendants rely. In *Group Health*, an antitrust case, Judge Sullivan compelled the production of 101 specific documents previously withheld based on the deliberative process privilege because (i) they were relevant to the City's central claim, "that the merger would be anti-competitive," (ii) they were relevant to defendants' "second defense, that the merger will not have an anticompetitive effect," and (iii) they were relevant, "at a minimum, to impeaching the assertions of [the City] and its witnesses." 2009 WL 10736876, at *2. In *Condit v. Dunne*, a defamation case, Judge Leisure permitted the defendant to question former Congressman Gary Condit about his sexual relationships with various women "in so far as they are relevant to a defense of substantial truth, mitigation of damages, or impeachment of plaintiff." 225 F.R.D. at 13. Here, by contrast, defendants' "sole objective" in serving the Second Subpoenas and Fifth RFPs is their "hope that such information will reveal false statements by [plaintiff] that [they] can use to impeach [her] credibility in this litigation." *Taylor v. AFS Techs*, 2010 WL 11515549, at *2.

That hope is insufficient justification for the discovery sought, which is both broad and deep. Defendants have demanded detailed and potentially voluminous information about virtually

---

[7] During the October 7 conference, defendants' counsel argued that the financial performance of plaintiff's startups is independently relevant to her claims in this case because those claims will be "more plausible" if she is able to present herself at trial as a "successful sophisticated entrepreneur." Oct. 6 Tr. at 16. I disagree. In the SAC, plaintiff does not present herself as a "successful sophisticated entrepreneur." To the contrary: as defendants pointed out a few months ago, *see* Def. Apr. 21 Ltr. at 2, the SAC alleges that plaintiff (who lived in New Zealand in 2015 and had yet to manage a business of her own) "lacked familiarity with American law, startup culture, and business organization practices," leaving her "in a position of particular weakness and dependence on Endicott," who was a Harvard-trained lawyer working as an investment banker, resident in New York, with "contacts who were potential investors in start-ups." SAC ¶ 278. Moreover, while evidence of plaintiff's *lack* of business sophistication in 2015 could, perhaps, support her fiduciary duty claims, the discovery now at issue would go, if at all, to plaintiff's *current* level of sophistication – six years and two startups later – which does not bear, either positively or negatively, on the plausibility of her claims concerning the events of 2015.

11

every aspect of both nonparty businesses: their revenues, their expenses, their fundraising (including production of every deck, pitch book, model, presentation, memo, video or other item created or used by either company "for the purpose of soliciting investment") and even their tax returns.[8] In addition, defendants ask for lists of their investors (with percentage ownership interests), their employees, and even their vendors, as well as documents concerning "every trip or travel service booked or provided by Tripsha." Second Tripsha Subp. ¶¶ 2, 8-14; Second Radiant Subp. ¶¶ 5-11; Second Botensten Subp. ¶¶ 2, 8-14; Fifth RPF Nos. 2, 15-21, 23-29. Even where the demands are keyed to specific statements that plaintiff made in the press, they are sweeping in scope and could, in some cases, require her nonparty businesses to provide highly sensitive material going well beyond anything necessary to confirm or contradict the challenged statements.[9] Defendants thus cannot hope to convince the Court that "[t]he discovery at issue is narrowly drawn." Def. Moving Ltr. at 4.

---

[8] The Second Subpoenas ask for copies of all of the federal, state and local tax returns filed by Tripsha and Radiant. Second Tripsha Subp. ¶ 7; Second Radiant Subp. ¶ 4; Second Botensten Subp. ¶ 7. The Fifth RFP asks plaintiff for the same documents, and also requests her personal W-2s, 1099s, K-1s, and any other "IRS forms" reflecting "income received by you from any source." Fifth RPF Nos. 12, 14, 22. Although tax returns are not "inherently privileged," *Rosas v. Alice's Tea Cup, LLC*, 127 F. Supp. 3d 4, 11 (S.D.N.Y. 2015), "courts are typically reluctant to compel their disclosure because of both the private nature of the sensitive information contained therein and the public interest in encouraging the filing by taxpayers of complete and accurate returns." *Uto v. Job Site Services Inc.*, 269 F.R.D. 209, 212 (E.D.N.Y. 2010). Thus, relevance alone is generally an insufficient basis for a court to compel discovery of tax income tax returns. The requesting party must also show "'that there is a compelling need for the returns because the information contained therein is not otherwise readily obtainable.'" *Rosas*, 127 F.R.D. at 212 (quoting *Securities and Exchange Comm'n v. Cymaticolor Corp.*, 106 F.R.D. 545, 547 (S.D.N.Y. 1985)). No such showing has been made here.

[9] For example, defendants ask Tripsha, Botensten, and Shih for all documents "concerning work performed or supervised by Cassandra Shih "writing . . . code," whether for Tripsha or for "any other person." Second Tripsha Subp. ¶ 6; Second Botensten Subp. ¶ 6; Fifth RFP No. 9. These requests, if enforced as written, would require the Non-Parties and plaintiff to turn over any code that Shih wrote, or that others wrote under her supervision.

Moreover, while defendants assert that they believe plaintiff's portrayal of her companies and herself to be "dishonest," Pl. Moving Ltr. at 1, their belief is based primarily on speculation. For example, defendants say that they do not credit Shih's statements about her work for Tripsha, or about Tripsha's revenues, because "[n]othing in Plaintiff's disclosed education or employment history (a series of low-level short lived government policy jobs between 2015 and 2017) corroborates them," and because of the pandemic that "has severely limited non-essential travel since March 2020." Def. Moving Ltr. at 3. But they point to no evidence actually contradicting any of the statements they believe to be false. As Judge Francis explained in *Davidson Pipe*, "To justify an inquiry into facts relevant solely to credibility, the party seeking discovery must . . . have a factual basis for believing that . . . acts of deception will be revealed." 120 F.R.D. at 463. *See also Ellis v. Hobbs Police Dep't*, 2019 WL 5697787, at *6 ("[T]the mere fact that information, if found, would be relevant does not automatically make every file in which it might be found, discoverable.").

In *Davidson Pipe*, one of plaintiffs' witnesses had already testified about unreported Christmas "gifts," thus providing an adequate "foundation" for the further inquiry defendants sought. 120 F.R.D. at 463. In *Condit v. Dunne*, a woman with whom the plaintiff had a sexual relationship had already accused him of "urging her to sign a false affidavit denying their affair." 225 F.R.D. at 110. And in *SEC v. CCI*, the key witness, Holt, had already admitted lying to the lawyers whom defendants sought to depose, 338 F.R.D. at 314; nonetheless, Judge Gorenstein allowed defendants to question only one of those lawyers, and only as to matters "that directly relate to the allegations in the amended complaint." *Id*. at 317, 324. Here, by contrast, defendants present only the "hope of unearthing a falsehood," *Davidson Pipe*, 120 F.R.D. at 463, as to matters otherwise unrelated to the parties' claims and defenses, if they are permitted to rummage broadly and deeply through the files of two nonparty businesses that are connected to this action only

13

because the plaintiff owns them, as well as a nonparty individual who happens to work for one of those businesses. Even if the Non-Parties had not previously been served with substantially similar subpoenas – to which they responded, objected, litigated, and produced documents within the limits set by this Court six months ago – I would conclude that the discovery now sought by defendants is not proportional to the needs of the case.

### III. CONCLUSION

For the reasons set forth above, defendants' letter-motion to compel the Non-Parties and plaintiff to produce the documents sought by the Second Subpoenas and the Fifth RFP is DENIED. Nothing in this Opinion prevents defendants from asking plaintiff, at deposition, about the statements they believe to be dishonest, nor from otherwise pursuing impeachment evidence in a manner that is proportional to the needs of the case.

Dated: New York, New York
November 12, 2021

**SO ORDERED.**

_____
**BARBARA MOSES**
**United States Magistrate Judge**